

ADAM JOHN MACKINTOSH (*Pro Se*)
(For safety and security purposes, Plaintiff's contact information must be sealed. He will use this Courts electronic system to litigate.)

FILED
CLERK, U.S. DISTRICT COURT
JUL 8 2024
CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

ADAM JOHN MACKINTOSH,

      Plaintiff,

    *v.*

TIM COOK,
APPLE, INC, ET AL.
KATHERINE ADAMS,
BRUCE SEWELL,
DANIEL JORDAN,
MARC LEWIS,
LATHAM WATKINS, LLP,
SEAN BERKOWITZ,
LEWIS & LLEWELLYN, LLP
GIBSON, DUNN & CRUTCHER, LLP,
LARRY PAGE, SERGEY BRIN,
GOOGLE, INC.,
UBER TECHNOLOGIES, INC.,
TRAVIS KALANICK,
DARA KHOSROWSHAHI,
TONY WEST,
CRAIG CLARKE,
ANGELA PADILLA,
COVINGTON BURLING, LLP,
MORRISON & FOERSTER, LLP,
ARTURO GONZALES,
ESTHER CHAN,
JEFF BEZOS, AMAZON, INC.,
ANDY JASSY,
AMAZON WEB SERVICES, INC.,
VMWARE, LLC, AND DOE
DEFENDANTS 1-500,

      Defendants.

Case Name: Mackintosh v. Apple, Inc. et al.

Case No. CV24·5854·UA

**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR DECLARATORY JUDGEMENT AND INJUNCTIVE RELIEF, DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)**

Date:
Time:
Dept:
Judge: Hon. _____

Mackintosh v. Apple, Inc. et al.

i

**TABLE OF CONTENTS**

I.     INTRODUCTION .................................................................................... 1

       1.  What is Fraud on the Court ........................................................ 2

       2.  How is Fraud on the Court Detected .......................................... 3

       3.  Remedies and Sanctions for Fraud on the Court........................ 4

II.    PLAINTIFF'S REQUEST TO ANALYZE HIS FRAUD ON THE COURT
       RULE 60(D)(3) MOTION AGAINST APPLE, INC. ET AL. AND WHAT
       HE MUST PROVE TO OBTAIN RELIEF....................................... 4

III.   JURISDICTION AND VENUE.......................................................... 5

IV.    PRELIMINARY REQUEST BARRING DEFENDANTS FROM
       ANSWERING AS A SEVERE SANCTION, PROCEDURAL
       LIMITATIONS, FEE WAIVERS, SPECIAL JUDICIAL COUNSEL............ 6

       1.  Plaintiff Notices this Court of his Motion and Relevant
           Misconduct that Constitutes Fraud on the Court........................ 9

       2.  Plaintiff Files a Civil RICO lawsuit after a Years-Long
           Investigation ............................................................................ 19

       3.  Apple Fabricated Screen Capture Evidence Subverting Justice,
           Causing Harm to the Courts, and Prevented the Courts from
           Functioning in their Usual Manner............................................ 20

V.     RELIEF SOUGHT .......................................................................... 24

       1.  Request for a Final Default Judgment in Favor of
           Plaintiff..................................................................................... 24

       2.  Request for an Order for Declaratory and Injunctive
           Relief......................................................................................... 25

           I.   United States Declaration of Independence and
                Constitutional Arguments are Grounds for Relief,
                Alteration and or Abolishment ........................................... 25

           II.  Authorities On Which Declaratory And Injunctive
                Relief Can Granted: Fraud on the Court Inherently
                Violates the Declaration of Independence ......................... 29

                1. Violation #1: User Data Infringes Privacy, Security,
                   Freedom and Independence.......................................... 29

                2. Violation #2: User Data Infringes American Life and Liberty ........... 37

ii

NOTICE OF MOTION AND MOTION FOR DECLARATORY JUDGEMENT AND INJUNCTIVE RELIEF,
DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

3. Violation #3: User Data Inherently Creates a
Destructive Government and Erodes Public Trust
in Our System of Justice ................................................ 44

4. Violation #4: A Court Order Violation is Fraud on the Court ............ 47

5. Violation #5: Defendants Will Allow Mass Harm to Keep iPhone
Backdoor ...................................................................... 47

6. Violation #6: Technological Gamesmanship is
Fraud On The Court ...................................................... 48

7. Violation #7: Fabrication of Evidence by
an Officer of the Court is Fraud on the Court ...................... 49

a. Severe Sanction #1: Treat Corporate Acts as
Government Acts ........................................................... 49

b. Severe Sanction #2: Temporarily Ban iPhone
and Android Sales ......................................................... 53

c. Severe Sanction #3: Temporarily Ban Apple and
Google's App Stores ...................................................... 54

d. Severe Sanction #4: Adverse Inferences from
Destruction of Evidence ................................................. 54

e. Severe Sanction #5: Apple and Google Refunds
and Disgorgements ........................................................ 54

f. Severe Sanction #6: Alteration and or Abolishment
of Apple and Google ...................................................... 55

g. Severe Sanction #7: Fraud on the American People by
Corporations ................................................................ 56

h. Severe Sanction #8: Fraud on the United States
Elections ..................................................................... 56

i. Severe Sanction #9: Fraud on the United States
Presidents .................................................................... 56

j. Sanction #10: Fraud on the American People by
Government .................................................................. 58

k. Sanction #11: Fraud on the American People by
Judges ......................................................................... 58

l. Sanction #12: Fraud on the American People by
Politicians ................................................................... 58

3. CONCLUSION ............................................................... 59

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

NOTICE OF MOTION AND MOTION FOR DECLARATORY JUDGEMENT AND INJUNCTIVE RELIEF,
DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

Mackintosh v. Apple, Inc. et al.

## TABLE OF AUTHORITIES                                    Page

*Aoude,* supra 892 F.2d at p. 1118 ...................................................................... 44

*Benny v. Pipes,*
    799 F.2d 489, 495 (9th Cir. 1986), modified 807 F.2d 1514 (1987) ................... 19

*E.g. Clafin v. Houseman.,*
    *93 US 130, 136 (1876)* ........................................................................ 5

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.,*
    322 U.S. 238, 244 (1944) ............................................................... passim

*Hull,*
    356 F.3d at 103 ................................................................................ 4, 8

*In re Levander,*
    180 F.3d 1114, 1118 (9th Cir. 1999) (internal quotations omitted) ................... 7

*In Pfizer Inc. v. Lord,*
    456 F.2d 532 (8th Cir. 1972) ............................................................. 9

*Rockdale Management Co. Inc. v. Shawnut Bank, N.A.,*
    Mss. 596, 598, 599-600 (1994) ........................................................ 2

*Intermagnetics,*
    926 F.2d at 916 ........................................................................... 2, 22

*Landscape Props., Inc. v. Vogel,*
    46 F.3d 1416, 1422 (CA8 1995) ..................................................... 20

*Lall v. Bank of New York,*
    5th Circuit 2018-10554 (August 13, 2019) ....................................... 20

*Miranda v. Arizona,* 384 U.S. 436, 483 n.54 (1966) (quoting Hoover, Civil Liberties and Law Enforcement: The Role of the FBI, 37 Iowa L. Rev. 175, 177-82 (1952)) ......... 8

*Munshani,*
    60 Mass. App. Ct. at 720-21 ............................................................ 4

*Pacific Packaging v. Barenboim, et al.,*
    *case Nos. MICV2009-04320-J* .......................................................... 3

*Pumphrey v. KW Thompson Tool Co.,*
    62 F.3d H28, 1128, 1130 (9th Cir. 1995) ......................................... 6

*Rockdale Management Co. Inc. v. Shawnut Bank, N.A.,*
    Mss. 596, 598, 599-600 (1994) ........................................................ 2

*Waymo, LLC v. Uber Technologies, Inc. et al.,*
    California's Northern District Court 3:l 7-cv-00939 ........................... passim

NOTICE OF MOTION AND MOTION FOR DECLARATORY JUDGEMENT AND INJUNCTIVE RELIEF,
DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

<div align="center">

**TABLE OF AUTHORITIES**  **Page**

**(continued)**

</div>

**UNITED STATES CONSTITUTION**
United States Constitution,
  Article III, Section 1.6.3,
  Doctrine on Federal and State Courts ................................................................. 5

United States Constitution,
  Article III, Section 1.6.4,
  State Court Jurisdiction to Enforce Federal Law ................................................. 5

United States Declaration of Independence ....................................................... passim

**STATE CONSTITUTION**
California State Constitution,
  Article I, Section 2(a) ........................................................................................ 36

**TREATISES**
Court of General Jurisdiction,
  Black's Law Dictionary (11th ed. 2019) ............................................................. 5

The Federalist Papers ................................................................................. 45, 49, 57

**ALL OTHER PRECEDENT, STATUTES, MOTION PRACTICE RULES, AUTHORITIES, MODEL CODE OF JUDICIAL CONDUCT, UNITED STATES CONSTITUTION AND CONGRESSIONAL AUTHORITIES:**

See the *Mackintosh v. Apple, Inc. et al.* motion in the Appendix attached hereto.

Mackintosh v. Apple, Inc. et al.

v

NOTICE OF MOTION AND MOTION FOR DECLARATORY JUDGEMENT AND INJUNCTIVE RELIEF, DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

Mackintosh v. Apple, Inc. et al.

## I.     INTRODUCTION

1.     The litigation misconduct associated with Tim Cook, Travis Kalanick, Larry Page and their respective attorneys center on the Edward Snowden revelations. These Defendants defrauded The FBI and other government agencies to dispense justice on acts of fraud and deceit using iPhone backdoor. The misconduct was not comprised of mistakes on the periphery. It was not the consequence of episodic errors of judgment. Instead, it was systematic, pervasive, and purposeful, with each act aimed at affecting the fair administration of justice through the use of thoroughly corrupted espionage tactics to influence user data, erase and tamper with evidence, violate court orders, and execute iPhone backdoor to aid and abet Tim Cook's <u>fraud on the Court</u>.

2.     As this misconduct marched towards its payoff, Tim Cook, Apple, Google, Uber and their inner department employees who work with the FBI were more than willing to carry and place their deceptions deep within the machinery of federal courts' legal processes by creating and exploiting user data to tamper with the outcome of cases to dispense justice on deception. The numerous deceptions were not minor. They began at the very heart of the underlying motion and involve the persecution of Plaintiff, after he sent Tim Cook a partnership email. The email pertained to Plaintiff's invention, an Artificial Intelligence Healthcare System that pledged to eventually eliminate some areas of healthcare costs for every American.

3.     The persecution and fraud on the Court moved outward from there. After Plaintiff filed a civil Racketeer Influenced and Corrupt Organizations Act lawsuit in California's Northern District Court on December 23, 2020 against Apple, et al. for damages and relief, it was pointedly answered by repeated usurpations and abuses of power by officers of the courts. Every petition Plaintiff filed thereafter for redress was met by repeated injury that prevented the courts from functioning in their usual manner. In fact, the collusion between Apple, Tim Cook, their attorneys and co-conspirators was so foreign to what one would expect during legal proceedings, that it furthered Plaintiff's injuries by tampering with his faith in our system of justice.

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

Mackintosh v. Apple, Inc. et al.

### 1.    What is fraud on the Court

4.    Fraud on the Court is a very serious offense. It involves officers of the court perverting justice to conceal their transgressions. This species of fraud is so corrosive to democracy, courts have initiated evidentiary hearings on their own motion to reveal the fraud and quash it. The offending party is severely sanctioned under a fraud on the Court deterrence doctrine while the non-offending party is provided relief.

5.    In the case of *Hazel-Atlas*, 322 U.S. 238, 246, 88 L. Ed. 1250, 64 S. Ct. 997 (1944), the Supreme Court defined fraud on the Court and outlined the scope of the appropriate remedies. During arguments, our Justices rejected Hartford, the offending party's argument, that fraud on the Court exists only where reliance on the fraudulent evidence was "basic" to the underlying decision. Id. at 246-47. In this regard, our Justices found it more than adequate that "Hartford's officials and lawyers," who are all "officers of the court," "thought to fabricate evidence," to persuade a hostile Patent Office to grant their patent application and went to considerable trouble and expense to get it published…"[T]hey urged the article upon the Circuit Court and prevailed." Id. at 247. The Supreme Court therefore concluded that Hartford was "in no position now to dispute its effectiveness" after the fact. Id. Moreover, they observed that, because "it is wholly impossible [to] accurately… appraise the influence that the article exerted on the judges," it would not attempt to do so. Id. Our Justices concluded and ruled that "the total effect of all this fraud… calls for nothing less than a complete denial of relief to Hartford[,]" and its officials and lawyers. Id. at 250.

6.    The Supreme Judicial Court in the State of Massachusetts also addressed fraud on the Court cases. Our Justices also ruled and decided that fraud on the Court occurs when a party tampers with the fair administration of justice by deceiving "the institution setup to protect and safeguard the public" or otherwise "abusing" and or "undermining the integrity of the judicial process" to "prevent it from functioning in its usual manner." *Intermagnetics*, 926 F.2d at 916; *Rockdale Management Co. v. Shawnut Bank, N.A.*, 418 Mss. 596, 598, 599-600 (1994).

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

Mackintosh v. Apple, Inc. et al.

**2.       How is Fraud on the Court Detected**

7.      Fraud on the Court is undetectable. This species of fraud causes grave miscarriages of justice. It's a serious perversion of justice. It's always overlooked, even by the best and the brightest attorneys who are members of the oldest honor societies, who have extensive educational backgrounds from the most prestigious law schools across the nation. Elite Trial attorneys, who have decades of legal experience, have also fail to detect such fraud. In fact, federal judge William H. Alsup suspected this species of fraud during the 2017 Waymo v. Uber trial (the *Waymo* case) in California's Northern District (Cal. N.D.). While Uber's attorneys concealed iPhone backdoor evidence from federal prosecutors, Alsup asserted: "You don't get taught how to deal with [this type of] problem in law school. In 25 years of practice and 18 years in this job, I've never seen such a problem." Alsup was unable to detect the fraud on the Court and fell victim to it. He subsequently ordered a criminal investigation to uncover why Uber violated his court order by concealing iPhone backdoor evidence.

8.      In the case of *Pacific Packaging v. Barenboim, et al.*, case number MICV2009-04320-J—Michael Gottfried, lead counsel at the prestigious law firm Duane Morris, LLP, who represented his client in a fraud on the Court case, also affirmed Alsup's sentiment. Mr. Gottfried stated it was the "first time in 34 years of practice[,] that he's had to litigate a fraud [on] the Court claim." He acknowledged it was fortunate for his client that a witness revealed the fraud. Similarly, Richard Jacobs, a key witness in the high-profile *Waymo* case, revealed the fraud in a whistleblower letter ("Jacobs Letter" see Exhibit A attached hereto). It's a letter so implicating, Uber's CEO, Travis Kalanick, et al. violated Alsup's court order to conceal it and all related evidence to it, see the *Mackintosh v. Apple, Inc. et al.* case in the appendix attached hereto (referenced hereafter by *Id*, citing page(s) as ¶). All in all, Mr. Gottfried concluded that fraud on the Court is, "very hard to catch…" and that "the[se] [fraud on the Court] cases say that one of the reasons [there] need[s] to be []severe sanctions when []caught is that you need the deterrent effect" (*Id.* ¶ 104).

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

Mackintosh v. Apple, Inc. et al.

### 3.    Remedies and Sanctions for Fraud on the Court

9.    Courts have always dismissed the offending parties answers and defenses. As was the case in *Munshani*, multiple Massachusetts courts repeatedly found, the need to deter future unscrupulous litigants who could coldly calculate the potential costs and benefits of defrauding the Court to obtain favorable results would by itself mandate "<u>zero tolerance</u>" on the rare occasions when such egregious species of fraud is able to be detected. *Munshani*, 60 Mass. App. Ct. at 720-21 (upholding dismissal as sanction for fraud on the Court, citing "the need to deter future attempts by litigants to avail themselves of what might otherwise be viewed as a low-risk means of gaining an advantage in high stakes litigation"); *Hull*, 356 F.3d at 103 ("… since not everyone will be caught, the penalty needs to be severe enough to deter"). "All in all, we find it surpassingly difficult to conceive of a more appropriate use of a court's inherent power than to protect the sanctity of the judicial process——to combat those who would dare to practice unmitigated fraud on the Court itself" (*Id.* ¶¶ 5, 80-82, 148, 163).

## II.    PLAINTIFF'S REQUEST TO ANALYZE HIS FRAUD ON THE COURT RULE 60(D)(3) MOTION AGAINST APPLE, INC. ET AL. AND WHAT HE MUST PROVE TO OBTAIN RELIEF

10.    **NOW COMES PLAINTIFF**, Adam John Mackintosh, who detected and caught Tim Cook's fraud on the Court, and submits this consolidated briefing to (1) Identify the fraud on the Court test; (2) Hold an evidentiary hearing (3) Assuming at this stage the truth of the facts and evidence, assessing if the fraud constitute a "fraud on the Court;" (*Id.* ¶¶ 85, 91, 100-125); and (4) Granting Plaintiff relief upon finding the Defendants perpetrated a fraud on the Court, and ordering severe sanctions under the fraud on the Court deterrence doctrine (*Id.* ¶¶ 62, 163). And because there is no threshold burden that Plaintiff must satisfy to proceed under Rule 60(d)(3), nor a threshold of showing set forth in the rule itself, it appears the only prerequisite to seeking relief and damages is Plaintiff "the complainant, was a party to the action in which the 'fraud on the Court' occurred" *Hazel-Atlas*, 322 U.S. at 244 (*Id.* ¶¶ 57-170).

4

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

Mackintosh v. Apple, Inc. et al.

### III.    JURISDICTION AND VENUE

11.    This venue is proper (*Id.* ¶¶ 80, 147-148). United States Constitution, Article III, Section 1.6.3, Doctrine on Federal and State Courts:

> "In contrast to the federal system, the states operate courts of general jurisdiction, which are not subject to the constitutional jurisdiction limits placed on federal courts," see also Court of General Jurisdiction, Black's Law Dictionary (11th ed. 2019) ("A court having unlimited or nearly unlimited trial jurisdiction in both civil and criminal cases").

12.    As part of such general jurisdiction, state courts have concurrent jurisdiction to hear most cases that raise issues under the Constitution or federal law. *E.g. Clafin v. Houseman. 93 US 130, 136 (1876)*:

> "If exclusive jurisdiction be neither expressed nor implied, the State courts have concurrent jurisdiction whenever, by their own constitution, they are competent to take it."

13.    Not only do the Defendants operate primarily in this State, the amount in controversy exceeds the minimum for unlimited civil jurisdiction of this Court. In addition, under the fraud on the Court remedy, the United States Supreme Court generally ruled that "<u>a court</u>" must address a litigant who thought to fabricate evidence and urged it upon the Court. Thus, it was "neither expressed nor implied" that "<u>only federal courts</u>" can address and make rulings on fraud on the Court cases, i.e. Rule 60(d)(3) motion (*Id.* ¶¶ 47-62) in particular:

> "because the federal Constitution, statutes, and treaties are the 'supreme Law of the Land,'" and federal courts are the final authority on the interpretation of federal law, state courts applying federal law are bound by the controlling decisions of the federal courts. *Constitution Article III, Section 1.6.4 State Court Jurisdiction to Enforce Federal Law.*

14.    This motion is also timely and proper in this Court pursuant to our Supreme Court's instructive ruling that, "the only prerequisite to seeking relief under Rule 60(d)(3) [is that] the complainant, was a party to the action in which the fraud on the Court occurred" *Hazel-Atlas*, 322 U.S. at 244 (*Id.* ¶¶ 59, 80).

Mackintosh v. Apple, Inc. et al.

## IV.    PRELIMINARY REQUEST BARRING DEFENDANTS FROM ANSWERING AS A SEVERE SANCTION, PROCEDURAL LIMITATIONS, FEE WAIVERS, SPECIAL JUDICIAL COUNSEL

15.    Plaintiff respectfully requests a preliminary ruling barring the Defendants from answering and continuing to disclaim the effectiveness of their fabricated evidence, after the fact. In *Hazel-Atlas*, our Supreme Court Justices ruled that "[a] party who presented fraudulent evidence cannot disclaim its effectiveness after the fact." Plaintiff's request is also warranted given the anticipated actions of Tim Cook, et al., Apple and their attorneys. They are likely to perpetuate their deceptions here as they did in the federal circuits (*Id.* ¶¶ 119-127). Their actions will only serve to obfuscate the record, conceal the truth and defraud the presiding judges as they did Alsup. Their obstructionist delay tactics will impede and obstruct the truth-finding mechanics of this Court, only to perpetuate their original fraud on the Court. The Defendant's patterns of deceptions through wire and mail communication is imminent here. It will prevent this Court from uncovering the crux of the original fraud that began as early as 2015, or earlier.

16.    Its alleged that around October 8, 2015, Travis Kalanick, Tim Cook, and their co-conspirators used Apple's iPhone backdoor to access politicians, competitors, and lawmaker's iPhones to secretly record private meetings and their voice conversations for unlawful competitive gain and political blackmail among other illegal acts to ill-gain.

17.    At around the same time, federal prosecutors at the Justice Department obtained multiple court orders under the *All Writs Act* in the State of New York and California, compelling Apple to create an iPhone backdoor (*Id.* ¶¶ 85, 90). Tim Cook and Apple retained attorney Theodore J. Boutrous, Jr. from Gibson, Dunn & Crutcher, LLP who ignored the courts signed orders. *Pumphrey v. K W. Thompson Tool Co.,* 62 F.3d 1128, 1130 (9th Cir. 1995) court order violations constitute "fraud on the Court." While Apple's attorneys ignored multiple court orders, Congress called for a hearing on iPhone encryption and iPhone backdoor. FBI Director James B. Comey and Apple's attorney Bruce D. Sewell, attended the high-profile 2016 hearing. Under sworn oath, Comey convincingly declared

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

that FBI cannot access iPhones and needed Apple to create a backdoor, while Sewell
declared "it would be too dangerous" to create an iPhone backdoor because it would
threaten the "civil liberties that are at the foundation of our country." When in reality, Uber,
Kalanick and various espionage teams, had already utilized iPhone backdoor months prior
to access Plaintiff's iPhone to track him down, violate his civil liberties and raid his iPhone
for his intellectual property (*Id.* ¶¶ 22, 39, 59, 90-92, 115-118, 124, 142, 169). Cook and
Kalanick had already integrated "com.apple.private.allow-explicit-graphics-priority"
"Private IOKit" among other code within their pre-installed apps on iPhone that formed
iPhone backdoor. It allowed them to surreptitiously access Plaintiff and other Americans
valuable user data for political blackmail, to ill-profit and to ill-gain (*Id.* ¶¶ 87, 89).

18.    By 2017, approximately one year after Apple, Comey and the FBI declared
under oath that iPhone backdoor didn't exist, Kalanick directed Uber's in-house attorney,
Angela Padilla, to withhold Jacobs Letter from Alsup's courtroom during the *Waymo* case
(*Id.* ¶ 59). Instead, the letter was turned over to Alsup by public officers at the
Justice Department, National Security and Intellectual Property Theft Sections.
Jacobs Letter alleged Kalanick and his subordinates at Uber used espionage teams and
Apple's iPhone backdoor to create and collect user data, gather intelligence and spy on
competitors, lawmakers, and politicians. Plaintiff alleges the espionage teams used iPhone
backdoor to access Donald J. Trump's iPhone and spied on others in his campaign while he
was running for United States President. The activity went undetected as a result of the false
and misleading filings and testimony that were directed by Apple, et al., Tim Cook,
Kalanick, Sewell, Comey, and their attorneys. It prompted government to rely on their
sworn statements that prevented courts from functioning in their usual manner thereon.

19.    So to ascertain the truth here, this Court must follow the instructive ruling in
*In re Levander,* 180 F.3d 1114, 1118-19 (9th Cir.1999). The Ninth Circuit judges in
*Levander* ruled that fraud on the Court motions are free from procedural limitations. Their
reasoning for such drastic measures and departure from the rigid adherence to court rules in
fraud on the Court cases, centers on allowing the court to focus on uncovering and quashing

Mackintosh v. Apple, Inc. et al.

the Defendant's original fraud on the Court and to protect the sanctity of the courts and provide relief to those who were wronged (*Id.* ¶ 60). It means, this Court may preclude the Defendant's from answering this motion and sign orders striking their filings as their "lies to the court[s]" related to iPhone backdoor [were] intentional, repeated, and about issues "central to the truth-finding process" (*Id.* ¶¶ 62, 161, 165). Thus, the focus here is the Defendant's fraud on the Court, not the merits of the *Mackintosh* case (*Id.* ¶ 163).

20.    Furthermore, if this Court determines the Defendant's perpetrated a fraud on the Court during an evidentiary hearing without the Defendants interference, severe sanction are warranted and would fall under the fraud on the Court deterrence doctrine, *Hull*, 356 F.3d at 103 (*Id.* ¶ 161). Moreover, conducting an honest evidentiary hearing is not only the duty of officers of this Court who were sworn to carry out this obligation and uphold the Constitution, it's in the interest of justice. As noted by the Supreme Court, "we can have the Constitution, the best laws in the land, and the most honest reviews by courts — but unless the law enforcement profession is steeped in the democratic tradition, maintains the highest in ethics, and makes its work a career of honor, civil liberties will continually — and without end be violated." *Miranda v. Arizona*, 384 U.S. 436, 483 n.54 (1966) (quoting Hoover, Civil Liberties and Law Enforcement: The Role of the FBI, 37 Iowa L. Rev. 175, 177-82 (1952)).

21.    In addition, Plaintiff asks this Court to waive all fees including the filing fee on the basis this motion seeks to continue combatting Tim Cook's fraud on the Courts. It's a continuation of a federal action. Plaintiff has paid exorbitant federal fees, including to the Ninth Circuit Court of Appeals. In fact, the Chief Judge of the Ninth Circuit cashed in Apple stock after he stonewalled Plaintiff's fraud on the Court motion (*Id.* ¶ 148). Plaintiff paid fees for intangible honest services in which he was deprived.

22.    Lastly, in order to save this Court's valuable time and resources, Plaintiff respectfully asks that this Court appoint a Special Master or Special Judicial Counsel to conduct the evidentiary hearing alongside Plaintiff and produce an independent report to assist this Court in its fraud on the Court ruling (*Id.* ¶ 162).

8

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

Mackintosh v. Apple, Inc. et al.

Mackintosh v. Apple, Inc. et al.

### 1.    <u>Plaintiff Notices this Court of his Motion and Relevant Misconduct that Constitutes Fraud on the Court.</u>

23.    Plaintiff, respectfully notices this Court, that he will and does, hereby files this Rule 60(d)(3) motion for relief, and as asserted above and further herein, declares, affirms, alleges and re-alleges that:

24.    This fraud on the Court motion involves Tim Cook directing Apple's attorneys to fabricate evidence during high-stakes litigation to conceal Apple's iPhone backdoor (*Id.* ¶¶ 71-77, 92, 102-104, 125-126, 135, 187). The alleged fraud also involves the FBI using Apple and Google as a backdoor to manipulate and delete user data on apps like Twitter, Inc., et al. to continue covering up Tim Cook's lies https://judiciary.house.gov/committee-activity/hearings/hearing-weaponization-federal-government-twitter-files. Specifically, the Twitter files revealed that FBI and intelligence officers caused irregularities during the 2020 Election that allegedly swayed voters to elect Joseph R. Biden as United States President (*Id.* ¶ 152). On Biden's first day in office, he affixed his signature to an already prepared executive order, weakening the Administrative Procedures Act. An act that was subsequently used by federal judge Keith P. Ellison to block Plaintiff's fraud on the Court motion against Tim Cook, et al. and Apple (*Id.* ¶¶ 170-173).

25.    Plaintiff alleges Cook, et al., FBI and Biden, et al., acted in unison in violation of the Five Pillars of Justice (*Id.* ¶ 190). They allegedly carried out operations using espionage teams and iPhone backdoor as described in Jacobs Letter to investigate and target competitors, political opponents and others who stood in the way of their profits, political gain, funding, legal interests, buybacks, political contributions, tangible and intangible bribes i.e. re-election and political fame among other things (*Id.* ¶ 18). The FBI and its agent's acts were however immune from the law, as federal judges prohibit Americans from naming public officials or governmental entities, including FBI, as defendant persons in legitimate RICO lawsuits because the agencies "cannot form the necessary mental intent to commit a crime." *Gil Ramirez Group, L.L.C. v. Houston Ind. Sch. Dist., 786 F.3d 400, 412 (5th Cir. 2015)*; *Abcarian v. Levine*, 972 F.3d 1019, 1027 (9th Cir. 2020) (*Id.* ¶ 39).

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

26.   In order to remain immune from the law, FBI Directors and their agents and alter-egos internally structured their agency to rotate agents in-and-out of divisions, transferring them to different departments including in-and-out of the agency itself. The FBI Directors allegedly shuffled agents to conceal their identities and their collusion with Uber Technologies, Inc., Apple, Inc., Google, Inc., Amazon, Inc., Twitter, Inc., and other corporations to control American's user data. It's alleged these agents and federal prosecutors clandestinely colluded with Tim Cook, Larry Page and their respective corporations and attorneys to structure various espionage teams as described in Jacobs Letter, between approximately 2012 to present.

27.   The covert operation enabled the FBI and its agents to operate in the shadows. In fact, during trial in the 2017 *Waymo* case, their activity led federal judge Alsup to remark, "We have to get more to the bottom of this shadow system Uber set up; the real stuff goes on in the shadow system." Apple and Google's shadow system prevented FBI and its agents from being identified and named in legitimate RICO cases——and to completely conceal their organized crime, they structured:

28.   Strategic Services Group to collect raw Human Intelligence (HUMINT). Josef Acebedo and other members of HUMINT were given assignments to join startups and political party campaigns to gather information that's not within user data collected by Apple and Google (*Id.* ¶ 191). The raw intelligence was stored on Amazon servers and accessible to government, corporations, executives and each DOE Defendant; and

29.   Marketplace Analytics team, including Jerry Wang and others who were employed for the express purpose of using iPhone backdoor to acquire and collect trade secrets, codebase, and competitive intelligence, including deriving key business metrics of supply, demand, and the function of applications from major competitors globally. This team worked in conjunction with HUMINT to use iPhone backdoor to influence and create user data for destructive investigations and persecutions. The influenced and tailored user data was allegedly transferred under attorney-client privilege and or physically handed off to CEO's of corporations, FBI, et al. and others.

*Mackintosh v. Apple, Inc. et al.*

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

30.    As part of the RICO Enterprise activities, Defendants Cook, Kalanick, Page, Apple, and Google facilitated Wang and Acebedo in remotely accessing iPhone and Android devices to activate cameras and microphones for the purpose of gathering raw human intelligence on Plaintiff, Anthony Levandowski, and other competitors and political opponents. And in order to create and collect raw user data, they agreed to Apple and Google's terms and conditions, and utilized Apple and Google operating systems to install virtual operating system programs that connect to Apple's Xcode software, iPhone simulators and local devices. This setup employed an Apple key and modified software. It allowed them to send commands through virtual private networks and cellular towers to surreptitiously connect to any iPhone or Android screen. Once connected, they used their local devices and simulators to remotely mirror iPhone and Android screens of competitors and political opponents to "screen capture" raw intelligence. Every screen capture was saved to servers and apps installed on Wang and Acebedo's local devices (*Id.* ¶ 26) and viewable to Cook, Kalanick, Jeff Bezos and others while remaining hidden from the espionage activity. They used these capabilities to access live user data, including exceptionally valuable user data, trade secrets and intellectual property ("IP") that formed valuable apps (*Id.* ¶ 102).

31.    The Defendants access to live user data gave Tim Cook, Kalanick, the FBI, et al. and their attorneys the power to scheme and employ pre-emptive hacking and psychological influence and human intelligence gathering operations against Plaintiff and other Americans (*Id.* ¶¶ 15, 36, 49, 118, 152, 85-118). Specifically, between approximately 2015-2019, Page and Cook, et al. and their respective attorneys, sought to obtain a corrupt indictment on app store competitor Levandowski with the goal of misdirecting the Justice Department. Apple, Google, and Uber led by Kalanick, et al. and Tim Cook, et al. set in motion an unconscionable scheme to use federal prosecutors to obtain an indictment—*while*—underhandly exchanging Google and Waymo's self-driving car trade secrets to illegally monopolize a nascent $1.2 trillion dollar self-driving car market as described in Waymo's federal complaint.

Mackintosh v. Apple, Inc. et al.

Mackintosh v. Apple, Inc. et al.

32.    Kalanick and his subordinates instructed Acebedo, Wang and other members of HUMINT and Marketplace Analytics Teams, to access Levandowski's iPhones and Macbook Pro. The activity was indirectly ratified in private by Page, Brin, Kalanick, Cook, and various unknown DOE Defendants at their headquarters, law firms and elsewhere. Under their directives, Wang, et al. utilized iPhone backdoor to impersonate Levandowski on his devices to tamper with his Google related user data (*Id.* ¶¶ 26, 30, 194). The surreptitious activity allowed the Defendants to take control of devices belonging to Levandowski to "perform searches to 'find and install specialized' software." The "specialized software" allowed Wang, et al. to download 14,000 Google files to Levandowski's Macbook. They also "sync'd Levandowski's Gmail []that contained Google and Waymo's 'self-driving car schematics and information'" and "'downloaded' Google and Waymo's 'trade secrets.'"

33.    After the Defendants remotely created user data that made it digitally appear as though Levandowski committed a crime by downloading "thousands of files," they executed the "delete" "empty recycle bin" and "reformat" commands on Levandowski's devices to frame him of covering up a theft (that never occurred). The remote commands happened on Levandowski's devices while he was unaware (*Id.* ¶ 107). Subsequently, at the behest of Cook and Page, et al. and their respective attorneys and others who are in-and-out of the criminal justice system, (*Id.* ¶ 39), the FBI used the illegal user data to launch an investigation into Levandowski. It allowed Apple's self-driving car team (Project Titan) to receive Google and Waymo's trade secret information, undetected, through the same espionage teams who used iPhone backdoor software (*Id.* ¶¶ 71-77, 92, 102-103).

34.    While Apple was accelerating the development of its self-driving car using Google and Waymo's trade secrets and information—Cook, Kalanick, and Brin actively controlled the FBI's investigation by having the Strategic Services Group and other espionage teams create tailored user data that was being turned over to the FBI through their legal counsel, Angela Padilla, et al. (*Id.* ¶¶ 42, 162, 191).

Padilla, Craig Clarke, and other in-house attorneys for Uber abused the attorney-client privilege by using encrypted ephemeral messaging apps to conceal their instructions to espionage team members to create and tailor specific user data for blackmail and persecutions, that was actively being turned over to the FBI for use (*Id.* ¶¶ 49-50).

35. Uber's attorney, Arturo Gonzales at Morrison and Foerster, LLP and Apple's attorney Boutrous at Gibson Dunn also violated court orders during these legal proceedings. Notably, Tim Cook, et al. was allowed to flagrantly disregard federal and Congressional court orders and requests by the FBI, et al. to cover up the collusion (*Id.* ¶¶ 9, 74-75, 87, 90, 101-104). The illegal user data was ultimately turned over to FBI agents and federal prosecutors to indict Levandowski (*Id.* ¶ 71).

36. Several filings were ultimately urged upon multiple district courts by the FBI centering on illegal user data to reduce Levandowski under ***absolute despotism***, violating his unalienable rights that are at the heart of the United States Declaration of Independence and the Constitution. Levandowski had no defense in the criminal case against him, because he was unaware of iPhone backdoor, and because the espionage teams were surreptitiously impersonating him on his devices. His attorneys advised him to invoke the Self-Incrimination Clause under the Fifth Amendment of the Constitution, which made him "appear guilty." He faced 330 years in federal prison, see the 2018 Cal. N.D. case *United States. v. Anthony Scott Levandowski* (*Id.* ¶ 104).

37. In 2019, after Levandowski was corruptly sentenced, he made a plea to United States President, Donald J. Trump, to use the Executive Powers of the Office of the President to pardon him. President Trump **GRANTED** the plea to (1) combat the fraud on the Court to protect the sanctity of the justice system; and (2) overturn injustices caused by the fraud on the Courts. In doing so, Trump became a greater target for thwarting Apple, Cook, Google, Page and Brin's business arrangement and RICO schemes (*Id.* ¶ 17). Specifically, "the Podesta emails" were anonymously uploaded to Julian Assange's Wikileak's website in 2016, and revealed that Tim Cook was a 2016 Vice Presidential candidate for Hilary R. Clinton's run for United States President.

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

Mackintosh v. Apple, Inc. et al.

Having such powerful influence over democrats, Tim Cook knowingly and willfully asserted publicly on CBS, that President Trump is "not above the law" and should be "held accountable" for "an alleged influence operation" that was executed using "Apple's iPhone backdoor, various espionage teams, FBI Informants and or Government Contractors." The influence operation was (1) "not thwarted by the FBI" and (2) was "coincidently labeled" an "insurrection" by the FBI, et al. that's being used to obstruct Donald J. Trump's 2024 Presidential run. It's alleged President Trump is being targeted for thwarting Apple and Google's illegal monopolization that promised to grow Nancy Pelosi, Chuck Schumer and other public officers stock holding value in Apple, Google and other apps in the app stores by over $1.2 trillion dollars (*Id.* ¶ 17).

38.  Shortly after Tim Cook made these pejorative and powerful influential statements——political party democrat prosecutors and officers of the court, begun reducing Trump under ***absolute despotism*** during a 2024 election year. An election Tim Cook, et al. may run for United States President after causing President Trump to face over 700 years in federal prison, nearly doubling Levandowski's sentence (*Id.* ¶¶ 39, 53). The species of this fraud derives from Cook's original fraud on the Courts related to iPhone backdoor that gave him influence and power over government and immunity from the law. President Trump is being targeted because if elected, he could overturn these injustices, and call out those who are making a mockery of justice and using the court system to (1) propagate political and legislative nepotism (2) grow corporate and governmental power and (3) corruptly win cases.

39.  Similarly to Levandowski, President Trump and potentially other Americans, Plaintiff was also targeted after he sent Tim Cook a partnership email. At the time, Plaintiff was unaware of the alleged organized crime. He innocuously thought Tim Cook carried Steve Jobs tradition of helping app store competitors through partnerships. In Plaintiff's email, he asked Tim Cook to springboard his invention and valuable app (*Id.* ¶¶ 29-30, 50). On approximately November 22, 2015, Cook received Plaintiff's email and read it in its entirety. Upon review, Cook used Plaintiff's

Mackintosh v. Apple, Inc. et al.

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

Mackintosh v. Apple, Inc. et al.

1  information and ideas derived therefrom without Plaintiff's authorization. Cook

2  proceeded to have the email deleted and begun utilizing Plaintiff's valuable user data

3  at Apple to change Apple's pre-existing profit structure and app store operations.

4       40.    Between approximately October 2015 to June 2016, Kalanick, et al. and

5  Cook, et al. orchestrated several egregious schemes against Plaintiff knowing it would

6  cause him harm and maliciously inflict injury, including and not limited to:

7    a. Exploiting cellular towers that surrounded Plaintiff to hack his PC that was

8       connected to his iPhone and internet plan. After they unlawfully gained access,

9       they extracted Plaintiff's patent draft and used the valuable user data from it;

10   b. Colluding and or otherwise coercing Plaintiff's phone carrier to increase his

11      iPhone internet plan from $29.99 to $49.99 without authorization and or consent;

12   c. Removing and blocking a non-Apple app store Plaintiff used to connect all of

13      his devices through his iPhone internet plan, resulting in coercing Plaintiff to

14      pay an extra $30 for a separate mobile hotspot internet plan in order to continue

15      connecting all of his devices he used for his startup;

16   d. Tampering with an Amazon Ec2 server that was embedded within Plaintiff's

17      healthcare app, causing the sign-up API to continuously fail on the server side;

18   e. Continuously looping and kicking Plaintiff out of his Apple Developer Account

19      after he paid $99 to use it for the year to launch his startup;

20   f. Exploiting Plaintiff's geolocation user data to locate him. After learning his

21      whereabouts, the Defendant's raided and damaged the cargo trailer Plaintiff used

22      as a small office to start up his company. During the raid, the Defendant's cut

23      all electrical wiring and damaged the generator that powered the office. This

24      targeted raid prevented Plaintiff from charging and using his laptop, iPhones and

25      iPads, thereby hindering the operation of his startup and use of the office.

26      41.    The organized interference with interstate and foreign commerce defined

27  under RICO law accelerated beyond these initial schemes. They also occurred prior

28  to, during, and after Comey, Sewell, Boutrous, et al. concealed iPhone backdoor

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF,
DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

1   from the courts and Congress. Their separate and collective deceptions allowed
2   unauthorized access to Plaintiff's iPhone, iPads and laptop, allowing Wang, et al.,
3   Acebedo, et al. and espionage teams to screen capture valuable trade secrets,
4   intellectual property, and other valuable user data (*Id.* ¶¶ 71, 100-107).

5   42.   It is also alleged that upon reviewing Plaintiff's valuable user data
6   in healthcare, Kalanick and Cook were informed that the value exceeded Waymo's
7   nascent self-driving car market worth approximately $1.2 trillion. Plaintiff's healthcare
8   technology and patent draft represented the first United States Artificial Intelligence
9   Healthcare System, which Plaintiff intended to develop to potentially reduce healthcare
10  costs for Americans by hundreds to thousands of dollars over time and integrate it into
11  the current American Healthcare System. After becoming aware of the value of
12  Plaintiff's user data, Cook and Kalanick directed Acebedo and Wang to join Plaintiff's
13  startup. Their tasks involved aiding and abetting Uber, Apple, Tim Cook, and others in
14  initiating multiple influence operations and criminal activities against Plaintiff,
15  knowing it would cause deep psychological injury and perpetual damage.

16  43.   By 2016, Cook and Kalanick, et al. accessed Plaintiff's iPhone user data,
17  specifically his iPhone call log, web browser and keylogging activity. The user data
18  revealed he was searching for ridesharing insurance and a lead app developer for his
19  startup so he could focus on establishing healthcare partnerships to generate revenue.

20  44.   Kalanick, et al. used the espionage teams, specifically Wang, et al. in the
21  Marketplace Analytics Team and Acebedo, et al. in the HUMINT team. They were
22  instructed to contact Plaintiff and present themselves as app developers and rideshare
23  drivers who could obtain rideshare insurance and help launch his healthcare app. Wang
24  and Acebedo were also given specific instructions at Uber's headquarters and
25  elsewhere to contact Plaintiff at different times to deceive and trick Plaintiff into
26  believing they were unassociated and didn't know each other personally. Throughout
27  their time at Plaintiff's startup, between approximately October 2016 through
28  March 2018, Wang and Acebedo were routinely given tasks in private and through

Mackintosh v. Apple, Inc. et al.

ephemeral messaging apps by Joseph Sullivan, Mat Henley, Kalanick, Clarke, and other Uber employees (Id. ¶¶ 21-22, 58, 64-65, 70-161, 189). These tasks involved Cook and Apple's app store team approving Wang's submission of Plaintiff's "real app" after Wang surreptitiously deleted NSLocation Services and other code to break it. While the "real app" was broken and sat in Apple's app store, Wang and Acebedo were tasked with influencing Plaintiff to raise $2 million dollars from "investors" using a "demo app" to pay for a call center to handle booking transportation for seniors and healthcare patients manually and to continue paying Wang, et al. This criminal initiative accomplished three things, ***first*** it created witnesses to testify on behalf of the FBI, et al. that Plaintiff's "real app didn't work," ***second***, it influenced Plaintiff to admit the "real app" didn't work, and ***third***, it created user data for the FBI.

45.    This criminal initiative intended to improperly influence a grand jury in their decision to indict Plaintiff. This scheme was also executed in a separate Cal. N.D. case, *United States v. Elizabeth A. Holmes, et al. 18-CR-00258-EJD*. Specifically, the FBI proved Holmes, a defendant in the case, committed conspiracy to defraud investors because she "raised millions of dollars" from investors using a "demo product" "knowing the 'real product' didn't work." Similarly to the *Holmes* case—after Wang, et al. surreptitiously deleted GPS and NSLocation Services code from Plaintiff's "real app" and while Tim Cook and Apple's app store approved it, Wang setup a video conference call with Plaintiff to give an "update and reasons for the delays." While they were on the conference call, Apple, Google, Amazon, and Uber, et al. created user data of the entire call and interaction ranging from phone number identifiers, geolocation, times, cellular tower identifiers, contacts, social-graphs, call logs, video and other user data with the intent to have the FBI, et al. use it as evidence to prosecute Plaintiff once an indictment was issued. On the conference call, Wang offered to develop a "demo app" for "free" after taking tens of thousands of dollars from Plaintiff to launch the "real app." Wang was tasked with creating user data of Plaintiff agreeing to "raise $2 million dollars from investors" knowing the "real app didn't work."

Mackintosh v. Apple, Inc. et al.

46.    While Wang was attempting to influence Plaintiff to commit conspiracy to defraud investors and creating illegal user data, Acebedo was instructed to simultaneously contact Plaintiff's friends, family and business acquittances to claim Plaintiff was "stealing millions of dollars from investors," knowing the claim was materially false. Acebedo not only ruined Plaintiff's startup, he decimated Plaintiff's relationships with all of his friends, family and business acquittances. The espionage allowed the FBI, et al. to obtain a corrupt indictment and reduce Plaintiff under *absolute despotism* knowing he would have no defense, similarly to Levandowski. The Defendants attempted to set Plaintiff up of a crime to cover up Tim Cook's use of Plaintiff's user data that turned Tim Cook into a billionaire in four-to-five short years and allowed Apple to evolve and have a $2.5 trillion growth spurt, climbing to $3 trillion dollars in value in the same period time (*Id.* ¶ 21).

47.    Plaintiff's IP, user data, keylogging activity and other valuable competitive information, also allowed Uber to revive its failing healthcare taxi service division and spun Uber out of a single purpose "push a button taxi app" in the app store into a multi-functional app, that also turned Kalanick into a billionaire.

48.    In addition to these egregious acts, prior to, during and after executing this alleged criminal initiative against Plaintiff at his startup (*Id.* ¶ 125)—Wang, et al. surreptitiously impersonated Plaintiff and others on their iPhones and other devices to plant evidence and other user data, similar to their activity against Levandowski.

49.    After the user data was surreptitiously created—Tim Cook, et al., and Uber turned the illegal evidence over to federal prosecutors as "user data" in hopes Cal. N.D. would dispense justice on acts of their fraud and deceit. If Plaintiff was falsely arrested, it gave the Defendant's an opportunity to "delete" Plaintiff's digital evidence (iPhone backdoor i.e. screen captures) that was surreptitiously being sync'd to his iPhones and other systems without his knowledge. This unconscionable influence operation and criminal initiative was one of many, that allowed Tim Cook, et al. and Kalanick, et al. to ill-gain and unjustly enrich themselves at Plaintiff's detriment.

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

**2.  Plaintiff Files a Civil RICO lawsuit after a Years-Long Investigation.**

50.  On December 23, 2020, Plaintiff mailed a filing fee in the amount of $402 to Cal. N.D., San Francisco Division, along with his original civil RICO Complaint, Cover Sheet and other documents required by the court to make the lawsuit operative. The District Court's Clerk, in her public official capacity, assigned a case number to Plaintiff's civil RICO complaint, stamped the Summons and other legal documents, and mailed Plaintiff the originals. Plaintiff paid approximately $400 to hire process servers who personally serve the initial Defendants with copies of the original.

51.  In the first quarter of 2021, Plaintiff submitted to the court undisputed proofs of service after each Defendant was properly, personally and amply served the documents. Each Defendant was deemed to have been properly served with a copy of said documents, making Plaintiff's civil RICO lawsuit valid and within the federal and civil rules of procedures making it fully operative. Defendants, Apple, Inc., Uber Technologies, Inc., Uber Health, LLC, Josef Acebedo, and Jerry Wang had proper notice and was required "by law" and "by the rule of law" to answer it within 21-days. Wang's responsive pleading deadline was on February 12, 2021, Acebedo's on February 18, 2021, Uber, Uber Health and Apple on February 22, 2021. Uber Health, Uber, Wang and Acebedo refused to answer or otherwise failed to file a responsive pleading to the court within 21-days and missed their deadline set by the court. All five Defendants also failed to dispute Plaintiff's proofs of service, affirming they were legally and properly served that made the lawsuit operable (*Id.* ¶ 148).

52.  Thus Uber, Wang, Uber Health and Acebedo defaulted. *Benny v. Pipes*, 799 F.2d 489, 495 (9th Cir. 1986), modified, 807 F.2d 1514 (1987) (*Id.* ¶¶ 118-119) "allegations in pleadings are admitted when not denied" [emphasis added] (*Id.* ¶ 40). Thus, these initial four Defendants admitted to the allegations in the civil RICO complaint, and liability is established against each of them. Moreover, after Acebedo defaulted, he retained a criminal defense attorney who threatened Plaintiff over the phone with a lawsuit if Plaintiff continued litigating the case. The threat also happened

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF,
DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

Mackintosh v. Apple, Inc. et al.

1    in and around the same month Apple wired a payment to Wang, et al. as a bribe to

2    remain silent. Uber and Uber Health also remained silent and sat in default status while

3    they waited for Apple to file its answer.

      **3.    Apple Fabricated Screen Capture Evidence Subverting Justice,**

      **Causing Harm to the Courts, and Prevented the Courts from Functioning**

      **in their Usual Manner.**

7    53.    While the initial four Defendants defaulted and remained silent, Apple's

8    General Counsel Katherine Adams, Cook, Latham Watkins, LLP and its attorneys

9    all whom aided and abetted Cook, et al., (*Id.* ¶¶ 110-113), directed Apple to hire a

10   small boutique law firm "as a proxy to fabricate screen capture evidence" and urge it

11   upon the Court. *In Re Veg Liquidation, Inc.*, (July 16, 2019) in the 8th Circuit

12   "A finding of fraud on the Court "is justified only by the most egregious misconduct

13   directed to the court itself, such as []fabrication of evidence by counsel"; *Landscape*

14   *Props., Inc. v. Vogel*, 46 F.3d 1416, 1422 (CA8 1995)"; *Lall v. Bank of New York*, 5th

15   Circuit 2018-10554 (Aug. 2019) (*Id.* ¶¶ 64, 118-119, 64, 68, 143, 169, 172, 51, 80).

16   54.    Specifically, between approximately March 2020 to January 2021,

17   Apple retained attorney Marc Lewis, a University of California at Los Angeles alumnus

18   with a Juris Doctor and a member of the Phi Beta Kappa, the oldest academic honor

19   society in the United States, founded in 1776. Apple also retained Paul Llewellyn, an

20   Elite Boutique Trailblazer Plaintiffs' attorney.

21   55.    Both Lewis and Llewellyn are partners at the San Francisco law firm

22   Lewis & Llewellyn, LLP. As part of Tim Cook and Apple's scheme to continue

23   defrauding Plaintiff and the American People, Apple paid Lewis and Llewellyn to

24   hire a lead attorney who was willing to take on the risk of fabricating evidence to

25   "get Plaintiff's civil RICO lawsuit thrown out." They subsequently hired a young

26   attorney named Daniel J. Jordan. By February 2021, Tim Cook, Uber's Chief Legal

27   Officer Tony West, Uber's CEO Dara Khosrowshahi, Lewis, Llewellyn, Adams,

28   Gibson Dunn, Latham Watkins, and others (*Id.* ¶ 42) allegedly continued a pattern of

Mackintosh v. Apple, Inc. et al.

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF,
DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

Mackintosh v. Apple, Inc. et al.

1   fraudulent activity directed at the courts. They influenced attorney Daniel Jordan to

2   undermine the judicial process to conceal iPhone backdoor (*Id.* ¶¶ 64, 70, 85-136).

3       56.    Jordan thereafter purportedly logged into his computer at the law firm and

4   elsewhere, and used software to take multiple screen shots of an online website, and

5   inserted these screen shots in his declaration in support of Apple's motion to dismiss.

6   He then declared under penalty of perjury (*Id.* ¶57) pursuant to the laws of the State of

7   California, that his "screen shots" were "screen captures" (*Id.* ¶ 122). In addition to the

8   reckless misrepresentations and fabricated evidence, Tim Cook, et al. directed Jordan

9   to launch *ad hominem* attacks at Plaintiff and his mother. The attack made in Apple's

10  motion to dismiss intended to obfuscate Plaintiff's assertions in his civil RICO

11  complaint that his mother was murdered for being a key witness in this case and

12  potentially other future cases. The murder occurred approximately four weeks after

13  Plaintiff sued Uber, et al. where Jacobs Letter was central to the case. It is noteworthy

14  that Cook and his associates were fully cognizant that murder constitutes a RICO

15  offense, which may be why Jordan was instructed to attempt to upend the allegation.

16      57.    Nonetheless, Plaintiff became aware of the alleged murder after his

17  brother informed him their mother suffered a sudden brain hemorrhage subsequent to

18  a "routine back pain 'medicine' injection." Plaintiff's brother informed him in private

19  that a California Medical Doctor at Stanford Medical Center in Silicon Valley deemed

20  the cause of her death to be inconclusive and medically implausible.

21      58.    The murder intended to injure Plaintiff during litigation because he was

22  focused on prosecuting the case and revealing more truths about Jacobs Letter that

23  could reveal Tim Cook, et al.'s fraud on the Courts. The murder also happened after

24  Plaintiff's mother called him. While they were on the call, she sounded threatened, and

25  in her last voice mail to Plaintiff, she asked him to work on a new business. Presumably

26  her "live user data" was exploited to access her "geolocation" where she was "coerced"

27  into warning Plaintiff (in not so many words) to stop investigating Jacobs Letter.

28  After she was murdered, the litigation came to a halt while Plaintiff attended her

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF,
DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

funeral in California (*Id.* ¶¶ 118, 159). Plaintiff proceeded with his case to not only obtain relief and protect himself, but to protect his fellow Americans, who can be subjected to the same or similar targeting, as their geolocation and other user data and identifiers within it can cause them the same real-world harm and injuries.

59.    While Plaintiff waited for Apple to answer his civil RICO complaint in Cal. N.D., Jordan proceeded to attach his declaration containing the fabricated evidence to Apple's motion to dismiss and prepared it for electronic filing.

60.    Tim Cook knew "screen capture" is an "unrecognized file-type" created from Apple's iPhone backdoor cyber-surveillance each time its executed (*Id.* ¶ 118). It remotely captures a user's iPhone screen activity while simultaneously capturing images and audio from the front and back facing cameras and microphones of iPhones. The thought of creating screen shots (which any American can do) to present them to the court as "screen captures" to confuse the judiciary and the American People, effectively attacked the central issues being tried in Plaintiff's RICO case. It furthered the Defendant's RICO concealment scheme (*Id.* ¶¶ 18, 25, 41-50, 53-54, 60, 64). It harmed the judicial process and prevented the court from functioning in its usual manner. *Intermagnetics*, 926 F.2d at 916. This species of fraud also significantly changed the picture already drawn from Plaintiff's civil RICO allegations (*Id.* ¶ 134).

61.    After Jordan used the federal electronic filing system (ECF) to urge Apple's bogus motion to dismiss and fabricated evidence on the court, he mailed Plaintiff a copy through the United States Postal Service. After the filing, Lewis and Llewellyn paid, bribed or otherwise influenced Jordan to re-affirm the fabricated evidence by signing additional filings under penalty of perjury under the laws of the State of California that the "screen shots" were "screen captures" and urged the filings upon the court (*Id.* ¶¶ 120-124). Jordan committed these acts knowing his "screen shots" were not "screen captures" (*Id.* ¶¶ 121-124). The fabricated evidence was contradictory to Plaintiff's forensic evidence (*Id.* ¶¶ 74, 124, 136). Evidence that derives from the espionage activity launched against him in approximately 2015-2018

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF,
DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

Mackintosh v. Apple, Inc. et al.

Mackintosh v. Apple, Inc. et al.

1 (*Id.* ¶¶ 126-129). The forensic evidence disproved Apple's fabricated evidence urged
2 upon the federal court because it was covertly sync'd to Plaintiff, allegedly under
3 Congressional Power during its investigation into Apple, Uber, Tim Cook, et al.,
4 Travis Kalanick, et al., FBI, et al. and others between approximately 2013-present.

5     62.    During the investigation, Congress instructed the DOJ, National Security
6 and Intellectual Property Theft Sections, including and not limited to the United States
7 Department of Defense Agents to sync the evidence to Plaintiff's systems. It's alleged
8 the DOJ, DoD and higher government agencies were conducting covert anti-corruption
9 operations and tactical counter-espionage missions against the FBI, et al., Page, Brin,
10 Apple, Cook, and Kalanick's organized espionage activity (*Id.* ¶ 26). It's further
11 alleged, that after certain government agents and those who are associated to them
12 within the Central Intelligence Agency and the National Security Agency learned the
13 targeting was turning deadly against Plaintiff, they too sync'd additional forensic
14 evidence to Plaintiff in an effort to save his life and prevent him from being reduced
15 under ***absolute despotism*** by the organized crime and fraud on the Courts.

16     63.    While Plaintiff unknowingly possessed the evidence, he became a greater
17 target as the evidence could substantiate the Edward Snowden revelations and reveal
18 iPhone backdoor. It could expose Tim Cook's years-long fraud on the Courts and his
19 lies to Congress and the American Public, and threaten Apple's existence.

20     64.    Despite the Defendant's deceitful actions that obstructed justice through
21 fraud and trickery, this Rule 60(d)(3) motion is not about the merits of the *Mackintosh*
22 case or the assertions presented, which serve only as a background. The Court's
23 primary focus here must be to conduct an evidentiary hearing, regardless of its
24 duration. In the event this Court finds the Defendant's perpetrated a fraud on the Court
25 on its face from the courts records, and or if Plaintiff presents evidence proving
26 (1) iPhone backdoor exists and (2) the Defendants "fabricated evidence" to conceal it,
27 this Court must **GRANT** Plaintiff's injunction, damages and relief he has sought for
28 nearly half a decade (*Id.* ¶¶ 179, 190).

## V.    RELIEF SOUGHT

### 1.    Request for a Final Default Judgment in Favor of Plaintiff

1.    For the foregoing reasons, and as a mechanism under the fraud on the Court deterrence doctrine, (*Id.* ¶¶ 5-16, 62, 161, 163, 165), Plaintiff requests that this Court restore justice and enter a final default judgement favoring Plaintiff for damages, life-long injuries and being deprived of nearly a decade of his life, and sign an order:

    a.  award Plaintiff $25.876 million dollars as reimbursement for approximately 12,938 hours performing attorney-related work to bring forth this motion;

    b.  award Plaintiff significant damages for his cyber-surveillance and iPhone backdoor injuries, as the nature of this injury is new to law. The amount should be set above maximum and based on the size of the corporation as the injuries are non-rehabilitating, life-long and can be passed down when Plaintiff starts a family. The injury is a form of digital cancer from Apple and Googles ubiquitous "essential digital products" that are in possession of Americans who can be exploited at the whim of the Defendants, including targeting Plaintiff's future family and friends, causing more injury, oppression, fear, harm and further violating Plaintiff's right to life;

    c.  award Plaintiff damages recorded in the courts records (*Id.* ¶ 202);

    d.  award Plaintiff a treble multiplier for damages and reimbursement of time for attorney-related work for each instance of fraud on the Court perpetrated;

    e.  award Plaintiff all other relief discussed during the courts proceedings; and

    f.  award Plaintiff all other relief this Court deems just and proper.

Dated: July 4, 2024                    Respectfully Submitted,

ADAM JOHN MACKINTOSH (*Pro Se*)

Mackintosh v. Apple, Inc. et al.

**2.     Request for an Order for Declaratory and Injunctive Relief**

**I.     United States Declaration of Independence and Constitutional Arguments are Grounds for Relief, Alteration and or Abolishment**

1.     Plaintiff, Adam John Mackintosh, submits this petition that deserves only the most prudent and honorable judge. One who's insulated from outside government influences and the political bands from which have penetrated them, and from whatever party, democrat or republic, as the law knows no difference (*Id.* ¶¶ 169, 190).

2.     **NOW LET IT BE HEARD**, our Founding Fathers of the United States of America blessed us with their protective instincts and expressive thoughts that were carefully transcribed onto the most significant document ever conceived by mankind, the United States Declaration of Independence. Our Founding Fathers brought their Declaration for Independence to life with their unwavering devotion, pledging their Lives, Fortunes, and sacred Honor to each other to empower We The People.

3.     Their Declaration gave life to the American Flag that became a symbol of our Independence and Freedom. It was so foundational, that during the War of 1814, our American Soldiers raised our American flag so proudly in celebration of our crucial victory in the War of 1812. The King of Great Britain responded with relentless bombardments and gunfire that took aim at our flag. In the eyes of the King, when our flag fell, it signified surrender. In response, American Soldiers stood in front of our flag, protecting it with their bodies while enduring bullet and bomb shrapnel wounds. As American Soldiers fell from their fatal wounds, their fellow American Soldiers had to pull their bodies away from the flag and proudly stood in their place. One after the next. The bombing continued through the night, and upon sunrise, as the morning fog and smoke from the bombs bursting in air begun to make way, there stood our wounded American Soldiers who continued holding up our American Flag. It was battered, torn and bloodied, but never fell. Our Founding Fathers and fallen American Soldiers devotion to protect our American Flag and keep our Independence alive was resolute. They sought to prevent future general misfortunes for mankind by ensuring their

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

Declaration was passed on from generation to generation and preserved, so that one day, The People of America could use it to combat all future forms of oppression.

4.    **NOW COMES PLAINTIFF**, who can never measure up to the greatness of our Founding Fathers and fallen American Soldiers courageous acts. Rather, he is fighting alongside them in spirit and in America today. He is in an active cyber War with Tim Cook, et al. in every State. Fighting for his Life and Independence, much like our Founding Fathers did in the 1800's against the King of Great Britain in the State of New York. This cyber War is silent, and being fought by Plaintiff and others in the shadows. A shadow system federal judge Alsup declared existed. Plaintiff knows first-hand what this new oppression feels like. He has shed light on it, and is now suffering injuries from its effects. In fact, every time Plaintiff won a crucial battle against Tim Cook, et al.——Apple employees were directed to engage in technological gamesmanship to further reduce Plaintiff and his fellow American's Independence.

5.    Specifically, in early-2020, Plaintiff unknowingly engaged in activity that can only be described as counter-surveillance and anti-corruption counter measures against Apple, Tim Cook and each DOE Defendant. In particular, the Defendant's covertly replaced Plaintiff's roommate with FBI informants guised as roommates. They setup specialized modems inside Plaintiff's home to obfuscate iPhone backdoor and to surveil Plaintiff's investigative progress into Jacobs Letter to extract his findings to continue covering up. Upon suspecting the roommates may be copying his storage devices while he was away, he set in motion a tactical counter measure.

6.    While conducting the operation, Plaintiff parked across the street and faced his car towards the entrance of his home, and setup two iPhones with active cellular plans to conduct the counter-measure. As part of the operation, he retained the SIM card in iPhone #1, and removed the SIM card from iPhone #2 (SIM cards create a continuous connection to Apple and the internet). He then launched Apple's camera apps on iPhone #1 and #2 and started video recording the roommates suspicious activity. Approximately forty minutes into the operation, the Defendants remotely

1   executed commands to stop the Apple Camera apps and initiated a screen overlay to
2   mask iPhone backdoor control. iPhone #1 turned off and depicted a screen message
3   stating the "iPhone needs to cool down" before it can be used. The Defendants had
4   remotely attempted to turn off the cameras to stop Plaintiff from filming the roommates
5   faces and activities, and masked the remote activity with an overheating screen overlay.
6   Plaintiff's counter measure worked. iPhone #2 remained on and recorded the evidence
7   as he had removed the SIM card from it and caught Apple and Google's exploitation
8   of the roommates. He continued capturing Apple's iPhone backdoor and while
9   continuing to gather evidence to substantiate Jacobs Letter, Apple launched a massive
10  counter-offense against Plaintiff on U.S. soil. Apple announced a "new eSIM" feature
11  that effectively disallows Americans from removing SIM cards from iPhones.



16      7.    What appeared to be a "new technological innovation" in the eyes of
17  Americans who were excited about the coercive change, it was actually a change in the
18  design to continue reducing Plaintiff and other Americans under ***absolute despotism***.
19  It stripped Plaintiff and his fellow Americans of their Inalienable Rights, Independence
20  and Liberties, as SIM cards can no longer be removed from iPhones to stop the
21  Defendant's from creating geolocation user data and other identifiers that can be used
22  to cause them real-world harm. Tim Cook's tyrannical decision directly violated the
23  Declaration of Independence. It stepped on our Founding Father's Declaration and their
24  Life sacrifices they made for us. Apple made a mockery of our fallen American
25  Soldiers who gave their last full measure of devotion on the battlefield so Americans
26  could freely exercise their Independence. Tim Cook knew Plaintiff had exploited
27  Apple's SIM card design in his counter measures while investigating Jacobs Letter.
28  Knowing this fact, Tim Cook still decided to tighten his grips on Plaintiff and other

27

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF,
DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

1    Americans, as they can no longer remove SIM cards if they wish to be independent and

2    defend themselves from being exploited by the digital tyranny.

3        8.    **NOW COMES PLAINTIFF**, who seeks to follow in the footsteps of

4    our Founding Fathers. To continue vigorously combatting this new type of oppression

5    that has become increasingly exploitative and deadly in the last decade. The oppression

6    is led by Tim Cook, Larry Page, et al. and corporations. It thrives on corruption, user

7    data creation, and fraud on the Courts. The oppression has effectively reduced

8    Levandowski under ***absolute despotism***, and has caused Plaintiff life-long injuries.

9        9.    So as to achieve the purpose of Plaintiff's extraordinary request that seeks

10    to eradicate the tyranny that has grown an appetite for targeting high-profile and

11    high-value Americans, and to prove his request should be **GRANTED**, let facts be

12    submitted to The People and a candid world. And in support of this Court's movement

13    in upholding our Founding Father's Declaration and the Constitution and all laws that

14    derive therefrom, Plaintiff seeks to use his authorities that are deeply-rooted and

15    transcribed in the Declaration of Independence to: (1) continue protecting and

16    defending himself, his family and friends; (2) continue protecting and defending his

17    fellow Americans; (3) guard this Court and assist in protecting the sanctity of the

18    judicial process; and (4) repress the Defendants attack on our Liberties. "***Whenever***

19    ***any Form of Government becomes destructive of these ends, it is the Right of the***

20    ***People to alter or to abolish it***" ~ Declaration of Independence.

21        10.    Plaintiff wishes to use his powers enshrined in the Declaration of

22    Independence, to respectfully demand this Court to use the full weight of its inherent

23    powers to combat the Defendant's surreptitious fraud on the Courts and oppression.

24    An oppression that's unrelenting and creating vast amounts of user data from American

25    Lives with the intent to infringe their Independence, and reduce them under ***absolute***

26    ***despotism*** at the whim of Apple, Google, Uber and Tim Cook, et al.——and what's even

27    more concerning, such oppression cannot be thwarted by its victims including judges,

28    juries and courts. It's digitally hidden and has the power to corrupt justice.

Mackintosh *v.* Apple, Inc. et al.

## II. Authorities On Which Declaratory and Injunctive Relief Can Granted: <u>Fraud on the Court Inherently Violates the Declaration of Independence</u>

11.     Plaintiff contends Tim Cook, Jeff Bezos, Amazon, Apple, Google, and their co-conspirators self-evident tyranny is foreign and transcontinental in the face of domestic principals outlined in the Declaration of Independence. Central to their tyranny, they must collect and manipulate American's user data to take control of and corrupt justice to reduce Americans under ***absolute despotism***. It effectively strips Americans of their Independence, and threatens to reduce them in court, if they do not bow their heads back down to their iPhones and other digital devices. For these reasons, and others which are too many to list here, Plaintiff seeks declaratory and injunctive relief that must be **GRANTED** on the grounds that user data creation is not only unconstitutional, its eroding our system of justice that should work to protect American Life, Liberty and Independence. Plaintiff now lays the foundation on which relief is guaranteed under the Declaration of Independence and fraud on the Court remedies:

### 1.     Violation #1: User Data Infringes Privacy, Security, Freedom and Independence

12.     America's Founding Fathers knew this day would come. A day a destructive government and or corrupted wealthy subclass faction would obstruct American Life, Liberty and Independence to grow and concentrate their own power, wealth, political influence and self-interest. To control and manipulate. To overreach, knowing it will cause American suffering. Nevertheless, our Founding Father's Declaration enlightened The People of America. To help us realize we can never stand for such oppression. That we were freed, and should always have Freedom, Separation and Independence from government. Our Independence is God given, and not mere privilege. It's a necessity to cultivating rugged American individualism and patriotism that only develops and grows independent of government. When this separation exists, Americans flourish and grow an inherent tendency to repress such corrupt wealthy

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

Mackintosh v. Apple, Inc. et al.

1   subclass factions who dare seek to penetrate and use legitimate government institutions
2   to further their own wealth, power, influence and control over the American People.

3       13.   Our Founding Father's recipe for this experiment we call Freedom in the
4   United States of America would be a success, but it would require not merely a factious
5   majority in the legislature, but the concurrence of the courts of justice and of the body
6   of The People to combat fraud on the Courts. This concurring harmony doesn't exist
7   today, as the Defendants have instilled political bias and venality in Officers of the
8   Courts and Public Officials, so as to allow the Defendants to continue practicing
9   unmitigated fraud as evidenced in New York's persecution of President Trump,
10  Levandowski's persecution and the targeting of Plaintiff in California. This cyber War
11  seeks to sanitize and weaken American's sense of their unalienable rights to reduce
12  them under ***absolute despotism*** through usurpation of judicial power paired with
13  unconstitutional "Privacy, Employment and User Data Creation Terms" "Trust, Safety,
14  Content and Speech Moderation Teams" among other unelected wealthy subclass
15  factions within corporations and government who seek to infringe American Life.

16      14.   This species of fraud must be abolished, for if it is not, Tim Cook, Apple,
17  Uber, Jeff Bezos, Google, Larry Page, their attorneys, law firms and the other named
18  Defendants and their legal counsel will continue exerting their will, corrupt ideals and
19  oppression upon The People of the United States of America and continue profiting
20  from the exploitation of American Life. Every word and positioning phrase the
21  Defendant's use in their legal clauses and the actions of their trust and safety and
22  moderation teams controls and manipulates American Life. It's a cyber War that seeks
23  to control The People of the United States of America through their user data that's
24  created and collected from their lives and routinely exposed to serve the Defendants.

25      15.   This unconstitutional fraud removes all protections and safety for
26  Americans when the Defendants hack, manipulate, delete, tamper with and or create
27  influenced and or corrupted user data that's urged on government and the courts to
28  dispense justice on acts of fraud and deceit. There is no saving Americans when the

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF,
DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

*Mackintosh v. Apple, Inc. et al.*

1    Defendants choose to target them and engage in fraud on the Court tactics that go

2    undetected. The only protection Americans have is the relief Plaintiff has set forth here.

3          16.    As perhaps proof the Defendants are currently silencing, manipulating

4    and obstructing Plaintiff's free speech and other user data from reaching his fellow

5    Americans——TikTok, Facebook, Google and other digital platforms have blocked,

6    removed and or manipulated Plaintiff's videos and other content so Americans remain

7    blind to the growing infringement of their privacy and security. As exhibited below:

8    (1) Plaintiff is being reduced by Tim Cook, et al.'s cancel culture RICO scheme.

9          Specifically, Apple has aided and abetted other corporations and their apps to

10         obstruct Plaintiff from speaking out against Tim Cook and iPhone backdoor;

11   (2) TikTok has also taken several actions against Plaintiff: (a) It has prevented

12         Plaintiff from peacefully assembling with Amy K. Nelson and other RICO

13         victims on its platform by de-tagging them after Plaintiff tagged them in posts to

14         prevent further communication; (b) It removed Plaintiff's videos from trending,

15         citing unconstitutional guidelines as justification to hinder other Americans from

16         learning about Plaintiff's case; (c) When Plaintiff attempted to reach his fellow

17         Americans by boosting one of his videos, it was blocked for "political reasons."

18   (3) Page, Sergey and Google have used Google's search engine to delist Plaintiff's

19         South Florida motion which is presided over by federal judge Aileen M. Cannon,

20         the same federal judge overseeing President Trump's classified documents case.

21   (4) Facebook and Mark Zuckerberg interrupted Plaintiff's content from playing.



NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF,
DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

Mackintosh v. Apple, Inc. et al.



NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF,
DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

Mackintosh v. Apple, Inc. et al.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

< **Order details** 

⊗ **Not delivering**

Your order is not delivering because it doesn't comply with our advertising policies. Click "Status details" to learn more about the reason(s) for this rejection.

User ID: 7
User Name: adam
Order ID: 1

Not Delivering Reason(s):
• The ad or video has been rejected as it contains political content or political advocacy. **See the training video.** Affected country or region: US

To fix this, we recommend that you:
• Review your order to make sure it's in line with our **advertising policies**.
• Watch policy training videos (if any) based on the target region provided in the reason for rejection section.

If you are located in the EEA, you may have other ways to seek resolution, such as out-of-court dispute settlement processes or in-court proceedings. **Learn more**

For more information, please refer to **Ad Group Rejection** in our Help Center.

Thank you!

See less ⌃

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF,
DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

Mackintosh v. Apple, Inc. et al.

17.     Apple has also willfully, egregiously and oppressively blocked Plaintiff's payment cards and payment methods, preventing him from promoting his TikTok content to share his story with his fellow Americans to raise awareness of the violations of their constitutional rights. Despite having sufficient funds in his bank account, every attempt to add his Visa debit cards and Master credit cards fail.

18.     Tim Cook, et al.'s collusion with corporate executives, banks and others, is silently canceling Plaintiff's Life, and continuing to reduce him under ***absolute despotism***. As demonstrated below, Plaintiff is being exposed to a cancel culture that's eroding American Lives. As a result, Plaintiff now joins a growing list of billionaires, celebrities and other victims targeted by executives and corporations led by Tim Cook in their tyrannical and destructive cancel culture RICO scheme (*Id.* ¶ 43). These victims include former United States President Donald J. Trump, Brad Pitt, Joe Rogan, Elon Musk, Kevin Spacey, Alex Jones, Piers Morgan, Iggy Azalea, Johnny Depp, J.K. Rowling, Russell Brand, Mark Wahlberg, Kanye West, among others. This cyber War against Human Life, is driven by corporate tyranny and technology. It has, and will continue, infringing the Life of every American and their Pursuit of Happiness.




34

20.    **AS THE COURT CAN SEE HERE,** the Defendants are using their software designs to manipulate what is projected onto American's digital devices i.e. iPhone and Android screens, to influence what they see and believe. To cover up Tim Cook, et al.'s transgressions and cyber War against the United States Declaration of Independence. These willful acts are vigorously striking Plaintiff and his fellow American at the heart of their unalienable rights. Even rights that are guaranteed under Article I, Sec. 2(a) of California's Constitution among other laws. Plaintiff's TikTok account    @adam.mackintosh    and his free speech within it continues to be suppressed. These attacks demand a complete alteration and or abolishment of Apple and Google under Plaintiff's direction. Such drastic action is necessary to uphold American's inalienable Rights to Life, Liberty, Independence, Free Speech, Peaceful Assembly, and other Freedoms for which our Founding Fathers and fallen American Soldiers sacrificed their lives. **NOTHING** physically and or digitally created by man, woman and or corporations, shall ever outweigh our God-given Right to Life.

21.    **PLAINTIFF NOW SEEKS** to vigorously prevent yet another general misfortune for mankind. Specifically, Plaintiff seeks to use the Declaration of Independence to protect his fellow Americans from the tyranny of this cyber War that exists in a modern day America that's growing at a rapid pace. To fight against corruption which has penetrated our legitimate government institutions that were established to prevent such mass infringement of American Life. Perhaps we are witnessing Modern Day Americans and Australians who are upholding our right to life values akin to those of our Founding Fathers——who are being oppressed from combatting such digital tyranny and oppression. These individuals, who are natural born protectors of Human Life and Rights, much like our Founding Fathers, are being attacked, geolocated, targeted, and reduced under ***absolute despotism***. Notable among them are Edward Joseph Snowden, Julian Paul Assange, Adam John Mackintosh, and other RICO victims. They are high-value and high-profile targets of Tim Cook, Pelosi, Bezos, Page, Obama, Biden, and others who are aiding and abetting the targeting.

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

Mackintosh v. Apple, Inc. et al.

1    **2.    Violation #2: User Data Infringes American Life and Liberty**

2    22.    Corporations, specifically, Apple, Amazon, Uber, Google, and their
3    collusion with specific government agencies and corrupted politicians have slowly
4    integrated iPhones, Androids and other digital devices into American society.

5    23.    Every American, whether they are aware of it or not, are slowing being
6    indoctrinated and reduced with every bit of user data created from their lives when they
7    possess these digital devices. In fact, Americans are currently under computer control
8    when they swipe up, down, left, right, tap, press and hold their screens to "feel alive."
9    This live movement is recorded and transmitted through corporate cellular towers to
10    data centers and or server farms designated by Apple, Google, and Amazon, et al. to:

11        (a) infringe American Independence and the right to Assemble Peacefully by
12        creating location identifiers (geolocation) to track them and those around them.
13        To target them with absolute precision, and cause illegal and destructive
14        investigations, to blackmail them, murder them and those around them, and or
15        bribe or coerce those around them to engage in acts to harm, injure and create
16        user data to reduce all of them under *absolute despotism*; and

17        (b) infringe American Lives by controlling their iPhone and Android Screens
18        (remote screen recordings and screen captures) and activating Cameras and
19        Microphones. With these capabilities, Apple, Google, government, hackers,
20        and others can remotely listen in, video record and control American's screen
21        activity, private and intimate conversations, location information, activities,
22        photos, bank accounts, search history, keylogging entries and or view their
23        trade secrets, startup ideas, sketches, schematics and other intellectual property.

24    24.    Having such intrusive access to the most deepest parts of American Lives
25    and secrets, the Defendants pre-emptively scheme and create criminal initiatives and
26    influence operations to reduce Americans for any purpose Tim Cook, Apple, Bezos,
27    Google, Page, Uber, Kalanick and the other named Defendants deem sufficient. These
28    acts and designs amount to a direct violation of the Declaration of Independence.

Mackintosh v. Apple, Inc. et al.

25.    The basis for Plaintiff's extraordinary requests below, in its most purest form and understanding, is that iPhones, Androids, mobile computing devices and the software designs that operate them are scientifically exploitable, even with the strongest encryption, safety and security measures. This fact is undisputed and has been confirmed by experts who have appeared to testify in front of Congress over the years. Apple, Tim Cook, Uber, Google, Bezos, Page, Kalanick and their co-conspirators knew these facts. Their corporations run on exploitable software. In fact, they employ hackers to try and patch their software vulnerabilities that leave Americans exposed to injury and real-world physical harm. They also use these same hackers and others to access and exploit American's user data through the same exploits. They knew iPhones and Androids are destructive to the societal fabric of the United States of America.

26.    The Defendants knew Americans would be harmed, and instead of actually protecting them, they used "software vulnerability flaws" to continue "releasing software updates" among other pushes for "security" knowing the next update "will be exploitable" and allow hackers and others to access American's iPhones, Androids and user data. There was never security, only continuous harm to Americans. Perhaps Apple, Google, Tim Cook, Larry Page and others intended to use their iPhones, Androids and software designs to indoctrinate and subjugate Americans under ***absolute despotism***. To siphon American's rich user data for profit and to gain power over them. To sell and bargain with the user data amongst corporations and executives to control the course of mankind and used as a sport against Human Life. And they obscured these glaring "software exploitability facts" by dressing them up as "new features and updates." There will always be flaws and vulnerabilities in every iPhone or Android manufactured and the servers and cellular towers in which they are continuously connected. This was best described in a recent Congressional hearing by the Honorable Jen Easterly, Director of the Cybersecurity and Infrastructure Security Agency. She declared under oath that, "The truth is, the Chinese cyber actors have taken advantage of very basic flaws in technology, we've made it easy on them."

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

27.    Plaintiff argues the same is true for iPhones, Androids, cellular towers, servers, computational devices and the internet itself. It was always a design to control. These devices are not immune from exploitation. Its scientifically implausible to secure software, and to make it hack proof. In fact, the Defendants concealed these truths from the American People for profit, political power and to cheat in court. And they knowingly affected public officials to defraud legitimate government institutions causing a ***long-train of abuses and usurpations***—in an all-out effort—to conceal the capabilities of their tyrannical digital power over The People of America by creating, collecting, and exploiting American's user data to threaten their Liberties if they dare speak up, compete or campaign against them (*Id.* ¶¶ 44, 76, 134, 141, 161, 168, 195).

28.    For the simple reason Americans are being fraudulently induced to use iPhones, Androids and other computing devices to create user data from their lives to one day reduce them at the Defendants whim——this Court should **GRANT** Plaintiff's request. This Court should also prohibit the Defendants from continuing to create user data from Americans, on the immutable basis, that it's the equivalent to harming, injuring, harvesting, extracting, misappropriating, exploiting, profiting, infringing, and obstructing American's Independence, their Pursuit of Happiness and Liberty, Wealth, Intellectual Property, Innovations, Thoughts, Free Thinking, Ideas, Knowledge, Wisdom, Speech, Voices, Movement, Morale, Character Development, Love, Happiness and other rich characteristics that intrinsically give Life to Americans. This precious and short-lived Life forms rugged American individualism and patriotism that keeps Americans unified and prosperous. This Rich Life should never be extracted and put in the hands of a few, which is happening in America today. Thus, those engaging in and or allowing such activity, is committing Treason against Americans and our Founding Fathers and fallen American Soldiers before us. By harming, injuring, harvesting, extracting, misappropriating, exploiting, profiting, infringing and obstructing American's user data in its simplest form, is a ***design to reduce*** Americans under ***absolute despotism*** and end American Life at the Defendants will (*Id.* ¶¶ 195).

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF,
DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

Mackintosh v. Apple, Inc. et al.

29.    As perhaps evidence that iPhone and Android devices are a design to extract rich user data from American Life (Ideas, Intellectual Property, Inventions, and Thoughts) consider the following: Given Plaintiff's inherent inventive intelligence and different thinking, between in and round approximately 2018, he addressed a concern raised by Apple customers, that when they lose one AirPod, they are required to purchase a new set leaving them with three. In response, Plaintiff leveraged his innovative thinking to develop a novel solution known as "Silent Sound Technology" as follows:



adam.john.mackintosh 😊 I think Apple should invest in a team of acoustic scientists that are leading in their field of work. Put these scientist in the same room with a team of Apple software and hardware engineers and dev leaders.

The teams can then research and develop new "silent sound technology," (term doesn't exist). To integrate displacement amplitude technology into the iPhone. Which is essentially a measurement of distance of the movement of a particle from its equilibrium position in a medium as it transmits a sound wave.

By using the gyroscope, accelerometer and displacement amplitude technology in conjunction with each other, you calibrate the iPhone with your eye/ear/body level. We can then manipulate the wave of sound to have a delayed increase in tone to a specific area(s). Meaning, ONLY YOU can hear the sound coming from the iPhone without having to wear earbuds, and even share the sound with others.

30.    Approximately nine to twelve months later, Apple used Plaintiff's "Silent Sound Technology" described above and named it "Spatial Audio."



NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

31.    During Apple's yearly keynote, specifically in September 2020, Apple Employee Mary-Ann Ionascu announced:

"We also have an exciting new feature coming to AirPods Pro, 'Spatial Audio.'

You know the experience of being in a movie theatre with state of the art surround sound system? One where the sound not only comes from in front of you but from the left, right, behind and even from above you. Well! We are thrilled to bring that same immersive experience to AirPods Pro.

But it turns out it's a lot harder to do when you only have a single ear bud in each ear. So our team created advanced spatial audio algorithms for AirPods Pro that replicate the movie theatre experience.

By applying direction audio filters and subtly adjusting the frequencies each ear receives, we can place sound virtually anywhere in space.

Creating an immersive surround sound experience. But to truly deliver on this promise, we had to factor in real life situations.

First people move their heads, for an authentic surround sound experience you need the sound field to stay fixed, so the voice feels like it's coming from the actor and not some random point in space.

So we use the accelerometer and gyroscope in AirPods Pro to track the motion of your head.

Remapping the sound field so its anchored to your device, even as your head moves. And it's not only your head that can move, but you might move your iPad or iPhone as well.

That's why we constantly compare the motion data from your head and your screen, to understand how they are moving in relation to each other. So if your bus turns the corner or your plane banks the sound stays in-sync.

The result is a surround sound experience that keeps you in the middle of the action no matter where you go. Spatial audio for AirPods Pro will work with content encoded in 5.1, 7.1 and even Dolby Atmos."

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

Mackintosh v. Apple, Inc. et al.

32.    Apple has gone as far as filing multiple patents from Plaintiff's user data prior to, while, and after Plaintiff's fraud on the Court motion was stonewalled. As was the case in *Hazel-Atlas*, Apple's conduct mimics Hartford and its officials and lawyers, as they urged false and misleading statements upon the United States Patent Office to obtain a patent. Apple has intentionally omitted the fact that "Spatial Audio" and parts of Apple's "patents" derive from Plaintiff. In fact, Tim Cook ratified Apple's attorneys to file these patents knowing Plaintiff's user data was being cyber-surveilled, exploited and used by Apple, et al. for its inventiveness. User data that sits on data centers and server farms, at rest, and available to be exploited by a wealthy subclass faction. As exhibited below, Apple filed multiple patents that were recently granted based on fraud on the Court much like Hartford did in the *Hazel-Atlas* case.

33.    These are only a few examples of how easily Apple has profited from American's rich user data from their iPhones without them knowing to grow a corrupted subclass faction's wealth. All in all, Apple can argue that their employees invented the technology, however and conversely, because Apple employees and espionage teams have exploited Plaintiff's inventive user data over the years to pump up Apple, et al.'s stock price, any counterargument submitted by Apple (which should be strickened) is doomed on its face. Cook, et al. never intended to pay Plaintiff royalties after stealing Plaintiff's "Spatial Audio" idea, yet Cook still knowingly cashed in Apple's stock price that was illegally pumped up using Plaintiff's user data.



NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

Mackintosh v. Apple, Inc. et al.

Mackintosh v. Apple, Inc. et al.

34.    In yet another illustration of Apple's exploitation capabilities, after Plaintiff had a private discussion regarding the low mileage range per electric car charge, Plaintiff wrote out an equation and sketched a designed that can double or triple the range of electric cars and battery life using a low gravity ▮▮▮▮▮ system operating on a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ system, working in parallel with a ▮▮▮▮▮ drive-train and lithium-ion battery setup.

35.    Following the capture of a photo of his invention sketched out on paper, as exhibited below, Apple's secret projects team, "Project Titan" begun developing the technology to implement it into Apple's Self-Driving Car. Subsequently, during Plaintiff's motion practice, it became apparent that Apple had been illicitly extracting Plaintiff's innovation from his user data over the years. Exploiting Plaintiff's Human Life for its unique and rare inventiveness. It was also discovered that Apple had mirrored Plaintiff's MacBook and unlawfully copied his patent draft involving a wheelchair system for self-driving automobiles. This invention aimed to reduce costs for seniors and healthcare patients under his Rideshare for Healthcare startup. A proposed partnership with Tesla, Ford, and other companies leveraging his invention was intended to lower healthcare costs for Americans nationwide and potentially worldwide. Apple has since shut down its self-driving car division in and around the same time the Justice Department sued Apple for alleged violation of antitrust laws.



43

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

Mackintosh v. Apple, Inc. et al.

**3.     Violation #3: User Data Inherently Creates a Destructive Government and Erodes Public Trust in Our System of Justice**

36.     **PLAINTIFF NOW DECLARES**, that user data creation activity has effectively blurred the lines between legal exercise of government and their courts and an illegal usurpation of authority. As government becomes more interconnected with corporations to create and control American's user data, it will only perpetuate and hinder courts from functioning in their usual manner. It will continue harming and injuring state and federal judges, who are steeped in the democratic tradition of judgeship, who maintain the highest in ethics, and makes their work a career of honor.

37.     As perhaps proof of Plaintiff's serious assertions, federal judge Alsup, reluctantly sentenced Levandowski to federal prison. During the sentencing hearing, Alsup second guessed himself, and didn't want to imprison Levandowski. *Aoude*, supra 892 F.2d at p. 1118. He knew Levandowski was influenced in many ways, but his gut instinct told him Uber's story didn't add up, because: (1) Levandowski's iPhones were "misplaced" and or "destroyed" during litigation and forensic evaluation; (2) certain "user data" i.e. text message s were deleted between Tim Cook and Travis Kalanick during litigation (*Id.* ¶ 23); (3) "Levandowski deleted user data" on his Apple Macbook that "didn't exist" and "emptied its recycle bin that had no trash" which no user can do. It was Apple and Google's espionage teams and others, remotely executing the commands, not Levandowski. The remote commands were executed at various times, including while Levandowski attended a deposition for the *Waymo* case.

38.     Alsup suspected wrongdoing but couldn't put his finger on it, as it was remotely being executed using iPhone backdoor and through other hidden technologies. At every step in the litigation process, Tim Cook and Kalanick, et al. concealed evidence, violated court orders and concealed iPhone backdoor evidence all to protect and cover up their misconduct. Page, Brin and Google also covered up by renaming chrome laptops screen shot function to "screen capture" in anticipation of Jacobs Letter prior to the *Waymo* case. The activity upset Alsup on a number of

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

occasions during litigation, and in the end, Alsup's honor was stained by the fraud on the Court, because he was coerced into sentencing Levandowski. This is one example, of many cases, that demonstrates how destructive Apple and Google's control over how American's user data is created and stored. It pervasively hampers judges, misdirects government and is eroding the United States Judicial System. It threatens American's security as courts are dispensing justice on acts of fraud and deceit, while judges are reluctantly reducing Americans who are targets of Cook, Bezos and others.

39.    The exploitation of American's user data has caused mass-scale American "*suffering*," while any action taken against Apple or Google is only "*sufferable.*" ~ The Federalist Papers. To this day, Apple and Google still refuse to right their wrongs by altering or abolishing the "*forms to which they are accustomed*" that are increasing American suffering. ~ The Federalist Papers. In fact, Plaintiff is suffering from cyber-surveillance injury. There is no rehabilitation for such an injury, and it will always infringe Plaintiff's Pursuit of Happiness for the rest of his Life. The injury has killed his excitement for life and his innocent curiosity for invention because of the espionage activity against him and the murdering of his family members and friends for attempting to take legal action for the theft of his inventive ideas that aimed to enrich American Lives. In fact, he is still a high-value and high-profile target, and suffers injuries that are reducing his morale and infringing his character development. It's an injury Edward Snowden and other RICO victims have tried to warn Americans about and prevent because our Founding Fathers suffered the same.

40.    What we have on our hands here is a serious homeland attack on American Liberties. The assaults are coming from Apple and Google, who are the real backdoors into American Lives, and their key weapon is user data creation and vulnerabilities that can easily be exploited at any time to harm Americans.

41.    In particular, on one hand, Americans who have not yet been targeted are in such amazement with every new app they think improves their Lives. While on the other hand, these apps are merely another software design that cuts into another

Mackintosh v. Apple, Inc. et al.

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

part of their Life to collect user data to continue bleeding them of their Independence. Having possession and access to American's user data allows Apple, Google, government and hackers to control us, by and through the threat of exploiting our user data, tampering with it to use it to place us in prison by dispensing justice on acts of fraud and deceit that no judge or jury can detect or correct.

42.    Apple and Google's user data collection software designs would not be tolerated by our Founding Fathers. Not one bit. Yet, Apple and Google are allowed to continue creating user data from Americans under specific acts and bills. This means there's even a greater danger here. Its far greater than any one person or corrupted wealthy subclass faction penetrating government and turning it destructive. A corrupted subclass of government officials and agencies are colluding with destructive corporations and their executives, specifically in this case, with Tim Cook, et al., Page, Uber, Bezos, Apple, Google and their software application designs in their app stores. These public officials are allowing the Defendant's to jointly infringe American Life, Liberty and Freedoms by allowing the Defendants to create, extract and collect user data from American Life at an unconscionable and incomprehensible level.

43.    Public officials are aiding and abetting the Defendants unconstitutional power that's inherently destructive to American Liberties. And there's most likely a number of Americans who have been reduced and or imprisoned by having their user data exploited without their knowledge and hidden from them during prosecution by and through the Defendant's fraud on the Court tactics and obstructionist delay measures. It disheartens Plaintiff as the number of Americans wronged is unknown. He suffers with these thoughts each and every day because the truth is now self-evident to him. The Defendants oppression will only accelerate with time unless and until this Court intervenes. What we are witnessing here, is the beginnings of digital American tyranny perpetrated by corporate executives and all those associated to them. These ***men of factious tempers, of local prejudices, or of sinister designs, may, by intrigue, by corruption, or by other means, first obtain the suffrages, and then betray the***

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

Mackintosh v. Apple, Inc. et al.

*interests, of the people*, which has happened here. ~ Federalist Papers. Plaintiff is at War with the Defendants because we have all been fraudulently induced to possess digital products to assimilate in society whilst our user data is used to reduce us and causes American suffering. We have been betrayed by corporate tyrants and their army of attorneys who seek to topple our Liberties and cause division amongst Americans.

**4.     Violation #4: A Court Order Violation is Fraud on the Court**

44.     The Defendants have refused to dissent to law. They obstructed courts from functioning in their usual manner, and concealed facts from federal prosecutors at the Justice Department that would have revealed iPhone backdoor and prevented the targeting of Plaintiff that has caused him serious life-long injuries and damages.

45.     Tim Cook, et al. violated court orders. One in New York and the other in California. Travis Kalanick and Uber, et al. violated a third court order in California. They both refused to assent to the truth and confess they were using iPhone backdoor as it was disclosed by Edward Snowden in 2013, revealed in Julian Assange's Wikileaks website in 2016, described in Jacobs Letter in 2017, litigated by Plaintiff between 2020-2022 and testified by Peiter Zatko former DoD Agent in 2022.

**5.     Violation #5: Defendants Will Allow Mass Harm to Keep iPhone Backdoor**

46.     The Defendants have enabled mass cyber-surveillance that Wars against the Constitution by "failing to thwart" destructive Life Events. Specifically, a number of Life Events have changed the course of America. From terrorists bombings, to terrorists mass shootings to terrorists hi-jacking planes and crashing them into the World Trade Center in 2001. After every significant event that the "government coincidently fails to thwart" comes the passing of certain legislative bills. The words on each of these bills and documents are seated in allowing government to interconnect, overreach, and infringe American's Privacy, Independence, Freedoms, Liberties, Right to Assemble Peacefully, Right to Bear Arms, Right to Free Speech, Right to a Jury—"for safety." And they need iPhone backdoor and the cyber-surveillance as a

Mackintosh v. Apple, Inc. et al.

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF,
DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

1  tool to ensure this "safety" (*Id.* ¶190). When in reality, iPhone backdoor and the
2  cyber-surveillance is being used to engage in economic espionage as exposed by
3  Snowden, Jacobs, Wikileaks, the *Mackintosh* case and others. To extract rich user data
4  from American Lives to make a subclass faction wealthier and more powerful——while
5  the targeted Americans (Plaintiff in this case) are reduced and face suffering.

6        **6.**    **Violation #6**: **Technological Gamesmanship is Fraud on the Court**

7      47.   As argued in Plaintiff's 2021 preliminary injunction, which was
8  obstructed by Cal. N.D. federal judge Vince G. Chhabria—who owns Apple stock and
9  failed to disclose his holdings during litigation—Apple continues to engage in
10  technological gamesmanship.

11      48.   Technological gamesmanship means Tim Cook and other executives at
12  Apple, in collaboration with attorneys and employees, continually devise ways to alter
13  Apple hardware and software to perpetuate their fraud and mislead the courts.

14      49.   For instance, while Chhabria blocked Plaintiff, Apple altered its software
15  and hardware to deceive and indoctrinate Americans into believing the Defendants
16  corrupted narrative that only serves the subversion of truth. Specifically, Plaintiff's
17  motion described how Apple executives, including Wang, et al. remotely connected to
18  iPhones to control and manipulate user data, transferring it through Uber, et al. who
19  then handed it over to the FBI to obtain corrupt indictments.

20      50.   As of June 12, 2024, Apple now allows users to remotely connect to
21  their iPhones from a MacBook. This action distorts the truth and American's
22  perception, potentially misleading future jury members into believing remote mirroring
23  of iPhones from MacBooks is merely a software and hardware "magical technological
24  feature," rather than an illegal act that violates the espionage and defense trade secret
25  acts among other laws (*Id.* ¶15).

26      51.   When in reality, this function was unlawfully utilized between 2013 and
27  2020 by espionage teams as described in Jacobs Letter, during which Tim Cook and
28  others ratified its use for illegal purposes, not limited to planting evidence, planting

*Mackintosh v. Apple, Inc. et al.*

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF,
DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

1  user data, creating user data, manipulating user data, stealing trade secrets, intellectual
2  property and ideas from Americans for a big payoff (*Id.* ¶69).

3      **7.    Violation #7: Fabrication of Evidence by an Officer of the Court**
4      **is Fraud on the Court**

5      52.    Plaintiff's request must be **GRANTED** in part because the Defendants
6  have violated the foundational principals of the Declaration of Independence.
7  Likewise, the other part pivots on the Defendants perpetrating fraud on the Courts.
8  The sum of the two gives this Court full authority to **GRANT** Plaintiff's request of
9  severe sanctions, declaratory and injunctive relief as follows:

10      **a.  Severe Sanction #1: Treat Corporate Acts as Government Acts**

11      53.    America's Founding Fathers predicted this activity. They also outlined
12  Tim Cook and Apple's oppressive influence and Apple and Google's tyrannical and
13  destructive powers. In fact, *Alexander Hamilton* addressed it in the *Federalist Papers*,
14  and described the power as significant, all intense, pervasive and destructive.

15      54.    These elements form oppression that was not only predicted by the great
16  *Alexander Hamilton* himself, along with our other Founding Fathers, but they
17  collectively declared that when such unconstitutional power forms and presents
18  itself, The People of the United States of America should not only combat it, but they
19  have a duty to combat it, to keep our Independence alive and restore our Liberties.
20  As Thomas Jefferson so famously said, "***the Tree of Liberty must be refreshed from***
21  ***time to time.***" Plaintiff believes this motion should be used as a stepping stone to
22  refreshing the Tree of Liberty.

23      55.    Thus, Plaintiff maintains that Apple, Google, Amazon and Uber, et al.
24  and their respective executives, attorneys and global law firms are not immune from
25  liability here. The Defendants' attorneys cannot claim that Apple, Amazon,
26  Google, and Uber's deliberate actions to grow their user data collection to cause harm
27  to Levandowski, Plaintiff, and numerous other Americans, including and not limited
28  to Amy K. Nelson, are justified. Plaintiff anticipates the Defendants will argue they

Mackintosh v. Apple, Inc. et al.

are permitted to inflict such harm on American Life because the Constitution does not apply to their corporations and law firms, as they are not "government entities." This argument is fundamentally flawed and must be rejected by every tribunal globally.

56.    The Defendants can no longer remain immune from the law and excuse themselves from such traitorous acts. Their willful creation of digital objects (i.e. iPhone, Androids, etc.) and software designs (i.e. iOS, AndroidOS, etc.) and their nefarious use of such foreign powers against Americans and fraud on the Courts to conceal these weapons of War, relinquishes any immunity they may otherwise think they have.

57.    Thus, their rights are vanquished for reasons raised by Plaintiff and reinforced by America's Founding Fathers and supported by over 200 years of precedent set by our Supreme Court Justices, Appeals Judges and Lower District Court Judges (*Id.* ¶ 202). In support of relinquishing their immunity, Plaintiff makes the crucial point that corporations did not emerge until the 1800's, with the inaugural United States corporation, "Boston Manufacturing Co.," established in 1813. As such, if corporations did exist in the 1700's, specifically in 1776, America's Founding Fathers, who architected and framed the United States of America, would have likely recognized that the potential harm corporations could and would inflict on Americans, paralleling the concerns about a destructive government, contingent upon corporations scale, size and operational characteristics——would have likely classified corporations with government. Thus, Plaintiff respectfully seeks to re-amend the words of our Founding Father's that are transcribed on the Declaration of Independence only for purposes of this request, to combat the Defendant's fraud on the Courts, and to further guard and strengthen American protections, before they too fall victim to the life-long iPhone backdoor injuries Plaintiff and others are suffering from, specifically:

> *"That whenever any Form of Government* [or Corporation and all those associated to these Corporations] *becomes destructive…. it is the Right of the People to alter or to abolish [them]."*

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF,
DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

Mackintosh v. Apple, Inc. et al.

Mackintosh v. Apple, Inc. et al.

58.    Now set forthwith, the corporate Defendants are no longer immune from the law, specifically, the Declaration of Independence, from which all law derives as it's the supreme law of the land and final say. The Defendant's continuous connection to Americans is the same as a destructive governments continuous connection, which violates American Independence. Plaintiff also contends if the Defendants refuse to abolish and or alter their continuous connection to Americans so Americans can be Free and Independent *again*, they are willfully continuing to cause harm, injury and suffering, and are as liable as government would be in any case.

59.    Nonetheless, what the Defendants have concealed from Americans, is the fact that iPhones and Androids can be exploited. And unbeknownst to Americans, their unalienable rights are being exploited through these digital products they have grown to love and have instinctively bonded with, through various software designs and apps. These apps have intertwined with American Life as these apps provide Americans with food and product delivery and shopping, banking details, chats with friends and family, news, updates, social media, and other communication methods. However, it has become prevalent that because apps are continuously connected to Americans through Apple and Google to create user data from Americans, these apps leave every part of American Life and Independence open to silent exploitation, infringement, tyranny and eventually death at the whim of the Defendants.

60.    For instance, Apple and Google, in collaboration with the FBI and other government agencies, manipulated and exploited millions of American votes by tampering with what Americans saw on the screens of their Apple iPhones and Google Androids. The manipulation, exploitation and deceit interfered and tampered with the 2020 United States Elections through various apps like Twitter, et al., as evidenced in the recently disclosed Twitter Files (*Id.* ¶¶ 105-108, 111, 150, 152).

61.    The exploitation measures through iPhone and Android, aimed to infringe and control American's votes and free speech to further the Defendant's power. To have Biden corruptly block Plaintiff's fraud on the Court case against Apple, so

Tim Cook, Google, Jeff Bezos, Larry Page, and the other Defendants can grow their unconstitutional power over The People of the United States of America for profit and control. So that Tim Cook could continue cashing in Apple stock that was illegally and artificially pumped up using Plaintiff's and other competitor's rich user data without their permission and without properly compensating them.

62.    Additionally, in yet another egregious and traitorous instance, the Defendants infringed American Independence and encroached upon American Sovereignty by creating, harvesting, profiting from, and exploiting geolocation datasets collected from iPhones, Androids and software designs that are interconnect with Americans who possessed them. In fact, because Plaintiff's mother used a phone app to contact Plaintiff on his phone app, her American Life was exposed. Her live user data collected by Apple and Google was used to launch criminal initiatives against her that reduced her Life under *absolute despotism*. Her murder was Plaintiff's punishment and retaliation for (1) investigating Jacobs Letter, (2) filing his civil RICO case, and (3) speaking truth to power in federal court. A power that should never exist over The People. Plaintiff now fears he will be reduced and murdered for fighting against corruption, oppression and tyranny as our Founding Father did against the King of Great Britain, see 18 U.S.C. § 1959. This continuous threat is a violation of Plaintiff's God-given rights outlined in the Declaration of Independence.

63.    Another example of the harm and injury inflicted on Plaintiff's Life is the Defendant's secret access to his iPhone microphone, voice-to-text and keylogging activity. Through his collective user data, the Defendants discovered that he disclosed to his close friends and family over the years that he doesn't believe in divorce. It was a strong belief, but one that would allow him to build a strong family and stable home in the future. The Defendant's also learned that he desired to get married once in his lifetime to honor his parents' decades-long marriage. This was one of his most profound secrets and a critical character development trait that sought to shape him into a more complete man. Now, Plaintiff faces a divorce as his Wife has flown back

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

Mackintosh v. Apple, Inc. et al.

1    to Australia for fear of her Life here in the United States after the Defendant's
2    nefariously and maliciously used iPhone backdoor as retaliation against her as a means
3    to harm Plaintiff and obstruct him from continuing the case, see Plaintiff's TikTok
4    content of the suffering they sustained, caused by the Defendants organized crime,
5    oppression and cyber-attacks on their lives: https://www.tiktok.com/t/ZPRKxMBwP

6    64.    These are only a few examples of the tens and thousands of ways
7    American Life can be controlled and exploited through user data. It's a means and
8    method to grow Apple and Tim Cook, et al.'s profits and power. To accelerate their
9    corruption and penetration into legitimate government institutions to persecute
10   Americans much like the King of Great Britain did to Americans in the 1700-1800's.

11   65.    In both instances Plaintiff outlined above, the Defendants have directly
12   caused real-world injury to Americans because they possessed Apple and Google
13   devices that were continuously being used to influence and control them.

14   66.    Thus, Plaintiff hereby requests that his Court allow Plaintiff to alter and
15   or abolish Apple and Google, et al. as they have become far more destructive than a
16   destructive government. It's presumed the Defendants will try and argue that the
17   interruption of their products, services, technology and partnerships will harm
18   Americans and the American economy—***CONVERSELY***—Plaintiff argues that no
19   object (iPhone, Android, etc.) or design (iOS, AndroidOS, apps, etc.) outweighs the
20   Inalienable Right of The People to Live Freely, Independently and with Liberty and
21   Justice For All.

22   **b. Severe Sanction #2: Temporarily Ban iPhone and Android Sales**

23   67.    In the event Plaintiff presents evidence and or evidence comes forth
24   during the evidentiary hearing substantiating that iPhone screens had the capability to
25   be remotely screen captured, Plaintiff respectfully requests this court use the full
26   weight of its inherent powers to temporarily ban all sales of all Apple, Google, Amazon
27   and other large technology corporations digital devices. The ban should remain until
28   Plaintiff resolves these issues with the Defendants.

*Mackintosh v. Apple, Inc. et al.*

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF,
DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

**c. Severe Sanction #3: Temporarily Ban Apple and Google's App Stores**

68.    In the event Plaintiff presents evidence and or evidence comes forth during the evidentiary hearing substantiating that iPhones have the capability to have their cameras and screens captured from remote screen recordings while Google attempted to aid and abet Apple in covering up these capabilities, Plaintiff respectfully requests this court to temporarily ban Apple, Google, Amazon and other large technology corporations app stores to prevent any further distribution of apps that are being used by espionage teams and others to create, gather and exploit American's user data. The ban should remain for the same reasons set forth above.

**d. Severe Sanction #4: Adverse Inferences from Destruction of Evidence**

69.    As outlined above, the Defendants have setup systems that allow them to avert a paper trail of their communications, activities and directives as proven in a recent landmark case see the *United States of America v. Google, LLC* in the District Court of Columbia, Nos. 1:20-cv-03010. These systems include and are not limited to ephemeral chat apps that are programmed to auto-delete their conversations and screen capture files within these threads of communications. Over the years the Defendants have used their own technological infrastructure to conceal their activity and delete or change user data at root access. The Defendants have had years to delete and change massive amounts of dispositive digital evidence that favored Plaintiff in his civil RICO case and fraud on the Court motion. For these reasons, adverse inference should be allowed to favor Plaintiff.

**e. Severe Sanction #5: Apple and Google Refunds and Disgorgements**

70.    iPhone and Androids are not mere products; they are instruments of control. Designed to place Americans under a form of ***economic despotism***. Americans do not truly own these devices, corporations do. Americans are bound by monthly payment plans, and when they approach the end of these payments, the devices often succumb to Apple's planned obsolescence, rendering them inoperable, coercing Americans into new payment plans for the latest iPhone and Android model. Even

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

those who manage to pay off their devices or purchase them outright at full retail price, find that they cannot fully utilize them as advertised. They are coerced into a deceptive cellular plan with throttled speeds and limited usage, preventing them from experiencing the full potential of the devices.

71.    Americans do not own these devices as the Defendants can remotely take digital possession of them, and control these devices from headquarters and elsewhere, to exploit American's user data that's unsecure and exploitable. They are simply a design to reduce American's in every way imaginable at the whim Tim Cook and the other Defendants. Plaintiff's serious assertion here have been proven by the actions of corrupted governments who used Apple and Google's digital devices and designs to murder an investigative journalist. The journalist's WhatsApp app, owned and operated by Facebook, was exploited using a click-through spyware link that exposed his location and sources who were in contact with him that threatened to reduce all of them. For this simple reason, and others outlined above, Tim Cook, Apple, Gibson, Dunn and every person and entity who has profited from Apple, Google, and Uber, et al. since 2007 to present, must disgorge such profits and any related gains from any investments and or distribution of funds to other legal entities or portfolios. All monies, ill-gains, purchases of private property, investments, or other tangible and intangible use of the monies should be disgorged. Plaintiff and every American and Government Agency should be reimbursed for every Apple and Google product and service they purchased since 2007 because there was never privacy, safety, security, encryption or passcodes, only the exposure of American Life.

**f. Severe Sanction #6: Alteration and or Abolishment of Apple and Google**

72.    In the event this Court concludes the Defendants have used their concentration of size, influence and power to perpetrate a fraud on the Court on its face using the courts records and or after Plaintiff's presentation of iPhone backdoor evidence, Plaintiff respectfully requests this Court sign an order dissolving all centralizations of power. Specifically, large law firms, large corporations, large

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

Mackintosh v. Apple, Inc. et al.

1 election software i.e. voting software, etc., and all large factions should be dissolved

2 to prevent further injury to Americans, American Innovators and America.

3      **g.  Severe Sanction #7: Fraud on the American People by Corporations**

4      73.    In the event this Court concludes the above named Defendants have

5 defrauded Americans out of their user data that is a digital form of their Life, every

6 large technology platform from every industry should (1) delete said user data (2) repay

7 every American for any and all profits made from such rich user data (3) order any

8 further profits from American's user data to be paid back to every American.

9      **h.  Severe Sanction #8: Fraud on the United States Elections**

10      74.    In the event this Court concludes the Defendants have used iPhones,

11 Androids and user data to *de minimis* tamper with the United States Elections, all

12 actions made under Biden's Presidency, that undermined American Life, should be

13 overturned and he, acting in his unofficial capacity (specifically, signing Executive

14 Order 13992 and using the APA to aid and abet Tim Cook, et al. in covering up iPhone

15 backdoor) should be disqualified from running again. He has no immunity from

16 liability, see *Trump v. United States*, Nos. 23-939 in the United States Supreme Court.

17      **i.  Severe Sanction #9: Fraud on the United States Presidents**

18      75.    In the event this Court concludes Intelligence Agents/Agencies, et al.,

19 and or Tim Cook, et al., influenced and or if there is a *de minimis* perception that

20 Intelligence Agents/Agencies, et al., and or Tim Cook, et al. influenced prosecutors,

21 judges and other public officers of the courts by any means and methods to harm

22 American's faith in our system of justice by persecuting United States President

23 Donald J. Trump and or United States President Joseph R. Biden, Plaintiff respectfully

24 asks this Court to sign an order prohibiting any further action against these Presidents.

25      76.    This foundational order aims to demonstrate to Americans that no one

26 man or woman (Tim Cook, Nancy Pelosi, et al.; same goes for Republicans; or a

27 collective group) and or corporation (Apple, Google, their executives and lawyers) or

28 any other entities and or persons should ever have enough power and influence to harm

Mackintosh v. Apple, Inc. et al.

United States Presidents (from whatever party, democrat, republican, independents, patriots, tea party, etc.) by way of public persecution and vicious waves of hatred for the parties. This dangerous activity only bolsters the formation of a dictatorship and erodes the foundational principals that formed America. It's entirely unfounded and anti-American activity that only agitates the American spirit and our faith in our system of government for these threadbare pleasing political scenes before us are soon to be *overwhelmed by tempestuous waves of sedition and party rage. If momentary rays of glory break forth from the gloom, while they dazzle us with a transient and fleeting brilliancy, they at the same time admonish us to lament that the vices of government should pervert the direction and tarnish the lustre of those bright talents and exalted endowments for which the favored soils that produced them have been so justly celebrated*. ~ Federalist Papers.

77.    Plaintiff must continue to exercise his First Amendment Right under the United States Constitution, to prevent a general misfortune of mankind, and to protect his Country from such pervasive corruption. A corruption our Founding Father fought to eradicate, that can only be remedied using the Declaration of Independence set forth by our Founding Fathers to protect us against such modern day oppression and newfound corruption. To secure the *public good and private rights against the dangers* of such wealthy and corrupted subclass factions that have penetrated our legitimate government institutions, and at the same time *preserve the spirit and the form of popular government*. ~ Federalist Papers - The Utility of the Union as a Safeguard Against Domestic Faction and Insurrection by *Alexander Hamilton*. It is then *the great object* to which Plaintiff *directs his requests here and any further requests in the future*. He thus brings forth these requests that are the great *desideratum by which this form of government can be rescued from the opprobrium under which it has so long labored, and be recommended to the esteem and adoption of mankind*. ~ Federalist Papers - The Utility of the Union as a Safeguard Against Domestic Faction and Insurrection by *Alexander Hamilton*.

Mackintosh v. Apple, Inc. et al.

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

Mackintosh v. Apple, Inc. et al.

### j. Severe Sanction #10: Fraud on the American People by Government

78.     If this Court finds that government and unelected persons and or entities within these governments and or those association to government——in collusion with Apple and Google——have touched Americans private user data that caused them *de minimis* harm, injury or mental duress, this Court should sign an order sanctioning government by limiting taxes, fees, and other financial harm for the same period their user data was unconstitutionally exploited. This order aims to relieve and restore American's faith in our system and trim big government and its overreach.

### k. Severe Sanction #11: Fraud on the American People by Judges

79.     If this Court finds that any United States Federal District Judge, Appeals Judge, Supreme Court Justice or any other Public Officer in any American tribunal have erred, omitted, obstructed and or otherwise tampered with justice knowingly and or unknowingly to conceal Apple and Google's manipulation, creation and or influence over American's user data to dispense justice on fraud and deceit——that Public Officer should step down and all judges thereafter must have term limits to prevent such contentment to collude with and or aid and abet corporate digital objects and designs that reduced, continue to reduce and or threaten to reduce Americans under *absolute despotism* and or used false testimony, claims and or omissions from corporations, executives, their attorneys and law firms to cover up their frauds, the same must apply.

80.     In the event any Public Officer and or Officer of the Court have, currently are and or will potentially profit from the exploitation of American's user data, i.e. Apple stock, Google stock, Amazon stock, etc. they must disgorge all profits and ill-gains from said user data as it is equivalent to profiting from American harm.

### l. Severe Sanction #12: Fraud on the American People by Politicians

81.     If this Court finds that any United States Politician has profited and or ill-gained from American's private user data and the infringement of American Life, they must step down from public office and or have their seat filled with another American who will agree to swear under oath and pledges to never profit from

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

American's personal and private user data and or profit from their harm and injuries. All United States Politicians and Public Officers who have profited from such exploitation of rich user data belonging to Americans and their private lives, should have term limits as a severe sanction to prevent such contentment to knowingly and or unknowingly collude with and or aid and abet corporations digital objects and designs that reduce Americans under ***absolute despotism*** to make a few wealthy, powerful and tyrannical, i.e. the corrupted and or wealthy subclass factions who have penetrated legitimate government institutions to cause corporate tyranny and ill-gain.

### 3.     CONCLUSION

82.     Plaintiff believes he has adequately cited multiple fraud on the Court cases in the appendix and herein to allow any court to act swiftly (*Id.* ¶ 202). Every judge in the cited fraud on the Court cases have assessed whether litigation conduct has harmed the integrity of the judicial system in a manner that warrants a finding of fraud on the Court.

83.     They frequently reviewed facts associated with conduct by privately employed officers of the court who are dealing with disputes between private parties. In those situations, where the conduct amounts to a scheme which has done damage to our system of justice, the courts are not shy about following the Supreme Court's direction in *Hazel-Atlas* and moving forcefully to protect and restore the integrity of our legal system. Apple's fabrication of evidence and user data corruption matter, however, presents a far more significant assault on the integrity of our judicial system and human life.

84.     Not only was the misconduct shockingly egregious and pervasive, it mostly took place after Plaintiff sent Tim Cook a partnership email. It was carried about by individuals sworn to protect the public and to preserve justice – by the FBI who may have given Uber's attorneys and employees instruction to have Wang and Acebedo influence Plaintiff to raise $2 million dollars and commit a crime to create and collect user data from the activity to reduce Plaintiff and conceal Tim Cook's theft

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

Mackintosh v. Apple, Inc. et al.

of Plaintiff's user data and ideas derived therefrom. All of this organized crime using iPhone backdoor ultimately worked a colossal fraud on seven or more courts, including Congressional Courts. Those courts that have addressed fraud on the Court involving private attorneys and government actors, *United States v. Shaffer Equipment Company, 11 F.3d 450 (4th Cir. 1993)* and *Dixon,* 316 F.3d at 1046-47 for instance (*Id.* ¶¶ 60, 66, 90), have acknowledged a heightened level of sensitivity and concern when such conduct is carried out by those who are sworn to protect justice.

85.    But even if they are sworn in to protect justice, how can they protect justice if justice can be controlled by Tim Cook, Larry Page, Jeff Bezos, Apple, Google, Amazon, their army of attorneys and the other named Defendants. In fact, judges, clerks, officers of the court, jury members and others can be exploited, prior to, during and after a complaint has been filed against the named Defendants.

86.    This user data scheme and subversion method strips Americans of all liberties, justice, fair evaluations and impartiality from the courts and system of justice. There is no more guarantee that courts are independent and insulated from outside government influence, because the Defendants have created user data on these officers of the court and those around them, that can be exploited when a complaint is brought against the Defendants to tamper with the fair administration of justice and cheat in court favoring the Defendants. This is textbook corruption that can never stand in a true democracy. The only remedy is **GRANTING** Plaintiff's requests.

87.    **THEREFORE**, when in the course of human events, it becomes necessary to address a violation of the United States Declaration of Independence and Constitution that derives therefrom, it is incumbent upon this Court to join Plaintiff and exercise the full measure of its powers to safeguard the integrity of our legal system and the sanctity of American Life over all else.

88.    Plaintiff, therefore, solemnly petitions this honorable Court to restore justice by granting the relief sought and any relief this Court deems proper. And given the magnitude of this motion, a careful and meticulous evaluation is warranted and

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF,
DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

should the presiding judge find it fitting, an in-person evidentiary hearing is indispensable to present digital video evidence, digital screen captures, and digital remote screen recording evidence, so that the truth may prevail.

89. In the event the Defendants attempt to dispute the effectiveness of their fabrication of evidence after they urged it upon the court, this Court should strike it down. *Hazel-Atlas*, Id. at 250 (Id. ¶¶ 6, 62, 161, 165). For if this Court should fail to act, it would be akin to permitting the very corruption and tyranny that endeavored to impede our Founding Fathers in their sacred task of drafting, finalizing, and proclaiming to a candid world their Declaration of Independence, which has safeguarded Life, Liberty, and the Pursuit of Happiness for over two centuries.

90. **NOW PLAINTIFF SETS IN MOTION** yet another combative legal tactic to continue to combat and repress the Defendant's fraud on the Courts. To use the courts as a Utility as a Safeguard Against Domestic Technological Faction and Digital Insurrectionists. The issues presented here are far beyond exceptional ones. They are foundational ones. Plaintiff raises these foundations and novel issue for reasons that technology in all its marvelous nature must be independent from Human Life. Technology should only augment American Life, not control it. And in the event there is a continuous and exploitable connection to it, it will, in the course of events, cause Americans to act under the control and influence of a corrupted subclass faction and or corrupted government, hackers and others who control it. By those who seek to gain more power, wealth and control over American Life through the continuous and exploitable connection. This cannot stand. Thus, this petition shall be filed here and continued to be echoed and combatted in other United States tribunals against the Defendant's tyranny, oppression and fraud on the Courts until it's eradicated. And to counter such egregious and malicious fraud, and to overturn all injustices it has created, Plaintiff hereby submits this second request and prays an honorable judge signs an order **GRANTING** it. *In Pfizer Inc. v. Lord*, 456 F.2d 532 (8th Cir. 1972), the Court noted "It is important that the litigant not only actually receive justice, but that he believes that he has received justice."

61

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF,
DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

1 | Dated: July 4, 2024                    Respectfully Submitted,

2                                          ADAM JOHN MACKINTOSH (*Pro Se*)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF,
DAMAGES AND ENTRY OF FINAL DEFAULT JUDGMENT UNDER RULE 60(D)(3)

Mackintosh v. Apple, Inc. et al.

# EXHIBIT A

Case 2:24-cv-05854-RGK-RAO     Document 1     Filed 07/08/24     Page 68 of 312    Page ID
#:68
Case 3:17-cv-00939-WHA    Document 2401-1   Filed 12/15/17   Page 1 of 37

Minneapolis Office

80 South 8th Street
IDS Center, Suite 1650
Minneapolis, MN 55402

612.605.4098
612.605.4099

Chicago Office

415 North LaSalle Street
Suite 502
Chicago, IL 60654

312.222.0650
312.222.1656

# halunenlaw

EMPLOYMENT   CONSUMER   WHISTLEBLOWER

May 5, 2017

## RULE 408 CONFIDENTIAL COMMUNICATION
## FOR SETTLEMENT PURPOSES ONLY VIA EMAIL
## AND U.S. MAIL

Angela Padilla
Associate general Counsel, Litigation & employment
Angela.padilla@uber.com

     Re:   **Richard Jacobs v. Uber**

Dear Ms. Padilla:

     During our communications last week you requested that we make our client available for an interview to assess the scope of our client's allegations and the facts supporting them. I indicated to you that we did not intend to produce our client but that we would be happy to provide additional information.

     Specifically, you said that you are interested in fully investigating the conduct our client observed at Uber that he feels was illegal or improper. Even more specifically, you indicated that our client's assertions regarding destruction, spoliation and manipulation of discovery documents were of particular concern. That is because this type of conduct would be contrary to your own directives to managers and lawyers with whom you deal for purposes of litigation holds. Finally, you said that you wanted to have a clearer understanding of what happened to give rise to our client's employment-related claims.

     With this understanding of what you are seeking, we provide the information below. We begin with a brief summary of Richard Jacobs' background and expertise, followed by an overview of the organizational structure relevant to understanding his experiences. This is

1

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 69 of 312   Page ID
#:69
Case 3:17-cv-00939-WHA   Document 2401-1   Filed 12/15/17   Page 2 of 37

followed by a description of illegal conduct observed at the company or believed to be occurring. Included in this description is an identification of at least some of the civil and criminal laws believed to be violated and sufficient detail to illuminate Uber's exposure and areas needing investigation. The next section provides an overview of Jacobs' employment experience, with a focus on the disclosures he made of illegal conduct and the retaliation he experienced.

Our hope is that this information will provide the basis for addressing the illegal conduct and resolving Jacobs' claims related to his employment.

### I.   Relevant Background

### A.  Richard Jacobs

Plaintiff Richard Jacobs served as Uber's Manager of Global Intelligence from March 14, 2016, until he was unlawfully demoted on February 14, 2017, for raising objections to and refusing to participate in unlawful activity. He was constructively terminated on April 14, 2017. Jacobs primarily worked out of Uber's headquarters located at 1455 Market Street and Uber's 555 Market Street location in San Francisco, California.

After earning his Maaster of Arts degree in Latin American and Hispanic Studies at Penn, Jacobs was recruited into the Defense Intelligence Agency. There, he worked in counter-narcotics operations and studied Colombian counterdrug policy. In these early years, Jacobs spent approximately 50 percent of his time between Cartagena and Bogotá, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Shortly after the Iraq War began, Jacobs volunteered for two consecutive battlefield assignments in Iraq, supporting Special Operations Forces. During these assignments, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Recognized for excellence and his record of success, ▮▮▮▮▮▮▮▮▮▮▮▮

2

Jacobs later decided to marry, change pace, and leave the demands of government service behind. He relocated to Seattle, Washington, where he was quickly able to apply his counterterrorism expertise as a consultant to the Bill & Melinda Gates Foundation.



After two years, Jacobs was recruited to Uber Technologies for his unique mix of geopolitical and threat intelligence, overseas experience, and his ability to build and scale an intelligence program. Jacobs was struck by the incredibly talented people at the company, the unmatched level of challenges and threats they faced, and energized by the opportunity to build a holistic intelligence team, across the spectrum of threat intelligence, geopolitical analysis, and strategic insights. He would go on to build capabilities to serve a constantly growing community of interest at Uber, and deliver insights to shape engagement strategies, advise business decisions, and continually protect his colleagues and the community of riders and drivers they served in cities across the globe.

**B. Uber's Relevant Corporate Structure**

Jacobs' direct supervisor at the time of hire was Mat Henley, Uber's Director of Threat Operations (ThreatOps). Jacobs also reported to Joe Sullivan, Uber's Chief Security Officer. Jacobs additionally followed orders from Craig Clark, Uber's Legal Director for ThreatOps, who later became a direct report to Sullivan, though Clark was not a part of Jacobs' direct management chain.

This narrative describes unlawful activities within Uber's ThreatOps division, which resides at the 555 Market Street location. ThreatOps was divided into different teams, each with distinct roles. For purposes of this letter, only relevant teams are listed below:

      i.    Global Intelligence (Intel) – Responsible for intelligence analysis. This team serves Uber's physical security (PhySec) team and other Uber internal customers, primarily the city teams and regional policy, legal and management officials. The team's

product lines span protective intelligence, geopolitical analysis, market entry/launch, and strategic intelligence on regulatory issues, opposition, and competitive risks.[1]

 ii. Strategic Services Group (SSG) – Responsible for human intelligence (HUMINT) collection through Uber in-house personnel or outside vendors. This team supports the Intel, Investigations, and Marketplace Analytics teams. It also receives confidential assignments from its manager Nick Gicinto. In addition, Henley, Clark, Sullivan, and Uber's senior executives (A-team) task SSG with assignments. As described below, SSG frequently engaged in fraud and theft, and employed third-party vendors to obtain unauthorized data or information.

 iii. Investigations – Responsible for handling accusations of abuse of Uber's internal data and tools, leaks, criminal complaints, defense against aggressive competitor attacks, and other missions as assigned by Henley, Sullivan, and the Director of PhySec, Jeff Jones.

 iv. Law Enforcement Outreach – Responsible for proactively building relationships with the law enforcement community to train them on how to interact with Uber, request data related to criminal investigations, and build productive relationships with foreign and domestic markets to support Uber's requests from law enforcement.

 v. Marketplace Analytics (MA)[2] – Under its Senior Manager, Kevin Maher, MA exists expressly for the purpose of acquiring trade secrets, codebase, and competitive intelligence, including deriving key business metrics of supply, demand, and the function of applications from major ride-sharing competitors globally. Henley and Sullivan also task MA with assignments. MA grew rapidly during Jacobs' tenure, from only two original employees when Jacobs joined the company to at least ten.

 vi. Counter Intelligence -- in March 2017, ThreatOps formed a new "counter intelligence" team for the express purpose of identifying aggressive operations targeting Uber and to strike back at competitors.

Sections II through VI provide information about the illegal activity Jacobs observed.

---

[1] In mid-February, 2017, when Henley Henley demoted Jacobs and took away his team management responsibilities, Global Intelligence was merged with the Strategic Services Group. The new team is called "Strategic Intelligence."

[2] Formerly "Competitive Intelligence" or "COIN" team that has been in the press as of late.

Case 2:24-cv-05854-RGK-RAO     Document 1     Filed 07/08/24     Page 72 of 312   Page ID
#:72
Case 3:17-cv-00939-WHA    Document 2401-1    Filed 12/15/17    Page 5 of 37

## II.    Sarbanes-Oxley Violations, Evidence Spoliation, and Other Discovery Abuses

The Sarbanes-Oxley Act of 2002 states that

> whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or
> makes a false entry in any record, document, or tangible object with the intent to
> impede, obstruct, or influence the investigation or proper administration of any
> matter within the jurisdiction of any department or agency of the United States or
> any case filed under title 11, or in relation to or contemplation of any such matter
> or case, shall be fined under this title, imprisoned not more than 20 years, or both.

Sarbanes-Oxley Act of 2002, Pub. L. 107-204, § 802, 116 Stat. 745, 800 (2002). Codified at 18
U.S.C. § 1519, this provision applies to private companies and has a broad reach that is not
limited to commenced litigation. Section 1519 "covers conduct intended to impede any federal
investigation or proceeding *including one not even on the verge of commencement.*" *Yates v.
United States*, —— U.S. ——, 135 S.Ct. 1074, 1087 (2015) (emphasis added). Similarly,
California Rule of Professional Conduct 5-2320 prohibits members of the bar from suppressing
evidence that the member or the member's client has a legal obligation to produce.

Uber has knowingly violated 18 U.S.C § 1519 and continues to do so.  Craig Clark,
Uber's Legal Director for ThreatOps, and Mat Henley, Uber's Director of Threat Operations
(ThreatOps), led Uber's efforts to evade current and future discovery requests, court orders, and
government investigations in violation of state and federal law as well as ethical rules governing
the legal profession. Clark devised training and provided advice intended to impede, obstruct, or
influence the investigation of several ongoing lawsuits against Uber and in relation to or
contemplation of further matters within the jurisdiction of the United States.

Early in his tenure, Jacobs advocated for a secure and encrypted centralized database to
ensure confidentiality and recordkeeping but provide access to intelligence for ThreatOps
personnel. He presented a draft proposal to managers Henley and Clark. However, discussions
broke down immediately because they objected to preserving any intelligence that would make
preservation and legal discovery a simple process for future litigants. Clark emphasized that this
was "exactly what we don't want to do . . . create [a paper trail] that could later be discoverable."
Clark noted the errors of past collections where Uber was forced to turn over documents. He

alluded to the lessons learned from the "Ergo Investigation" and noted that encryption alone was not enough to avoid discovery. Gicinto added his own objections, stating that while his team would be willing to share some details on collections, including sources and methods of collections on the ground in foreign countries, they were not willing to preserve the raw intelligence on Uber's network.

Jacobs then became aware that Uber, primarily through Clark and Henley, had implemented a sophisticated strategy to destroy, conceal, cover up, and falsify records or documents with the intent to impede or obstruct government investigations as well as discovery obligations in pending and future litigation. Besides violating 18 U.S.C. § 1519, this conduct constitutes an ethical violation

## A. Destruction and Concealment of Records Using Ephemeral Communications

Clark and Henley helped implement and directed the almost-exclusive use of ephemeral and encrypted communications software, including WickrMe (and later Wickr SCIF), to communicate sensitive information within ThreatOps. Wickr Inc. is a San Francisco-based company that describes its product as a "communications platform designed to empower greater control over data security... [using] multilayers of peer-to-peer encryption."[3] Henley and Clark implemented this program of ephemeral and encrypted communications for the express purpose of destroying evidence of illegal or unethical practices to avoid discovery in actual or potential litigation. The Wickr application uses robust encryption which prevents the information from being viewed by anyone except the intended recipient, but more importantly, programs messages to self-destruct in a matter of seconds to no longer than six days. Consequently, Uber employees cannot be compelled to produce records of their chat conversations because no record is retained. Such a policy is inherently violative of the Sarbanes-Oxley Act, 18 U.S.C. section 1519, and similar laws.

Further, Clark and Henley directly instructed Jacobs to conceal documents in violation of Sarbanes-Oxley by attempting to "shroud" them with attorney-client privilege or work product protections. Clark taught the ThreatOps team that if they marked communications as "draft," asked for a legal opinion at the beginning of an email, and simply wrote "attorney-client

---

[3] See https://www.wickr.com/security.

privilege" on documents, they would be immune from discovery. What Clark failed to teach the team, however, is that there is no attorney-client privilege, no "seal of secrecy," if the communications were made for the purpose of enabling the commission of a crime or fraud. *U.S. v. Zolin* 491 U.S. 554, 563(1989); *see also* Cal. Evid. Code § 956. For example, Clark enabled illegal activities and gave legal advice designed to impede investigations by directing the hacking of the ████████████████████████████████, and by directing the destruction of evidence related to eavesdropping against opposition groups in ████████, as discussed below. Given the ongoing criminal and fraudulent activities within Uber, the crime-fraud exception to privilege applies, and all of Clark's communications in furtherance of these schemes would be fair game in discovery. His attempt to pre-emptively conceal them under attorney-client privilege is illegal, unethical, and improper.

### B. Concealment and Destruction of Records Using Non-attributable Hardware

Clark, Gicinto, and Henley acquired "non-attributable" hardware and software with which SSG and select members of ThreatOps planned and executed intelligence collection operations. Specifically, Henley and members of the MA team use computers not directly purchased by Uber that operate only on MiFi devices—so that the internet traffic would not appear to originate from an Uber network—virtual public networks (VPNs), and a distributed and non-attributable architecture of contracted Amazon Web Services (AWS) server space to conduct competitive-intelligence collections against other ride-sharing companies.

Likewise, Gicinto and the SSG team had similar non-attributable devices purchased through vendors and sub-vendors where they conducted virtual operations impersonating protesters, Uber partner-drivers, and taxi operators. SSG used the devices to store raw information collected by their operatives from politicians, regulators, law enforcement, taxi organizations, and labor unions in, at a minimum, the U.S., ████████████████████ ████████████████████████████████████████████████████

By storing this data on non-attributable devices, Uber believed it would avoid detection and never be subject to legal discovery. This is because a standard preservation of evidence order typically focused on Uber work laptops, Uber networks, and Uber mobile devices. Non-attributable devices were deemed as not reasonably subsumed by any such preservation order

7

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 75 of 312    Page ID
#:75
Case 3:17-cv-00939-WHA    Document 2401-1    Filed 12/15/17    Page 8 of 37

and the team could, and did, "legally" (not so) dispose of any evidence or documentation held on these devices in the intervening period before knowledge of the devices' existence could be uncovered. Likewise, members of the ThreatOps team, notably Matt Henley, were known to use personal computers to conduct substantial Uber-related work for the purpose of evading discovery.

## C. Concealment, Cover-up, and Falsification of Records through the Abuse of Attorney-Client Privilege Designations

Clark developed training on how to use attorney-client privilege to further conceal activities described in any non-ephemeral communication channel. Specifically, he developed a training using innocuous legal examples and the "lawyer dog" meme to produce a slide deck that taught the ThreatOps team how to utilize attorney-client privilege to impede discovery.

While the presentation slides themselves did not depict or explain any unethical or illegal practices involving attorney-client privilege, Plaintiff observed Clark's presentation first-hand. During the presentation, Clark verbally coached the participants on how to use attorney-client privilege to ensure sensitive intelligence collection activities would not surface in litigation. Clark also answered specific questions from employees on the minimum standards required to claim privilege for the purpose of shielding information. This "legal training" was particularly noteworthy because it surprisingly bears no Uber-branding; it does not even mention Uber, which is startling in a company with strong branding and adherence to process.

Clark said that Uber needed to "shroud these work products in attorney-client privilege." Accordingly, Clark instructed Jacobs himself and others to address all emails on sensitive intelligence collection to him and ensure the emails were marked as "ATTORNEY-CLIENT PRIVILEGED AND CONFIDENTIAL," to mark any work product as "DRAFT" regardless of its actual status, and, on every communication, to specifically ask a question or request legal advice on some issue—even if no legal advice was needed or warranted. Likewise, he advised that Jacobs and others that they should communicate almost exclusively via phone, video teleconference ("Zoom"), or via the Wickr app, in that order of preference based on the record and audit trail each communications medium creates. Clark explained that the intent was to

prevent disclosure of such communications if Jacobs was ever put on legal hold or his communications were ever subject to a preservation of evidence order.

In reality, Jacobs observed that many communications camouflaged as privileged merely contained a pro forma request for Clark's legal advice, even though no legal advice or direction was actually being solicited. For example, between December 14 and 16, 2016, while Uber CEO Travis Kalanick was travelling in ███, SSG collected information from a WhatsApp group "penetration."[4] They learned ███████████████████████████████████████

███████████████████████████████████████████████████

███████████. Jacobs was the only person present with Clark at 555 Market Street, San Francisco, at the time, and he asked Clark if he could share the information directly with Kalanick's protection team in ███. Clark snapped and said to write "double-secret A/C Priv" on the document. Jacobs complied and the information was relayed to Kalanick and other Uber executives in ███. In the end, ███████████████████████████████████

████████████████████ but Clark's directions plainly demonstrate abuse of privilege.

* * * *

In sum, Uber has directly violated the document destruction, concealment, cover-up, and falsifications provisions of Sarbanes-Oxley in an effort to obstruct or impede active and future government investigations through the (1) acquisition and use of ephemeral communications programs; (2) the acquisition and use of non-attributable hardware and software; and (3) the wholesale abuse of attorney-client privilege designations.

Clark and Henley's directives described above specifically implicate ongoing discovery disputes, such as those in Uber's litigation with Waymo. Specifically, Jacobs recalls that Jake Nocon, Nick Gicinto, and Ed Russo went to Pittsburgh, Pennsylvania to educate Uber's Autonomous Vehicle Group on using the above practices with the specific intent of preventing Uber's unlawful schemes from seeing the light of day. Jacobs' observations cast doubt on Uber's representation in court proceedings that no documents evidencing wrongdoing can be found *on Uber's systems* and that other communications are actually shielded by the attorney-client privilege. Aarian Marshall, *Judge in Waymo Dispute Lets Uber's Self-driving Program Live—for*

---

[4] Penetration means unauthorized access, typically through impersonation of a partner-driver or taxi operator.

*Now*, wired.com (May 3, 2017 at 8:47 p.m.) ("Lawyers for Waymo also said Uber had blocked the release of 3,500 documents related to the acquisition of Otto on the grounds that they contain privileged information. . . . Waymo also can't quite pin down whether Uber employees saw the stolen documents or if those documents moved anywhere beyond the computer Levandowski allegedly used to steal them. (Uber lawyers say extensive searches of their company's system for anything connected to the secrets comes up nil.)"), *available at* https://www.wired.com/2017/05/judge-waymo-dispute-lets-ubers-self-driving-program-live-now/.

## III.    Illegal Intelligence Gathering

Uber has engaged, and continues to engage, in illegal intelligence gathering on a global scale. This conduct violates multiple laws, including some that are extra-territorial in scope.

### A.    Theft of Trade Secrets

The Economic Espionage Act of 1996, as amended by the 2016 Defend Trade Secrets Act, makes it unlawful to misappropriate and steal trade secrets. Defend Trade Secrets Act, Pub. L. 114-153, § 2(b)(1), 130 Stat. 376 (2016). This statute is extra-territorial in scope. "Trade secrets" under the Economic Espionage Act, as amended, is broadly defined and includes "all forms and types of financial, business, . . . technical, economic, or engineering information, including patterns, plans, compilations, methods, techniques, processes, procedures, programs, or codes," if the owner (1) has taken reasonable measures to keep such information secret and (2) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information. "Misappropriation" includes but is not limited to "the acquisition of a trade secret by a person who knows or has reason to know that the trade secret was acquired by improper means." It also includes the disclosure or use of a trade secret of another without express or implied consent by a person who (1) had used improper means to acquire knowledge of the trade secret or (2) had reason to know that the knowledge of the trade secret was derived from a person who had used improper means to acquire the trade secret or from a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret. "Improper means" includes "theft, bribery, *misrepresentation, breach or inducement of a duty to*

*maintain secrecy*, or espionage through electronic or other means." These definitions hew closely to other trade secrets laws, including the California Uniform Trade Secrets Act. Cal. Civ. Code § 3426, *et seq.*

The theft of trade secrets is also a criminal violation under federal law. 18 U.S.C. § 1832. One is criminally liable if, among other things, one (1) steals, or *without authorization appropriates*, takes, carries away, or conceals, *or by fraud, artifice, or deception obtains a trade secret*; (2) without authorization *copies, duplicates, downloads* or uploads a trade secret; or (3) *attempts or conspires with one or more persons to commit engage in such conduct*. Like the Uniform Trade Secret Act, the California Uniform Trade Secrets Act prohibits "misappropriation" of trade secrets and provides certain remedies. In addition, California law also allows for criminal penalties for stealing trade secrets. Cal. Civ. Code § 3426, *et seq*; Cal. Penal Code §§ 499c, 502.

Section 3 of the Defend Trade Secrets Act also amended section 1961 under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–68. The amendment added economic espionage and, particularly pertinent here, theft of trade secrets to the list of predicate offenses that may be considered "racketeering activity" under RICO. Defend Trade Secrets Act, Pub. L. 114-153, § 3(b), 130 Stat. 382 (2016); *see* 18 U.S.C. § 1961(1). RICO applies extraterritorially where the underlying predicate statute is itself extraterritorial. *RJR Nabisco, Inc. v. European Community*, 130 S. Ct. 2090, 2103 (2016). The intracorporate conspiracy doctrine, which holds that a corporation cannot conspire with its own officers while the officers are acting in their official capacity, does not apply to section 1962(c) of RICO. *Cedrick Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 166 (2001) (holding that an employee who conducts his corporation's affairs through illegal acts comes within section 1962(c)'s terms forbidding any "person" to unlawfully conduct an "enterprise"). In any event, it is clear that Uber has conspired with multiple other business entities to participate in a pattern of racketeering activity at home and abroad. *See* 18 U.S.C. § 1962(d).

California prohibits "unlawful, unfair, or fraudulent business acts and practices." California Bus. & Prof. Code § 17200, *et seq*. Uber has violated, and continues to violate, Code § 17200 through its unlawful attainment of trade secrets, and additional unlawful conscribed throughout this letter.

11

Uber's Marketplace Analytics (MA) team, exists expressly for the purpose of acquiring trade secrets, codebase, and competitive intelligence–including deriving key business metrics of supply, demand, and the function of applications–from major ridesharing competitors globally.

Jacobs is aware that the MA team fraudulently impersonates riders and drivers on competitor platforms, hacks into competitor networks, and conducts unlawful wiretapping (each tactic discussed in additional detail below). These tactics are used to obtain trade secrets about:

- the function of competitor's apps;
- vulnerabilities in the app, including performance and function;
- vulnerabilities in app security;
- supply data, including unique driver information;
- pricing structures and incentives.

These tactics were employed clandestinely through a distributed architecture of anonymous servers, telecommunications architecture, and non-attributable hardware and software. This setup allows the MA team to make millions of data calls against competitor and government servers without causing a signature that would alert competitors to the theft. For instance, a sophisticated competitor ▮▮▮▮ would set thresholds when they see devices attempting to request rides by the hundreds or thousands in a short period of time. However, if the data calls are diversified across what appear to be multiple devices and a broader time period, filters would not detect the anomaly.

In the summer of 2016, SSG specifically hired Ed Russo to further develop its intelligence program. Russo is a retired government employee Uber identified as having language skills and cultural insights that would be be effective at gathering intelligence for Uber in the ▮▮▮▮ region. His official title was Senior Risk and Threat Analyst, but he was actively engage in HUMINT and identifying market penetration opportunities for Uber in ▮▮ ▮▮▮▮▮▮▮ specifically. Part of his role was to enable competitive intelligence and the theft of trade secrets by recruiting sources within competitor organizations. He vetted insiders, and identified those who were willing to provide Uber with competitive trade secrets. Jacobs is aware that Uber used the MA team to steal trade secrets at least from Waymo in the

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 80 of 312   Page ID
#:80
Case 3:17-cv-00939-WHA   Document 2401-1   Filed 12/15/17   Page 13 of 37

U.S., ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓

*Waymo*

Shortly after the Otto "acquisition," Ed Russo presented a "fictionalized" account of SSG's recent contributions to Uber employees, including Jacobs. He asked his audience to consider a situation in which the CEO of a large company sought to acquire a smaller startup with industry-changing technology in the large company's field. Russo boasted that SSG, using ex-CIA field operatives skilled in counter-surveillance, could ensure the secrecy of meetings between the companies' CEOs for months before any acquisition was announced or finalized. Given the timing of this presentation, immediately following Otto's acquisition, when Jacobs and others heard Russo's so-called fictionalized account, they assumed Russo was alluding to the actual events surrounding the Otto acquisition.

Of course, by the time of its acquisition, Otto was just eight months old. Nevertheless, Uber acquired this eight-month-old company at an estimated cost of $680 million. Then, as stated above, shortly after the acquisition and just three weeks before the rollout of Uber's Autonomous Vehicle Group in Pittsburgh, Russo, Gicinto, and Nocon travelled to Pittsburgh and educated the team on using ephemeral communications, non-attributable devices, and false attorney-client privilege designations with the specific intent of preventing the discovery of devices, documents, and communications in anticipated litigation. These facts corroborate Google's legal theory in pending litigation that Otto was simply a shell company whose sole purpose was to dissemble Uber's conspiracy to steal Waymo's intellectual property.

▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, Uber worked to unlawfully obtain trade secrets from ▓▓▓. MA 1) remotely accessed confidential ▓▓▓ corporate communications and data, 2) impersonated riders and drivers on ▓▓▓ platform to derive key functions of ▓▓▓ rider and driver apps, 3) stole supply data by identifying possible drivers to boost Uber's market position, and 4) acquired codebase which allowed MA to identify code used by ▓▓▓ to understand in greater detail how ▓▓▓ app functioned.

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 81 of 312    Page ID
#:81
Case 3:17-cv-00939-WHA    Document 2401-1    Filed 12/15/17    Page 14 of 37

By credibly impersonating both riders and drivers, the MA team could request thousands of rides in a given geographic area to study the responsiveness and capability of ▇▇▇ app, price quotes, and disposition of available drivers. MA further impersonated prospective customers to ascertain the identity of drivers through their names, license plate numbers, and make/model of their vehicles. Uber then used this information to recruit competitors to Uber's platform. MA also obtained key technical details about how ▇▇▇ would troubleshoot issues in comparison to Uber, and then used that data to develop contingencies to slow or impede ▇▇▇ business operations.

Not only was Uber able to obtain ▇▇▇ trade secrets, but used the data it obtained to inflate the ultimate valuation of Uber ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Travis Kalanick explained in a company all-hands meeting that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, a value that was inflated by data Uber had unlawfully obtained through the tactics described above.

▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇ became the next logical target of MA and SSG activities after the ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. MA again employed tactics to obtain ▇▇▇ trade secrets, with a focus on stealing key supply data to boost Uber's pool of drivers, the function of the app and its vulnerabilities, and then used that data to develop an aggressive "counter intelligence" campaign to slow ▇▇▇ efforts.

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Upon arrival, Jacobs delivered the envelope to MA's Senior Manager, Kevin Maher, and subsequently learned that SIM cards within the envelope would be used to collect intelligence on ▇▇▇ trade secrets. The use of SIM cards ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇

Case 2:24-cv-05854-RGK-RAO   Document 1   Filed 07/08/24   Page 82 of 312   Page ID
#:82
Case 3:17-cv-00939-WHA   Document 2401-1   Filed 12/15/17   Page 15 of 37

Specifically, the SIM cards were used to fraudulently impersonate customers on ▮▮▮▮ rider and driver applications. By credibly impersonating riders and drivers, the MA team could: (i) develop processes to conduct thousands of data calls to reverse engineer products; (ii) identify and recruit supply (i.e. partner drivers); (iii) and derive key competitive business metrics to understand subsidies, available supply, processes for managing surge, and competitive market position. For instance, MA would be able to study key technical details of how ▮▮▮ had engineered solutions to common problems ride-sharing providers have at scale, and in the context of dense population centers like ▮▮▮▮. Uber would then use that data to identify possible improvements, gain competitive advantages, or exploit weaknesses of ▮▮▮ platform.

One tactic used by Uber to obtain trade secrets was by capturing "virtual walk-ins"—a term for a source who contacts an organization through the Internet to volunteer insider information and is prepared to provide Uber with trade secrets. On at least one occasion in fall 2016, Ed Russo vetted a purported virtual walk-in with information regarding ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ maintains an active HUMINT source in ▮▮▮ senior leadership team. Here, SSG vetted the virtual walk-in source by sending the intelligence collected to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮. To date, Jacobs is aware Uber still benefits from at least one well-place HUMINT source with access to ▮▮▮ executives and their collective knowledge of ▮▮▮ on-going business practices.

▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ has been the MA and SSG focus in ▮▮▮▮▮▮ over the past six months. Notably, the MA team identified a vulnerability in ▮▮▮▮▮▮ and collected comprehensive supply data, including the license, name, and contact information for every single ▮▮▮ driver around October/November 2016. Similarly, MA targeted not only the supply data from ▮▮▮, but also key business metrics, business strategy information and basic functionality of ▮▮▮▮ and security of their data. Targeting this trade secret data was all aimed to gain unfair advantage for Uber.

▮▮▮▮ ▮▮▮▮—a senior software engineer on the MA team—delivered these collections directly to Kalanick. In November 2016, ▮▮▮ continued his competitive

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 83 of 312   Page ID
#:83
Case 3:17-cv-00939-WHA    Document 2401-1    Filed 12/15/17    Page 16 of 37



intelligence activities on the ground against the ▮▮▮▮▮▮▮▮. Like a "scalp" collected, the MA team proudly has a ▮▮▮▮▮ nailed to the wall in their workplace to signify their successful theft of ▮▮▮▮ trade secrets.

▮▮▮▮▮▮▮▮ proposed that if Uber headquarters could hack the database and collect all driver information, it would have a perfect set of possible drivers for Uber's platform and could boost supply by targeting these operators and convert them to drivers for Uber.

Wanting to keep Uber's unlawful tactics under the radar, Clark directed Jacobs to get the initial information over to ▮▮▮▮ and the MA team, but not to inform Uber's ▮▮▮▮▮▮▮▮ team that Uber had an in-house team of engineers capable of conducting this type of work. After initial investigation, ▮▮▮▮ advised that the database in question requires users to individually enter the license plate number of a known taxi-driver and enter a Captcha,[6] to access the driver's record. ▮▮▮▮ explained that he could program a dispersed architecture of non-attributable servers to conduct the data calls over a period of weeks and extract the information without the website's administrators realizing that Uber had extracted the entire dataset. He was given the "green light" to proceed with his plan.

The data calls needed to be distributed over a network of computers unaffiliated with Uber. It would take approximately four million calls for data to cover the full spectrum of possible ▮▮▮▮▮▮ taxi-license variations. ▮▮▮▮ also explained that he would need to write or purchase a code to defeat the Captcha on this particular website. Within a few days, ▮▮▮▮ had overcome these hurdles and began running the program.

Within approximately two months, Uber had successfully obtained ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ trade secrets with the complete download of its driver database by

---

[5] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[6] A program or system intended to distinguish human from machine input.

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 84 of 312   Page ID
#:84
Case 3:17-cv-00939-WHA    Document 2401-1    Filed 12/15/17    Page 17 of 37

███. It contained approximately 35,000 taxi driver records. The database was built into a dashboard to be provided to the ███████ team, but was not immediately delivered. Uber learned of ongoing legal trouble at its ███████ location and concerns about an unexpected visitor (UEV) event—a term describing situations when local authorities might raid an office or show up unexpectedly to request data or seize media—that could expose the hack to government authorities. Consequently, ██████ maintained control of the data stolen from the ███████ taxi website.

### B. Impersonation

As discussed above, Uber used driver and customer impersonation to steal competitor trade secrets. This conduct not only violated the trade secrets law discussed above but also wire fraud law at 18 U.S.C § 1343, and California Penal Code § 528.5. Under this section, it is unlawful to knowingly and without consent, credibly impersonate another actual person through the Internet or email, in order to harm, intimidate, threaten, or defraud someone. This conduct further exposes a company to civil liability under Section 528.5(e). This impersonation was intended to fraudulently steal business and was an "unlawful, unfair, or fraudulent business act[] and practice[]." California Bus. & Prof. Code § 1720. It is also in violation of the CFAA and related laws, discussed below in § C.

Along with the theft of trade secrets, Jacobs observed SSG personnel, through their LAT[7] operatives and their vendors, knowingly impersonate actual people over the Internet in order to to keep tabs on competitors and opposition groups by accessing closed social media groups. This impersonation had the purpose of fraudulently stealing business and gaining a competitive advantage.

During the summer of 2016, Jacobs learned that city teams in other locations impersonated partner-drivers or taxi operators to gain access to private WhatsApp group messaging channels. Jacobs further investigated this conduct by searching Uber's internal

---

[7] LAT operatives are CIA-trained case officers fielded by Gicinto. They are capable of collecting foreign intelligence in priority locations for Uber. They are commercially covered, deeply back-stopped business persons with established reasons to travel to high priority locations important to Uber on little notice. They conduct business meetings, but collect intelligence for Uber on the side. Around early-to-mid 2016, they quickly became Uber's stable of non-official cover operatives. These independent contractors were given the meaningless acronym "LAT" to protect discussions about this resource and poke fun at Tal Global, a former vendor who provided intelligence collection support to Uber. LATs were seen as the opposite of Tal, who Uber had discontinued working with due to their low quality work.

network, TeamDot. He discovered a playbook created for the ▮▮▮▮▮▮▮
operations team on how to infiltrate such closed social media groups. Jacobs immediately
advised Clark of the documentation, removed the document from TeamDot, and admonished the
city team not to conduct such activities.

In late October 2016, in a regularly-scheduled Sync (one-on-one) meeting with Clark
and Gicinto, Jacobs once again raised concerns about the legality and ethics of using
impersonation tactics to gather the data that Uber was utilizing to monitor private groups. In one
instance, SSG had begun using a vendor and LAT operative in ▮▮▮. This individual was tasked
with penetrating opposition groups, and collecting information about local political figures and
parties, including virtual penetrations in WhatsApp. Jacobs reported that infiltrating WhatsApp
groups was unlawful and would get Uber kicked out of ▮▮▮. His concerns were ignored.

In another instance, in early January 2017, Jacobs received an email from ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This playbook was a guide to
combatting regulatory and enforcement activities slowing Uber's operations in ▮▮▮. The
presentation—which was shared across ▮▮▮▮▮▮▮▮▮▮▮▮ operations teams—was
intended to capitalize on the lessons learned in ▮▮▮ and share practices across the region.

The PowerPoint presentation included a section on "intel gathering," a slide on driver
chat group infiltration, and a link to the specific procedures for infiltrating driver-partner chat
groups (including the impersonation of actual driver-partners) to collect information on growing
discontent and possible opposition activities. Upon receipt, Jacobs disclosed the playbook to
Clark, who replied, "Do I want to know what it is?" Jacobs voiced concern as to its legality,
noting that it encouraged "intel gathering" and described how to penetrate WhatsApp groups.
Clark only replied that "this is happening everywhere and I'm not ready to deal with it." Clark
did not investigate the presumed criminal violation.

In late January and early February 2017, as part of SSG's virtual operations capability
(VOC), SSG brought in ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮ by posing as a sympathetic protestor interested in participating in actions
against Uber. By doing this, ▮▮▮ illegally gained access to closed Facebook groups and
chatted with protesters to attempt to understand their nonpublic plans and intentions.

18

To the last point, in mid- March 2017, Jacobs learned through members of his former team that Henley leveraged ███████████████████████████████ to access and investigate closed or private Facebook protest groups in ████████ to understand who might protest against Uber ███████████████████████████████. This access represents at least a violation of Facebook privacy standards and unethical ████████████ ██████████.

## C.  Unlawful Surveillance

### 1.   Illegal Wiretapping under California Law

During his employment, Jacobs observed conduct that violated the California Penal Code Section 631 and Section 632. Section 632 prevents a person or entity from intentionally using any kind of machine or instrument to tap into or make an unauthorized connection into a telephone line. It also disallows willfully reading or trying to read the contents of any message that has passed over a wire, unless there is permission from all parties to the message. It bars the use, attempted use, or communication of any information gained in this way. And lastly, it makes it illegal to aid or conspire to do any of the above. The California Penal Code Section 632 makes it illegal to intentionally, without the consent of all parties to the communication, use a device to amplify or record a conversation.

Uber's surveillance and collections operations against ████ executives, discussed below, also apparently violate the federal Wiretap Act. 18 U.S.C. § 2510 *et seq.* Sections 2510 and 2511 prohibits the interception, attempted interception, and use of oral communications—those communications uttered by a person having a reasonable expectation of privacy in the communication.

Over a two-to-three week period beginning early June 2016, Henley, Gicinto, and Sullivan coordinated multiple surveillance and collections operations against ███████████ ████████████████████████. This included recording of mobile phone video and/or photography during private events in ██████████████████████.

To do this, multiple surveillance teams infiltrated private-event spaces at hotel and conference facilities that the group of ████ executives used during their stay. In at least one instance, the LAT operatives deployed against these targets were able to record and observe

Case 2:24-cv-05854-RGK-RAO     Document 1     Filed 07/08/24     Page 87 of 312   Page ID
#:87
Case 3:17-cv-00939-WHA   Document 2401-1   Filed 12/15/17   Page 20 of 37

private conversations among the executives—including their real time reactions to a press story that Uber would receive $3.4 billion dollars in funding from the Saudi government. Importantly, these collection tactics were tasked directly by Sullivan on behalf of Uber's CEO, Travis Kalanick. Upon information and belief, these two Uber executives, along with other members of Uber's executive team, received live intelligence updates (including photographs and video) from Gicinto while they were present in the "War Room" ████████████████████████████████.

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████        ████████████
████████████████████████. As proof or perhaps to gloat about the surveillance, Gicinto later showed Jacobs pictures and screen captures from the unlawfully recorded content.

As a part of this surveillance, Gicinto asked Jacobs to develop targeting packages on ████████ leaders to improve SSG efforts to collect intelligence on these figures and work to develop a mole or internal source of information among the ████ leadership team. Jacobs had concerns over the legality of this assignment and ultimately chose not to respond to the request. Instead, he began developing his own strategy for intelligence gathering that did not involve tactics which Jacobs believed to be illegal.

Additionally, Uber violated California Penal Code Section 632, and likely the federal Wiretap Act, by improperly recording ████████████████ call following allegations of sexual harassment by a former Uber employee. Uber did not tell the participants that the call was being recorded and accordingly had not received permission from the call participants to record it, as required by California law. This was a particularly egregious violation given the sensitive subject of the call and the stated objective to hold anonymous and candid Listening Sessions. Not only did Uber unlawfully record the call, but the Investigations team, ████████████████████ ████████, used the recording, along with other egregious and purposeful violations of personal privacy to identify a ██████████████████████████████. This employee subsequently separated from Uber.

### 2. Illegal Hacking in violation of Computer Fraud and Abuse Act

The Computer Fraud and Abuse Act (CFAA) outlaws accessing certain computers or computer systems without authorization or in excess of authorization, with the intent to defraud. 18 U.S.C. §1030(a)(4), (e)(2) says:

> (a) Whoever ... (4) knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period ... shall be punished as provided in subsection (c) of this section.... (e) As used in this section ... (2) the term 'protected computer' means a computer – (B) which is used in or affecting interstate or *foreign commerce or communication, including a computer located outside the United States* that is used in a manner that affects interstate or *foreign commerce* or communication of the United States. (Emphasis added.)

Accordingly, the CFAA has extraterritorial reach.

California Penal Code Section 502 bars similar behavior. Part 1 makes it illegal to knowingly access and without permission, alter or use any data or computer system or network, to devise or carry out a plan to defraud, deceive, or extort, or to wrongfully control or obtain money, property, or data. Part 2 makes it illegal to knowingly access and without permission, take or use data from a computer or network, or take any supporting documentation, whether internal or external to a computer or network. Part 3 makes it illegal to knowingly and without permission use computer services or cause them to be used. Part 5 makes it illegal to cause a disruption in service to an authorized user. Part 6 makes it illegal to knowingly and without permission help someone else access a computer in a manner that violates this law. And Part 7 makes it illegal to knowingly and without permission access or cause to be accessed any computer, computer system, or computer network.

As discussed above, Jacobs was aware of many instances where computer hacking tactics were deployed to obtain trade secrets and to infiltrate closed social media groups. Two specific

Case 2:24-cv-05854-RGK-RAO   Document 1   Filed 07/08/24   Page 89 of 312   Page ID
#:89
Case 3:17-cv-00939-WHA   Document 2401-1   Filed 12/15/17   Page 22 of 37

instances are reiterated here to illustrate how the conduct violates the laws discussed in this section.

███████████████████

████████████████████████████████████████

████████████████████████████████. Uber's intent in accessing this protected computer database was to lure these drivers away to work for Uber instead. As noted above, the database was protected by "Captcha" to prevent the sort of automated downloading that Uber's MA team intended to carry out. MA was ultimately successful in hacking the system and obtaining the driver database. Because Uber knowingly accessed a protected computer in order to fraudulently capture its valuable contents to gain a competitive advantage, the hack violates the CFAA, as well as California Penal Code Section 502.

████

████████████████████████████████████████

██████████████████████████████████. As noted above, Uber used SIM cards █████████████████████████████████████████████████
██████████████████. The SIM cards allowed Uber to hack into the ███████
████████████. Through Uber's hack it was able to learn how ████ system operated, steal ideas, exploit any identifiable weaknesses and identify drivers in order to recruit them to Uber.

### 3. Unlawful Phone Toll Analysis

At the beginning of July, 2016, SSG, with the support of Clark and the planning of Gicinto, began mobile-phone collections in ████████████████. One of Gicinto's LATs had a "new technical capability" to conduct collections of mobile-phone call records and mobile-phone link analysis on opposition figures, politicians, and government regulators in ████
████. To do this, the LAT operative collected mobile-phone metadata either directly through signal-intercept equipment, hacked mobile devices, or through the mobile network itself. The information eventually shared with Jacobs and others included call logs, with time and date of communications, communicants' phone numbers, call durations, and the identification of the mobile phone subscribers. The subsequent link-analysis of this metadata occurred on U.S. soil

and revealed previously unknown, non-public relationships between Uber opposition figures, politicians, and regulators with unfavorable views on Uber and the ride-sharing industry.

At the beginning of September, 2016, Jacobs met with Gicinto and Clark and raised the issue of mobile phone collections in ▉▉. Specifically, Jacobs challenged Gicinto and Clark on the legality of SSG's intelligence collections, citing the mobile phone collections that occurred in ▉▉ as a prime example. Clark discounted Jacobs' concerns, claiming that ▉▉ laws are different. Certainly, such activities were not lawful and violated at least the CFAA.

## VI.   Other Likely Illegal Conduct

During the course of Jacobs' employment he observed Uber engage in targeted business practices aimed at gaining the support of government officials in foreign countries. Many of these efforts involved similar surveillance conduct to that discussed above and likely involve violations of foreign government civil and criminal laws. Its conduct further exposed Uber personnel to personal and professional harm.

### A. Espionage

▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

Specifically, the LAT operative collected details on ▉▉, including: information on these firms' connections to political and regulatory officials, their data sharing agreement and connection to the ▉▉▉▉▉, their efforts to replace Uber in ▉▉ ▉▉▉▉▉, and their investments in the taxi sector in ▉▉. These facts demonstrate that vendors, directed by Uber employees, conducted foreign espionage against a sovereign nation despite Jacobs's objections.

▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 91 of 312   Page ID
#:91
Case 3:17-cv-00939-WHA   Document 2401-1   Filed 12/15/17   Page 24 of 37

██████████████████████████████████████████████████████ . SSG wanted
to determine which political figures may have been supporting opposition groups in the
taxi/transport sector, and those who had issued orders to the ████████████ to begin targeting
Uber vehicles for harassment and impoundment.

The intelligence collected identified the political connections of each person or group and
detailed the size of their stake in the taxi ████████████████████████████████████████
████████ . Information on their government connections provided insight into whom among the
group might have the political clout and motivation to direct aggressive enforcement activity
against Uber, and who might be compelled to end costly enforcement activities or partner with
Uber to unblock the market and open up the supply of partner-drivers out of shared financial
incentive.

████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████ was trying to gather threat intelligence on
taxi groups, unions, and agitators harassing Uber partner-drivers in the area. To do this, ████ used
undercover agents to collect intelligence against the taxi groups and local political figures. The
agents took rides in local taxis, loitered around locations where taxi drivers congregated, and
leveraged a local network of contacts with connections to police and regulatory authorities.

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████ . SSG had collected intelligence on opposition groups in ████████

████████████████████████████████████████████████████

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 92 of 312   Page ID
#:92
Case 3:17-cv-00939-WHA    Document 2401-1    Filed 12/15/17    Page 25 of 37



to attempt to verify threats from taxi union officials against ████████████████████
████, and to investigate arson attacks on Uber partner-driver vehicles.

SSG then tasked a LAT operative, with an active intelligence source network in ████████
████, to begin HUMINT collections on opposition groups, taxi union officials, and government
leaders. The goal was to determine the plans and intentions of union groups, the veracity of
physical threats to Uber employees, the identification of political leaders who were pushing an
anti-Uber agenda, and what political leaders may be persuaded to stop any opposition. SSG used
these collections as an opportunity to introduce their LAT virtual operations capacity.

That is, a U.S. based LAT operative impersonated a taxi driver who was sympathetic to
Uber opposition in ████████████, established bona fides with the administrator of a private
WhatsApp chat group administered by ██████████████████████████████████, and was
eventually admitted into the group, through which the LAT could monitor private
communications to identify persons involved in Uber opposition, as well as their plans and
intentions.

Moreover, between August and November 2016, SSG tasked a LAT operative to collect
intelligence on ████████ government officials to determine if a senior political official would
be willing to push a ride-sharing agenda through the city or national government. Similarly,
between October 2016 and January 2017, ████████ or one of the LAT operatives he managed,
maintained access from the U.S. to closed and private ████████ taxi groups and
communications channels. This access meant SSG had screenshots of communications, and
could interact with drivers through chat. These collections identified the names of taxi operators
most adamantly opposed to Uber's operations, included pictures of these individuals, and
provided warning of possible incidents and protests.

Worse yet, in January 2017, ████████████████████████████████████ contacted
Jacobs on Wickr and advised they "had a bug in a meeting with transport regulators," and that
they "needed help cleaning up the audio." Jacobs immediately contacted  Clark and informed
him of the unlawful request. Clark instructed Jacobs to tell the city team that Uber did not have
the technical capabilities to assist, encourage them not to transmit the audio, and convince them
to "make it go away."  Clark did not investigate the presumed criminal violation.

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 93 of 312   Page ID
#:93
Case 3:17-cv-00939-WHA   Document 2401-1   Filed 12/15/17   Page 26 of 37

## B.  FCPA – 15 U.S.C § 78dd-2

The Foreign Corrupt Practices Act (FCPA) prohibits an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to any foreign official, or to any person, while knowing that all or a portion of such money or thing of value will be offered, given, or promised, directly or indirectly, to any foreign official for the purposes of influencing any act or decision, or to use their influence affect any act or decision of a foreign government.

During the course of his employment, Jacobs heard about the practice of bribing foreign government officials. Based on his knowledge of targeting foreign officials to identify those with influential power, and the rapid insights into new markets without longer-term HUMINT development he observed in several occasions, Jacobs reasonably believed that bribery of foreign officials was taking place. Specifically, he believed this conduct to be going on in multiple areas including ███████████████████████████████████████████████████████

███████████████████████████████. Jacobs believes that violations of the FCPA took place and would likely be shown through discoverable evidence. Jacobs was aware that Uber was targeting government officials in order to learn:

> •    who might be compelled to end costly enforcement activities or partner with Uber to unblock the market;
>
> •    what  local network of contacts has connections to police and regulatory authorities;
>
> •    what political leaders may be persuaded to stop any opposition; and
>
> •    if senior political officials would be willing to push a ride-sharing agenda through the city or national government.

Additionally, Jacobs is aware of Uber paying foreign third party vendors inflated wages, the excess of which could be used to purchase information. With this information in mind, we anticipate that discovery will confirm Jacobs' reasonable beliefs bribes were being offered to government officials to benefit Uber.

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 94 of 312  Page ID
#:94
Case 3:17-cv-00939-WHA    Document 2401-1    Filed 12/15/17    Page 27 of 37

VII.    **Jacobs' Employment Experiences and Uber's Retaliation Against Him**

A.  **Jacobs Is Quickly Introduced to ThreatOps' Disturbing Corporate Culture but Sets a Positive and Successful Course for Global Intelligence**

Two or three days after he was hired as Uber's Manager of Global Intelligence, Jacobs was called into an unscheduled meeting with



Jacobs declined to participate, artificially chalking up his reticence to being new and not understanding the limits of what was appropriate to pursue. This introduction to Uber's corporate culture within ThreatOps was disturbing to Jacobs.

Nonetheless, Jacobs proceeded to lead the team for which he was responsible, Global Intelligence, in a manner that caused it to grow from a small narrow focus to a much more sophisticated, developed and organized team that effectively worked towards its team goals and provided substantial support to ThreatOps. He was respected by his reports and peers and did not receive any critiques or warnings from any of his managers – until it became clear to Uber that he would not participate in Uber's ongoing illegal schemes.

B.  **Jacobs Discloses and Objects to Illegal Conduct in the Summer of 2016**

Through the first three months of Jacobs' tenure, he had worked to develop his own intelligence program to distance the intelligence analysis function from SSG's illegal intelligence

collections. Jacobs' program was inherently safer than SSG's HUMINT collection mechanisms, because it would employ only reputable, overt, and long-standing vendors. In contract, SSG's growing HUMINT collection capabilities needlessly exposed Uber and its employees to severe risk—including the likely termination of Uber's operations and possible imprisonment of its employees—should capable security services in many overseas locations discover Uber's espionage.

To that end, Intel was developing in ways where it could work with city teams and regional leadership, flesh out intelligence requirements and attempt to resolve these requirements with open source research, or other overt vendor services, limiting the need to use SSG resources. Similar or better results were obtained through enhanced social media analysis, web scraping, improved vendor services in the area of network analysis and geopolitical analysis, and consulting services. Over time, Intel could develop professional networks to benchmark, get ground-truth and produce all-source intelligence analysis without resorting to covert HUMINT collections. This suite of tools and services would lower Uber's overall spend, expedite the delivery of insights, and eliminate risk. Despite these compelling arguments, Jacobs was rebutted at every step and ordered to make use of SSG resources.

On June 15, 2016, Jacobs held a meeting with Henley, Clark, and Kieu Lam—at the time Jacobs' supporting project manager—in San Francisco while Gicinto attended via Zoom. The purpose of the meeting was to discuss the establishment of a central intelligence database to preserve information, intelligence, research, and finished reports. Jacobs emphasized that a central repository of information would enable Uber's analysts to quickly familiarize themselves with previous work done where Uber operates. Jacobs thus advocated for a secure and encrypted database to ensure confidentiality and presented a draft proposal to the group. Discussions broke down immediately as the group objected to preserving any intelligence that would make preservation and legal discovery a simple process for future litigants. Clark emphasized that this was "exactly what we don't want to do . . . create [a paper trail] that could later be discoverable." Clark highlighted the errors of past collections where Uber was forced to turn over documents. He alluded to the lessons learned from the "Ergo Investigation" and noted that encryption alone was not enough to avoid discovery. Gicinto added his own objections, stating that while his team would be willing to share some details on collections, including sources and methods of

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 96 of 312   Page ID
#:96
Case 3:17-cv-00939-WHA    Document 2401-1    Filed 12/15/17    Page 29 of 37

collections on the ground in foreign countries, they were not willing to preserve the raw intelligence on Uber's network.

Jacobs then objected and proffered that if what Uber was doing was actually legal, there should be no problem having a central database so long as unauthorized personnel cannot inadvertently access it. However, the other meeting participants were firm in their objections, remained fixed on using HUMINT collection mechanisms, and repeatedly emphasized the requirement for Intel and SSG to work together. Jacobs' idea was effectively gutted. On June 16, 2016, Gicinto, Lam, and Jacobs met to review requirements for the intelligence database in light of the previous day's discussion. Jacobs again raised objections to engaging in activities that were deemed too confidential to document in any way, and noted that without preservation of the raw intelligence there was no need for an intelligence database.

As described above, June of 2016 was also the time when Henley, Gicinto and Sullivan coordinated multiple illegal surveillance and collections operations against ████████████ ████████████████. As proof of his prowess or perhaps to gloat about the surveillance, Gicinto later showed Jacobs pictures and screen captures from the unlawfully recorded content. When Gicinto asked Jacobs to develop targeting packages on ████ leaders, Jacobs expressed concerns over the legality of this assignment, delayed any response, and ultimately ignored the request.

On June 29, 2016, Jacobs and Pooja Ashok, Sullivan's Chief-of-Staff, had a one-on-one meeting where Jacobs presented his intelligence program strategy, which used ethical, legal, open-source methods. Jacobs' goals were to diversify intelligence vendors, reduce risk and expense by using publicly-available information sources instead of covert intelligence collection, and working threats proactively to provide long-range forecasting instead of tactical responses to existing threats.

Per Henley's instructions, Jacobs' presentation included a slide with blocks representing the different sources of information the Intel team used to conduct analysis. The blocks, which were color-coded from white to black representing overt to covert collection, respectively, depicted two blocks where no specific vendor or capability was named. One represented LAT collections and the other represented mobile phone collections. Ashok asked, "Why do we have vendors we can't even put on a slide deck?" Jacobs used the question as an opening to raise

objections about Gicinto's recent surveillance and collection against ███████████
███. Ashok appeared to share those concerns. She asked Jacobs if the ███ collections were
worth the risk, and if they accomplished anything more than "addressing the paranoia of
executives." Jacobs replied that it was just paranoia and "we should not be doing it."

On July 5, 2016, emboldened by his earlier discussions with Ashok, Jacobs raised
objections regarding unethical and unlawful intelligence collections and further described his
outlook for the Intel team to Henley. Jacobs described the changes he would make and how
evolution would take Uber into proactive and strategic work that could be handled internally, and
would eliminate the need to outsource collections through SSG.

For example, Jacobs explained that his approach would enable Intel to conduct due
diligence on potential fleet partners to identify reputable companies who already had
constructive relationships with local authorities in foreign countries. This was a way to boost
Uber supply in foreign countries, rather than stealing supply data virtually or through HUMINT
collections targeting politicians and business persons to identify a similar set of candidate firms.
Additionally, Jacobs described how his team could conduct "influencer mapping," to describe for
the business how decisions are made in a local context, who truly holds power over the
regulatory and enforcement activities affecting Uber, and how Uber should target its engagement
strategy for the best long-term success for business growth. This was a legitimate way for Uber
to find out who controlled foreign markets and who Uber should negotiate with, instead of
getting information through unlawful collection methods.

Discounting Jacobs' approach, Henley only emphasized, "You need to continue working
with Nick [Gicinto] as one team." Jacobs heard this response as telling him not to resist Gicinto's
illegal methods of collecting information.

## C. Jacobs Discloses and Objects to Illegal Phone Collections and Other Illegal Conduct in the Fall of 2016

On September 1, 2016, Jacobs held a Sync (one-on-one) with Gicinto and  Clark and
raised the issue of mobile phone collections in ████. Jacobs had earlier become aware of this
conduct and believed it was critical to eliminate or at least limit the Intel team's involvement
with anything related to those types of illegal data collections. Specifically, Jacobs questioned
the legality of collecting intelligence necessary for the analysis, which targeted ███████

politicians, regulators, and taxi union officials. Clark offered the excuse that "the laws are different in ████" Discounting Jacobs' concerns, Gicinto suggested that while he and the LAT operatives had conducted espionage in their previous careers they were "all Boy Scouts now."

After raising objections to the legality of these practices, Jacobs was not privy to additional collections of this type. But Clark initiated a weekly one-on-one meeting with Jacobs to "align on legal questions." Jacobs understood this to be a reaction to him questioning the ethics and legality of Uber's practices, and an effort by Clark to ensure he had an adequate pulse on Jacobs' concerns with the work Clark was attempting to keep hidden.

In their first such meeting, Jacobs reiterated the risk of continuing these types of intelligence collections. He further voiced concern with the technical collections as described in ████████ as well as identical collections undertaken in ████████ against opposition figures and government officials. Clark used the discussion as an opportunity to emphasize the security practices he had developed, specifically around the need to communicate via phone, Zoom or Wickr, and ostensibly abuse attorney-client privilege to protect those practices from disclosure.

On October 27, 2016, in a regularly-scheduled Sync meeting with Clark and Gicinto, Jacobs once again raised concerns about the legality and ethics of the intelligence collection tactics being employed by Uber in ████, as discussed above, specifically, using impersonations to infiltrate private groups. Both Gicinto and Clark responded as they always had, dismissed his concerns, and defended their actions.

### D. Jacobs Discloses and Objects to Illegal Conduct in Early 2017

The new year did not yield a new and more legal approach to the work of ThreatOps. Its teams continued to engage in illegal conduct and Jacobs continued to try to steer the boat another way. In January 2017, Jacobs informed Clark, as discussed above, that a ████████ team member had illegally bugged a meeting. Clark did nothing.

In early January 2017, Jacobs became aware of the ████████ discussed above and reported it to Clark. Although it promoted illegal intel gathering Clark dismissed Jacobs' concern and did nothing about it.

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 99 of 312   Page ID
#:99
Case 3:17-cv-00939-WHA   Document 2401-1   Filed 12/15/17   Page 32 of 37

During a March 8, 2017, meeting between Jacobs and Gicinto, Jacobs questioned the hiring of two additional people who were allocated to the newly-formed Strategic Intelligence team, discussed below. Gicinto said the two positions were intended to support Uber's Autonomous Technology Group ("ATG"), but because of the recent lawsuit by Waymo against Uber, Strategic Intelligence would keep them off the ATG books while litigation was ongoing. Gicinto, working with both Clark and Henley, said this would enable Uber's competitive intelligence efforts to remain hidden and protected from discovery or any legal proceedings. Jacobs understood this to be yet another effort to obscure the actual structure and function of ThreatOps from possible litigation, given that the existence of a team designed to steal competitor data (MA), and human-intelligence experts (SSG) engaging in theft and fraud to access unauthorized data, would be detrimental to any pending litigation.

### E. Uber Retaliates

On January 19, 2017, during the monthly ThreatOps Leads meeting, Henley publically embarrassed Jacobs by divulging negative feedback (a "B" or one of Jacobs' "Bottom" qualities needing improvement) intended for Jacobs' performance review. Referencing Jacobs' upcoming review, Henley stated, "[Jacobs] hasn't heard this yet, but when I get feedback that there are missteps between ThreatOps and PhySec and we need to improve process, I know we need to work on our communications across security."

To downplay the inappropriateness of Henley's disclosure of this confidential information, Jacobs asked facetiously, "I'm going to assume that's an excerpt of one of my T's (a term used to describe a "Top" quality or favorable attribute of an individual)?" The other leaders at the meeting had no reason to know about Jacobs' performance review, and he experienced the disclosure as retaliation for Jacobs' disclosing of and resistance to engaging in illegal conduct.

On February 14, 2017, Henley and Jacobs met to discuss Jacobs' performance review. He received a rating of Zone 2, which is below meeting expectations. This was a complete shock for Jacobs because nothing negative about his performance had been communicated to him prior to that day. Henley's main criticisms revolved around what he called the "gap" between Intel and SSG. He criticized Jacobs for not working enough with SSG and shielding his team from SSG. Henley cited meetings with customers and stakeholders in ████████████████████

██████, where Intel did not involve SSG personnel or resources, as a sign of the "gap" which could not continue. Moreover, although Clark was not in Jacobs' direct management chain, he was present at the meeting and was quoted multiple times in the performance review. Henley claimed that Jacobs was not working with legal enough and needed to further "protect information from discovery." Finally, Henley said that Jacobs focused too much on the Threat Map, despite giving Jacobs direction to make this a priority for the last two months of 2016.

Then Henley abruptly demoted Jacobs. He ordered that going forward, all of Jacobs' employees would report directly to Gicinto, who would have direct responsibility for both SSG and Intel, in a claimed realignment of the organization. The new team was named "Strategic Intelligence." Henley then suggested that Jacobs should be removed from management entirely, but left that ultimate decision to Jacobs and Gicinto to work out.

Jacobs expressed that he was "floored" by the negative review and that it was a "gut punch." He repeatedly questioned Henley about why he had not received any previous negative feedback, as it would have been in everyone's interest to give him an opportunity to correct any perceived deficiencies. Further, it would have kept Jacobs' career on-track. Henley's only response was that he shouldn't have to tell Jacobs how he was doing and that the events themselves should have provided that information to him.

Jacobs experienced this review and demotion as pure retaliation for his refusal to buy into the ThreatOps culture of achieving business goals through illegal conduct even though equally aggressive legal means were available to achieve the same end. Jacobs had repeatedly disclosed and objected to this illegal conduct to his supervisors and others with the authority to investigate, discover, or correct the violations of law at issue, but nothing changed. He resisted requests to engage in illegal conduct and directed his team to avoid utilizing SSG whenever possible to protect them from professional and personal harm. Jacobs proposed alternative methods of intelligence collection that were legal and effective. He repeatedly disclosed to Henley, Clark, and Gicinto that SSG's and MA's collection methods were unethical, illegal, costly, time-consuming, and risky to the company's personnel and reputation. Their primary response—work more closely with Gicinto and his SSG team. In other words, Uber would allow no "gap" between Jacobs and ThreatOps' illegal conduct, and when Jacobs resisted, he was punished.

At the end of Jacobs' performance review meeting, Henley had said he was open to a follow-up session to discuss options for Jacobs. That said, Henley subsequently cancelled two separate meetings to further discuss Jacobs' performance, without explanation. It was thus left to Gicinto's to determine what Jacobs' new role would be, if any.

The following day on February 15, 2017, Gicinto met with Jacobs to discuss the organizational changes. Jacobs asked Gicinto—in this meeting and two subsequent meetings—why Henley and Sullivan felt this change was needed, what the objectives of the change were, and what exactly Uber was trying to remedy. Gicinto replied that he was not told the purpose behind the organizational change. Likewise, Jacobs attempted to discuss what his new role would be at the company. Gicinto said that was between Jacobs and Henley. Jacobs explained that Henley told him the exact opposite, and that he and Gicinto were supposed to work out his new responsibilities.

Within about three days, Jacobs received a Wickr message from Gicinto explaining that he had spoken with Henley and still did not have any clarity on what Jacobs' role should be. Further, he did not know what the objectives of the newly-formed "Strategic Intelligence" team were, but that for the "foreseeable future everyone will be reporting to me."

On February 16, 2017, Henley emailed Jacobs regarding how to best notify Jacobs' team of the structural changes. Henley stressed that he "supported" Jacobs and did not want to "step on [Jacobs'] message." Jacobs did his best to remain positive and supportive, stating that he wanted to "cause as little disruption for the team as possible." However, Jacobs said that he could not deliver a message to his former team without first knowing the details of his new role. Henley replied that the main decision was whether Jacobs would be okay with his role as a non-manager and stated: "If you're not wanting that role, we should talk about what's next whether that's looking for other opportunities within Security, Uber, or elsewhere." Jacobs replied that he would accept a new role if it gave him the "opportunity to excel and is messaged in a way that enables [him] to be effective." Henley never replied.

Contrary to his previous representations, Henley announced the changes to ThreatOps without any input from Jacobs. On February 27, 2017, during a ThreatOps all-hands meeting with at least 30 attendees, Henley explained the new organizational structure. He highlighted that "[Jacobs] takes the hit here seeing the color of his bubble change," effectively making it clear to

34

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 102 of 312   Page
ID #:102
Case 3:17-cv-00939-WHA   Document 2401-1   Filed 12/15/17   Page 35 of 37

all present that Jacobs was being demoted and sending a message about the consequences of resisting ThreatOps' corporate culture.

On March 8, 2017, Jacobs and Gicinto had a one-on-one meeting where Jacobs described a possible future role for himself since maintaining his management role was not an option. Jacobs first detailed this possible role and his objections in email. In an email that day, Jacobs wrote, "Hi Nick, I've been thinking about a job description for my role in Strategic Intelligence, and would like to discuss during our 1:1 today, time permitting. My preference is to remain the global intel manager and evolve the program to align with the new objectives Joe has for our team, in partnership with you. Understanding that may not be allowable, below is an outline of where I can contribute as an IC (individual contributor)." Jacobs proposed a job description followed with a newly-proposed title of Manager, Strategic Analysis. Gicinto and Henley consulted with HR and later explained that the title would not be acceptable. Instead, they assigned Jacobs the title of Senior Analyst for Strategic Intelligence.

Demoted, effectively ostracized, and unable to continue working Jacobs sent his constructive termination letter to Uber on April 14, 2017. You have seen the letter. Directed to members of Uber's A-team, it details various instances of unlawful conduct and pleads for constructive change at the company. Since his termination, Jacobs has learned that, rather than conduct a legitimate investigation, CEO Travis Kalanick informed several of the implicated parties about Jacobs' claims prior to any legitimate investigation. This is largely the reason that Jacobs does not feel Uber has acted in good faith, and why he does not wish to sit down for a formal interview.

Jacobs' demotion and constructive discharge violated California Labor Code section 1102.5, which prohibits retaliation when an employee discloses or opposes information that he reasonably believes violates state or federal statute, or local, state, or federal rules or regulations. *See* Cal. Labor Code § 1102.5. Based on the laws identified above and the conduct he observed, Jacobs had reasonable cause to believe he was disclosing and opposing violations of law in every instance described above. In fact, the activities he disclosed and opposed as illegal were actual violations of law, so his reasonable belief was also true.

Jacobs' protected activities individually and collectively constituted a substantial motivating factor in Uber's decision to take adverse employment actions against him, ultimately causing his constructive termination.

This is also a case where punitive damages are appropriate and will be sought. We do not hesitate in believing that clear and convincing evidence will show that Uber's treatment of Jacobs subjected him to oppression and malice.

## F. Impact of Retaliation on Jacobs

Jacobs had high expectations of himself and believed he was making substantial contributions to Uber, even though the conflicts regarding illegal activity created significant stress in his life. His demotion and construction termination brutally undercut the objective evidence of his success in developing the Global Intelligence team, causing emotional distress and serious reputational harm that are ongoing.

Jacobs is also experiencing economic damages, including lost wages and benefits, limited job growth and future earnings potential based on the stark and cruel demotion from directing a successful team to individual contributor.

Jacobs' base salary was $130,000. His initial equity grant was 4,098 restricted stock units ("RSUs"), of which one quarter would vest on Jacobs' anniversary and then 1/36 per month until he was fully vested at four years. At the time of Jacobs' hire, Uber explained to him that the value of those RSUs was $48 per unit, or $196,704, bringing Jacobs' annual compensation to $179,176 assuming full vesting and no further equity grants.

In addition, Jacobs was eligible for an annual performance bonus. In his offer letter, the bonus was described as up to $270,000 for the highest performers. That value would again be given in equity. However, based on feedback from his colleagues, Jacobs believes that, for 2017, the highest bonus available to employees performing at "Zone 6" is $360,000. Furthermore, Uber's Senior Recruiting Lead Andrew Cesarz told Jacobs at the time of his hire that the "top tier bonus paid in 2015 at your level is now worth $1,000,000."

Certainly, the compensation was one reason why Jacobs accepted the position at Uber, ultimately to his detriment. Instead of receiving anything remotely amounting to the above, Jacobs' annual bonus after his demotion was $12,000, which was paid 20% cash and 80% RSUs

vested over 36 months. Effectively, he only received $2,400 in cash and one bonus equity vesting of 7 RSUs after completing his thirteenth month at Uber.

The demotion in title also affects Jacobs' earning potential and competitiveness in applying for other positions. In addition to the public humiliation he experienced, Jacobs remains out of work and has been unsuccessful in attaining comparable future employment

### VI. Next Steps

This letter was prepared to respond to your request for more detailed information about the illegal conduct Jacobs observed during his employment and the retaliation he experienced at Uber. While long, this letter does provide what we believe is useful information that will allow Uber to investigate Jacobs' allegations.

In his termination letter Jacobs wrote: "While working conditions have become intolerable for me, my hope with this letter is to effect useful change within the company culture, end these illegal practices, and assure reassignment of my former team to work under better leadership." He offers the information in this letter with the same hope and purpose.

Once you have discussed this communication with your client, please let us know how Uber would like to proceed.

Very truly yours,

HALUNEN LAW

Clayton D. Halunen

CDH/cam

37

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

UBER00326369

# Appendix

ADAM JOHN MACKINTOSH (*Pro Se*)
PO BOX 475363
San Francisco, California 94147

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| ADAM JOHN MACKINTOSH, | Case Name: Mackintosh v. Apple, Inc. et al. |
| Plaintiff, | Case Number: |
| *v.* | |
| APPLE, INC. et al., | |
| Defendants. | **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF A RULE 60(d)(3) MOTION** |

i

## TABLE OF CONTENTS                                    Page

TABLE OF AUTHORITIES ........................................................................ v

I.      INTRODUCTORY ALLEGATIONS AND RICO SCHEMES THAT
        FORMED THE DEFENDANTS BUSINESS ARRANGEMENT .................... 1

II.     PARTIES AND NON-PARTY WITNESSES TO THIS 60(d)(3) MOTION ... 24

        1.   The Apple Company Enterprise .................................................. 24
        2.   The Uber Company Enterprise.................................................... 24
        3.   The Counsel Enterprise .............................................................. 26
        4.   The Lobbying, Public Relation,
             Media, Political, and Judicial Enterprises................................. 27

III.    The Integrity of the Judicial Process is Most Severely Damaged
        When Government Actors Defraud the Court.................................... 35

        A.   Because they Represent the Sovereign, Government Attorneys, Judges,
             Clerks and other Officers of the Court Are Held to a Higher Standard.. 35

IV.     FRAUD ON THE COURT SUMMARY................................................. 38
V.      MAJORITY STANDARD: Harm to the Integrity of the Judicial Process ......... 39
VI.     MINORITY STANDARD: Perjury and Non-Disclosure .................... 41
VII.    THE DEFENDANTS ALLEGED FRAUD ON THE COURT ......................... 42
VIII.   WHAT PLAINTIFF MUST PROVE TO SEEK RELIEF UNDER
        RULE 60(D)(3) ............................................................................ 43

        B.   The Test for Fraud on the Court
             within the Meaning of Rule 60(d)(3)......................................... 43

        C.   Examples of Litigation Misconduct which have been Held to
             Constitute Fraud on the Court.................................................... 46

             1.   Hazel-Atlas Glass Company v. Hartford-Empire Company ....... 47
             2.   United States v. Shaffer Equipment Company ........................... 50
             3.   Pumphrey v. K.W. Thompson Tool Company........................... 53
             4.   In re Levander ........................................................................ 57
             5.   Derzack v. County of Allegheny, Pennsylvania ....................... 58
             6.   Pacific Packaging Products, Inc. v. Barenboim, et al. ............... 60
             7.   Fraud upon the Court may arise from a Course of Conduct........ 62

        D.   A Motion or Action for Fraud on the Court is Not Precluded
             by Passage of Time and may be Filed Anytime Fraud is
             Perpetrated on the Court............................................................ 64

ii

IX.      LEGAL ANALYSIS ........................................................................... 67

         E.      Apple, Tim Cook, Bruce Sewell, Travis Kalanick, Uber and the other
                 Defendants Have Allegedly Perpetrated a Fraud Upon the United
                 States Senate and Congressional Courts, including various Ninth Circuit
                 District Courts and the Ninth Circuit Court of Appeals to Conceal the
                 Cyber-Surveillance, Sherlocking, Targeting and other Schemes. ..............67

X.       PROCEDURAL HISTORY & FACTUAL BACKGROUND OF EACH
         SEPARATE INSTANCE OF MISCONDUCT BY THE DEFENDANTS,
         AND CORRUPT GOVERNMENT ACTORS, WHO ARE ALL OFFICERS
         OF THE COURT, CONSTITUTE FRAUD ON THE COURT. ...................... 68

         F.      Background Facts Relevant to the Defendants Alleged
                 Fraud on the Court .................................................................................. 69

                 1.     Tim Cook Allegedly Conspired with Apple's Attorneys to Conceal
                        Apple's Cyber-Surveillance Methods by Corrupting a United States
                        District Court in the Eastern District of New York and a Central
                        District Court of California .................................................................69

                 2.     Apple and Former FBI Director James Comey Devise a Baseless and
                        Sham Hearing aimed at Defrauding Congress and the American
                        People to the Conceal Cyber-Surveillance ..........................................75

                 3.     The Defendants Devise and Execute a Fraudulent
                        Media Blitz to Conceal the Cyber-Surveillance ......................................77

                 4.     Apple Hires Jonathan Zdziarski to Manipulate, Falsify and Delete
                        Cyber-Surveillance Files that Revealed Apple's iPhone Backdoor ...81

                 5.     Tampering with Witnesses, Violating Court Orders, Withholding
                        Documents, and Making False Statements to Obstruct Judicial
                        Proceedings........................................................................................ 84

                 6.     Tim Cook, Apple and each DOE Defendant used Apple's
                        Offensive Cyber-Surveillance to Locate and Delete the "Apple
                        Cyber-Surveillance Files" from Twitter During The Waymo Case .. 92

                 7.     Apple, Cook and others hire Latham Watkins, LLP to
                        Obstruct Adversarial Proceedings to Conceal their Emerging
                        Misconduct and Use of Cyber-Surveillance ..................................... 94

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

8.   Tim Cook's Alleged Perjury, Fraud On Congress, and Acts that Furthered the Concealment Scheme ........................................... 98

9.   Apple, Cook and their Counsel Launched *ad hominem* Attacks at Plaintiff, Fabricated Cyber-Surveillance Evidence, Obfuscated the Record, and Perjured Multiple Legal Briefs to Conceal the Cyber-Surveillance and Other Illegal Acts ..................................... 101

10.   A Ninth Circuit Judge Cashed in on Apple Stock and sent a Notification Letter to Joseph R. Biden After Obstructing Plaintiff's Rule 60(b) Motion ............................................................. 131

11.   Fraud on the Court by a Federal Judge ........................................... 144

12.   A Potential Abuse of Congressional-like Power under the APA.... 154

13.   The Defendants Continue Their Interstate Fraud upon the Court Scheme ................................................................................................ 163

XI.   **MULTIPLE INSTANCES OF MISCONDUCT BY OFFICERS OF THE COURT COLLECTIVELY CONSTITUTES FRAUD ON THE COURT AND FRAUD UPON THE CIRCUIT** ............................................... 168

XII.   **THE DEFENDANTS CORRUPTED THE FIVE PILLARS OF JUSTICE.. 174**

**I.   JUDICIAL POWER** ..................................................................................... 174

**II. THE FIVE PILLARS OF JUSTICE** ............................................................. 174

1.   **Accountability**,
2.   **Ethical Probity**,
3.   **Accessibility**,
4.   **Efficiency**,
5.   **Discipline** .................................................................................... 174

XIII.   **PLAINTIFF HAS SUFFERED SUBSTANTIAL DAMAGES AS A RESULT OF THE DEFENDANTS CONSPIRACY, AND ENFORCEMENT OF A CORRUPT JUDGMENT, ORDERS AND MANDATE WOULD ONLY DEEPEN THE HARM** .......................... 176

XIV.   **CONSTITUTIONAL ARGUMENT** ................................................................. 179

A.   **PLAINTIFF INVOKES HIS RIGHTS UNDER THE DECLARATION OF INDEPEDENCE TO GRANT HIM INSTANT INJUNCTIVE RELIEF** ............................................. 179

XV.   **CONCLUSION & RELIEF SOUGHT** ................................................................. 186

## TABLE OF AUTHORITIES

**Page**

### CASES

*Alexander v. Robertson,*
   882 F.2d 421, 424 (9th Cir. 1989) ............................................................ 44

*American Association of Naturopathic Physicians v. Hayhurst,*
   227 F.3d 1104, 1106 (9th Cir. 2000)....................................................... 103

*Anderson v. Cryovac, Inc.,*
   862 F.2d 910, 924 n.10 (1st Cir. 1988) ................................................... 153

*Aoude v. Mobile Oil Corp.,*
   892 F.2d, 1115, 1118, (1st Cir. 1989) ................................................ passim

*Aoude v. Mobil Oil Corp.,*
   892 F.2d 1115, 1119 (1st Cir. 1989) .................................................. passim

*Automated Medical Labs., Inc.,*
   770 F.2d at 407 (citing *Old Monastery Co. v. United States,*
   147 F.2d 905, 908 (4th Cir. 1945)) ........................................................... 8

*Bauer v. Bauer,*
   944 N.E.2d 578 (2011), No. 22A05-1003-DR-191 ................................... 129

*Bell Atlantic Corp. v. Twombly,*
   127 S. Ct. 1955, 1964-65 (2007) ........................................................... 117

*Berger,*
   295 U.S. at 88...................................................................... 35, 125, 127

*Brand Energy & Infrastructure Servs. v. Irex Contr. Grp,*
   2017 at *27-28 (E.D. Pa. Mar. 23, 2017) ............................................... 128

*Bridge v. Phoenix Bond & Indem. Co.,*
   553 U.S. 639, 647 (2008).................................................................... 165

*Brockton Sav. Bank v. Peat., Marwick, Mitchell & Co.,*
   771 F.2d 5, 11-12 (1st Cir.1985) ............................................................ 66

*Buck,*
   281 F.3d at 1341-42........................................................................40, 131

*Bulloch v. United States,*
   763 F.2d 1115, 1121 (10th Cir. 1985)...................................................35, 142

*Burlington Indus., Inc. v. Ellerth,*
   524 U.S. 742, 756 (1998)....................................................................... 8

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 111 of 312    Page
ID #:111
Case 9:23-cv-80316-AMC   Document 4-1   Entered on FLSD Docket 03/02/2023   Page 6 of 203

## TABLE OF AUTHORITIES                    Page

**CASES**                         (continued)

*Caudle v. Thomason,*
   942 F. Supp. 635, 638 (D.D.C. 1996) .......................................................... 117

*Chambers,*
   501 U.S. 32............................................................................. 43, 52, 133

*Chambers v. NASCO, Inc.,*
   501 U.S. 32, 44 (1991) .................................................................... 43

*Chevron v. Danziger, et al.,*
   S.D.N.Y., 1:11-cv-00691 ............................................................. 148, 166

*Clipper Exxpress v. Rocky Mtn. Motor Tariff Bur., Inc.,*
   690 F.2d 1240, 1261 (9th Cir. 1982).................................................... 158

*Cohens v. Virginia,*
   19 U.S. (6 Wheat) 264, 404, 5 L.Ed 257 (1821) ............................................. 51

*Cone v. Harris,*
   Case Nos. 12288, (Okl. 1924), 230 P. 721, 723...................................... 54, 142

*Cooper v. Aaron,*
   358 U.S. 1, 78 S.Ct 1401 (1958) ......................................................... 51

*Davis v. Mutual Life Ins. Co. of New York,*
   6 F.3d 367, 378-80 (6th Cir. 1993) ..................................................... 8

*Del Puerto Water Dist. v. U.S. Bur. of Reclamation,*
   706 So. 2d 43, 47 (Fla. 5th DCA 1998)................................................ 22

*Derzack v. Cnty. of Allegheny Children & Youth Servs.,*
   118 F.3d 1575 (3d Cir. 1997) ...................................................... passim

*Derzack v. Cnty. of Allegheny, Pa.,*
   173 F.R.D. 400, 416 (W.D. Pa. 1996)................................................ passim

*Diaz v. Methodist Hosp.,*
   46 F.3d 492, 497 (5th Cir. 1995) .................................................. 152

*Diaz v. Home Depot USA, Inc.,*
   196 So. 3d 504, 505 (Fla. 3d DCA 2016) ....................................... 46, 145, 149

*Dixon,*
   316 F.3d at 1046................................................................... passim

**TABLE OF AUTHORITIES**                              Page

**CASES**                    (continued)

*Dixon,*
    316 F.3d at 1046-1047 ................................................................ passim

*Dixon v. C.I.R.,*
    316 F.3d 1041, 1046 (9th Cir. 2003) ............................................ passim

*E.g., Ty Inc. v. Softbelly's Inc.,*
    353 F.3d 528, 536-37 (7th Cir. 2003) ............................................. 153

*Elvig v. Calvin Presbyterian Church,*
    375 F.3d 951, 954 (9th Cir. 2004) .................................................. 102

*England,*
    281 F.2d at 309 ............................................................................... 45

*England v. Doyle,*
    281 F.2d 304, 310 (9th Cir. 1960) ............................................. 40, 44

*Erickson v. Neb. Mach. Co.,*
    WL 4089849, at *1 n.1 (N.D. Cal. Jul. 6, 2015) ........................... 11

*Epic Games v. Apple, Inc.,*
    case in the Ninth Circuit Appeals 21-16506 .................................. 28

*Eppes v. Snowden,*
    656 F. Supp. 1267, 1279 (E.D. Ky. 1986) ..................................... 66

*Gould,*
    220 F.3d at 178 ............................................................................ 117

*Green v. Foley,*
    856 F.2d 660, 665 (4th Cir. 1988) ............................................... 152

*Hasty v. Carpenter,*
    276 S.E.2d 513 (1981) citing *Acceptance Corp. v. Samuels,*
    11 N.C.App 504, 181 S.E.2d 794 (1971) ..................................... 103

*Hazel-Atlas,*
    322 U.S. at 240-241 ............................................................ throughout

*Hazel-Atlas,*
    322 U.S. at 241 ............................................................................... 47

*Hazel-Atlas,*
    322 U.S. at 242 & 245 ............................................................. passim

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO   Document 1   Filed 07/08/24   Page 113 of 312   Page
ID #:113
Case 9:23-cv-80316-AMC   Document 4-1   Entered on FLSD Docket 03/02/2023   Page 8 of 203

## TABLE OF AUTHORITIES   Page

**CASES**                    (continued)

*Hazel-Atlas,*
   322 U.S. at 246-247 ............................................................................... passim

*Hazel-Atlas,*
   322 U.S. at 250.................................................................................49, 171

*Hazel-Atlas,*
   322 U.S. at 253............................................................................... 48

*Hazel-Atlas Glass Co.* v. *Hartford-Empire Co.,*
   322 U.S. 238, 244 (1944)............................................................... 44

*Independent Oil and Chemical Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co.,*
   864 F.2d 927, 929 (1st Cir. 1988) ............................................... 118

*Intermagnetics,*
   926 F.2d at 917 ............................................................................. passim

*Islamic Shura Council of S. Cal. v. F.B.I.,*
   779 F. Supp. 2d 1114, 1125 (C.D. Cal. 2011)....................145, 160

*Hazel-Atlas,*
   322 U.S. at 264.................................................................................45, 166

*In re Intermagnetics Am., Inc.,*
   926 F.2d 912, 916 (9th Cir. 1991) ...............................................44, 132

*In re Cardwell,*
   No. 09-43121, 2017 WL 2304220, at 5-6 (Bankr. E.D. Tex. May 25, 2017).........41, 125

*In re Clinton Street Foods Corp.,*
   254 B.R. 523 (Bankr. S.D.N.Y. 2000) ...........................41, 54, 116, 125

*In re Levander,*
   180 F.3d 1114, 1118-19 (9th Cir. 1999)....................................... passim

*In re Napster, Inc. Copyright Litig.,*
   479 F.3d 1078, 1097 (9th Cir. 2007)........................................... 143

*In Pumphrey,*
   1128, 1130 ..................................................................................... passim

*In re Pretrial Proceedings in Antibiotic Antitrust Actions,*
   538 F.2d 180, 195 (8th Cir.1978) ................................................ 64

## TABLE OF AUTHORITIES                                                Page

**CASES**                                    (continued)

In re Sawyer,
    124 U.S. 200 (1888) ..................................................................................... 51

*Julius J. Harang et al. v. Uber Technologies, Inc. et al.,*
    Northern District of Illinois Eastern Division case number 1:17-cv-08500 ................. 94

*Julius J. Harang et al. v. Uber Technologies, Inc. et al.,*
    Central District Court of California case number 2:18-cv-02998-PSG-GJS ............... 94

*Kann v. United States,*
    323 U.S. 88, 94 (1944)) ............................................................................... 165

*Kornblum v. Schneider,*
    609 So.2d 138, 139 (Fla. 4th DCA 1992) ............................................. 74, 85, 98

*Leber-Krebs, Inc. v. Capitol Records,*
    779 F.2d 895, 899-900 (2nd Cir. 1985) ........................................................... 41

*Living Designs, Inc. v. El Dupont de Nemours and Co.,*
    431 F.3d 353, Court of Appeals (9th Cir. 2005) ........................................ 63, 133

*Longshoremen's Ass'n v. NLRB,*
    735 F.2d 1384, 1395 (D.C. Cir.1984) ............................................................... 8

*McMunn,*
    191 F. Supp 2d at 445 .......................................................................... 46, 147

*Oki Semiconductor Co. v. Wells Fargo Bank,*
    298 F.3d 768, 775-76 (9th Cir. 2002) ............................................................... 8

*Pacific Packaging Products, Inc. v. Barenboim, et al.,*
    case number MICV2009-04320-J .................................................. 60, 61, 123, 173

*People v. Zajic,*
    88 Ill.App.3d 477, 410 N.E.2d 626 [1980] ..................................................... 142

*Pumphrey,*
    62 F.3d 1128 ................................................................................... passim

*Pumphrey,*
    62 F.3d 1131-32 ......................................................................... 118, 120

*Pumphrey,*
    62 F.3d 1133 ................................................................................... passim

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

**TABLE OF AUTHORITIES**                        Page

CASES                          (continued)

*Pumphrey v. K.W. Thompson Tool Co.,*
  62 F.3d 1128, 1130 (9th Cir. 1995) ..................................................40, 43, 45, 147, 170

*Pumphrey* v. *K.W. Thompson Tool Co.,*
  62 F.3d 1128, 1133 (9th Cir. 1995) ..................................................................... passim

*Quattrone,*
  441 F.3d at 170................................................................................................... 164

*Ramey* v. *Haverty Furniture Co., Inc.,*
  993 So. 2d 1014, 1018 n.2 (Fla. 2d DCA 2008)...............................46, 145, 149

*Root Ref. Co. v. Universal Oil Prods. Co.,*
  169 F.2d 514, 517, 541 (3d Cir. 1948) ...................................................... 152

*Rozier v. Ford Motor Co.,*
  573 F.2d 1332, 1339 (5th Cir. 1978); see Ty Inc., 353 F.3d at 536-37 ........................ 153

*Schmuck v. United States,*
  489 U.S. 705, 712, 715 (1989) .................................................................... 165

*Schultz v. Butcher,*
  24 F.3d 626, 631 (4th Cir. 1994) ............................................................... 153

*Sedima, S.P.R.L. v Imrex Co.,*
  473 U.S. 479, (1985) .................................................................................. 126

*Sedima,*
  at 486 ...................................................................................................... 126

*Shaffer,*
  11 F.3d at 457 ..............................................................50, 51, 52, 116, 144, 160

*Shear,*
  606 F.2d at 1253................................................................................... 117

*Standard Oil of Cal.* v. *United States,*
  429 U.S. 17 (1976)................................................................................. 44

*Stirone v. United States,*
  361 U.S. 212, 215, 80 S.Ct. 270, 272 (1960) ............................................... 128

*Stonehill,*
  660 F.3d at 443-44................................................................................39, 44

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

## TABLE OF AUTHORITIES                                    Page

**CASES**                          (continued)

*Stonehill,*
   660 F.3d at 445, 446 ................................................................................ passim

*Stonehill,*
   660 F.3d at 448 ................................................................................ 104, 143

*Stonehill,*
   660 F.3d at 452 & 552 ............................................................................ passim

*Sun-Diamond Growers,*
   138 F.3d at 970 .......................................................................................... 8

*Swann v. Charlotte-Mecklenburg Bd. of Educ.,*
   402 U.S. 1 (1971) .................................................................................... 147

*Tompkins v. 23andMe, Inc.,*
   WL 2903752, at *1 n.1 (N.D. Cal. Jun. 25, 2014) ...................................... 11

*Tramel v. Bass,*
   672 So.2d 78, 83 (Fla. 1st DCA 1996) ...................................................... 46

*Ty Inc.,*
   353 F.3d at 536-37 .................................................................................. 153

*United States v. Aguilar,*
   515 U.S. 593, 598 (1995) ........................................................................ 164

*United States v. Apple, Inc.,*
   Central District Court of California Case Number 5:16-cm-00010-SP ............... passim

*United States v. Bortnovsky,*
   879 F.2d 30, 39 (2d Cir. 1989) ................................................................ 165

*United States v. Brothers Constr. Co. of Ohio,*
   219 F.3d 300, 310-311 (4th Cir. 2000) ........................................................ 8

*United States v. Buck,*
   281 F.3d 1336, 1342 (10th Cir. 2002) ...................................................... 40

*United States v. Carter,*
   311 F.2d 934, 942 (6th Cir. 1963) .............................................................. 8

*United States v. Coiro,*
   922 F.2d 1008, 1017 (2d Cir. 1991) ........................................................ 164

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

**TABLE OF AUTHORITIES**                                    **Page**

CASES                              (continued)

*United States v. Debrow,*
  346 U.S. 374, 377 (1953)..................................................................... 73

*United States v. Estate of Stonehill,*
  660 F.3d 415, 443 (9th Cir. 2011) ................................................... passim

*United States v. Faulkner,*
  17 F.3d 745, 771 (5th Cir. 1994) ....................................................... 151

*United States v. Farrell,*
  921 F. 3d 116, 139 (4th Cir.), 140 2. Ct. 269 (2019) .............................27, 104

*United States v. Hairston,*
  46 F.3d 361, 376 (4th Cir.), cert. denied, 116 S.Ct. 124 (1995)...................... 71

*United States v. Hanson,*
  41 F.3d 580, 583 (10th Cir. 1994) ..................................................... 151

*United States v. Heater,*
  63 F.3d 311, 320 (4th Cir. 1995) ....................................................... 71

*United States v. Kumar,*
  617 F.3d 612, 620-21 (2d Cir. 2010)................................................... 164

*United States v. Manton,*
  107 F.2d 834, 846 (2d Cir. 1939) ..................................................138, 153

*United States v. Maloney,*
  755 F.3d 1044, 1046 (9th Cir. 2014).................................................... 172

*United States v. Maze,*
  414 U.S. 395, 400 (1974)............................................................... 165

*United States v. Najjar,*
  300 F.3d 466, 483 (4th Cir. 2002) ...................................................... 8

*United States v. Philip Morris USA, Inc.,*
  449, F.Supp.2d 1, 909, D.D.C.2009...................................................... 121

*United States v. Philip Morris USA, Inc.,*
  449 F. Supp. 2d at 892-93.45............................................................ 8

*United States v. Profit,*
  49 F.3d 404, 406 n. 1 (8th Cir.)........................................................ 151

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

## TABLE OF AUTHORITIES

Page

**CASES**                                   (continued)

*United States v. Quattrone,*
   441 F.3d 153, 170 (2d Cir. 2006) ............................................................ 164

*United States v. Sierra Pacific Industries, Inc. et al.,*
   15-15799 (9th Cir. 2015) ........................................................................ 38

*United State v. Silverman,*
   745 F.2d 1386, 1395 (11th Cir. 1984) ..................................................... 71

*United States v. Sun-Diamond Growers of California,*
   138 F.3d 961, 970 (D.C. Cir. 1998), aff'd, 526 U.S. 398 (1999) ................. 8

*United States v. Sun-Diamond Growers of California,*
   964 F. Supp. 486, 490 (D.D.C. 1997) ....................................................... 8

*United States v. Thompson,*
   685 F.2d 993, 999 (6th Cir.1982) (en banc) 459 U.S. 1072 (1983) ........... 142

*United States v. Throckmorton*
   98 U.S. 61 (1878) ................................................................................... 130

*United States v. Turkette,*
   452 U.S. 576, 580 – 81[1981] .................................................................. 27

*United States v. Walser,*
   3 F.3d 380, 388 (11th Cir. 1993) ............................................................ 71

*United States v. Warner,*
   Nos. 02 CR 506-01, 02 CR 506-4, 2006 WL 2583722 at *4
   (N.D. Ill. Sept. 07, 2006) ....................................................................... 143

*United States v. Wise,*
   370 U.S. 405 (1962) ................................................................................. 8

*United States v. Young,*
   470 U.S. 1, 25-26 (1985) ........................................................................ 36

*Valley v. Northern Fire & Marine Ins. Co.,*
   254, U.S. 348, 41 S. Ct. 116 (1920) ........................................................ 151

*Vasserman v. Henry Mayo Newhall Mem'l Hosp.,*
   65 F. Supp.3d 932, 942-43 Central District California 2014) ..................... 22

*Virden v. Graphics One,*
   623 F. Supp. 1417 (C.D. Cal. 1986) ........................................................ 19

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

## TABLE OF AUTHORITIES

**Page**

CASES                          (continued)

*Waymo, LLC v. Uber Technologies, Inc. et al.*,
   California's Northern District Court 3:17-cv-00939 ............................................. passim

*Wells v. United States*,
   851 F.2d 1471, 1473 (D.C. Cir. 1988) .......................................................................... 117

*Wickard v. Filburn*,
   (317 U.S. 111) .................................................................................................................. 128

*Williamson v. Berry*,
   8 HOW. 945, 540 12 L. Ed. 1170, 1189 (1850) ............................................................. 151

*Wilkin v. Sunbeam Corp.*,
   466 F.2d 714, 717 (10th Cir. 1972) .............................................................................. 152

*Wyle v. R.J. Reynolds Indus., Inc.*,
   709 F.2d 585, 589 (9th Cir.1983) ................................................................................... 66

*Zone Sports Center Inc. LLC, et. al. v. Red Head, Inc.*,
   No. 11-CV-00634-JST, 2013 WL 2252016, at *6 (N.D. Cal. May 22, 2013) ........ 40, 131

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

**TABLE OF AUTHORITIES**                                      Page

(continued)

### STATUTES

California Business & Professional Code § 17200 (Unfair Competition) .................. 20, 102
California Uniform Trade Secret Act Cal. Civ. Code §§ 3426 et seq. ................. 20, 102
Comprehensive Computer Data Access and Fraud Act ............................ 20, 102
Computer Fraud and Abuse Act 18 U.S.C. § 1030, et seq. ........................ 20, 102
Conspiracy to violate 18 U.S.C. §§ 1961(5), 1962(d) and California Penal Code § 502 20, 102
Defense Trade Secret Act ("DTSA") ........................................ 20, 102
Economic Espionage Act of 1996 as amended by DTSA ......................... 20, 102
Hobbs Act, 18 USC § 1951 ................................................. 128
Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C.
§ 1961 et seq., § 1961 (3), (4), § 1962 (c), (a), § 1964 (a) and (c), § 1965 ............ passim
Stored Communications Act, 18 U.S.C. § 2701, et seq. ........................... 94
Wiretap Act, 18 U.S.C. § 2511, et seq. ........................................ 94
28 U.S.C. § 1331, § 1367 ................................................... 31
18 U.S.C. § 1341, 1343, 1346, 1349 ...................................... passim
18 U.S.C. § 2 .............................................................. 135

### FEDERAL MOTION PRACTICE

7 James Wm. Moore & J. Lucas, Moore's Federal Practice ¶ 60.33 (2nd ed. 1978) ..... 44, 132
11 Wright & Miller, Federal Practice & Procedure § 2870 (3rd Edition)............... 39
Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2870
(2nd Edition 1987)........................................................ 64
12 MOORE'S FEDERAL PRACTICE § 60.43[1][d] (3d ed. 2012) (quoting *Lonsdorf v.
Seefeldt*, 47 F.3d 893, 898 (7th Cir. 1995)).................................. 152
Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357
at 321 (1990 Edition) ..................................................... 117
United States Department of Justice, Criminal Division, Organized Crime and
Racketeering Section Federal Civil RICO: A Manual for Federal Attorneys
(Case Citations and RICO Precedent) ...................................... passim
Manual of Model Criminal Jury Instructions for the District Courts of the
Eighth Circuit 6.18.1341 (West 1994)), cert. denied, 115 S.Ct. 2289 (1995) .......... 151
Manual for Complex Litigation, 1995 Edition, 33.8
Civil RICO fn 1273 .81, Pleadings (33.81) ................................... 150

---

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 121 of 312   Page
ID #:121
Case 9:23-cv-80316-AMC   Document 4-1   Entered on FLSD Docket 03/02/2023   Page 16 of 203

**TABLE OF AUTHORITIES**                                             **Page**

(continued)

### RULES

Federal Rule of Appellate Procedure 27(a)(3) .................................................. 132
Federal Rule of Civil Procedure 7(a)(2).......................................................... 103
Federal Rule of Civil Procedure 12, 12(b), 12(b)(6) ............................ 102, 103, 117, 118, 119
Federal Rule of Civil Procedure 11, 16, 26, 37 & 41 ........................................... 66
Federal Rule of Civil Procedure 60 and 60(b)............................................... passim
Federal Rule of Civil Procedure 60(b)(3), 60(c), 60(c)(1)................................... 39, 64
Federal Rule of Civil Procedure 60(d), 60(d)(1)........................................... passim
Federal Rule of Civil Procedure 60(d)(3)............................................... throughout

### MODEL CODE OF JUDICIAL CONDUCT

Canon 1, 2, 3 .................................................................................. 120

### UNITED STATES CONSTITUTION AND CONGRESSIONAL AUTHORITIES

United States House Judiciary Committee Hearing on Apple's iPhone encryption............ 75
United States House Judiciary Committee Hearing on Antitrust Applied:
Examining Competition in the App Store, Subcommittee on Competition
Policy, Antitrust, and Consumer Rights................................................. 16, 110
United States Congressional Hearing on Antitrust, Commercial and
Administrative Law on Examining Online Platforms and Market Power ................. 115, 116
United States Senate Committee on Homeland Security
and Governmental Affairs: Examining Irregularities in the 2020 Election ...................... 136
United States Senate Hearing on Threat to National Security ........................................ 136
United States Constitution ................................................................ throughout
United States Declaration of Independence ............................................. throughout
United States Senate Committee on the Administrative Procedures Act........................... 154
First, Fifth, Fourth, and Fourteenth Amendment....................................... passim
115 Congressional Record 5874 (1969)......................................................... 22, 23
116 Congressional Record 586 (1970), 962, 35199-35200 (1970)........................................ 23

### CONGRESSIONAL ACTS

Administrative Procedure Act, Pub.L. 79-404, 60 Stat. 237 enacted June 11, 1946 .......... 156

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

## I.   INTRODUCTORY ALLEGATIONS AND RICO SCHEMES THAT FORMED THE DEFENDANTS BUSINESS ARRANGEMENT

Apple, Inc. was founded in 1976 by Steve Jobs and Steve Wozniak. Since the founding, Apple designs, manufactures, maintains, and distributes personal computers, also known as PCs. Fast forward to January 9, 2007, Jobs launched a hand-held digital computing device Apple labeled as "iPhone." iPhone is more advanced than a PC in every way. iPhones also run on a mobile operating system called "iOS." The early versions of "iOS" offered basic iPhone functionality through mobile applications, known today as "apps." Apple pre-installs apps on iPhones before retail sale. Alternatively, apps are available to download onto an iPhone from Apple's "App Store." Apps offer basic iPhone operations. For example, Apple developed a phone app that allows Apple Customers to communicate with others.

Fast forward to August 24, 2011—after Tim Cook joined Apple in 1998 during a vulnerable bankruptcy moment for Apple and Jobs, he strategically positioned himself to influence Jobs and was eventually appointed CEO of Apple. Prior to the appointment, Jobs spent a significant amount of time carefully determining the proper amount of stock to give Cook that would steer him away from becoming too greedy and or focusing on profits instead of driving down the cost of Apple products that Apple Customers use and need in their daily lives. Apple's board ultimately awarded Cook a $365 million stock grant. In the latter part of 2011, Jobs passed away, leaving Cook at the helm of Apple. Shortly thereafter, under the good name, trust and impression Jobs left on the iPhone and App Store—Cook did the opposite—and sought to establish the iPhone and App Store as a

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 123 of 312    Page
ID #:123
Case 9:23-cv-80316-AMC    Document 4-1    Entered on FLSD Docket 03/02/2023    Page 18 of 203

vessel to artificially inflate and pump Apple's stock price, by any means necessary. Cook would also use Apple to expand his own selfish political ambitions. In doing so, he used Apple as a means and method of corruptly electing various politicians into office as favors, who in return, provided Cook, his subordinates, counterparts and others with immunity from the law through illicit means, not limited to intentional erring in law, perjury, bribes, stock payments, dividends and other tangible and intangible things of value.

By approximately 2013, Cook conspired with multiple individuals, entities and legal entities, to collectively execute, participate and aid and abet multiple RICO schemes ("schemes") funded by Apple, ratified by Cook and others unknown at this time.

The schemes formed a business arrangement that required the participation, cooperation and assistance of many individuals, entities and legal entities, including corrupt government actors within legitimate government institutions and agencies, acting in concert with one another to carry out numerous tortious and criminal acts.

One scheme involves penetrating the judicial and political branches of government. Specifically, federal judges and other government actors would heavily invest in Apple's stock in various portfolios and other methods of holding a legal interest in Apple that inherently created judicial and political bias that favored Apple, and prejudiced any party who could reveal the schemes. To further this scheme, Cook signed and approved Apple's stock split on June 9, 2014 at a 7-for-1 ratio. Under the guise of a lawful stock split, various individuals who would aid and abet the schemes, including those in positions of power, purchased an abundance of Apple stock at a lower price and or had their shares multiplied by the stock split in anticipation of the artificial inflation in Apple's stock as payment and or form of bribery to aid and abet the schemes. Other individuals were paid and or bribed

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO   Document 1   Filed 07/08/24   Page 124 of 312   Page
ID #:124
Case 9:23-cv-80316-AMC   Document 4-1   Entered on FLSD Docket 03/02/2023   Page 19 of 203

with tangible and intangible things of value to aid and abet Cook, Apple and the schemes.

Another scheme involves influencing and making political payments to a number of

politicians and other public officers, causing them to aid and abet and or participate in the

schemes. The political payments were intended to elect and or keep certain politicians in

office who would appoint, influence and or affirm judges in the Ninth Circuit and elsewhere

who actively invested in and or hold Apple stock as a form of bribery and or payment to:

a) obstruct or otherwise corruptly impede antitrust enforcement and or RICO cases;

b) instruct and or obstruct investigations; and c) sign orders closing cases that could

potentially uncover the schemes that formed the illicit business arrangement. As exhibited

in the photo below, Cook and Nancy Pelosi are associated through a loose-knit political

group and donors, lobbyists, public officers and other government employees.



Yet another scheme involves price and storage manipulation. This means Apple

(1) sets extremely high prices for more storage in its products while (2) continuously

increasing the megabytes produced from cameras, audio and other functionality within

its products. This fraudulent scheme coerces Americans to (3) buy "devices with low

storage" and (4) "cloud storage" among other services with a single goal of allowing

3

Apple to (5) illegally and coercively create and extract user data from iPhones and other

Apple products with the intent and desire to allow hackers, corrupt government actors and

contractors to exploit the user data and target Americans and influence those around

them for illegal means to provide Apple, its investors and others with illegal gains.





Another scheme involves Cook exploiting the relationship Jobs established with

"third-party developers" who develop apps in the App Store. For example, starting as early

as 2013 through about 2016, Cook, his subordinates, counterparts and others met with and

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

influenced Travis Kalanick, Uber's CEO and third-party developer, who operated an on-demand taxi and ridesharing app in the App Store that Apple distributed to iPhones. Kalanick, an upcoming entrepreneur, was awarded 10% of Uber's stock, including 16% of Uber's voting power and approximately 35% of Uber's Class B common stock.



Cook and Kalanick's "common interests" were aligned: they both owned a large number of shares in Apple and Uber stock, and they both wanted to become billionaires, by any means necessary.

In achieving their "common interests," Cook faced a monumental hurdle. He knew that after Jobs passed away, Apple's innovation stopped, and that no one at Apple, even himself, could continue innovating in the same way that Jobs did—who most consider, one of the greatest technological innovators of our time. Cook did however, spend fifteen years working next to Jobs. He recognized "certain traits" in Jobs, such as the innate ability to "tunnel vision" and "hyper-focus" on solving real world problems that ultimately led to technological breakthroughs and innovation. These traits are rare, and exist in only 1.5% of Americans in the U.S., not limited to Elon Musk. These unique individuals possess traits that are consistent with those who have High-Functioning Autism and Asperger Syndrome.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

They operate at a high level, learn at an accelerated rate, who are extremely inventive.

They have "vision" and "think differently," and as a result, they have "given Americans

innovative products," such as the "iPhone," and "Fully Electric Self-Driving Cars," among

other life-changing products for Americans.



Cook, his subordinates, counterparts and others knew they could not innovate at

this level and spent several months thinking about ways to do so. As early as 2011, but

no later than 2013, Cook devised a scheme that would allow him to appear "innovative."

Over the next several months, in their internal and external communications and during

private meetings at Uber, Apple, various law firms and elsewhere, Cook, Kalanick and

others conspired to use Apple's technological surveillance to detect and or recognize

individuals who demonstrated a pattern of behavior that resembled Jobs, and chose to

target these individuals who have High-Functioning Autism and Asperger Syndrome.

The technological surveillance includes, and is not limited to, accessing their (1) iPhone

keylogging/screen activity, cameras and microphones, including reading (2) notes related

to patent drafts, inventions and other innovative work that reveals new ideas. Cook would

then use and claim the innovation as his own. In an effort to accelerate the theft, Cook

conspired to distribute "Apple-provided software" to Kalanick and other Defendants

aimed at targeting individuals who demonstrated traits that resemble Jobs. Through the

course of their conspiracy and desire to unlawfully inflate and pump their stock prices

at their respective companies, Cook and Kalanick conspired with their subordinates,

6

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

counterparts and others to continue accessing the iPhones of these unique individuals who share similar traits to Jobs, who use Apple products to compete in the U.S.

Cook and Kalanick chose to access trade secrets and other high-value data from iPhones belonging to these unique individuals (hereafter "third-party developers and inventors") who compete and or use apps in the App Store.

Cook and Kalanick understood third-party developers possess highly valuable, novel and innovative trade secrets from their unique years-long research and development, labor, expense and sacrifice.

In seeking to expand on the cyber-surveillance, Cook and Kalanick met in private with known and unknown individuals to personally negotiate, continuously confirm, re-confirm, and amend ways to improperly acquire user data from third-party developers ("the Targeting Scheme"). They personally understood their agreement to participate in the targeting scheme would be unlawful and injurious to third-party developers and others. Exhibited below is one of many confirmations from Kalanick, affirming his in person meetings with Cook. The evidence exhibited below is from a related high-stakes theft of self-driving car trade secrets case, see *Waymo, LLC. v. Uber Technologies, Inc.*, et al.



| 5/11/2016 | 5/11/2016 13:39(UTC-7) | From: | | Travis Kalanick | Also, I can likely find strong k |
| 5/11/2016 | 5/11/2016 13:56(UTC-7) | From: + | | Travis Kalanick | |
| 5/11/2016 | 5/11/2016 13:56(UTC-7) | From: + | | Travis Kalanick | FYI, bout to meet Tim Cook |

in the Northern District Court of California, San Francisco Division, case number 3:17-cv-00939 ("the *Waymo* case"). After multiple meetings between approximately 2013 through about 2016, in exchange for Kalanick's commitment to aid and abet Cook in his effort to artificially inflate and pump Apple's stock price—Apple knowingly granted Uber's

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

apps sensitive code in the App Store to illegally access Apple products, ratified by Cook. [1]

With the code, Kalanick and the co-conspirators continued to extract ridesharing and

self-driving car trade secrets [2] (as defined under the Federal Defense Trade Secret Act

and California's Uniform Trade Secret Act ("DTSA Data")) from third-party developer's

iPhones, servers and elsewhere.

---

[1] Civil RICO suits are typically brought against collective entities such as corporations[]. It is well established that a collective entity, such as a corporation[], may act only through its agents, and hence may be held liable for the acts of its officers, employees, and other agents. This is true in both criminal prosecutions, see *United States v. Wise*, 370 U.S. 405 (1962); *United States v. Najjar*, 300 F.3d 466, 483 (4th Cir. 2002); *United States v. Sun-Diamond Growers of California*, 138 F.3d 961, 970 (D.C. Cir. 1998), aff'd, 526 U.S. 398 (1999), as well as in civil cases. See *United States v. Brothers Constr. Co. of Ohio*, 219 F.3d 300, 310-311 (4th Cir. 2000). See also *Davis v. Mutual Life Ins. Co. of New York*, 6 F.3d 367, 378-80 (6th Cir. 1993) (*respondeat* superior liability in RICO cases permissible, since "corporate principals may act only through their agents").

*Accord*, *United States v. Philip Morris USA, Inc.* ("the *Philip Morris* case") 449 F. Supp. 2d at 892-93.45. Therefore, a collective entity may be held liable for the statements or wrongful acts of its agents or employees when they are acting within the scope of their authority or the course of their employment, see *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 756 (1998); Restatement (Second) of Agency § 219 et seq. (1958), so long as the action is motivated, at least in part, to benefit the principal. See *Sun-Diamond Growers*, 138 F.3d at 970; Local 1814, *Int'l Longshoremen's Ass'n v. NLRB*, 735 F.2d 1384, 1395 (D.C. Cir.1984); Restatement (Second) of Agency § 228 (1958). However, a plaintiff need not show that the agent was acting exclusively for the Defendant collective entity; it is enough that the employee was acting in part for the benefit of the collective entity. Likewise, "it is not necessary for agent's actions to have actually benefited the corporate entity." *Automated Medical Labs., Inc.*, 770 F.2d at 407 (citing *Old Monastery Co. v. United States*, 147 F.2d 905, 908 (4th Cir. 1945)); *United States v. Carter*, 311 F.2d 934, 942 (6th Cir. 1963); *United States v. Sun-Diamond Growers of California*, 964 F. Supp. 486, 490 (D.D.C. 1997) (citing cases).

[2] See also *Oki Semiconductor Co. v. Wells Fargo Bank*, 298 F.3d 768, 775-76 (9th Cir. 2002) ("This possibility of *respondeat superior* liability for an employee's RICO violations encourages employers to monitor closely the activities of their employees to ensure that those employees are not engaged in racketeering. It also serves to compensate the victims of racketeering activity. Vicarious liability based on the doctrine of *respondeat superior* thereby fosters RICO's deterrent and compensatory goals") (citations omitted).

---

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

As part of the business arrangement, Cook agreed to protect Kalanick and others who aided and abetted the schemes, by any means necessary, including illegal means.

On one front, Cook used Apple's political power, influence and political payments to a number of politicians and other government employees as leverage. For instance, Cook paid, influenced or otherwise bribed Barack Obama to join him at a "Summit on Cybersecurity and Consumer Protection" to push a false narrative aimed at concealing the existence of cyber-surveillance used to improperly acquire ridesharing, self-driving car trade secrets and other DTSA data to pump Apple and Uber's stock prices. Apple and Cook's attorneys advised them that these false narratives will act as "influence tactics" to taint or otherwise corrupt the U.S. judiciary. In fact, when their attorneys suggested that "no judge would rule against them" because he or she "believes that no iPhone backdoor existed," Cook fully consented to continue pursuing the concealment scheme. And of course, Apple and Cook's attorneys knew that "no judge would rule against them" because he or she won't get away with it in terms of the "judges career" among other repercussions and persecution, including launching injurious influence operations against the judges family and others around them using the cyber-surveillance. On a separate front, Cook and others influenced, bribed or otherwise corrupted individuals to influence antitrust regulation and legislation and or instruct and or obstruct investigations in an effort to conceal the cyber-surveillance scheme and other known and unknown schemes.

In pursuing the business arrangement, the Defendants had the motive, the opportunity by their meetings, and the technical capability to access third-party developer's ridesharing and self-driving car trade secrets within Apple and Uber's digital products and platforms to: a) interfere with multiple markets; b) harm and or eradicate third-party

<div align="center">9</div>

developers from the App Store affecting the marketplace; and c) interfere with the forces

of supply and demand in multiple markets—in an all-out effort to pump Apple and Uber's

stock prices by controlling the App Store Marketplace among other things, and to share in

the illegal profits derived therefrom.

   As another part of the business arrangement, Cook and Kalanick signed Apple

and Uber agreements, and contracts with each other, and signed thousands of iPhone,

iMac, Macbook, Xcode, SDK and API agreements over the years, with and amongst

their counterparts at Apple, Uber and elsewhere—not limited to Eddy Cue, Phil Shiller,

Jerry Wang, Joseph Sullivan, Tony West, Craig Clarke, Angela Padilla, Craig Federighi,

Mat Henley and Josef Acebedo to cause the execution of surveillance (hereafter the

"cyber-surveillance-scheme" or "cyber-surveillance" or "cyber-surveillance-fraud") used

to perpetrate acts in furtherance of the business arrangement, and for their mutual benefit.

   While conducting cyber-surveillance, Apple, Uber, Cook, Kalanick and others

signed agreements that benefited foreign powers and foreign corporations, not limited

to China, including DiDi, a Chinese-based company, and agreed to materially share in the

information gathered from the cyber-surveillance-fraud activity, and perpetrated acts to

artificially inflate stock prices and other legal interests in their respective corporations.

   In seeking to accelerate the gathering of third-party developers self-driving car,

ridesharing, and other DTSA data, Apple updated its advertisements aimed at luring

more third-party developers into the App Store, including those who competed in the

ridesharing and self-driving car industries. Cook understood they possessed highly valuable

DTSA data. Cook understood what DTSA data was being collected by Apple and apps.

Between approximately 2013 to 2017, and thereafter, the Defendants surreptitiously

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

accessed through wire communication—both ridesharing and self-driving car DTSA data

from apps third-party developers used on their iPhones to: communicate; store files; sketch

out ideas; take photos of prototypes; store inventions in form of documents, notes and

voice notes; and create and edit confidential project boards that contain highly valuable

trade secrets. By 2015, Adam John Mackintosh ("Plaintiff") an inventor and founder of

iHug Health, purchased an Apple Developer Program Membership having no knowledge

of the unlawful business arrangement. Plaintiff signed multiple Apple agreements as a

third-party developer to provide a novel healthcare app, predicated on artificial intelligence

("Ai") and other novel healthcare technologies aimed at: pioneering a rideshare-based

transportation service for healthcare; providing a healthcare platform; and eliminating the

need for full-coverage health insurance by augmenting healthcare operations using Ai.

 Plaintiff was susceptible to Apple's App Store advertising, especially advertising

that presents competing in the App Store as a rite of passage into the global marketplace.

Apple also advertised that by bringing your creativity to the App Store, you will reach a

billion customers as exhibited below from a June 2015 internet archive snapshot.[3]



 Developer Program

One membership. Unlimited possibilities.

The new Apple Developer Program combines everything you need to develop, distribute,
and manage your apps on all Apple platforms into one single program, making it easier
than ever to bring your creativity to over a billion customers around the world. Get your
apps ready for the App Store on iPhone, iPad, Mac, and Apple Watch, by enrolling in the
Apple Developer Program today.

---

[3] In *Erickson v. Neb. Mach. Co.*, WL 4089849, at *1 n.1 (N.D. Cal. Jul. 6, 2015) ("Courts have taken judicial notice of the contents of web pages available through the Wayback Machine...") (citations omitted); *Tompkins v. 23andMe, Inc.*, WL 2903752, at *1 n.1 (N.D. Cal. Jun. 25, 2014) ("the Court takes judicial notice of the Internet Archive (http://archive.org) version of 23andMe's website as of November 20, 2013").

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Plaintiff also purchased an iPhone. Apple claimed that when you purchase an iPhone, your data is "safe, private and encrypted." Plaintiff, like many others, tapped on various agreement buttons on his iPhone in order to access and use it after purchase. Apple and its employees went as far as claiming that Plaintiff and other Apple Customers would have to create a "password" to "encrypt their iPhone," and when they wanted to decrypt their iPhone, they had to enter the password they created.

Through the course of Apple and Plaintiff's relationship, Plaintiff paid, without limitation, more than five thousand dollars ($5,000) to purchase Apple products, including an Apple Developer Program Membership, for money had and received by Apple. He also setup a "password" to ensure his iPhone and Macbook, and the data on these devices were encrypted, including and not limited to his DTSA data, using "Apple's established security measures and encryption technologies." Plaintiff had a reasonable expectation of privacy because his iPhone was encrypted. Plaintiff, like many others, reasonably relied on Apple's promises, without limitation that:

- iPhone is private, safe and encrypted; third-party developers will reach a billion customers; the public can rely on, and trust Apple.

Apple's advertisements and claims induced Plaintiff to upload highly-valuable DTSA data onto his iPhone and into the App Store. Specifically, highly valuable and novel healthcare "ideas, sketches, patent drafts, formulas, various non-public code, trade secrets and other valuable user data i.e. audio files, .docx, .pdf files, screen shots, notes, and various apps" that gave Plaintiff's health platform and app, a first-mover advantage in healthcare. After Plaintiff purchased an Apple Developer Program Membership through Apple's website on July 22, 2015 at 2:09pm, Plaintiff sought a partnership with Apple

<hr>

12

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

because Jobs always held a tradition at Apple that supported third-party developers by working with them to grow their startups and app businesses. After Jobs passed, Cook himself admitted he reads his emails and works with third-party developers. Throughout the course of the "Plaintiff / Apple relationship," Plaintiff never saw Apple or Cook as a competitor, but as a platform to grow his nascent startup and build his own health app and healthcare platform. Plaintiff believed an "Apple partnership" would propel his nascent health app with a first-mover advantage. On November 18, 2015, still unaware of the illicit business arrangement, Plaintiff sent Cook a confidential partnership email as exhibited below:

---

Subject: **Partner With Us To Transform iWatch**
From: **adam@ihug.mobi**
Date: **Wed, Nov 18, 2015 4:54 pm**
To: **tcook@apple.com**

Hello Tim,

I will make this email short. My start-up is on the verge of transforming ▮▮▮▮▮▮▮▮▮▮ including ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

I want to setup a meeting so we can discuss a partnership where our teams can secretively revolutionize iWatch. We've already connected the dots, and would like to integrate iWatch into our company's future.

Please let me know if you have some time to meet in an effort to drive Apple to the next level and so I can fulfill my life long dream. Technology has always been my friend.

With Great Respect,

Adam

"Your time is limited, don't waste it living someone else's life. Don't be trapped by dogma, which is living the result of other people's thinking. Don't let the noise of other opinions drown your own inner voice. And most important, have the courage to follow your heart and intuition, they somehow already know what you truly want to become. Everything else is secondary." ~ Steve Jobs

---

While Plaintiff waited for a response from Cook, he prepared the launch of his non-public app on the App Store through Test Flight (Apple-based app testing software) and uploaded his non-public app codebase onto Apple's servers to locally deploy the app

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

onto his iPhone for testing. Unbeknownst to Plaintiff, prior to, during and after he tested his healthcare app—the Defendants hacked or otherwise surreptitiously accessed Plaintiff's DTSA within his devices, to view his patent draft outlining the healthcare platform predicated on Ai and other healthcare technologies.

In furtherance of the targeting scheme, Kalanick, Sullivan, Henley and others were bribed, influenced or otherwise instructed by Cook during private meetings and through encrypted chat apps to continue accessing third-party developer's DTSA data from various industries outlined in Plaintiff's DTSA data.

They further continued utilizing and or executing hacking operations and utilized the cyber-surveillance to extract Plaintiff's and other third-party developer's DTSA data from iPhones and elsewhere. Additionally, Wang, a former Apple employee and Silicon Valley Hacker, and other Apple employees at Apple's headquarters, continued remotely accessing Plaintiff's iPhone, and screen recorded DTSA data from his health app.

The unlawful access was code-signed and or approved by Apple employees ratified by Cook and others unknown at this time, see California's Central District Court case number 5:16-cm-00010-SP at Dkt. Entry 16-33 ¶ 7 ("the *DOJ* case"), an Apple employee declared under penalty of perjury, "Absent Apple's proper cryptographic signature, this device will not load a [rewritten iOS]." Plaintiff also described the "iOS/rewritten iOS/key" in California's Northern District Court ("the *Mackintosh* case").

Through improper and unlawful means, the Defendants used Apple's "continuous connection" to Plaintiff's iPhone to access and extract his DTSA data from apps, Test Flight, Apple servers and elsewhere through Apple's technological methods. They did so without Plaintiff's knowledge, notification or permission—and intentionally, recklessly, and

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

with wonton disregard violated Plaintiff's rights, and materially, with wonton disregard of Plaintiff's rights breached all binding contracts between Plaintiff and Apple.

Apple and Cook fraudulently induced Plaintiff to purchase multiple iPhones and an Apple Developer Program Membership. Cook knew or should have known Apple's advertisements were false at the time he met with Apple's marketing and advertising departments to review and approve the updated advertisements. Thus, Apple falsely agreed to provide Plaintiff with a private, safe and encrypted iPhone, Macbook and App Store services for the Defendants benefit without intent to perform any of their promises, and without intent to provide Plaintiff with anything of value for his money. Plaintiff reasonably relied on Apple's promises to his detriment, including, without limitation: that his iPhones and other Apple Products are private, secure and encrypted; that his DTSA data was encrypted; and that Plaintiff will reach a billion customers if he brought his creativity (DTSA data) to the App Store.

Subsequently, Plaintiff's DTSA data was surreptitiously transmitted to Apple and Uber's software and product development teams, and to others unknown at this time who are employed by and or otherwise contracted and or associated with Apple and Uber, who silently used Plaintiff's DTSA data, and ideas derived therefrom, to develop and integrate new goods, services, products and partnerships into Apple, Uber and other's existing digital products and platforms at the detriment of the Plaintiff.

In seeking to accelerate and prolong the business arrangement, and to conceal the schemes, by any means, Apple's Board, Cook and his subordinates and counterparts, agreed to exclude Uber from paying a required "30% commission/tax fee in the App Store" that other "non-favored third-party developers" were paying. Kalanick and Uber's Board

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

instantly accepted the exclusion worth billions of dollars over time, in exchange to continue participating in the cyber-surveillance-scheme in furtherance of the business arrangement.

Apple also promoted Uber's app in the App Store and integrated Uber into various Apple products as another form of bribery in exchange for Uber, Kalanick, and his subordinates and counterpart's participation in the schemes. The acts and omissions of the Defendants were committed with oppression, fraud and malice and in conscious disregard of Plaintiff's privacy and rights to advance a scheme to maliciously deceive and to take unfair advantage of Plaintiff in every way. As perhaps proof of the Defendants fraud, a recent 2021 United States Senate and Congressional investigation established that Apple's unregulated access to, and use of, third-party developer's DTSA data has been labeled as "sherlocking an app," ("the Sherlocking Scheme") https://judiciary.senate.gov/meetings/antitrust-applied-examining-competition-in-app-stores. During the hearing, United States Senator for Connecticut, Richard Blumenthal, testified that, Apple's "sherlocking" activity is "potentially actionable." When Apple and its employees sherlock an app, they effectively *copy* features, functions and other innovation from third-party developers and their apps, and illicitly implement the innovation into Apple's own digital products and platforms and or create new products, services and goods derived from the misappropriated DTSA data—all aimed at—*killing* the third-party developer's nascent app for the benefit of Apple—simultaneously and illegally pumping Apple's stock price.

Apple and Uber have thus engaged in, and their activities have affected substantially the interstate and foreign trade and commerce of the United States, evidenced in their intentional marketing, distribution, sale, and offering of illegal goods, services, products and partnerships to consumers throughout the fifty states and across state lines and in

16

foreign countries. Cook's business arrangement was successful and complete as evidenced in Apple's stock price pump after each illegal good, service, product and partnership launch.

The illegal profits derived therefrom were used, continue to be used, and threaten to be used to stifle nascent markets affecting interstate and foreign trade and commerce of the United States. Cook's unlawful schemes artificially inflated Apple's valuation from $500 billion to over $3 trillion in five short years between approximately 2016 to 2021 using Plaintiff's innovation. Apple knowingly injured Plaintiff by way of its unlawful use of cyber-surveillance and other methods used to sherlock apps in the United States market.



17

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

These infringing and illegal products, services, goods and partnerships caused millions of customers to "buy more" iPhones and Apple Watches, and or caused them to "upgrade" to these digital products at the detriment of Plaintiff and other third-party developer's years-long research and development, labor, expense and sacrifice.

In seeking to accelerate the unlawful cyber-surveillance activity used to sherlock Plaintiff's app—in 2016—Cook laundered money by "investing" $1 billion into DiDi, ratified by Apple, its Executives and Board, making Apple part owner in DiDi and Uber. Chinese-based DiDi, subsequently "invested" the $1 billion into Uber ratified by Kalanick, and others at Uber. By doing this, the Defendants and other persons unknown at this time, were successful in accelerating the artificial inflation of Apple and Uber's stock prices as part of the business arrangement and their agreement to execute the cyber-surveillance used to target and access Plaintiff's and other third-party developer's DTSA data.

The unlawful activity occurred while Obama, Cook and others held thousands and potentially millions of shares in Apple stock, and after Obama and others accepted millions of dollars from Apple, ratified by Cook to further influence those associated to them. It also took place after Cook ratified Apple's stock split and granted Uber and the other Defendants access to the cyber-surveillance in 2014—the same year Obama and others appointed Vince Chhabria as an Article III judge in California—who later corruptly obstructed and stonewalled Plaintiff's cyber-surveillance and theft of DTSA data case against the Defendants—who participated in the Defendants schemes, not limited to "the Judicial and Fraud on the Court Schemes" as described further below.

Cook was paid in excess of $1.5 billion (in stock, cash payouts and bonuses) over the same period of time to ensure the success of the business arrangement and concealment of

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

the cyber-surveillance. Additionally, Cook, still holds an unknown number of shares in

Apple with plans to split Apple's stock yet again at a 4-for-1 ratio multiplying Cook's

shares in 2022 so that he can cash out again in 2025 at the detriment of Plaintiff and

other third-party developers. Both Kalanick and Cook have used Apple and Uber's digital

products, platforms and their subordinates and counterparts, and have utilized Apple and

Uber's size in the past for unlawful purposes, using unlawful means to achieve unlawful

objectives described throughout this motion pursuant to 18 U.S.C. 1961, sections §§ 1951,

1953. *Virden v. Graphics One, 623 F. Supp. 1417* (C.D. Cal. 1986), exhibited below are

articles affirming Cook's billionaire status and Apple's $3 trillion market valuation:





As exhibited further below, Kalanick was also paid approximately $2.5 billion

(in stock, cash payouts and bonuses) to ensure the success of the business arrangement

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

and concealment of the schemes. The Defendant's conspiracy to violate the civil RICO act among other laws through a repeating pattern of racketeering of improperly and by illegal means, accessing and using DTSA data and ideas derived therefrom that was located on third-party developers iPhones, Test Flight, apps in the App Store, Apple servers and elsewhere also violates the Defense Trade Secret Act "DTSA," the Economic Espionage Act of 1996 as amended by DTSA, the Computer Fraud and Abuse Act and Unfair Competition Laws.



**CNET**  Your guide to a better future

Tech > Mobile

# Former Uber CEO Travis Kalanick leaves company's board of directors

He's sold off nearly 95% of his stake in the company, worth more than $2.5 billion, over the last seven weeks.

As a direct, foreseeable, intended and proximate cause of the conspiracy and schemes, Plaintiff continues suffering substantial cyber-surveillance injuries, emotional distress and duress injuries, and damages, including damages to his property and interest in that property. Plaintiff has been injured and damaged by reason of Defendant's civil RICO violations because Plaintiff purchased and owned Apple products required to compete in the App Store as a third-party developer at his detriment as a direct result of, and not limited to, the cyber-surveillance and sherlocking schemes. As a direct result of these years-long schemes, Defendants were able to profit, and continuously generate revenue in excess of $1 billion dollars at Plaintiff's detriment. Moreover, the business arrangement caused Plaintiff's injury and damages, and continues to unjustly enrich the Defendants at Plaintiff's expense. By reason and nature of the violation, Plaintiff was

20

injured in his place of business and or property and his DTSA data has been damaged and are substantially threatened with future injury and damage.

In seeking to conceal the schemes that caused Plaintiff's injuries and incalculable damages, Cook, Apple, its Board and others used Apple and Uber to penetrated legitimate institutions in a years-long scheme of corrupting politicians, political and judicial figures, and government actors ("the Influence, Corruption, and Bribery Scheme")——who allegedly use legitimate government institutions as RICO enterprises to impede and or close cases, tamper with investigations, persecute and corruptly indict anyone who could reveal the schemes and endanger the business arrangement—while unlawfully benefiting from Apple and or Uber's stock under the guise of lawful stock trading activity, and or placing their money in retirement and other investments funds, not limited to the Vanguard Fund, one of the largest holders of Apple stock—a fund valued at approximately $99 billion.

As perhaps another example of the scheme, Nancy Pelosi, and others conspired with Cook, and agreed to delay antitrust legislation—while Pelosi and others gained from Apple's unlawful profits, who have the political power to impede legislation, investigations and inquiries that could reveal and or endanger the business arrangement that Cook, Obama, Pelosi, and others have benefited therefrom as exhibited below:

| investopedia.com | | | |
|---|---|---|---|
| ≡ **&** Investopedia | | | |
| TABLE OF CONTENTS | | | |
| Vanguard Total Stock Market Index Fund | 431,222,114 | 2.57% | 57,218,862,306 |
| Vanguard 500 Index Fund | 320,241,258 | 1.91% | 42,492,812,524 |

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO   Document 1   Filed 07/08/24   Page 143 of 312   Page
ID #:143
Case 9:23-cv-80316-AMC   Document 4-1   Entered on FLSD Docket 03/02/2023   Page 38 of 203

Cook, Apple, Apple's Board and others effectively "bought immunity from the law"
through deeply-rooted schemes that penetrated the judicial and political bodies of
government using Apple's technology, influence, illegal profits from illegal goods, products,
services and partnerships, inflated stock payments and dividends among other bribes.
The thoroughly corrupt schemes concealed the business arrangement, cyber-surveillance
activity, and other racketeering activity. The Defendants also transferred payments through
wire and mail to multiple attorneys, and bribed or otherwise influenced government actors
and officers of the court to perpetrate fraud on the Court acts to not only harm the judicial
system and obstruct justice, but to protect the Defendants and conceal their schemes. In
doing so, multiple courts and the judicial system has been harmed alongside Plaintiff and
other third-party developers, and there is a threat the harm will continue.

Plaintiff has sustained significant injuries and damages. He was deprived of
intangible honest services, property and damages, proximately caused by the Defendants
fraud on the Court. However, their racketeering in court is no stranger to the judicial
system. In fact, it has been addressed by former Members of Congress and Senators
in past United States Senate and Congressional hearings, investigations and inquiries,
see the 115 Congress, Congressional Record ("Cong. Rec.") 5874 (1969),[4] Members of
Congress and Senators agreed on the RICO statute for reasons raised by Plaintiff here.

---

[4] States House of Representatives, (Oct. 6, 2020), the Court finds it appropriate to take
judicial notice of public documents generated by Congress, see *Vasserman v. Henry Mayo
Newhall Mem'l Hosp.*, 65 F. Supp.3d 932, 942-43 Central District California 2014)
(noting that [a] court can take notice of '[o]fficial acts of legislative, executive, and judicial
departments of the U.S.'"); see also *Del Puerto Water Dist. v. U.S. Bur. of Reclamation*, 271
F. Supp.2d 1224, 1234 (E.D. Cal. 2003) (taking judicial notice of House Reports).

22

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

In the 115 Congressional hearing, Senators asserted that "it seems clear to us that those who played the leading roles in the enactment of the RICO statute thoroughly understood organized crime's impact upon government entities."

Senator McClellan, the chief sponsor of this bill and chairman of the committee which drafted it, said: "To exist and to increase its profits, Mr. President, organized crime has found it necessary to corrupt the institutions of our democratic processes, something no society can tolerate." 115 Cong. Rec. 5874 (1969) Further, he said, "For with the necessary expansion of governmental regulation of private and business activity, its power to corrupt has given organized crime greater control over matters affecting the everyday life of each citizen." Id.

Senator McClellan also pointed out that organized crime had "in some localities, established corrupt alliances within the processes of our democratic society; with the police, prosecutors, courts, and legislatures" 116 Cong. Rec. 586 (1970).

Another Senator, Senator Murphy, quoted the conclusion of the President's Crime Commission, "Organized crime flourishes only where it has corrupted local Officials" 116 Cong. Rec. 962 (1970).

Representative St. Germain told the House, "(t)he greatest danger from organized crime lies not in its provision of illegal goods and services, but in its penetration of the country's legitimate institutions." He further stated, "One of the most ominous statistics turned up by the President's Crime Commission in their surveys was the estimated $2 billion paid out each year by organized crime to public officials in and out of the criminal justice system to 'buy immunity from the law'" 116 Cong. Rec. 35199-35200 (1970).

---

23

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

## II.   PARTIES AND NON-PARTY WITNESSES TO THIS 60(d)(3) MOTION

Plaintiff, Adam John Mackintosh is a person defined under § 1964 (c).

Defendant, Tim Cook is person as defined under § 1961 (3).

### 1.   The Apple Company Enterprise

Defendants, Cook and his subordinates and counterparts perpetrated the alleged racketeering through their positions at the (Apple, Inc. ("Apple")) corporation affecting interstate commerce, organized and existing under the laws of the State of Delaware, headquartered in Cupertino, California.

The company is a RICO enterprise as defined under 18 U.S.C. § 1961 (4).

The late Steve Jobs, Apple and its Board, appointed Cook as the company's Chief Executive Officer in 2011, and awarded him a $384 million stock grant.

Cook, Apple's Board and their subordinates and counterparts within the company participated in, and conducted their affairs by, and through multiple schemes, and racketeering activity, repeatedly and continuously within a ten (10) year period.

Defendant, Travis Kalanick is person as defined under § 1961 (3).

### 2.   The Uber Company Enterprise

Defendants Kalanick and his subordinates and counterparts perpetrated the alleged racketeering through their positions at the (Uber Technologies, Inc., Rasier, LLC, Uber Health, LLC ("Uber")) corporations affecting interstate commerce, organized and existing under the laws of the State of Delaware, headquartered in San Francisco, California.

Uber is a RICO enterprise as the term is defined under 18 U.S.C. § 1961 (4).

Kalanick joined Uber's Board at Uber in 2011.

24

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 146 of 312    Page
ID #:146
Case 9:23-cv-80316-AMC    Document 4-1    Entered on FLSD Docket 03/02/2023    Page 41 of 203

Kalanick was awarded 10% of Uber's stock, including 16% of Uber's voting power
and approximately 35% of Uber's Class B common stock.

Uber, Uber's Board and their subordinates and counterparts within the company
participated in, and conducted their affairs by, and through multiple schemes and
racketeering, repeatedly and continuously within a ten (10) year period.

In private, the Defendants Cook and Kalanick, their Boards, subordinates,
counterparts, and attorneys personally negotiated, continuously confirmed, re-confirmed,
and amended through Apple and Uber's digital products and platforms, various schemes
that formed the business arrangement.

Their acts were aided and abetted by Apple and Uber and the Defendants
attorneys not limited to Bruce Sewell, Daniel Jordan, Sean Berkowitz, Salle Yoo,
Angela Padilla, Katherine Tassi, Arturo Gonzalez, Tony West, Sabrina Ross, and
Craig Clarke.

Each individual attorney is a person as the term is defined under § 1961 (3).

The Defendants attorneys directly and or indirectly, collectively and or separately,
contrived, ratified and or otherwise participated in, and aided and abetted multiple
schemes, including the sherlocking scheme, cyber-surveillance-scheme, fraud on the Court
schemes and other racketeering activity in furtherance of the business arrangement and the
Defendants unjust enrichment and ill-gotten gains, tangible and intangible legal interest and
other legal interests in Apple and Uber.

Cook and Kalanick, CEOs of Apple and Uber, were paid approximately $4.5 billion
in bonuses, stock grants and other legal interest in Apple and Uber for the success of the
business arrangement.

---

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 147 of 312   Page
ID #:147
Case 9:23-cv-80316-AMC    Document 4-1    Entered on FLSD Docket 03/02/2023    Page 42 of 203

The aforementioned Defendants, including Apple and Uber's Board and attorneys knew or should have known the business arrangement and other agreements and fully understood their purpose, intent and motive, and approved and ratified them. Defendants, Dara Khosrowshahi Uber's CEO, Joseph Sullivan Uber's former Chief Security Officer, and Mat Henley Uber's former Security Officer are persons defined under § 1961 (3).

Dara, Sullivan, Henley and others ratified the business arrangement and or engaged in and or otherwise aided and abetted the racketeering activity, not limited to using government to indict a self-driving car engineer at Google, Anthony Levandowski. The aforementioned Defendants counterparts, Jerry Wang and Josef Acebedo are persons as defined under § 1961 (3), who aided and abetted in the execution of the cyber-surveillance, theft, and transfer of Plaintiff's DTSA data to the Apple and Uber Company Enterprises.

### 3.    The Counsel Enterprise

The Defendants attorneys have persistently, and continue to purposefully perpetrate the alleged fraud on the Court acts. The acts were aided and abetted or otherwise ratified by Latham and Watkins, LLP, Lewis and Llewellyn, LLP, Morrison and Foerster, LLP, Covington and Burling, LLP, not limited to Gibson, Dunn and Crutcher, LLP and other law firms.

Each law firm is an enterprise pursuant to 18 U.S.C. § 1961 (4). Each law firm is funded by Apple and Uber, ratified by the Defendants to operate in every Circuit Court in the United States to intercept, impede, influence and or obstruct any lawsuit adverse to the aforementioned Defendants that could reveal the schemes and business arrangement. This scheme also involves the Defendants retaining and accumulating the largest law firms

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO   Document 1   Filed 07/08/24   Page 148 of 312   Page
ID #:148
Case 9:23-cv-80316-AMC   Document 4-1   Entered on FLSD Docket 03/02/2023   Page 43 of 203

to collectively block any third-party developer and any third-party developer's attorneys

from revealing the schemes through proper litigation. Each above-named law firm advised,

ratified or otherwise participated and or knew about the alleged schemes who are aiders

and abettors, see *United States v. Farrell*, 921 F. 3d 116, 139 (4th Cir.), 140 2. Ct. 269 (2019)

("Just as an attorney may operate and manage an enterprise in violation of section 1962 (c),

attorneys may be held liable as conspirators…" Any lawyer providing advice concerning

ongoing unlawful activity is circumscribed in the legal advice that can permissibly be

provided, lest he become a participant in the unlawful activity. That is, a lawyer

representing or advising such an entity can readily turn himself into a co-conspirator—or

aider and abettor—in the form of a "consigliere and fixer"), *United States v. Turkette*, 452

U.S. 576, 580 – 81[1981] (although an enterprise can be a legal entity, such as a partnership,

corporation, or association, it can also be an individual or simply a relatively loose-knit

group of people of legal entities. These latter groups are referred to as "association-in-fact"

enterprises under the statute 18 U.S. § 1961 (4).

### 4. The Lobbying, Public Relation, Media, Political, and Judicial Enterprises

Defendants Cook, Apple and others unknown at this time, paid, promised,

rewarded, influenced, and or otherwise corrupted lobbyists and their respective companies,

including and not limited to political parties, judicial and legislative appointees in an effort

to carry out the fraudulent course of conduct by way of aiding and abetting the Defendants

schemes that formed and furthered the business arrangement and or aiding and abetting

the concealment of the cyber-surveillance through corrupt acts in Congress, Appeals,

and Lower District Courts in furtherance of the Defendants racketeering activity aimed

at pumping Apple and Uber's stock price.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 149 of 312    Page
ID #:149
Case 9:23-cv-80316-AMC    Document 4-1    Entered on FLSD Docket 03/02/2023    Page 44 of 203

Cook, Apple, its Board and others unknown at this time, bribed, influenced,

promised or otherwise paid millions of dollars in private and political payments, and or

other legal interest including access to manipulated user data from the cyber-surveillance-

fraud activity in exchange to have legislation delayed and or judicial appointees

"intentionally misapply sub-sections of statues and refuse to use the courts inherent powers

to obstruct cases that could reveal the cyber-surveillance" "abuse their power," "prosecute

individuals through unlawful means," "ignore central issues in cases" "intentionally err

in law," "unlawfully close cases," "unlawfully obstruct cases" "unlawfully obstruct factual

development" "ignore clear cyber-surveillance evidence" "conceal proposed orders from

the consuming public, " and repeatedly commit a plain "usurpation of judicial power,"

("the Judicial Scheme") to further, and to protect the Defendants business arrangement,

see *Epic Games* case in the Ninth Circuit Appeals 21-16506 at Dkt. Entry 56 ¶ 14 of 48.

The Ninth Circuit District judge made several legal errors (that gave Apple immunity

from the law) impeding the DOJ from enforcing antitrust laws against Apple. The DOJ

itself admitted the judge erred in several areas of antitrust law interpretation that will

harm their antitrust enforcement in the future.

≡ **engadget**    🔍

"The United States believes that its participation at oral argument would be helpful to
the court, especially in explaining how the errors (in antitrust law interpretation)
could significantly harm antitrust enforcement beyond the specific context of this
case," the Justice Department wrote on Friday.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION



**Schumer Kills Bills Big Tech Feared Most**

Schumer never allowed a vote on antitrust bills targeting Apple, Amazon and Google but offered a...

time.com

https://time.com/6243256/schumer-kills-antitrust-big-tech-bills/

This guy stopped the antitrust bill moving forward. He's received funds from Apple... bribery

At all relevant times, the unknown DOE Defendants operated as political leaders and influencers, corrupt and bias judicial and legislative appointees, and other DOE Defendants who operate within the public relations, media and lobbying arms of the Apple and Uber Company Enterprises who are aiders and abettors, agents and or employees. The unknown DOE Defendants acted as facilitating agencies and co-conspirators in furtherance of the schemes that formed the business arrangement and other racketeering activity. Each DOE Defendant acted within the course and scope of their employment and agency and or otherwise through their loose-knit political group affiliation and or in-fact association with Apple, and with the knowledge, consent, permission, and authorization of Apple and Uber,

29

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

including Cook, Kalanick and their attorneys. Each DOE Defendant's acts were ratified and aided and abetted by Cook and other officers and managing agents of the Apple and Uber Enterprises, not limited to their attorneys and law firms and each DOE Defendant.



Apple, Tim Cook and others were successful in obstructing various proposed laws that could have potentially protected Plaintiff, Levandowski, and other Americans from injury and harm. The legislative acts are as follows: (1) Advancing Americans Interest Act; (2) Platform Liability Act; (3) Innovation and Competition Act; (4) American Data Privacy and Protection Act; (5) American Choice and Innovation Online Act; (6) Open App Markets Act; (7) American Competes Act, among other legislation.

At all relevant times, each DOE Defendant, either individually and or separately, and through their agents, signed agreements with the Apple, Uber, Counsel, Lobbying, Media, Political and Judicial Enterprises, and materially participated in each of these Enterprises either in person and or through digital products and platforms owned and

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

operated by the Apple and Uber Company Enterprises, and materially aided and abetted one or more of the Enterprises, Defendants and each DOE Defendant in the alleged unlawful, misleading, and fraudulent conduct, and have affected interstate commerce in the United States, including this state.

At all relevant times, each Defendant, and each DOE Defendant who participated in, and perpetrated, or are otherwise liable as aiders and abettors was a "person" or "enterprise" within the meaning of 18 U.S.C. §1961 (3) (4). At relevant times, each individual Defendant was a "person" as defined under 18 U.S.C. §1961 (3), because each individual Defendant was "capable of holding a legal or beneficial interest in property."

This Court is not only vested with jurisdiction to adjudicate fraud on the Court, its implored by the Supreme Court. This Court also has subject matter jurisdiction over the federal question doctrine pursuant to 28 U.S.C. §§ 1331, 1367 and 18 U.S.C. §§§§§ 1964 (a) and (c), 1965, 1341, 1343; and general principals of ancillary and pendent jurisdiction.

This Court has personal jurisdiction over the Defendants, including the Apple and Uber Company Enterprises, and the Counsel, Media, Lobbying, Political and Judicial Enterprises because each Defendant and DOE Defendant participated in the racketeering activity in this District using Apple and Uber's digital products, platforms and various private and non-public hardware and software, and other means used to conduct and participate and or otherwise aid and abet the racketeering activity.

Additionally, the Ninth Circuit employs or are otherwise associated with the Defendants and each DOE Defendant who are influenced, corrupted or are otherwise aiding and abetting the Defendants and Enterprises through corruption, i.e. the judicial scheme and other fraud on the Court acts that has harmed, and continues harming Plaintiff

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

and various courts and the judicial system as a whole. The misconduct has attempted, and did, impede various lawsuits including Plaintiff's RICO lawsuit against the Defendants in furtherance of the business arrangement and cyber-surveillance-scheme.

In fact, when the Defendant's fraud on the Court presented itself, the Ninth Circuit chose not to uphold the integrity of the judicial system, and chose not to do substantial justice as described in the *Mackintosh* case.

The Defendants racketeering activity may also involve coercively remanding cases back to the Ninth Circuit Courts and the Ninth Circuit Court of Appeals to receive corrupt, bias and or favorable rulings, and unlawful dismissal and closure of cases ("the Change Venue Scheme"). Venue is therefore proper here.

The alleged fraud on the Court activity to have been perpetrated by Cook, Kalanick, Padilla, their subordinates and counterparts and each DOE Defendant were acquiesced in by their attorneys and the law firms, and undertaken pursuant to their agreement to conspire and conceal the business arrangement—That is, by reason of agreements between Cook, Kalanick, their subordinates, counterparts and attorneys, aided and abetted by the Enterprises for purposes of obtaining money and property from investors by means of materially false and fraudulent pretenses, representations, promises, and material omissions to fuel the racketeering—Defendants did, and knowingly transmitted and caused to be transmitted by means of wire and mail communication in interstate commerce certain writings, signs, signals and pictures, that is, communication and data transfers between the aforementioned Defendants and Enterprises, and with each DOE Defendant within various courts and judiciaries, not limited to political and potentially other bodies of government.

---

32

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

The Defendants understood their conduct would violate the civil RICO act, economic espionage act, computer fraud and abuse, defense trade secret act and other laws. They had been advised by their attorneys in private while under employment agreements, retainer agreements and other various verbal and non-verbal agreements, who all knew the misconduct would harm various courts and proximately harm Plaintiff and others. Under the direction, advice and participation with their attorneys, and each DOE Defendant, the Defendants perpetrated acts intending to, and did, subvert the judicial machinery in various courts in an effort to conceal their racketeering activity in contumacious disregard of the law, thereby waiving any privilege that otherwise would attach to communications with their attorneys and the law firms, and with each DOE Defendant. The Defendants and their attorneys also knew the Apple and Uber Company Enterprises had been subjected to federal investigations and more than five federal probes, presumably as a result of multiple data breaches, economic espionage, and theft of trade secrets pursuant to multiple RICO predicate acts not limited to 18 U.S.C. §§ 1831-1832.

During these active investigations—to shield themselves from being a suspect and or from prosecution—the Defendants and each DOE Defendant perpetrated fraud on the Court using the cyber-surveillance to fabricate, plant, tamper with and or destroy evidence on Levandowski's and potentially other's iPhones, Macbooks and other Apple products. The illicit activity created bogus investigative leads and fabricated evidence that was then transmitted to government and federal prosecutors, who used it to indict Levandowski and potentially others, with the malicious intent of concealing the schemes.

The Defendants, including and not limited to their attorneys, perjured themselves between approximately 2013 through 2023, and or otherwise participated in multiple fraud

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

on the Court schemes during the same period of time, and sought to ensure that no company, entity, legal entity and or person—in the United States or overseas—broke ranks from Defendants concealment scheme, which are based on falsehood and deception. If any person, entity or company admitted to the schemes that are harming various courts, tampering with the judicial system, artificially inflating the market valuation of the Apple and Uber Company Enterprise and their respective stock prices, the business arrangement would be endangered. In order to avoid discovery of the schemes that formed and furthered the business arrangement, and to avoid the possibility that they might be called to account for their illegal and criminal acts—the Defendants separately and or collectively, directly and or indirectly through each DOE Defendant who are employed by or otherwise associated with the Counsel, Judicial, Legislative and Political Enterprises—perpetrated fraud on the Court acts and or aided and abetted the acts either directly and or indirectly.

These acts were intentional and made or caused to be made under the direction and influence of Cook, West, Jordan, Berkowitz, Padilla, Gonzalez, the Defendants attorneys, and each DOE Defendant. Each fraud on the Court act, either attempted or successful, was made in the sense of a culpable state of mind, in the nature of awareness that the deceit and misconduct would cause harm and erode the courts and the proper administration of justice—inflict injury and damages and be prejudicial to Plaintiff and others—while using cyber-surveillance to target and prejudice Plaintiff, and tamper with DTSA data and other unlawful means used to conceal their activity. The Defendants corruptly influenced, obstructed, and impeded, and endeavored to influence, obstruct, and impede, and any applicable combination through wire and mail, the due and proper administration of the law using their attorneys, as well as corrupt, and yet to be corrupted government actors.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 156 of 312    Page
ID #:156
Case 9:23-cv-80316-AMC    Document 4-1    Entered on FLSD Docket 03/02/2023    Page 51 of 203

III.    **THE INTEGRITY OF THE JUDICIAL PROCESS IS MOST SEVERELY
DAMAGED WHEN GOVERNMENT ACTORS DEFRAUD THE COURT.**

A.    **Because they Represent the Sovereign, Government Attorneys, Judges, Clerks and
other Officers of the Court Are Held to a Higher Standard.**

The standards discussed herein are applied more stringently when the misconduct
at issue is alleged to have been perpetrated by attorneys and judges, who are officers of the
court. *Bulloch v. United States*, 763 F.2d 1115, 1121 (10th Cir. 1985), "A judge is an officer
of the court, as well as are all attorneys."

For example, public attorneys who are officers of the court each play a unique
role in our judicial system, as they are "the representative not of an ordinary party to a
controversy, but of a sovereignty . . . [whose] interest in a . . . prosecution is not that it
shall win a case, but that justice shall be done," *Berger*, 295 U.S. at 88 (emphasis added),
this foundational standard ensures the effective functioning of government in an ordered
society.

As a result of their unique positions, there are special rules and standards in place,
applicable to court clerks, attorneys, judges, federal prosecutors and other persons within
various government entities.

If there were no special rules and standards, it would allow these government
actors to perpetrate the very malfeasance at issue here, and would most definitely be
corrosive of the very institutions that are best able to safeguard our liberty and our rights:
the courts, the First, Fifth and Fourteenth Amendment Rights, Rights bestowed upon
Americans under the intrinsic power of the Declaration of Independence, longstanding
precedent and venerable laws, and the democratically elected branches of government.

35

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Furthermore, these special rules and standards are set in place to define their roles, duties, expectations and interests so as to safeguard the public and ensure the integrity of both the judicial process and our government.

For example, an attorney representing the United States, is "held to a higher standard of behavior." *United States v. Young*, 470 U.S. 1, 25-26 (1985) (Brennan, J., concurring) (emphasis in original).

This standard also applies equally to government clerks, judges and attorneys in civil and criminal cases. Federal judges are also officers of the court. These judges are arbiters of truth, who uphold the integrity of the courts and judicial system at all times, and protect against attempts and actual tampering with the judicial machinery and truth-finding mechanics within these courts, and safeguard all constitutional rights, judicial process, and ensure our government is diligent and absolutely impartial.

When federal judges participate or otherwise aid and abet fraudulent acts upon the court, they effectively tamper with the judicial machinery and truth-finding mechanics of the courts. When this happens, the very mechanics within these honorable institutions in which justice shall be administered is corrupted.

This type of corruption stems from influence, promises, political payments and political campaign contributions, political bias, judicial bias, personal bias, financial interests and bias favoring Apple and Uber that furthers the financial interest, bias opinions, kickbacks, promises of appointment to higher courts, and other forms of bribery aimed at harming the courts and subverting justice that intends to provide certain persons, entities and corporations with immunity from the law.

This type of corruption also undermines the core of the administration of justice,

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO   Document 1   Filed 07/08/24   Page 158 of 312   Page
ID #:158
Case 9:23-cv-80316-AMC   Document 4-1   Entered on FLSD Docket 03/02/2023   Page 53 of 203

generating substantial obstacles to the right to an impartial litigation proceeding or trial, and severely undermines the trust in the judiciary. It has an adverse and direct impact on the non-offending party, and inherently infringes constitutional rights under the law as well.

The cyber-surveillance that caused and continues causing the corruption, particularly in the *Mackintosh* case, and all other related pleadings, decreases public trust in justice and weakens the capacity of our judicial system to guarantee the protection of the law and guarantees of constitutional rights. It affects the tasks and duties of these judges, clerks, attorneys, federal prosecutors, investigators and others.

By seeking immunity from the law (allegedly obtained by Cook, Apple, Uber and others in the *Mackintosh* case in the Ninth Circuit) through a scheme of litigation misconduct (which may constitutes as a repeating pattern of racketeering activity according the Ninth Circuit) it has a detrimental effect on the judicial system as a whole.

This type of years-long corruption has a variety of faces, bribery being only one of them, another being political corruption—that also allegedly exists in part in the *Mackintosh* case.

Corruption is broad in range, including actions enabling it not only to influence the judicial system, but all the sectors of state administration as well. Illicit interferences with the administration of justice can also be violent and non-violent, particularly when perpetrated directly by members of organized crime and persons who are in-fact associated or associated through a relatively loose-knit group. These forays are intended to secure specific objectives, such as the closing of a particular case, much like Chhabria, a federal judge, ordered in the *Mackintosh* case.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

## IV.    FRAUD ON THE COURT SUMMARY

To prevent a grave miscarriage of justice, Plaintiff brings this Rule 60(d)(3) motion. *United States v. Sierra Pacific Industries, Inc. et al.*, 15-15799 (9th Cir. 2015) "relief from judgment for fraud on the Court is 'available' only to prevent a grave miscarriage of justice." This motion will focus on a particular "species of fraud" allegedly perpetrated on multiple courts in "an effort by Apple, Cook, Uber and others, that prevented the judicial process from functioning 'in the usual manner'" and that "involve 'egregious' 'reckless' and 'pervasive' malfeasance [ ] so fundamental that it undermined the workings of the adversary process itself," *United States v. Estate of Stonehill*, 660 F.3d 415, 445 (9th Cir. 2011).

Plaintiff is now before this Court to set aside the judgements, orders and a mandate obtained by the Defendants through the alleged fraud, corruption and organized crime in the Ninth Circuit. The *Mackintosh* case arises from the Defendant's years-long egregious fraud that continues harming our judicial system in contumacious disregard for the law. The fraudulent acts were not comprised of a series of mistakes. Their acts were not the consequence of sporadic errors of judgment. Instead, their fraudulent acts were purposeful, willful, organized and calculated. This alleged species of fraud affected the administration of justice through the use of thoroughly corrupt schemes that were designed to subvert the truth-finding mechanics within multiple court's judicial machineries in an effort to conceal the Defendants schemes and racketeering activity inside and outside of court.

These fraudulent acts were allegedly perpetrated by the Defendants, their attorneys, and other officers of the court to unlawfully get ahead competitively, politically, judicially and legislatively. The alleged schemes proximately caused Plaintiff's injury and deprived Plaintiff of damages, property, honest services, intangible honest services and justice.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

## V.   MAJORITY STANDARD: Harm to the Integrity of the Judicial Process

A majority of courts have adopted that judgments are not absolute for the very reason raised by Plaintiff here.

Specifically, Rule 60 of the Federal Rules of Civil Procedure ("F.R.C.P.") provides various mechanisms for a court to set aside a final judgment or order.

Importantly, under Rule 60(b), it provides that "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding" for various reasons, including "fraud that harms the judicial process (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by the opposing party" F.R.C.P. 60(b)(3), especially fraud perpetrated by a judge, attorney and other officers of the court.

Although also addressing acts that amount to fraud on the Court, Rule 60(d) provides a separate and distinct avenue for relief by recognizing and codifying the inherent power of the court to "set aside a judgment for fraud on the Court." Id. 60(d)(3). *Hazel-Atlas*, 322 U.S. at 244. While most motions under Rule 60(b), including those for fraud, must be made no more than a year after the entry of a judgment, there are no such time restrictions when filing a motion for fraud upon the Court under Rule 60(d), Id. 60(c)(1), *Stonehill*, 660 F.3d at 443-44.

Rule 60(d) supports two distinct procedural avenues to seek to set aside a judgment procured by fraud on the Court: either by filing an independent action or through a motion. WRIGHT & MILLER, 11 FEDERAL PRACTICE & PROCEDURE § 2870 (3rd Edition).

The ability of a party to choose the preferred procedural route is demonstrated in multiple circuit cases analyzing allegations of fraud on the Court.

39

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 161 of 312    Page
ID #:161
Case 9:23-cv-80316-AMC    Document 4-1    Entered on FLSD Docket 03/02/2023    Page 56 of 203

For example, in the case of *Pumphrey v. K.W. Thompson Tool Co.*, 62 F.3d 1128,

1130 (9th Cir. 1995), the court analyzed an independent action for fraud on the Court,

while in *England v. Doyle*, 281 F.2d 304 (9th Cir. 1960), the court analyzed a motion to

set aside on the grounds of fraud on the Court. Moreover, because a court's power to set

aside a judgment for fraud on the Court arises from the long-recognized "historic power

[in] equity to set aside fraudulently begotten judgments," the substance of a party's filing

related to fraud on the Court controls over its form. *Hazel-Atlas*, 322 U.S. at 245;

*United States v. Buck*, 281 F.3d 1336, 1342 (10th Cir. 2002) ("no purpose would be

served by denying…relief on the ground that the motion misstyled the plea for relief…

[t]he substance of the plea should control, not the label").

And because the form of the filing is of no regard, the court has been understood

to have the power to treat a motion as an independent action or vice versa. *Zone Sports

Center Inc. LLC, et. al. v. Red Head, Inc.*, No. 11-CV-00634-JST, 2013 WL 2252016, at

*6 (N.D. Cal. May 22, 2013) ("The court has the authority to construe Plaintiff's request

as either a motion brought under Rule 60(b) or as an independent action under Rule 60(d)

because the substance of the relief sought is what controls, not the label of the

submissions.") and as described in this motion, Rule 60(d)(3) controls; *Buck*, 281 F.3d at

1341-42 (finding that the federal courts have the power to construe a motion for fraud on

the Court "either as an independent action….or, because there are no formal requirements

for asserting a claim of fraud on the Court, as a pleading invoking the court's inherent

power to grant relief for fraud upon the Court"); WRIGHT & MILLER, 11 FEDERAL PRACTICE

& PROCEDURE § 2868 (3d ed.) ("A party is not bound by the label used in the party's papers.

A motion may be treated as an independent action or vice versa…").

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

## VI.   MINORITY STANDARD: Perjury and Non-Disclosure

A minority of courts, adopted similar fraud on the Court standards that

encompasses a wider range of conduct that can constitute fraud on the Court. For example,

the bankruptcy court in *In re Clinton Street Foods*, allowed the trustee's "fraud on the

Court" claim finding that the four-prong analysis previously set forth by the Second Circuit

Court of Appeals was instructive and the facts at hand satisfied such requirements,

including that the claim was based on "(1) the defendant's misrepresentation to the court;

(2) the denial or grant of the motion based on the misrepresentation; (3) the lack of an

opportunity to discover the misrepresentation and[] bring a timely turnover proceeding; and

(4) the benefit the defendant derived by inducing the erroneous decision," 254 B.R. at 533,

*Leber-Krebs, Inc. v. Capitol Records*, 779 F.2d 895, 899-900 (2nd Cir. 1985).

In applying this analysis, the court found that the actions of a litigant alone can

invoke the doctrine of fraud on the Court and that an officer of the court need not be

involved. Id. Specifically, the defendants lied to the court regarding whether any bidding

agreements existed which led to the approval of the sale by the Chapter 7 trustee,

subsequently allowing the defendants to buy $2 million worth of property for $320,000. Id.

In *In re Cardwell*, the court held that a Chapter 7 debtor's actions (without referring

to the debtor as an "officer of the court") standing alone can constitute fraud on the Court.

2017 WL 2304220, at *5-*6. The court looked at [t]he misrepresentations, together, and

determined that the debtor used the court to further his fraudulent scheme. Id.

Specifically, the debtor filed false bankruptcy schedules, misrepresented liabilities on

real property, included a co-conspirator, prepared fraudulent loan documents, and violated

18 U.S.C. § § 152 and 157. Id. at *5.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO   Document 1   Filed 07/08/24   Page 163 of 312   Page
ID #:163
Case 9:23-cv-80316-AMC   Document 4-1   Entered on FLSD Docket 03/02/2023   Page 58 of 203

## VII.   THE DEFENDANTS ALLEGED FRAUD ON THE COURT

As Cook, Apple, Kalanick, Uber, Henley, Acebedo, Wang, and the other

Defendants misconduct trailed towards the total subversion of the administration of justice

in the Ninth Circuit—both Apple and Uber's attorneys and their law firms not limited to

Gibson, Dunn and Crutcher, LLP, Latham Watkins, LLP, Lewis and Llewellyn, LLP,

Orrick, Herrington and Sutcliffe, LLP, and Morrison and Foerster, LLP—in concert with

corrupt officers of the court and potentially other corrupt government actors—were more

than willing to carry out and place their deceptions deep within multiple United States

Senate, Congressional and District Courts and elsewhere. The gross malfeasance was so

egregiously pervasive, at one point, District Judge, William Alsup, in the high-profile

*Waymo* case stated: "You don't get taught how to deal with this problem in law school.

In 25 years of practice and 18 years in this job I've never seen such a problem." In fact,

Alsup warned he would sanction Uber's attorneys with malpractice if another case is

brought before him related to Uber's litigation misconduct, i.e. the destruction of "chat

apps" "screen captures" and related evidence as demonstrated in the *Mackintosh* case.

Fraud on the Court is not taught in law school, and for good reason as discussed

further. The species of fraud on the Court perpetrated by the Defendants in the *Mackintosh*

case obstructs honest reviews by courts—and even when officers of the courts are steeped in

the democratic tradition that maintains the highest ethics, and makes their work a career of

honor—the Defendants have, and will continue exploiting these officers through corruption

and influence, not limited to exploiting their data and devices—and continue obstructing

the function of these courts, and civil liberties will continually—and without end be

violated.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

## VIII.   WHAT PLAINTIFF MUST PROVE TO SEEK RELIEF UNDER RULE 60(D)(3). [5]

**B.   <u>The Test for Fraud on the Court within the Meaning of Rule 60(d)(3).</u>**

Rule 60 of the F.R.C.P., entitled "Relief from a 'Judgment' or 'Order,'" provides that judgments, while ordinarily accorded a degree of finality, are subject to being set aside when appropriate, whether for ministerial reasons at one end of the spectrum or for fraud at the other. F.R.C.P. 60. Rule 60 (b), which is focused on fraud between parties, is governed by a one-year statute of limitation. Rule 60(d), on the other hand—the premise and basis on this motion, is focused on fraud on the Court and has no time bar whatsoever.

Moreover, Rule 60(d) "does not limit a court's power to . . . set aside a judgment for fraud on the Court," F.R.C.P. 60(d), as it simply codifies a fundamental principle: federal courts have always had the "inherent equity power to vacate judgments obtained by fraud," *United States* v. *Estate of Stonehill*, 660 F.3d 415, 443 (9th Cir. 2011) (citing *Chambers* v. *NASCO, Inc.*, 501 U.S. 32, 44 (1991); *In re Levander*, 180 F.3d 1114, 1118-19 (9th Cir. 1999)).

---

[5] In this portion of Plaintiff's motion, Plaintiff will outline the applicable test and controlling authority for assessing whether a fraud on the Court has occurred, i.e., what Plaintiff must prove in order to obtain relief.

Because there is no case establishing a threshold burden that Plaintiff must satisfy to proceed under Rule 60(d)(3), nor a threshold showing set forth in the rule itself, **it appears that the only prerequisite to seeking relief under Rule 60(d)(3) is that Plaintiff, the complainant, was a party to the action in which the fraud on the Court occurred,** *Hazel-Atlas*, 322 U.S. at 244.

Of course, it is beyond dispute that the court itself also may initiate proceedings *sua sponte* if it discovers conduct constituting fraud upon the Court, *Pumphrey* v. *K.W. Thompson Tool Co.*, 62 F.3d 1128, 1130 (9th Cir. 1995) (proceedings initiated from court learning of conduct constituting fraud on the Court).

---

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

As upheld by the Supreme Court, a federal court's power to vacate a judgment procured by fraud originates from a rule of equity that "fulfill[s] a universally recognized need for correcting injustices which, in certain circumstances, are deemed sufficiently gross to '**demand a departure from rigid adherence**'" to the rule that a final judgment is typically binding and final. *Hazel-Atlas Glass Co.* v. *Hartford-Empire Co.*, 322 U.S. 238, 244 (1944), overruled on other grounds by *Standard Oil of Cal.* v. *United States*, 429 U.S. 17 (1976).

While courts have "struggled to define the conduct that constitutes fraud on the Court," the Ninth Circuit has confirmed this particular species of fraud exists when the moving party demonstrates, by "clear and convincing evidence," that the opposing party's misconduct has harmed "the integrity of the judicial process . . . ." *Stonehill*, 660 F.3d at 443-44 (quoting *England* v. *Doyle*, 281 F.2d 304, 310 (9th Cir. 1960) (evidentiary standard); *Alexander* v. *Robertson*, 882 F.2d 421, 424 (9th Cir. 1989) (standard for harm)); *Dixon* v. *C.I.R.*, 316 F.3d 1041, 1046 (9th Cir. 2003).

"[F]raud on the court . . . embrace[s] only that species of fraud which does[,] or attempts to, defile the court itself, or is perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are present for adjudication," *In re Intermagnetics Am., Inc.*, 926 F.2d 912, 916 (9th Cir. 1991) (quoting 7 JAMES WM. MOORE & J LUCAS, MOORE'S FEDERAL PRACTICE ¶ 60.33 (2nd ed. 1978)), when pervasive and fraudulent misconduct harms "the integrity of the judicial process . . . and the fraud rises to the level of 'an unconscionable plan or scheme which is designed to improperly influence the court in its decisions,'" there has

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO   Document 1   Filed 07/08/24   Page 166 of 312   Page
ID #:166
Case 9:23-cv-80316-AMC   Document 4-1   Entered on FLSD Docket 03/02/2023   Page 61 of 203

been a fraud on the Court, and the court "not only can act, [but] should." See case

*Dixon*, 316 F.3d at 1046 (quoting *England*, 281 F.2d at 309). "[T]he inquiry as to whether

a judgment should be set aside for fraud upon the Court . . . focuses not so much in terms

of whether the alleged fraud prejudiced the opposing party. . . ." *Intermagnetics*, 926 F.2d

at 917.

Fraud on the Court "is a wrong against the institutions set up to protect and

safeguard the public, institutions in which fraud cannot complacently be tolerated

consistently with the good order of society," *Pumphrey* v. *K.W. Thompson Tool Co.*,

62 F.3d 1128, 1133 (9th Cir. 1995) (quoting *Hazel-Atlas*, 322 U.S. at 264).

Thus, the question of whether one party "would have prevailed" but for the

opposing party's fraud on the Court is decidedly not the relevant inquiry. Id. at 1132.

Instead, the question is "whether the alleged fraud harms the integrity of the judicial

process," *Intermagnetics*, 926 F.2d at 917.

As alleged in the *Mackintosh* case, and as discussed in this Rule 60(d)(3), and as

could be shown through an expedited evidentiary hearing, the Defendants worked an

egregious and massive fraud upon six or more United States Courts, grievously damaging

the integrity of our judicial process that proximately harmed these courts and the judicial

system and ultimately injured and harmed Plaintiff and others in the process.

The court's historic power, recognized under Rule 60(d), comes from its

"historical power of equity" and its need "to manage [its] own affairs so as to achieve

the orderly and expeditious disposition of [its] cases" and "further[] the pursuit of

achieving complete justice," In re *Levander*, 180 F.3d 1114, 1118 (9th Cir. 1999)

(internal quotations omitted).

---

45

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 167 of 312    Page
ID #:167
Case 9:23-cv-80316-AMC    Document 4-1    Entered on FLSD Docket 03/02/2023    Page 62 of 203

C.    **Examples of Litigation Misconduct which have been Held to Constitute Fraud on the Court.**

Courts have held that a wide range of fraudulent misconduct can constitute fraud on the Court.

The fraud allegedly perpetrated upon multiple United States Senate, Congressional and District Courts by the Defendants is multi-faceted and pervasive, involving numerous, distinct types of misconduct, each one of which is sufficient to implore this Court to use the full weight of its inherent powers to address the misconduct and cause this Court to now redress the injury and damages and enter a final order for default judgment against the Defendants in favor of Plaintiff (the non-offending party) and other relief as a matter of law and as a sanction that's addressed here, and in the conclusion of this motion. In multiple cases, see *Diaz v. Home Depot USA, Inc.*, 196 So. 3d 504, 505 (Fla. 3d DCA 2016) and *Ramey v. Haverty Furniture Co., Inc.*, 993 So. 2d 1014, 1018 n.2 (Fla. 2d DCA 2008), the district courts signed orders ("…striking defendant's answer and defenses[]") which may be employed against a defendant who has perpetrated a fraud on the Court.

In the Florida case of *Tramel v. Bass*, 672 So.2d 78, 83 (Fla. 1st DCA 1996) the district court of appeals affirmed the trial courts order—striking the defendant's answer and affirmative defenses as a sanction for defendant's fraud on the Court. The justification for such harsh and severe sanctions against the offending party is exercised only "When a party lies to the court and [its] adversary intentionally, repeatedly, and about issues central to the truth-finding process (that allegedly exists in the *Mackintosh* case), it can fairly be said that [the party] has forfeited [the] right to have [the] claim decided on the merits." (*McMunn*, 191 F. Supp 2d at 445).

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 168 of 312    Page
ID #:168
Case 9:23-cv-80316-AMC    Document 4-1    Entered on FLSD Docket 03/02/2023    Page 63 of 203

1.    **Hazel-Atlas Glass Company v. Hartford-Empire Company**

In *Hazel-Atlas* case, the Supreme Court found a fraud on the Court when the

plaintiff in the underlying action, Hartford, presented manufactured evidence to the court

in connection with a merits-based decision. 322 U.S. at 245. Specifically, Hartford had a

pending application for a patent, which the Patent Office opposed. Id. at 240.

In support of the application, Hartford's attorneys and officials wrote a bogus

article describing the device at issue as a "remarkable advance in the art" and

"revolutionary." Id. Thereafter, the attorneys and officials "procured the signature" of

a disinterested expert and had it published in a trade journal. Id. Hartford subsequently

submitted the article in support of its pending patent application, which was ultimately

granted. Id. at 240-41. Hartford then brought suit against *Hazel-Atlas* for patent

infringement. Id. at 241. While the case was pending before the district court, *Hazel-Atlas*

heard rumors concerning the article's fraudulent authorship, but did not defend the suit on

those grounds. Id.

The district court dismissed the case in any event, finding Hartford failed to show

patent infringement. Id. Hartford appealed. Id. The Third Circuit reversed the district

court's decision in favor of *Hazel-Atlas*, quoted the fraudulent pro-Hartford article at

length, and held that *Hazel-Atlas* had infringed Hartford's valid patent. Id. at 241-42.

While the deadline for *Hazel-Atlas's* petition for rehearing of the appeal was

approaching, Hartford obtained a signed statement from the supposed author of the article,

stating that he had written the article. Id. at 242-43. *Hazel-Atlas* then "capitulated" and

settled the case. Id. at 241. It paid Hartford $1,000,000 and "entered into certain licensing

agreements." Id. As a result of the settlement agreement, *Hazel-Atlas* did not file a petition

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

for rehearing, and the district court entered judgment against *Hazel-Atlas* in accordance with the Third Circuit's mandate. Id. at 253 (Roberts, J., dissenting). At the time the judgment was entered, *Hazel-Atlas* was actively investigating the fraud. Id. at 242. Seven years later, when these facts fully came to light, *Hazel-Atlas* brought a motion to vacate the judgment for fraud on the Court. Id. at 243. Finding the story "sordid," id., the Supreme Court stated: "Every element of the fraud here disclosed demands the exercise of the historic power of equity to set aside fraudulently begotten judgments.

This is not simply a case of a judgment obtained with the aid of a witness who, on the basis of after-discovered evidence, is believed possibly to have been guilty of perjury." Id. at 245. The Supreme Court also noted that even if it "consider[ed] nothing but Hartford's sworn admissions," Hartford's misconduct amounted to "a deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals." Id. [6] Importantly, the Supreme Court firmly rejected Hartford's argument that fraud on the Court exists only where reliance on the fraudulent evidence was "basic" to the underlying decision. Id. at 246-47. In this regard, the Supreme Court found it more than adequate that "Hartford's officials and lawyers thought the article material." They conceived it in an effort to persuade a hostile Patent Office to grant their patent application

---

[6] As further alleged below, the *Mackintosh* case is similar to *Hazel-Atlas* in that officers of the court conceived a plan to fabricate "screen capture" evidence and manufacture bogus declarations to support the dismissal of the case. Additionally, while Plaintiff investigated Apple's misconduct, corrupt officers of the court continued entering judgements, orders and a mandate to obstruct justice. Thereafter, Defendants advanced the litigation which allowed Apple's attorneys to lie repeatedly under penalty of perjury, all in a carefully executed scheme that harmed the court and deprived Plaintiff of intangible honest services, property and damages. Just as the Hartford parties and their attorneys submitted a bogus article to receive a void patent, Apple's attorneys submitted bogus declarations and fabricated evidence to attack the central issues being tried in the case—in an all-out effort to conceal the schemes.

---

48

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

and went considerable trouble and expense to get it published. . . . [T]hey urged the article upon the Circuit Court and prevailed." Id. at 247. [7] The court therefore concluded that Hartford was "in no position now to dispute its effectiveness." Id. Furthermore, the court observed that, because "it is wholly impossible [to] accurately . . . appraise the influence that the article exerted on the judges," it would not attempt to do so. Id. The Supreme Court further and affirmatively asserted that "the total effect of all this fraud . . . calls for nothing less than a complete denial of relief to Hartford for the claimed infringement of the patent thereby procured and enforced." Id. at 250.

The Supreme Court specifically and with particular distinction, acknowledged that while *Hazel-Atlas* had been aware of at least the possibility of Hartford's fraud at the time of both the trial and appeal, "every element of the fraud here disclosed demands the exercise of the historic power of equity to set aside fraudulently begotten judgments." Id. at 245. The Supreme Court ruled in their opinion that the Hartford parties and their attorneys had "tamper[ed] with the administration of justice," and thus committed "a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." Id. at 246.

The Supreme Court's decision in *Hazel-Atlas* provides the foundation for assessing what constitutes a fraud on the Court and confirms the intolerance the judiciary must have for misconduct which defiles the court.

---

[7] As was in the *Hazel-Atlas* case, the record shows that Apple's attorneys not only "urged" perjured and bogus declarations upon the Court and prevailed—the documents furthered the Defendants concealment scheme. The perjured documents obfuscated the existence and use of cyber-surveillance methods (screen captures) used to access Plaintiff's and other's DTSA data. Cook, Apple and their attorneys, effectively concealed the Defendants execution of cyber-surveillance used to sherlock apps in furtherance of the business arrangement.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 171 of 312    Page
ID #:171
Case 9:23-cv-80316-AMC    Document 4-1    Entered on FLSD Docket 03/02/2023    Page 66 of 203

## 2.    United States v. Shaffer Equipment Company

Of course, manufacturing evidence is not the only type of misconduct that can

lead to a finding of fraud on the Court. In *United States v. Shaffer Equipment Company*,

11 F.3d 450 (4th Cir. 1993), a government lawyer who swore to uphold the integrity of the

judicial system intentionally failed to comply with his duty of candor was found to be

sufficient. Specifically, in *Shaffer*, government attorneys for the Environmental Protection

Agency ("EPA") brought suit to recover the costs of an environmental cleanup but

wrongfully failed to reveal to the court and the defendants that the EPA's on-scene cleanup

coordinator, Caron, had misrepresented his academic credentials in that case and in prior

cases. Id. at 452. The same government attorneys also wrongfully obstructed the

defendants' efforts to root out these discrepancies in Caron's credentials. Id. Indeed, Caron

had admitted to one of the government attorneys "as early as September 1991 that he did

not have a college degree," id. at 459, because he had not "complete[d] his class work for a

degree from Rutgers and never attended any classes at any . . . other schools," id. at 454.

Instead of exposing this corruption, the government attorney simply watched as

Caron falsely testified in his deposition that "he had completed all of the requirements for a

degree at Rutgers and the only reason he had not received his diploma was a question of

paperwork[,]" and that "he had continued taking courses at Drexel for a master's degree.

[Caron] stated that his bachelor's degree work was in environmental science and his

master's degree work was in organic chemistry." Id. at 454. At a later deposition, the

government directed Caron not to answer any questions about his resume in which Caron

claimed to have received degrees from Rutgers and Drexel, claiming the inquiry was not

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

relevant to the litigation. Id. [8] As this same government attorney researched the issue and concluded two days later that the coordinator's credibility was relevant as a matter of law, but he "did not supplement the government's response to an earlier interrogatory directed to Caron's credentials (to which the government had objected on the basis of irrelevance) and did not withdraw the relevancy objection to the discovery . . . ." Id. at 455. The government also failed to disclose to the court and defense counsel, that Caron was being investigated both criminally and civilly by the EPA. Id. Despite these issues, the government "continued to litigate the matter unabated without disclosing the investigations to the court." Id. at 456. Another government attorney, a supervisor, involved in the case was aware not only of these facts, but also aware that Caron had testified falsely in another litigation. Id. However, he prevented these facts from being disclosed to defense counsel. Id. The government also relied on the administrative record made by Caron in moving moving for summary judgment. Id. at 460. [9]

---

[8] As was the case in *Shaffer*, the record shows Chhabria, who's a federal judge, ordered the Defendants not to answer any more filings involving the cyber-surveillance allegations.[9] Additionally, but on a far greater scale, officers of the court in the Ninth Circuit repeatedly breached their duty of candor. The clerk, Susan Y. Soong, refused to assign the case to Alsup who's familiar with the nature of Plaintiff's cyber-surveillance case, even after Plaintiff related the *Waymo* case in his Civil Cover Sheet. She also abused her authority to manually reassign Chhabria to the case, who obstructed justice by stonewalling the adversarial by abusing his authority, violating his oath to protect the Constitution after gagging Plaintiff from "speaking" the truth related to the Defendants cyber-surveillance. *Cooper v. Aaron*, 358 U.S. 1, 78 S.Ct 1401 (1958) "No state legislator or executive or judicial officer can war against the Constitution without violating his undertaking to support it." Any judge who does not comply with his oath to the Constitution of the United States wars against the Constitution and engages in acts in violation of the Supreme Law of the Land. Having taken at least two, if not three, oaths of office to support the Constitution of the United States, and the Constitution in his/her state, he/she has acted in violation of the Constitution, and is engaged in an act or acts of sedition. If a judge does not fully comply with the Constitution, his orders are void, he/she is without jurisdiction, and acting without jurisdiction, see *In re Sawyer*, 124 U.S. 200 (1888); *Cohens v. Virginia*, 19 U.S. (6 Wheat) 264, 404, 5 L.Ed 257 (1821).

---

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 173 of 312   Page
ID #:173
Case 9:23-cv-80316-AMC    Document 4-1    Entered on FLSD Docket 03/02/2023    Page 68 of 203

The court found that the issue of Caron's "credentials, capability, and credibility [were] relevant to the examination of the administrative record," and the "integrity of the administrative record [was] relevant" to the central issues being tried in the case. Id.

The court observed that "a general duty of candor to the court exists in connection with an attorney's role as an officer of the court," and that "[o]ur adversary system for the resolution of disputes rests on the unshakable foundation that truth is the object of the systems process which is designed for the purpose of dispensing justice." Id. at 457.

Attorneys "who serve as officers of the court, have the first line task of assuring the integrity of the process[,]" id. at 457, and their duties to their client "are trumped ultimately by a duty to guard against the corruption that justice will be dispensed on an act of deceit," id. at 458. Citing to Chambers, 501 U.S. 32, the Fourth Circuit found that there is a "broader general duty of candor and good faith required" of officers of the court "to protect the integrity of the entire judicial process." 11 F.3d at 458.

The court cited to *Hazel-Atlas* for the rule that there is "general duty to preserve the integrity of the judicial process" which the government attorneys in *Shaffer* violated, 11 F.3d at 458 (citing 322 U.S. 238).

The court found that, in repeatedly failing to advise the court of "the Caron problem and the civil and criminal investigations relating to it," and in "continuing to litigate the matter unabated," the government attorneys sufficiently "undermine[d] the integrity of the judicial process" and violated "the general duty of candor that attorneys owe as officers of

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 174 of 312    Page
ID #:174
Case 9:23-cv-80316-AMC    Document 4-1    Entered on FLSD Docket 03/02/2023    Page 69 of 203

the court." Id. at 459. These actions were sufficient to constitute a fraud on the Court [10]
see id. at 461.

### 3. Pumphrey v. K.W. Thompson Tool Company

The Ninth Circuit's opinion and decision in *Pumphrey*, 62 F.3d 1128, is also
instructive.

The *Pumphrey* case involved a wrongful death action arising from an accidental
shooting wherein the defendant gun manufacturer participated in a scheme to defraud
the court by withholding evidence, and went as far as fabricating evidence and suborned
managers and others to perjure themselves.

The primary issue in the *Pumphrey* case was whether a certain model of gun
could accidentally fire when dropped despite having one or both safeties engaged. Id. at
1133. While the case was pending before the district court, the gun manufacturer instructed

---

[10] Notably, the Fourth Circuit did not rely solely on Rule 60(d)(3) in upholding the district
court's decision to vacate the judgment entered for the government. While the Fourth Circuit
discussed fraud on the Court and the Supreme Court's decisions in *Hazel-Atlas*, the
Fourth Circuit found its ability to vacate the judgment from its inherent power. 11 F.3d at
461. The court stated: "[d]ue to the very nature of the court as an institution, it must and does
have an inherent power to impose order, respect, decorum, silence, and compliance with
lawful mandates. This power is organic, without need of a statute or rule for its definition,
and it is necessary to the exercise of all other powers." Id.

If there has ever been a case where "officers of the court" grossly failed to carry out their
responsibility to assure the integrity of the process, it is the *Mackintosh* case. The record
shows that at best, Soong and Chhabria did absolutely nothing "to guard against the
corruption that justice will be dispensed on an act of deceit." 11 F.3d at 458. The worst that
can be said is that they affirmatively aided and abetted the Defendants not limited to Cook,
Apple, Kalanick, Dara, West, Uber and other Defendants and their attorney's trail of fraud
on the Court based on numerous acts of deceit. Their acts were coordinated and calculated
with Apple's attorneys and the Defendants misconduct, that collectively defiled the courts.

---

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

employees, including a company manager and general counsel to videotape drop tests involving the gun. Id. at 1131. During the tests that were video recorded, the company manager and the general counsel were present. Id. In the original video recording, which the company withheld, the gun fired when dropped. Id. In the second video recording, which the company produced to the court, the gun did not fire when dropped. Id.

Before filming the videos, the company answered requests for production by stating it was not aware of any records relating to handgun testing, but if records were later discovered the company would make them available to the plaintiff. Id.

During continued discovery, the company only produced the second video and, in answers to interrogatories, mischaracterized the results and stated there was no record of a test showing that the gun had accidentally fired. Id. at 1132.

The general counsel also never disclosed to the company's trial counsel the existence of the original video or its results. Id. The general counsel then attended the trial and watched as the manager falsely testified that he had never seen the gun fire when dropped during tests. Id. [11] The general counsel was also present at depositions in subsequent cases when the manager gave false testimony about whether engaging the gun's safety affected

---

[11] The general counsel neither suborned this perjury nor presented it to the court; he merely observed as the manager perjured himself. 62 F.3d at 1132. The company's trial counsel who presented the testimony to the court did not know that it was perjured. Id. at 1131. It was enough that the general counsel "participated in the case." Id. at 1130-31. The record shows the same occurred in the *Mackintosh* case, but on a far more egregious level. Specifically, Chhabria observed Apple's attorneys urge fabricated "screen capture" evidence and multiple perjured and bogus declarations upon the court and did nothing to address the unlawful conduct. Chhabria instead sat by and observed the unlawful misconduct, even after it was brought to his attention. *In re Clinton Street Foods,* see also *Cone v. Harris* Case Nos. 12288, (Okl. 1924), 230 P. 721, 723, fraud on the Court also occurs when "a judge himself is a party to the fraud..." "Perjury can only be a fraud on the Court if "officers of the court" were a party to the fraud, and presented it to the court in an effort to influence its decision."

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

whether the gun fired when dropped. Id. [12] The Ninth Circuit Court of Appeals found that

"[b]y failing to disclose the original video, mischaracterizing the results of the drop-tests,

and failing to correct the false impression created by [the manager's] testimony, [the general

counsel] undermined the judicial process." Id. at 1133. [13]

---

[12] The *Mackintosh* case presented facts similar to those of *Pumphrey*, in that the Defendants (which are too many to list here) participated in the concealment scheme. And in doing so, the Defendants and their attorneys in the *Waymo* case failed to disclose to the court material facts that would have revealed the existence of cyber-surveillance used to steal trade secrets, at Dkt. Entry 2401, 2307-2 in the *Waymo* case. It allowed the Defendants to lie repeatedly, effectively defiling the court and allowing the Defendants to continue targeting Plaintiff for his DTSA data through his iPhone and other Apple products using the offensive cyber-surveillance. The Defendants attorney's failure to disclose, proximately harmed Plaintiff, caused damages and prejudiced Waymo during motion practice and at trial.

The cyber-surveillance evidence i.e. remote screen captures and screen recordings that were illicitly destroyed from Henley, Acebedo, Wang and each DOE Defendants iPhones, chat apps and Macbook's contained pictures of Plaintiff's DTSA data and potentially Waymo's DTSA data. It was central to the issues being tried and at the heart of the causation—and because this evidence was destroyed—the parties and the court focused on "other" methods i.e. text messages (allegedly used to improperly transfer trade secrets) and—*not*—the use of cyber-surveillance. Presumably under the direction of Cook, Google's CEO Larry Page, the FBI/Comey, Morrison and Foerster, LLP, Uber's attorneys, Gonzalez, Esther Chang, who are officers of the court—pinned the theft on Levandowski—while attorneys for Kalanick at the law firm Orrick, Herrington and Sutcliffe, LLP, another former DOJ employee, deceived the court and Waymo by having them focus on Kalanick's text messages (text messages the Defendants knew would not contain the trade secrets) see *Waymo* case at Dkt. Entry 1164.

The Defendants blamed Levandowski in an effort to conceal Cook, Apple, Kalanick, Sullivan, West, Henley, Acebedo, Wang and each DOE Defendants use of the offensive cyber-surveillance to steal Waymo, Plaintiff's and other's DTSA data, ratified by Apple and Uber, their board and other DOE Defendants. Additionally, Padilla, attorneys for Uber, who's also an officer of the court, violated a court order by concealing Richard Jacobs whistle blower letter "Jacobs Letter." Richard Jacobs is a former Uber employee, who through his attorney alleged Kalanick, Sullivan, Henley and others used "screen captures" and other cyber-surveillance methods to access DTSA data and to spy on competitors, politicians, regulators, and law makers in furtherance of the unlawful business arrangement and concealment scheme in violation of 18 U.S.C. 1961, sections §§ 1831, 1832.

[13] The Ninth Circuit's focus on the defendant's "failure to disclose" clearly refutes Gonzalez and Padilla's contention that "failure to disclose "Jacobs Letter" and other central facts . . . is permissible." Pursuant to multiple Circuit Courts and the Supreme Court in *Hazel-Atlas*, it is clearly fraud on the Court.

---

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 177 of 312    Page
ID #:177
Case 9:23-cv-80316-AMC    Document 4-1    Entered on FLSD Docket 03/02/2023    Page 72 of 203

The court examined whether the fraudulent misrepresentations went to the main issue of the case, or instead went to "immaterial and technical inaccuracies." Id. *Pumphrey*, 62 F.3d at 1133.

After a careful analysis of the misconduct, the court found that the general counsels "failed to abide by the [rules of discovery and professional responsibility]" Id.

The court opinioned that the general counsel's failure to uphold the duty of candor by an officer of the court, harmed the integrity of the judicial process and obstructed the proper administration of justice.

The court ultimately ruled that the misconduct amounted to a fraud on the Court committed by an officer of the court. Id.

Importantly, the court specifically considered and rejected the argument that fraud could not be found where the concealment of evidence did not affect the outcome of the case.

In this regard, California's Ninth Circuit Court of Appeals stated that the defendant's argument "misse[d] the point." Id. at 1133.

The panel of federal judges asserted in their opinion and ruling that "The issue here is not whether [the plaintiff] would have prevailed had the original video been produced.

They also noted in *Intermagnetics*, that 'the inquiry as to whether a judgment should be set aside for fraud upon the Court under Rule 60(b) focuses not so much in terms of whether the alleged fraud prejudiced the opposing party but more in terms of whether the alleged fraud harms the integrity of the judicial process," Id. (quoting *Intermagnetics*, 926 F.2d at 917).

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO   Document 1   Filed 07/08/24   Page 178 of 312   Page
ID #:178
Case 9:23-cv-80316-AMC   Document 4-1   Entered on FLSD Docket 03/02/2023   Page 73 of 203

4.      **In re Levander**

In *Levander*, California's Ninth Circuit Court of Appeals found fraud on the

Court where the court relied on perjured testimony in issuing a decision. 180 F.3d at

1120.

The *Levanders* were Chapter 11 bankruptcy debtors who were awarded attorneys'

fees against a certain corporation. Id. at 1116. At the time the attorneys' fees were awarded,

neither the debtors nor the bankruptcy court knew of the existence of a partnership to

which the corporation had transferred all of its assets. Id. at 1117.

The bankruptcy court therefore awarded the debtors attorneys' fees and costs

against the corporation only. Id. The bankruptcy court and the *Levanders* were ignorant as

to the existence of the partnership because one of the corporation's officers falsely testified

at a deposition that the corporation had not sold its assets and was still an active company.

Id. [14] Notably, the Ninth Circuit's opinion never discusses whether the corporation's

attorneys were aware that this perjury was being committed. [15] Two years later, after the

---

[14] *Levander* is yet another case that clearly demonstrates Cook, Apple, Apple's attorneys and the other Defendants "committed or intentionally perpetrated unlawful acts with the intent to conceal the schemes that formed the business arrangement" and suborned the perjury from multiple officers of the court and "presented it to the court in an effort to influence its decision," specifically the fabrication of "screen captures" as well as Chhabria's failure to address the unlawful conduct. . . ." (Id.)—in an all-out effort to conceal Apple and Uber's use of cyber-surveillance. [15] As was the case in *Levander*, Apple and Uber's attorneys not only deceived Plaintiff, they deceived the court, and they did so not on peripheral issues but on issues going to the core and causation of these cases, including the *Mackintosh* case. They had their attorneys urge the bogus declarations upon the court through mail and wire. The Defendants alleged perjury went as far as testifying before Congress to claim "no backdoor existed into the iPhone" and that "iPhone is encrypted." These false and deceitful statements misled members of Congress as Cook and Apple had allegedly and already granted Kalanick, Uber, Sullivan, Henley, Wang, and each DOE Defendant access to third-party developer's iPhone screens to "screen capture their DTSA data." Apple expected Congress to rely on the perjured testimony, and Congress did rely upon it—entering it into the Congressional record.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

corporation failed to pay the attorneys' fees as ordered, it was revealed the partnership had

purchased the Corporation's assets several months before the corporate officer testified. Id.

The court found there was a fraud on the Court because "not only did the Corporation and

the Partnership deceive the *Levanders* . . . they also deceived the court, because the court

relied [16] on the Corporation's depositions to impose attorneys' fees on the Corporation

rather than on the party with the assets—the Partnership." Id.

**5.   Derzack v. County of Allegheny, Pennsylvania**

Because "[t]he discovery process is an integral part of the judicial process,"

pervasive discovery abuses not limited to false discovery responses, even when not

presented to the court, have been found to amount to fraud on the Court. [17] See case

*Derzack v. Cnty. of Allegheny*, 173 F.R.D. 400, 416 held in the United States District Court,

Western Division of Pennsylvania in 1996, aff'd sub nom *Derzack v. Cnty. of Allegheny*

*Children & Youth Servs.*, 118 F.3d 1575 (3d Cir. 1997).

In the case of *Derzack*, the "parties were engaging in court-ordered discovery under

the authority and jurisdiction of the [court] and its rules and procedures." Id. The plaintiffs

"engaged in a pattern and practice of 'stonewalling, bad faith and lack of candor." Id.

---

[16] As was the case in *Levanders*, the record shows Chhabria relied on Apple's attorney's legal briefs that deceive and misdirected the court, and attacked the truth-finding mechanics of the court's judicial machinery—all to conceal cyber-surveillance facts. [17] Of course, the *Derzack* case directly contradicts Uber's bad faith litigation misconduct it argued was legal. In fact, prior to and during the *Waymo* case, Cook, Kalanick, Henley and each DOE Defendant instructed and or otherwise destroyed critical cyber-surveillance evidence (i.e. remote screen captures/screen recordings files etc.) located on multiple Apple devices, not limited to iPhone and within encrypted chats and devices belonging to Wang, Acebedo and each DOE Defendant. The Defendants believed their acts would avoid detection and never be subject to legal discovery because Wang, Acebedo and each DOE Defendants were not legally hired by Apple or Uber, and a standard preservation of evidence order focused on Apple and Uber work laptops, Apple and Uber networks, and Apple and Uber devices i.e. iPhones.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 180 of 312    Page
ID #:180
Case 9:23-cv-80316-AMC    Document 4-1    Entered on FLSD Docket 03/02/2023    Page 75 of 203

The plaintiffs in the *Derzack* case manipulated financial data relevant to their

business loss claim, and turned over falsified and fraudulent documents to the opposing

party. Id. at 404. One of the plaintiffs then testified falsely at his deposition about these

documents and related facts. Id. at 405. The plaintiffs argued there was no fraud on the

Court, per se, because the fraudulent documents were never submitted to the court. Id.

at 403. However, the district court found that since the "parties were engaging in

court-ordered discovery under the authority and jurisdiction of the [court] and its rules

and procedures[,]" and the plaintiff's "knowing and intentional improper conduct occurred

under this court's supervision and . . . grossly tainted the litigation process of the court,"

it did not matter that the plaintiff's "improper conduct did not violate a per se order of this

court . . . ." Id. at 416. In short, the plaintiff's false discovery responses amounted to fraud

on the Court "[b]ecause the inherent power of the court reaches conduct both before the

court directly and beyond the court's confines, and because the discovery and settlement

processes in this case were certainly within the penumbra of the court's authority and at the

hands-on supervision of [the magistrate judge] . . . ." Id. Thus, the "plaintiff's misconduct

adversely impact[ed] the judicial system . . . ." Id. [18]

---

[18] Alsup concluded Uber's attorneys violated court orders by concealing Jacobs Letter. A
letter that described the Defendants use of remote "recordings" and "screen captures" as part
of the cyber-surveillance activity. Plaintiff alleges the concealment efforts were aided and
abetted by Cook, Clarke, Kalanick, Sullivan, Berkowitz, Padilla, Gonzalez, and former
United States Attorney, Eric Holder, attorney at Covington and Burling, LLP, and
potentially other corrupt government actors. The record shows the *Waymo* case was plagued
by "abuses affecting virtually every aspect of the discovery process" that concealed the cyber-
surveillance used to target Levandowski, Plaintiff, politicians, regulators and others. This
type of fraud satisfies *Derzack*. In fact, multiple screen captures/recordings containing
Plaintiff's DTSA data were deleted from Acebedo, Wang and other Defendants iPhones
using the remote cyber-surveillance during litigation in the *Waymo* case, and or consented it
to be destroyed when Uber's attorneys knew it was ordered to be turned over by the court.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 181 of 312    Page
ID #:181
Case 9:23-cv-80316-AMC    Document 4-1    Entered on FLSD Docket 03/02/2023    Page 76 of 203

6.      **Pacific Packaging Products, Inc. v. Barenboim, et al.**

In the *Pacific Packaging Products, Inc. v. Barenboim, et al.,* case number

MICV2009-04320-J ("the *Pacific Packaging* case"), a Superior Court Judge Bruce R. Henry

ordered the defendants to pay the plaintiff $916,364 in attorneys' fees, $125,595 for

expenses incurred for the forensic examinations of the defendants' computers and other

electronic devices, and $31,834 for other litigation costs.

The plaintiff's attorney in the *Pacific Packaging* case, Michael R. Gottfried, attorney

at the law firm Duane Morris, LLP in Boston, sees Henry's decision as sending a clear

message: "The courts and the parties need to be able to rely on witnesses' testimony and

their conduct, and that people will play by the rules so that there can be a fair result,"

Gottfried said. Here, *Pacific Packaging* was "denied the opportunity to have its

preliminary injunction request fairly resolved because the judge decided [on the] motion

[without knowing all of the true facts]." [19] Defendants James Barenboim, Andrew Slater,

Steven Slater and David Guild worked in sales for plaintiff *Pacific Packaging*.

---

[19] *Pacific Packaging* is yet another case that parallels the *Mackintosh* case. It demonstrates that Chhabria, who's a government actor, was "not aware of all of the true facts," and still chose to obstruct Plaintiff's preliminary injunction, a motion to dismiss hearing, and other hearings that would have revealed more of the true facts. Through a plain usurpation of judicial power, he concealed Cook, Apple, Apple's attorneys, and the other Defendant's trail of fraud on the Court. It obstructed factual development, and concealed the cyber-surveillance and sherlocking activity that's part of the Defendant's business arrangement that proximately caused Plaintiff's injury and damages. Additionally, as was the case in *Pacific Packaging* and the *Mackintosh* case, the Defendants spoliated and destroyed evidence throughout the trail of fraud on the Court from as early as 2013 to present. In what could be the most significant piece of cyber-surveillance evidence filed in federal court ((screen capture) in the *Mackintosh* case) not only did the Defendants destroy critical electronic evidence from iPhones, Macbooks, servers and elsewhere related to the existence and use of cyber-surveillance, Chhabria repeatedly failed to address Apple's attorney's unlawful fabrication of screen capture evidence after it was brought to his attention. Chhabria doubled down in his participation in the concealment scheme by corruptly defiling the court.

---

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 182 of 312    Page
ID #:182
Case 9:23-cv-80316-AMC    Document 4-1    Entered on FLSD Docket 03/02/2023    Page 77 of 203

In October 2009, Barenboim, Guild and the two Slaters left to form a competing

company, defendant Packaging Partners. Defendant Sandra Zeraschi, another sales

employee at *Pacific Packaging*, subsequently resigned her sales position and went to

work for Packaging Partners. By November 2009, the plaintiff sued the defendants for

misappropriation of trade secrets and violation of Chapter 93A, alleging the individual

defendants had taken proprietary customer information with them on their laptops when

they left for the new venture. Superior Court Judge Garry V. Inge granted the plaintiff's

motion for expedited discovery and ordered the preservation and production of all

documents and electronically stored data relating to the plaintiff's claims. After a hearing

that showed the defendants had misused *Pacific Packaging* information in securing business

from a certain customer, Judge Thomas P. Billings granted a preliminary injunction barring

the defendants from selling products to that customer for a period of one year.

Zeraschi later quit *Pacific Packaging* and made startling claims of misconduct on the

part of the other defendants in the case. In game-changing testimony [20] Zeraschi asserted

that the other defendants had not complied with discovery orders by turning over all

relevant information. Zeraschi also testified that the defendants had been selling products

in violation of Billings' injunction. Zeraschi's testimony prompted the plaintiff to move for

default judgment on the basis that the defendants committed fraud on the Court by falsely

testifying they had turned over all proprietary materials of the plaintiff in their possession,

and that they also had spoliated evidence and violated the preliminary injunction.

---

[20] As was the case of *Pacific Packaging*, even after attorneys omitted material fact from
Jacobs Letter related to Cook and Apple, it was a game-changing revelation i.e. the use of
cyber-surveillance to steal DTSA data, i.e. through remote screen captures/recordings, and
the Defendants concealment efforts that furthered the concealment scheme.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

For Gottfried, he expressed a similar opinion that Alsup expressed in the *Waymo* case, he stated it's the "first time in 34 years of practice that he's had to litigate a fraud upon the Court claim." He says it was fortunate for his client that Zeraschi came forward and revealed the fraud. "It's very hard to catch…" Gottfried further stated, "The cases say that one of the reasons they need to be sanctioned severely when it is caught is that you need the deterrent effect." In January 2014, Henry found that the defendants' misconduct warranted a default judgment with respect to claims relating to proprietary information used to obtain business in violation of the preliminary injunction.

### 7. Fraud upon the Court may arise from a Course of Conduct.

Fraud upon the Court may also be found in an entire course of conduct by a party, rather than a single act of fraud directed at the court. *Pumphrey*, 62 F.3d at 1133—listing course of conduct undertaken by general counsel which constituted fraud on the Court.

There is no authority suggesting that relief under Rule 60 depends on the existence of a single egregious act of litigation malfeasance. Rather, the case law makes clear that fraud on the Court occurs when a party engages in "fraud which does[,] or attempts to, defile the court itself, or is perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are present for adjudication," *Intermagnetics*, 926 F.2d at 916 (citation omitted), whether the fraud which defiles the court occurs in a single act, such as proffering perjured testimony for the court's reliance, *Levander*, 180 F.3d at 1120, or a course of conduct, *Pumphrey*, 62 F.3d at 1133. The sole issue is whether the conduct amounts to "an effort by the [opposing party (the Defendants attorneys, Chhabria, Soong and others)] to prevent the judicial process from functioning in the usual manner." *Stonehill*, 660 F.3d at 445. *Stonehill* evidences the

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO     Document 1     Filed 07/08/24     Page 184 of 312     Page
ID #:184
Case 9:23-cv-80316-AMC     Document 4-1     Entered on FLSD Docket 03/02/2023     Page 79 of 203

Ninth Circuit's recognition of this rule. There, the Ninth Circuit analyzed seven separate

instances of litigation malfeasance identified by complainant [21] *Stonehill*, who brought

the Rule 60 action, as proof of the government's fraud on the Court. 660 F.3d at 446-51.

The Ninth Circuit first examined each instance of misconduct in isolation to determine

whether it constituted a fraud upon the Court, and determined that each category did not

individually satisfy the standard. Id. at 466-51. It then examined whether the "allegations as

a whole" "change[d] the story as presented to the district court" such that they amounted to

fraud on the Court. Id. at 451, 452. The court ultimately found that the conduct, considered

in its totality, did not constitute fraud on the Court because it did not go to the central

issues of the case. Id. at 452. [22] Despite this fact-specific conclusion, *Stonehill* makes clear

that the law does not require that the court analyze each instance of misconduct in a

vacuum. Rather, the court must also consider whether a party's entire course of conduct

rises to the level of "harm[ing] the integrity of the judicial process" such that it was

"prevent[ed] . . . from functioning in the usual manner," Id. at 444-45… several instances

of litigation misconduct may collectively constitute a fraud upon the Court. Living Designs,

Inc., v. *El Dupont de Nemours and Co.*, 431 F.3d 353 (9th Cir. 2005).

---

[21] As was the case in *Stonehill*, Plaintiff has identified several cases described below
(i.e. United States Senate and Congressional hearings, inquiries and investigations, the
'*DOJ, Waymo, Harang* and *Mackintosh*" cases and potentially other cases) that involve the
Defendants alleged fraud on the Court. Their fraud concealed material facts related to the
use of cyber-surveillance and sherlocking activity, among other organized crime.

[22] In each relevant case, the record shows the Defendants perpetrated fraudulent acts that
attacked the central issues being tried or evaluated—through their concealment scheme used
to "hide key facts" related to the existence and use of cyber-surveillance to steal Plaintiff's
DTSA data. The Defendants also allegedly used the cyber-surveillance to: a) access witnesses
iPhones and DTSA data to threaten, harm, blackmail and or tamper with their testimony to
change the truth; b) fabricate evidence; and c) spoliate evidence—including other ways used
to obstruct Plaintiff and deprive him of damages, property and justice.

**D.** **A Motion or Action for Fraud on the Court is Not Precluded by Passage of Time and may be Filed Anytime Fraud is Perpetrated on the Court.**

There is no time bar to a motion to set aside a judgment for fraud on the Court. F.R.C.P. 60(c). Indeed, the rule makes clear that the one-year time-limit applicable to circumstances set forth in subdivision (b) does not apply to subdivision (d)(3). F.R.C.P. 60(c)(1). In keeping with the plain language of the rule, California's Ninth Circuit of Appeals has clearly held that Rule 60 "provides no time limit on courts' power to set aside judgments based on a finding of fraud on the Court." *Stonehill*, 660 F.3d at 443 (citation omitted). "[T]he power to vacate for fraud on the Court is . . . great," and is largely "free from procedural limitations . . . ." Id. at 444 (citing 11 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 2870 (2nd Edition 1987)). Thus, any delay in bringing a motion for fraud on the Court does not bar the court from granting relief under Rule 60(d)(3), see, e.g., *Hazel-Atlas*, 322 U.S. at 247. [23]

---

[23] Of course, the precedent set in *Hazel-Atlas*, 322 U.S. at 246, addresses the litigation malfeasance allegedly perpetrated by Apple and Uber's attorneys, the Defendants and their attorneys, and each DOE Defendant. Specifically, their thought to craft multiple schemes aimed at "…interfer[ing] with the judicial machinery performing the task of impartial adjudication…" "…[]by preventing [Plaintiff] from fairly presenting his case or defense…" *In re Pretrial Proceedings in Antibiotic Antitrust Actions*, 538 F.2d 180, 195 (8th Cir.1978) (citations omitted) also as described in Ninth Circuit Court of Appeals case related to the *Mackintosh* case. At every turn, the Defendants caused the system to dispense justice based on repeated acts of deception and fraud, and while it is clear the alleged interconnected conduct rises well above what is required for finding a fraud upon the Court, corrupt officers of the court and stewards of truth in the Ninth Circuit participated in the trail of fraud by ignoring their own past years-long instructive rulings, opinions and precedent they set to uphold the integrity of the judicial system, not limited to the cases of *Stonehill* and *Levanders*. The judges refused to address the Defendants alleged misconduct, even after Plaintiff cited the misconduct from the courts record and brought to their attention. Their failures happened while they continued allegedly receiving promotions and or other bribes, including cashing out of Apple stock as discussed further. Thus, as a matter of law, this Rule 60(d)(3) motion is properly filed here, and permitted, and Plaintiff's relief should be granted.

---

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

The Supreme Court has recognized, "[E]ven if [the moving party] did not exercise the highest degree of diligence [the] fraud cannot be condoned for that reason alone. . . . Surely it cannot be that the preservation of the integrity of the judicial process must always wait upon the diligence of the litigants.

The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud." Id.

The Ninth Circuit echoed this reasoning in *Pumphrey*, stating: "[E]ven assuming that [the plaintiff] was not diligent in uncovering the fraud, the district court was still empowered to set aside the verdict, as the court itself was a victim of the fraud." 62 F.3d at 1133.

Rule 60 unequivocally applies to any "judgment, order, or proceeding," and makes no distinction regarding its application to final dispositions such as stipulated judgments, consent judgments, or other orders. F.R.C.P. 60. Indeed, Rule 60(d) does not tie the court's power to "set aside a judgment for fraud on the Court" to the nature of the ultimate disposition of the case.

The case law and precedent is consistent with this broad language. Contrary to Apple's attorney's assertion in their motion to dismiss in the Ninth Circuit Court of Appeals, the Supreme Court implicitly recognized in *Hazel-Atlas* that "**a court**" (including this Court) should grant relief from a judgment obtained by fraud on the Court.

As set forth above and further herein, the Supreme Court and lower circuit courts have repeatedly recognized the need to protect the institutions of justice from egregious fraud, *Hazel-Atlas*, 322 U.S. at 246. "Courts cannot lack the power to defend their integrity against unscrupulous marauders; if that were so, it would place at risk the

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

very fundament of the judicial system." *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1119 (1st Cir. 1989).

As the First Circuit so precisely stated in Aoude, it is "[s]urpassingly difficult to conceive of a more appropriate use of a court's inherent power than to protect the sanctity of the judicial process—to combat those who would dare to practice unmitigated fraud upon the Court itself."

"To deny the existence of such power would . . . foster the very impotency against which the *Hazel-Atlas* court specifically warned." Id.

In light of the Supreme Court's decision in *Hazel-Atlas*, and the many cases recognizing the robust inherent power of a federal court to confront fraud worked upon it, a rule proscribing application of this power to judgments obtained through fraud would not only be superficial, it would allow a "wrong against the institutions set up to protect and safeguard the public" to go unchecked. *Pumphrey*, 62 F.3d at 1133 (quoting *Hazel-Atlas*, 322 U.S. at 246).

Furthermore, although Rule 60(d)(3) is the only rule that mentions a fraud on the Court doctrine, courts have cited and used F.R.C.P. 11, 16, 26, 37, and 41, in applying the doctrine of severe sanctions as a method of deterrence.

For example, courts have dismissed, defaulted, and sanctioned [defendants] for fraud on the Court, and have found the necessary authority outside of Rule 60(d)(3)—often citing the inherent power given to "all courts" to fashion appropriate remedies and sanctions for fraud on the Court. See *Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co.*, 771 F.2d 5, 11-12 (1st Cir.1985), *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 589 (9th Cir.1983), *Eppes v. Snowden*, 656 F. Supp. 1267, 1279 (E.D. Ky. 1986).

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

## IX.    LEGAL ANALYSIS

**E.**    **Apple, Tim Cook, Bruce Sewell, Travis Kalanick, Uber and the other Defendants Have Allegedly Perpetrated a Fraud Upon the United States Senate and Congressional Courts, including various Ninth Circuit District Courts and the Ninth Circuit Court of Appeals to Conceal the Cyber-Surveillance, Sherlocking and other Schemes.**

The alleged pervasive and coordinated acts by Cook, Kalanick, Apple, Uber and the other Defendants and each DOE Defendant, whether viewed in isolated parts or as a whole, clearly and convincingly reflects "an effort by officers of the court and government actors to prevent the judicial process from functioning 'in the usual manner,'" and also "involves fraudulent acts [ ] so fundamental that it undermined the workings of the adversary process itself." *Stonehill*, 660 F.3d at 445.

The Defendants attorneys who are all officers of the court, allegedly aided and abetted the Defendants concealment of the cyber-surveillance-scheme, sherlocking scheme and judicial schemes. The Defendants and their attorneys also aided and abetted the destruction of key documents and files by, and among other things, suborning and or coercing Apple and Uber employees to sign multiple bogus and fraudulent declarations, and to perjure themselves to conceal material key facts. The unlawful activity that took place in multiple courts of law, further aided and abetted the Defendants in their trail of fraud on the Court—that is—by fabricating screen capture evidence, tampering with witnesses, extorting Plaintiff, suborning witnesses to perjure themselves under oath, and while providing their testimony with information that may have misled them to lie, i.e. Sewell being misled or coerced to read scripts written by Apple's attorneys. Whether analyzed alone or collectively, these acts establish fraud upon the Court as set forth below.

X.    **PROCEDURAL HISTORY & FACTUAL BACKGROUND OF EACH SEPARATE INSTANCE OF MISCONDUCT BY THE DEFENDANTS, AND CORRUPT GOVERNMENT ACTORS, WHO ARE ALL OFFICERS OF THE COURT, CONSTITUTE FRAUD ON THE COURT.**

Plaintiff understands this Court will rule upon the sufficiency of the facts underlying a Rule 60(d)(3) motion.

When this Honorable Court makes a ruling regarding this motion, it must do so by assuming the facts to be true in all respects and view them in light most favorable to the court, judicial system and Plaintiff, and assess them in relation to the standards for relief under Rule 60(d)(3).

In an effort to reframe the underlying allegations in the manner most convenient for this Courts assessment of whether the allegations, taken as true, state a claim upon which relief under Rule 60(d)(3) can be granted, Plaintiff provides the factual and legal background that is germane as to all instances of the Defendant's alleged misconduct, and then, as appropriate, briefly describe additional allegations connecting the facts which are relevant to each particular instance of misconduct.

Immediately following each instance of misconduct, Plaintiff addresses whether, assuming the truth of the allegations, the facts separately constitute fraud on the Court within the meaning of Rule 60(d)(3).

At the conclusion of the discussion regarding each separate instance of misconduct, Plaintiff also addresses whether the multiple instances of alleged misconduct collectively constitute fraud on the Court within the meaning of Rule 60(d)(3) under the *Hazel-Atlas* precedent and other cited case law.

F.    **Background Facts Relevant to the Defendants Alleged Fraud on the Court.**

1.    **Tim Cook Allegedly Conspired with Apple's Attorneys to Conceal Apple's Cyber-Surveillance Methods by Corrupting a United States District Court in the Eastern District of New York and a Central District Court of California.**

In 2014, the National Security Division and Cyber and Intellectual Property Crimes Section of the DOJ sought Apple's technical assistance in case number 1:15-MC-01902-JO ("the *New York* case") in the United States District Court Eastern District of New York.

The litigation in the case led both federal prosecutors at the DOJ and the defendants to a roadblock. An "iPhone" belonging to the defendant was locked and passcode protected, and the DOJ could not access the user data because the iPhone was "encrypted."

On October 8, 2015, the DOJ filed an instant Application, ordering Apple to "rewrite iOS" allowing a backdoor into the iPhone to access the defendant's user data.

The DOJ made several pertinent factual assertions in its Application:

• "Because the iOS device is locked, law enforcement agents are not able to examine the data stored on the iOS device as commanded by the search warrant."

• "[I]n other cases, courts have ordered Apple to assist in effectuating search warrants under the authority of the All Writs Act. Additionally, Apple has complied with such orders."

• "The requested order would enable agents to comply with this court's warrant commanding that the iOS device be examined for evidence identified by the warrant."

• "Examining the iOS device further without Apple's assistance, if it is possible at all, would require significant resources and may harm the iOS device."

• "[T]he [requested] order [does not place an unreasonable] burden on Apple."

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 191 of 312    Page
ID #:191
Case 9:23-cv-80316-AMC    Document 4-1    Entered on FLSD Docket 03/02/2023    Page 86 of 203

In response, and to rebuttal the DOJ's factual assertions in the *New York* case,
Cook and Apple asserted through their in-house and outside attorneys at the law firm
Gibson, Dunn and Crutcher LLP, that, "As a preliminary matter, the government has
utterly failed to satisfy its burden to demonstrate that Apple's assistance in this case is
necessary—a prerequisite to compelling third-party assistance under the All Writs Act…"

Cook and Apple stated that, the "government has made no showing that it has
exhausted alternative means for extracting data from the iPhone at issue[], either by making
a serious attempt to obtain the passcode from the individual defendant who set it in the first
place—nor to obtain passcode hints or other helpful information from the defendant—or
by consulting other government agencies and third parties known to the government…"
Cook and Apple continued defying the DOJ and asserted that the, "government has gone
so far as to claim that it has no obligation [to satisfy its burden], notwithstanding media
reports that suggest that companies already offer commercial solutions capable of accessing
data from [iPhones] running iOS 7, which is nearly three years old, Ex. B [Kim Zetter,
How the Feds Could Get into iPhones Without Apple's Help, Wired (Mar. 2, 2016)
(discussing tech[] that might be used to break into [iPhones] running iOS 7)]…"
"…The order the Government seeks here, which would require Apple to take possession
of and use its own technology to extract data from an [iPhone] over which it has no
custody or control, is neither grounded in common-law nor authorized by statute."

Apple closed its argument by stating, "Because the order the government seeks
goes well beyond the common-law powers authorized by the All Writs Act, and the All
Writs Act confers interstitial rather than plenary authority, the court can only grant the
governments requested relief in some other statute that provides it with such authority.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

There is no such statute here." After Apple violated the New York District Court's order, the DOJ filed a subsequent action in California's Central District Court "the *DOJ* case" on February 19, 2016 further compelling Apple to comply with the court order it had violated in New York. As was the case in *Hazel-Atlas*, *Pumphrey*, *Levanders* and *Dixon*, Cook, Apple's in-house and outside attorneys, not limited to attorneys at Gibson, Dunn and Crutcher LLP, used mail and wire communications to deceive the DOJ, and defiled the Central District Court in the Ninth Circuit. They did so not on peripheral issues, but on issues central to the case, and the DOJ's request. In doing so, Cook and each DOE Defendant conspired to suborn employees who are in key positions at Apple to misdirect the court, aimed at concealing other methods used to gain backdoor access into iPhone.

By February 26, 2016, multiple Apple employees, including an employee who's a former attorney at the law firm Perkins Coie, LLP, who's an officer of the court, declared false and deceitful statements under penalty of perjury. These statements were carefully crafted and were material and central to issues being tried in the *DOJ* case. Soon thereafter, Cook, his attorneys, Apple's in-house and outside attorneys, "procured signatures," on multiple declarations through wire communication, see *DOJ* case at Dkt. Entry 16-32-33, *United States v. Hairston*, 46 F.3d 361, 376 (4th Cir.), cert. denied, 116 S.Ct. 124 (1995); *United State v. Silverman*, 745 F.2d 1386, 1395 (11th Cir. 1984); *United States v. Heater*, 63 F.3d 311, 320 (4th Cir. 1995); *United States v. Walser*, 3 F.3d 380, 388 (11th Cir. 1993). The declarations were then mailed and communicated to the court through wire—to "hide and conceal key cyber-surveillance facts"—harming the court through the course of conduct. Specifically, Apple refused to "rewrite iOS for iPhone to access and extract iPhone data" because it would be "too dangerous" and "undermine the United States Constitution."

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

In one declaration, an Apple employee declared that "When a user sets up an iPhone, the user designates a device passcode, consisting of four, six, or more alphanumeric characters. This passcode is part of the encryption for files with certain classes of protection. The stronger the user passcode is, the stronger the encryption becomes. On iPhones running iOS 8 or newer operating systems, the major types of user data, including messages, photos, contacts, email, notes, and calendar data all are encrypted with keys protected by a key derived from the user-chosen passcode."

The Apple employee further declared that "a further safeguard for iOS devices is the creation of a Unique ID ("UID") for every device during [production], which is not accessible to the operating system or stored by Apple. When the decryption key for a device is being generated, the user-chosen passcode is entangled with that device's UID. This means that data is protected with a key cryptographically tied to a given device, and consequently iOS is designed to require passcode validation (and therefore any attempted brute-force attack) be performed on the physical device itself."

All and all, Cook and Apple, and their attorneys suborned Apple employees to establish that "accessing user data on an iPhone through iOS is not possible." Instead, they fraudulently declared that Apple would have to "rewrite iOS" and sign a "certificate of authority" each time the government attempted to access user data on an iPhone, see the *DOJ* case at Dkt. Entry 149-3 ¶ 10 of 177 Page ID#2410 "A certificate authority is the entity that issues digital certificates. Certificate authorities create the public/private key pairs, and are responsible for ensuring the security of the private key. Apple has built its own certificate authority and has created its own public/private key pair used in the iPhone…" "…[]the public key is permanently programmed into the ROM of the iPhone,

72

Case 2:24-cv-05854-RGK-RAO   Document 1   Filed 07/08/24   Page 194 of 312   Page
ID #:194
Case 9:23-cv-80316-AMC   Document 4-1   Entered on FLSD Docket 03/02/2023   Page 89 of 203

while the 'private key is controlled and protected by Apple.' Because only 'Apple possesses its private key, only Apple is able to sign software that will be loaded on its devices.' By keeping the private key secret, Apple ensures that 'only software signed by Apple using its private key can be loaded on its devices during the boot process.'"

Theodore J. Boutrous Jr., Apple's attorney at Gibson, Dunn and Crutcher, LLP, procured the signatures on multiple perjured declarations. Boutrous subsequently urged the unlawful documents upon the Central District Court of California through mail and wire communication throughout February 2016, in violation of multiple courts orders.

One declaration for example was labeled, **"DECLARATION OF ERIK NEUENSCHWANDER IN SUPPORT OF APPLE INC'S MOTION TO VACATE ORDER COMPELLING APPLE INC. TO ASSIST AGENTS IN GOVERNMENT'S MOTION TO COMPEL ASSISTANCE"**, see *United States v. Debrow*, 346 U.S. 374, 377 (1953). The perjurious, bogus and unlawful declarations knowingly made calculated, misleading and deceitful claims that were material to the DOJ's request. Specifically, that accessing the defendant's user data on a locked and password-protected iPhone was not possible, short of "rewriting a new iOS." Apple employees declared that even if Apple were to "rewrite iOS" Apple would have to maintain a team to sign a certificate of authority each time the government executed the newly written iOS to access user data on an iPhone.

Cook, and his attorneys, Apple's attorneys, and the other Defendants unknown to Plaintiff at this time, knew or should have known Apple's employee's statements to be materially false and misleading. The misleading statements were still made with knowledge of its falsity and were made to deceive the court. Under the direction of Cook, his attorneys, Apple's in-house attorneys and Boutrous, multiple Apple employees

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

(except Cook) were *again* suborned into making deceptive statements by declaring that: "*if*" Apple and its employees were to assist the DOJ in accessing user data on an iPhone through a "rewritten iOS," each iPhone would have to be physically and securely transported to a government facility and or Apple's headquarters to extract the data.

These statements were materially made under penalty of perjury under the laws of the United States, with the intent, to conceal the true facts related to Apple's "alternative technological means" of accessing iPhone data. Specifically, Apple's iPhone mirroring capability Cook, Kalanick, Henley, Wang and others used to gain access to DTSA data in furtherance of the business arrangement. *Dixon*, 316 F.3d at 1046-47 ([] finding a fraud on the Court based on the actions of [officers of the court] in covering up relevant evidence.)

The false and deceptive statements made to the court, were made after Apple's secret projects teams, Uber, Kalanick, Sullivan, Henley, Wang, Acebedo and potentially others were actively using "Apple's private key, a rewritten iOS, Apple's certificate of authorities, Apple-code, Apple-provided software and other alternative technological means" to remotely access Plaintiff's iPhone screen through iOS to screen record and extract Plaintiff's DTSA data from his iPhone using remote screen captures in furtherance of the cyber-surveillance-fraud activity and business arrangement. The surreptitious access to Plaintiff's iPhone allegedly took place just months after Plaintiff sent Cook a partnership email, and during a criminal espionage investigation into Uber, and potentially Apple.

Cook knew or should have known the perjury and court order violations between approximately 2014-2016 would misdirect and conceal key facts that dramatically "changed the truth." *Kornblum v. Schneider*, 609 So.2d 138 (Fla. 4th DCA 1992); also, in *Pumphrey*, 1128, 1130, the court ruled that court order violations constitute "fraud on the Court."

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

2.       **Apple and Former FBI Director James Comey Devise a Baseless and**

**Sham Hearing aimed at Defrauding Congress and the American People to**

**Conceal the Cyber-Surveillance.**

In furtherance of the business arrangement, certain Defendants' attorneys in the

United States sought to defile any court and exploit any judge who threatened to reveal the

cyber-surveillance-fraud activity through proper and honest litigation. These United States

attorneys (including Apple and Uber's in-house and outside counsel among others) devised

a plan under the direction of Cook and corrupt government actors to subvert the district

courts orders that threatened to reveal Apple's "alternative means of extracting data from

the iPhone." To effect this plan, the Defendants' attorneys in collusion with former FBI

Director, James Comey initiated a sham hearing before Congress. On March 1, 2016, at

1:00pm E.T., then Apple's General Counsel and Senior Vice President, Bruce Sewell, who's

an officer of the court, testified under a properly administered oath before the United States

House Judiciary Committee Hearing on "Apple's iPhone encryption and the governments

demands to access data on an iPhone using a rewritten iOS." The Congressional hearing

transcript is available at: https://docs.house.gov/meetings/JU/JU00/20160301/104573/

HHRG-114-JU00-Transcript-20160301.pdf ¶ 4.

As exhibited below, during the hearing, Sewell stated, "The FBI has asked a court

to order [Apple] to give them something [Apple doesn't] have… To create an [iOS] that

does not exist… Granting the FBI's request would thoroughly undermine fundamental

principles of the [United States] Constitution." Sewell made these false and misleading

statements—*after*—Comey, allegedly participated in the concealment scheme, by

affirmatively stating that "Apple has never suggested[] another way" [to access iPhone

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

data]—*while*—Comey, the FBI, and potentially the DOJ and other government agencies

knew iPhone screens were being mirrored as they were investigating "Uber's iPhone

mirroring activity" described further below in "Jacobs Letter." Comey's statements were

made while the Defendants were causing the execution of iPhone screen mirroring into

Plaintiff's iPhone prior to and after Plaintiff emailed Cook in late December 2015. The

Defendants also used the cyber-surveillance to target justices, politicians, law makers and

others to unlawfully get ahead and inflate stock prices according to a former United States

Department of Defense Agent and former Uber Security Officer, Richard Jacobs.





76

3.      **The Defendants Devise and Execute a Fraudulent Media Blitz to Conceal the Cyber-Surveillance.**

While Sewell, Comey and others stood before Congress and made perjurious statements, Cook used attorneys at Latham Watkin, LLP, Gibson Dunn, LLP and other law firms to outline a "strategy" of continuing to fraudulently induce the American public using the Mainstream Media, i.e. the Media Enterprise arm of Apple.

As part of this sham strategy and false cyber-surveillance narrative, Apple and Cook's attorneys created and managed a campaign of false and misleading statements, and coordinated various efforts using various apps in the App Store, not limited to Twitter, Facebook, Apple News, the ABC News App among others. Cook himself also contributed to the efforts under the advice of his attorneys. And in fact, Cook and the other Defendants "hoodwinking of the mainstream media" benefits the Defendants counterparts doubly in that it allows them to republish-without correction-the mainstream media's false statements about the cyber-surveillance, as they did with the Comey's interview.

As another part of this sham strategy, Cook invited the ABC News Network in his office to perform an in person interview. During the bogus interview, Cook stated: "...David, if we knew a way to get the information on the [iPhone]... if we had a way to do this that would not expose hundreds of millions of other people... we would obviously do it... if a court can ask us to write this piece of software... think about what else they could ask us to write... maybe it's an operating system for surveillance..." as described in the *Mackintosh* case that describes, among other things, the Defendants offensive cyber-surveillance methods that were actively being used to target Plaintiff, and misappropriate Plaintiff's DTSA data from Apple Products, specifically, and not limited

77

Case 2:24-cv-05854-RGK-RAO   Document 1   Filed 07/08/24   Page 199 of 312   Page
ID #:199
Case 9:23-cv-80316-AMC   Document 4-1   Entered on FLSD Docket 03/02/2023   Page 94 of 203

to his iPhone while remotely activating his microphone and camera. Moreover, in addition
to recruiting reporters to cover the FBI v. Apple story and using the App Store to continue
fraudulently inducing the American People—Apple, Uber and others utilized the Lobbying,
Media, Public Relation, Political and Judicial Enterprise arms of Apple to distribute the
fabricated evidence in Congress' record, and pushed a false and deceptive narrative that
there is no backdoor into the iPhone, and that iPhone is private, safe, and encrypted.

Cook, Apple, and others were advised by their attorneys that if the false narrative
is echoed enough times to the consuming public, Americans will believe that there is
"no backdoor into the iPhone." Cook and Apple agreed. The Defendants then proceeded
to use Apple to echo and distribute thousands and potentially millions of articles to
hundreds of millions of iPhones through Apple's pre-installed news apps, Twitter, and
other illegitimate apps. The collective and separate goals were intended to hide key facts
(cyber-surveillance methods) from Congress and the consuming public. And as perhaps
proof that the Defendant's scheme and artifice to defraud Congress and the American
People succeeded, United States Senator for Florida, David Jolly's stated that, Cook and
Apple's Executives have "blood on their hands" [by not granting the FBI access to iOS
codebase] to rewrite iOS that grants the FBI backdoor access into a terrorists iPhone.



PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

**NEWS**

## Cook: FBI asking Apple to write software equivalent of cancer

**Jessica Guynn and Mike Snider** USA TODAY

Published 2:11 p.m. ET Feb. 24, 2016 | Updated 12:44 p.m. ET March 2, 2016

The FBI is asking Apple to write the "software equivalent of cancer," Apple CEO Tim Cook said in his first <u>public interview</u> since a federal judge ordered Apple to help law enforcement break into the iPhone of one of the San Bernardino, Calif., shooters.

"The only way to get information — at least currently, the only way we know — would be to write a piece of software that we view as sort of the equivalent of cancer. We think it's bad news to write. We would never write it. We have never written it — and that is what is at stake here," Cook said. "We believe that is a very dangerous operating system."

The deceptions however did not end there. Apple and Cook's reasoning for not granting FBI access to their codebase was structured by their attorneys in multiple scripts. One commonly used script was that Cook and Apple care deeply about "privacy and security," which was materially false and used to "hide key facts." This script is being used today, in multiple cases before multiple federal courts, as a reason not to regulate or break up Apple. These scripts are materially false because Cook, Apple and others had already granted Uber and potentially other Chinese funded apps backdoor access into millions of iPhones in 2014 to further the schemes that formed and furthered the business arrangement.

Notably in *Stonehill*, the Ninth Circuit Court of Appeals and a panel of circuit judges spoke of a scheme to hide "a key fact." (Id. 444.) Similar to *Stonehill*, and more to

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 201 of 312   Page
ID #:201
Case 9:23-cv-80316-AMC    Document 4-1    Entered on FLSD Docket 03/02/2023    Page 96 of 203

the point of fraud upon the Court, the Defendants made statements in open court under

penalty of perjury, and through various interviews and articles to "hide key facts." These

key facts are related to Apple's employees, not limited to Cook, Phil Schiller, Federighi

and Cue, the App Store Team and others at Apple—who granted Kalanick, Henley, Uber,

Wang, Government Contractors and the other Defendants, and each DOE Defendant

access millions of iPhones. The code also gave the Defendants access to Apple's codebase

to rewrite iPhone iOS and or access to Apple's private key used to conduct the offensive

and unlawful cyber-surveillance to aid and abet the theft of DTSA data in 2014 and or

targeting of politicians and law makers. These acts happened two years prior to the 2016

sham Congressional hearing.

In retrospect, Apple and Cook's court order violations, including Sewell and

Comey's perjury and fabricated evidence, and other false statements were intended to

"hide key facts" so as to advance a fraudulent defense and further the concealment scheme

to continue targeting Plaintiff and others for their DTSA data to further inflate and pump

Apple and Uber's stock prices. In fact, the Ninth Circuit Courts and Ninth Circuit Appeals

Court have observed that "most fraud upon the Court cases involve a scheme by one party

to hide a key fact[s] from the court and the opposing party." *Stonehill*, 660 F.3d at 444.

Here, the fraud perpetrated upon Senate, Congressional, and District Courts involve a

scheme by which Cook and the other Defendants used wire and mail communications

defined under 18 U.S.C. 1961, sections §§ 1341, 1343, to hide key fact[s]—(that the

Defendants used cyber-surveillance as early as 2013 to steal DTSA data and sherlock apps

to unjustly enrich Cook, Obama, Pelosi, Kalanick, Dara, Padilla, West, Federal Judges,

Congress Members, etc.)—from the United States Senate, Congress and the public.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

4.     **Apple hires Jonathan Zdziarski to Manipulate, Falsify and Delete**

**Cyber-Surveillance Files that Revealed Apple's iPhone Backdoor.**

Consistent with the concealment scheme and related strategies to coerce American's

into believing that there is "no backdoor" into iPhone——Apple's in-house and outside

counsel continued covering up any and all cyber-surveillance leaks. Through this approach

under Cook's directive——each DOE Defendant utilized Apple's unconstitutional mass

cyber-surveillance programs, operations, and data collection and discovered that a Forensic

Scientist named, Jonathan Zdziarski, had "identif[ied] suspicious "backdoors" running on

every iOS device. Zdziarski disclosed the evidence and files online for Americans to view.

Under the advice of its counsel, Apple was directed to hire Zdziarski, available at:

https://www.zdziarski.com/blog/?p=7016. Under the guise of a legitimate hiring process,

Zdziarski was hired to unlawfully sign "confidentiality contracts" and other legal

documents that required him to stay silent about Apple's backdoor access into iPhone

and delete any and all forensic findings and files. Apple knew that Zdziarski is a hacker,

who goes by the name "NerveGas" in the iPhone development community. Zdziarski

worked as a dev-team member on many of the early iOS jailbreaks and is the author of

five iOS-related O'Reilly books including "Hacking and Securing iOS Applications."

Before his hiring at Apple, and during his research, Zdziarski further demonstrated

that "a number of undocumented high value forensic services running on every iOS device"

and "suspicious design omissions in iOS []make [data] collection easier," in violation of the

Fourth Amendment of the United States Constitution, that is, "unreasonable searches and

seizures" among other foundational laws. He also provided examples of forensic artifacts

acquired that "should never come off the [iPhone]" without a user's consent.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Zdziarski made several pertinent factual assertions in his findings, that: (1) Apple is [disseminating] a lot of customer [user] data behind customers backs; (2) Apple is violating customer's trust and privacy to bypass backup encryption; (3) Apple has no valid excuse to leak personal [user] data or allow packet sniffing without the customer's knowledge and permission; (4) Apple is allowing much of this [user] data to simply come off the [iPhone], which Apple shouldn't, even during a backup: (5) Apple has added many conveniences for enterprises that make [easy] attack points for .gov and criminals. Finally, he asserted that overall, the otherwise "great security of iOS" has been compromised... by Apple... by design. Exhibited below is Zdziarski change in story and deleted files after Apple bribed and or tampered with Zdziarski's evidence during multiple criminal investigations into Apple and Uber's use of mirroring iPhone screens among other cyber-surveillance methods.

APPLE . SECURITY

## Joining Apple

ON MARCH 14, 2017 BY JONATHAN ZDZIARSKI

I'm pleased to announce that I've accepted a position with Apple's Security Engineering and Architecture team, and am very excited to be working with a group of like minded individuals so passionate about protecting the security and privacy of others.

82

undocumented services running
on every iOS device, according
to Zdziarski's presentation:

Encryption in iOS 7: Not Much Changed

- Almost all native application / OS data is encrypted with a key **not married to the passcode**, but rather encrypted with a **hardware deduced key (NSProtectionNone)**
- As of iOS 7, third party documents are encrypted, **but Library and Caches folders are usually not**
- Once the device is **first unlocked** after reboot, most of the data-protection encrypted data can be accessed until the device is shut down
  - Screen Lock != Encrypted
- **The undocumented services running on every iOS device help make this possible**
- Your device is almost always at risk of spilling **all data**, since it's almost always authenticated, even while locked.

(Slide: Jonathan Zdziarski)

Undocumented Services

- **Most services are not referenced by any known Apple software** (we've looked)
- The raw format of the data makes it impossible to put data back onto the phone, making useless for Genius Bar or carrier tech purposes (epio.gz, etc)
- The personal nature of the data makes it very unlikely as a debugging mechanism
- Bypassing backup encryption is deceptive
- Services are available **without** developer mode, eliminating their purpose as developer tools

(Slide: Jonathan Zdziarski)

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

5.    **Tampering with Witnesses, Violating Court Orders, Withholding Documents, and Making False Statements to Obstruct Judicial Proceedings.**

The Defendants cyber-surveillance operation was exposed by a former United States Department of Defense Agent, Richard Jacobs during a high-stakes high-profile lawsuit Waymo, LLC ("Waymo") filed against Uber for theft of Waymo's self-driving car trade secrets, "the *Waymo* case" in the Northern District Court of California, San Francisco Division. Waymo is an American self-driving car technology development startup company headquartered in Mountain View, California.

The Complaint filed in the Northern District Court of California alleged that Uber, Kalanick and other Defendants in the case, and other unknown DOE Defendants influenced Levandowski to "access Waymo's trade secrets" by "downloading them from various servers" onto an "Apple Macbook" and potentially other computing devices including onto an "Apple iPhone" belonging to Levandowski.

At all relevant points in the *Waymo* case, Cook and Apple had an interest in self-driving car trade secrets because, purportedly, Apple's "secret projects group" was developing self-driving car technology (code name "Project Titan") so that Apple could enter the self-driving car market—while Uber had acquired Waymo's trade secrets that were allegedly transferred to Apple and China, while operating on Apple and DiDi's $1 billion "investment." The litigation in the *Waymo* case led both the prosecution and the court to a roadblock, because allegedly, certain "Waymo trade secrets" Uber had acquired were not located in Levandowski's 16,000 downloaded files. The court was harmed and victim to the fraud upon the Court, because it could not determine, who acquired the trade secrets, how they were acquired, and where they were being stored and or transferred.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

On April 3, 2017, Uber violated a court order, after concealing and or destroying evidence central to the case, see *Waymo* case at Dkt. Entry 135 in violation of 18 U.S.C. 1961, sections §§ 1503, 1510. Waymo's attorneys at Quinn Emanuel purported that Uber's attorneys, not limited to Gonzalez, refused to turn over all of Levandowski files for examination. The examination would have allowed Waymo to conclude that Uber acquired Waymo's trade secrets that were not located in the 16,000 files Levandowski allegedly downloaded and "were actually acquired through screen captures." Exhibited below is a copy of Quinn Emanuel's admission that Uber was violating court orders. In the 1992 case of *Kornblum v. Schneider*, 609 So.2d 138 (Fla. 4th DCA), also in *Pumphrey*, 1128, 1130, the courts ruled that court order violations constitute "fraud on the Court."

---

**quinn emanuel** trial lawyers | san francisco

Case 3:17-cv-00939-WHA    Document 135    Filed 04/03/17    Page 1 of 4

April 3, 2017

Honorable William H. Alsup
U.S. District Court for the Northern District of California
San Francisco Courthouse, Courtroom 8 - 19th Floor
450 Golden Gate Avenue, San Francisco, CA 94102

Re:   *Waymo LLC v. Uber Technologies, Inc. et al.*, Case No. 3:17-cv-00939-WHA

Dear Judge Alsup:

Plaintiff Waymo respectfully submits this discovery letter brief to inform the Court of Defendants' ("Uber") willful violation of the Court's March 16 Expedited Discovery Order.

**Uber's Willful Violation of the Court's Order**. On March 16, the Court ordered Uber to produce several categories of documents regarding files and documents downloaded by Mr. Levandowski while still at Waymo, including the devices used for the downloads, "all subsequent emails, memoranda, PowerPoints, text messages, or notes that have forwarded, used, or referred to any part of said downloaded material," and an explanation of any modifications, deletions, or destructions of the downloaded materials. (Dkt. 61, ¶ 4.) At the March 29 hearing, Uber stated it would be "produc[ing] documents" responsive to the Court's Order. The Court responded: "I didn't just fall off the turnip truck. I know what you're telling me. That means you're not going to produce everything." (*Id.*, 4:24-5:1.) The Court also made clear its Order required Uber to produce documents in Mr. Levandowski's "personal" possession. (Tr. 12:6-11

---

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

By May 5, 2017, after a trail of court order violations, destruction and concealment of evidence, including and not limited to "losing" multiple of Levandowski's iPhones and being "unable to recover" some of Kalanick's iPhone text messages (allegedly related to Cook) and other harm to the court—the DOJ turned over a whistle blower letter ("Jacobs Letter") to the court as evidence, see *Waymo* case at Dkt. Entry 2401, 2307-2. The DOJ revealed Uber had concealed Jacobs Letter during the discovery process. "[T]he discovery process is an integral part of the judicial process…" pervasive discovery abuses and false discovery responses, even when not presented to the court, have been found to amount to fraud on the Court. This misconduct satisfies *Derzack*.

Alsup, who presided over the Waymo case, ordered an emergency hearing to question Padilla, Henley, and others on the merits of Jacobs Letter, see *Waymo* case, at Dkt. Entry 2401-1, 2309 ¶14:17-18. Jacobs Letter alleged Kalanick, Sullivan and Henley, (including those who are "in-fact associated and or associated through a loose-knit group (Wang and Acebedo))" executed backdoor cyber-surveillance, specifically, the offensive "remote recordings" and "screen captures" ———who also launched criminal initiatives against competitors. It alleged the Defendants "impersonated" Uber riders and drivers (allegedly on iPhones) to access user's DTSA data. It further alleged Uber employed DOE Defendants (Wang and Acebedo as alleged in the *Mackintosh* case) to access and steal trade secrets from competitors (Plaintiff, Waymo and others). The stolen trade secrets and ideas derived therefrom are in the trillions of dollars (outlined in the *Waymo* case at Dkt. Entry 1, ¶2, line 9; *Mackintosh* case at Dkt. Entry 55, Ex. 3, ¶22), and were used to pump Apple's stock, and used prior to Uber's initial public offering ("IPO"). Jacobs Letter described the cyber-surveillance-scheme and use of stolen trade secrets to inflate stock prices. After the

86

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

emergency hearing, and after an investigation was ordered by Alsup, the court appointed Special Master, John Cooper, attorney at Farella Braun and Martel, LLP, who allegedly participated in the concealment scheme while investigating the matter. His report is available in the *Waymo* case at Dkt. Entry 2396. Cooper concluded Jacobs Letter alleged "institutionalized and criminal efforts by Uber to conceal evidence and steal trade secrets."

The concealment scheme includes and is not limited to, purposefully, and intending to omit from legal documents (remote "recordings/screen captures" and other unlawful and offensive cyber-surveillance facts used against competitors, politicians, regulators and law makers) that were urged upon the court to "hide material key facts." In sum, when the Defendants chose to advance their defense by relying on these fraudulent documents that concealed material facts related to the use of cyber-surveillance, extort Jacobs, withhold Jacobs Letter during discovery, violate court orders, and urged upon the court perjured testimony———they clearly defiled and harmed the court in furtherance of the business arrangement. As exhibited below, Cooper reported Uber's theft of trade secrets. In the report, Cooper concealed the cyber-surveillance and other material facts that are central to the issues, that go to the "causation" of the case. Cooper also confirmed Padilla violated the court order by withholding Jacobs Letter knowing it was required to be produced.

The litigation misconduct in the *Waymo* case satisfies *Derzack* and *Hazel-Atlas*.

It is not easy, in the abstract, to determine where the line regarding the scope of discovery search should be drawn. But this is not a case involving mere possession of some document. The facts in this case suggest that Ms. Padilla knew of the Jacobs Letter at the time Uber had to respond to discovery requests calling for its production—it certainly was "reasonably accessible." Mr. Jacobs' correspondence alleged systemic, institutionalized, and criminal efforts by Uber to conceal evidence and steal trade secrets, and not just as a general matter but also specifically

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO   Document 1   Filed 07/08/24   Page 209 of 312   Page
ID #:209
Case 9:23-cv-80316-AMC   Document 4-1   Entered on FLSD Docket 03/02/2023   Page 104 of
203

involving the evidence and trade secrets at issue in this case—maybe the largest and most

significant lawsuit Uber has ever faced. Ms. Padilla, Uber's vice president and deputy general

counsel for litigation and employment received the Jacobs Materials around the same time that

discovery in this case was picking up and around the same time that the Court partially granted

Waymo's requested provisional relief. Shortly after that, Uber told federal prosecutors about the

Jacobs allegations and then later sent them a copy of the letter. It sent the materials to outside

counsel, including lawyers at MoFo that Uber hired to investigate the allegations. Two separate

Uber board committees got involved, including the committee overseeing *this case*. Uber paid

Mr. Jacobs $4.5 million, and his lawyer $3 million, to settle his claims.

    The Federal Rules obligate a party to produce known, relevant and reasonably accessible

material that on its face is likely to be responsive to discovery requests. RFP 29 and RFP 73 were

served on Uber on May 9, just a few days after Ms. Padilla received the Jacobs Letter on May 5.

Uber was therefore obligated to conduct a reasonable inquiry into those requests (and all others it

received) to see if it had documents responsive to those requests and produce non-privileged

responsive documents.

## IV.   CONCLUSION

    The Jacobs E-mail and Jacobs Settlement are not responsive to the Court orders or to

discovery requests that preceded their belated disclosure to Waymo. The Jacobs Letter is

DATED: December 15, 2017

                                  Special Master
                                  John L. Cooper

Ultimately, the *Waymo* case settled—while Apple and Uber maliciously used the offensive

cyber-surveillance to obtain a corrupt indictment on Levandowski—who faced 330 years in

prison on 33 counts of theft of self-driving car trade secrets—while Uber and Apple had

allegedly acquired Waymo's trade secrets, with the intent, to have Google and Apple

monopolize the nascent self-driving car market using their combined size. It's clear the

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Defendants and their attorneys, not limited to Orrick, Herrington and Sutcliffe, LLP, Gonzalez, and others, most certainly were parties to the fraud on the Court. They knew the cyber-surveillance and "deleted cyber-surveillance files" were central to the issues being tried, and at the heart of the causation. The "deleted files" show the Defendants used the cyber-surveillance to target and steal DTSA data from third-party developers, and used to corruptly indict and or eliminate third-party developers from nascent markets in furtherance of the business arrangement. The Defendants collectively instructed and or otherwise aided and abetted an unconscionable scheme of fraud worked upon the Court to further their unlawful gains. They were engaged in deception, litigation malfeasance, and a pattern of racketeering in court, yet they advanced the litigation knowing they concealed material facts from multiple documents, destroyed and or hid key fact[s] central to the case i.e. Apple granting Uber access to cyber-surveillance in 2014 and the business arrangement.

The core nature of this fraud, and the gross malfeasance it involves, is enough, standing alone, to conclude a fraud upon the Court occurred. Making the misconduct indefensibly egregious——after obtaining a corrupt indictment on Levandowski, the Defendants continued using the cyber-surveillance to target Plaintiff for his DTSA data in his place of business and or property using Wang, Acebedo, corrupt government actors and or government contractors as described in the *Mackintosh* case.

Over the course of the *Waymo* case, between February 13, 2017 to November 2017, Will Strafach, a cyber-security expert who worked with Zdziarski released a report on Twitter. The report and computer-science-based evidence revealed the cyber-surveillance in Uber and Apple's apps. The specific cyber-surveillance capabilities involved accessing a user's "geolocation, audio and text communications" as well as silently activating "cameras

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

and microphones" of iPhones. The Apple code enabling these capabilities was present on iPhone, and on both Apple and Uber's apps in the App Store and or pre-installed on iPhone since as early as 2013 or earlier. The cyber-surveillance code present in both Apple and Uber's apps was a central issue here, and the causation of the *Waymo* and *Mackintosh* and potentially other cases.

Exhibited below is a readout from Will's expert report. Will used a Professional Disassembler and Debugger ("IDA")—an IDA is an interactive, programmable, extensible, multi-processor disassembler. It's an industry leading and de-facto standard for the analysis of hostile code, and used for vulnerability research on newly released products and services, including detecting harmful code within apps in the App Store.

Will's report revealed Apple and Uber's apps had special and sensitive entitlements not limited to "com.apple.private.allow-explicit-graphics-priority" "Private IOKit" that allowed Cook, Kalanick, Sullivan, Henley, Acebedo, Wang and each DOE Defendant to remotely view and record iPhone, iMac and Macbook screens and access files and other DTSA data on Plaintiff's iPhones. Exhibited on the next page is another part of Will's computer-science-based expert report (allegedly deleted and or deleted by the Defendants through coercion and or impersonating Will on his iPhone to obstruct justice) that revealed Apple had granted Uber's 2014 apps access to IOKit Private Framework.

```
u'com.apple.private.allow-explicit-graphics-priority': True,
u'keychain-access-groups': [u'5F83KRY2FH.com.ubercab.UberClient']}


Extra "AOI_CERTIFICATES_SET_CUSTOM_TRUSTED_ANCHOR_CERTIFICATES"

Extra "AOI_CRYPTOGRAPHIC_HASH_GET_CRYPTOGRAPHIC_HASH_SHA1_ALGORITHM
```

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

| Risky/Malicious API: IOKit (2 of 2) |
|---|
| Access Registry Entries (via IOKit) |

| Main Binary (UberClient) |
|---|
| This application utilizes the IOKit Private Framework to read multiple registry entries from the device. |

This highly sensitive and private Apple code gave the Defendants the ability to remotely impersonate Plaintiff and other users on iPhones, iMacs, and Macbooks, including accessing, extracting, editing and manipulating internal data of these devices belonging to and not limited to Levandowski and Plaintiff. For example, during the *Waymo* case, an expert report made the claim in section "A. Anthony Levandowski, 1. Interview and Investigation..." that "...during the interview..." Levandowski "...seemed surprised at the amount of Google-related information that was on his [Apple Macbook Pro]..." The expert wrote that, "Levandowski... looked at his laptop and, to his apparent surprise, discovered that he had synced his Google e-mail (anthonyl@google.com) with his [Apple Macbook Pro] in 2014..." "[he] also attempted to empty the Trash bin on his MacBook Pro while he was at Stroz Friedberg's office on March 22, 2016..." "...but [Stroz] examination found no files were contained in his Trash at the time he attempted to empty it." Thereafter, Google and Uber worked with corrupt government actors to provide user data from Levandowski's Apple products that was fabricated, planted and or used to make Levandowski appear guilty of stealing Google/Waymo's self-driving car trade secrets—while Apple received the self-driving car trade secrets from Wang and others who used the cyber-surveillance—so China/Apple/Google/Waymo can monopolize the self-driving car industry globally and eliminate third-party developers in the self-driving car industry and or from the App Store.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 213 of 312    Page
ID #:213
Case 9:23-cv-80316-AMC    Document 4-1    Entered on FLSD Docket 03/02/2023    Page 108 of
203

6.    **Tim Cook, Apple and each DOE Defendant used Apple's Offensive**

**Cyber-Surveillance to Locate and Delete the "Apple Cyber-Surveillance Files"**

**from Twitter During The Waymo Case.**

The string of Tweets exhibited below were successfully recovered by Plaintiff after

they were deleted from Twitter in furtherance of Cook and Apple's concealment scheme.



The long string of Tweets involves a conversation between Will and other cyber-security

experts in the industry, including white hat hackers, who alleged Apple knowingly allowed

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

"large app developers in the App Store" to utilize private and sensitive entitlements to remotely access iPhones and DTSA data present on hundreds of millions of iPhones.

Will Strafach
@chronic

Follow

and there we have it! these shenanigans are likely what got Tim Cook upset with Uber (attached pics are from verify.ly + IDA)

ss Registry Entries (via IOKit)

API_EXT.1.1

Binary (UberClient)

application utilizes the IOKit Private Framework

rmine if use of this framework is required and the

30B2 (C function)

1:55 PM - 23 Apr 2017

199 Retweets 290 Likes

20 199 290

Will Strafach @chronic · 23 Apr 2017
Replying to @chronic
it is very strange for Uber to "geofence" Apple to pass App Review. other apps just use a boolean on/off "isUnderReview" check upon start.

3 6 34

Will Strafach @chronic · 23 Apr 2017
some literally using that name or a variant. pretty overt. never caught though.

1 1 7

7.    Apple, Cook and others hire Latham Watkins, LLP to Obstruct Adversarial Proceedings to Conceal their Emerging Misconduct and Use of Cyber-Surveillance.

After the *DOJ* case against Apple subsided in 2016, and while the *Waymo* case would proceed to trial in February 2018, the law firm, Sulaiman Law Group, LTD., filed a class-action lawsuit on November 22, 2017 against Apple, Uber, Cook, Kalanick, Dara and other Defendants.

The similarly situated class of plaintiffs alleged the Defendants perpetrated acts that violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, et seq., Stored Communications Act, 18 U.S.C. § 2701, et seq., Federal Wiretap Act, 18 U.S.C. § 2511, et seq., and other laws, see *Julius J. Harang et al. v. Uber Technologies, Inc. et al.* in the Northern District Court of Illinois Eastern Division case number 1:17-cv-08500 "the Illinois case."

During litigation (the Defendants allegedly perpetrated the change of venue scheme) and the case was transferred to California's Central District Court see case number 2:18-cv-02998-PSG-GJS the ("the *Harang* case").

The Plaintiffs alleged that multiple Uber employees signed multiple declarations under penalty of perjury affirming "Uber routinely deleted files which were subject to litigation holds," supporting Uber's discovery misconduct in the *Waymo* case that aimed at concealing facts related to Apple granting Uber access to the offensive cyber-surveillance. They further alleged Cook and Apple granted Uber access to "private and sensitive entitlements" that were used to remotely mirror and record iPhone screens and potentially screen capture iPhone data and control an iPhone and potentially Macbook Air and Macbook Pro activity.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Specifically, according to Luca Todesco, a researcher and Apple "iPhone jailbreaker," Uber's permission entitlement could have been exploited by Uber or a hacker:

> Although the entitlement isn't intended for this, the worry is that Uber—or a hacker who managed to break into Uber's network—could silently monitor activity on an [Apple] iPhone user's screen, harvesting passwords and other personal information. "Essentially it gives you full control over the framebuffer, which contains the colors of each pixel of your screen. So they can potentially draw or record the screen," explained Todesco. "It can potentially steal passwords etc."

Similarly, Will published his expert findings on Twitter in a series of Tweets and further affirmed the sensitive and private entitlements and API's as follows:

> "It looks like no other third-party developer has been able to get Apple to grant them a private sensitive entitlement of this nature," [Will] said. "Considering Uber's past privacy issues[,] I am very curious how they convinced Apple to allow this."

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

> "Granting such a sensitive entitlement to a
> third-party is unprecedented as I can tell, no
> other app developers have been able to convince
> Apple to grant them entitlements they've needed
> to let their apps utilize certain privileged system
> functionality."

Prior to, and during the *Waymo* and *Harang* case, Will affirmed that he indexed tens of thousands of apps in the App Store and the binary within these apps using his own company's (Verify.ly) internal data set derived from the App Store.

He affirmed the only apps in the App Store that were given Apple's private and sensitive code "com.apple.private.allow-explicit-graphics-priority" were Apple's own native apps (pre-installed) on iPhone available in the App Store for download to hundreds of millions of iPhones. After the change in venue, Apple's lead attorney at Latham Watkins, LLP, who represented Cook and others, paid unknown sums of monies through wire and mail to obstruct discovery with the intent to "hide relevant facts" and evidence related to the existence and use of cyber-surveillance. Uber followed suit in settling the case, presumably under the direction of Cook, Dara, Kalanick, West and other Defendants and each DOE Defendant. Under the above-named Defendants direction, Apple's lead attorney, Berkowitz, a partner attorney at Latham Watkins, LLP, ratified and executed contracts and mail and wire payments to the class of plaintiffs. The wire and mail payments were made with the intent to "conceal any and all evidence" related to "screen capture" and potentially other alleged unlawful and offensive cyber-surveillance methods used by the

96

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Defendants and each DOE Defendant aided and abetted by Apple and Uber—while Apple and Uber—extorted Jacobs, who's a witness, and tampered with his testimony, in violation of 18 U.S.C. 1961, sections §§ 1512, 1513—ratified by Cook, Dara, West and others. *Dixon*, 316 F.3d at 1046-47 (finding a fraud on the Court based on the actions of [officers of the court] in covering up relevant evidence). The Defendants wire and mail payments and other acts that "covered up" relevant cyber-surveillance evidence satisfies *Dixon*.

More specifically, the coordinated and simultaneous acts ratified by officers of the court, including the ratification of wire and mail payments to various parties, not limited to Richard Jacobs and his attorneys, and the extortion of Jacobs to retract his allegations while wiring additional monies to a class of plaintiffs in the *Harang* case without first allowing the adversarial process to proceed—it was "an effort by [officers of the court] to prevent the judicial process from functioning 'in the usual manner'" *Stonehill*, 660 F.3d at 445—that did not allow discovery and other truth-finding mechanics of the courts judicial machinery to function in the Ninth Circuit.

The Defendants misconduct described above to have happened in the *Harang* case was not about perjury, misrepresentation or nondisclosure, it was interrelated to the concealment scheme and other racketeering activity inside and outside of court. Moreover, and equally important, the conduct was related to the key issues in multiple cases cited above-and-below—*the causation*—and, as such, "was so fundamental that it undermined the workings of the adversary process itself." Id. That is, concealing the existence and malicious use of cyber-surveillance embedded within an unknown number of apps in the App Store and within iPhones that was actively being used to target Levandowski, Plaintiff and others at the behest of Apple, Uber, Cook, corrupt government actors and others.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

8.    **Tim Cook's Alleged Perjury, Fraud On Congress, and Acts that Furthered the Concealment Scheme.**

On July 29, 2020, after the Defendants allegedly spent years covering up their criminal misconduct, Cook was summoned to testify before Congress regarding antitrust violations in the App Store. David Cicilline, Chairman and Senator for Rhode Island, instructed Cook to raise his right hand, and asked, "…do you swear[] under penalty of perjury that the testimony you are about to give is true and correct to the best of your knowledge, information and belief, so help you God?" Cook replied, "I do."

Under a properly administered oath, and while having full knowledge of the schemes that furthered the business arrangement and cyber-surveillance activity—Cook participated in the concealment scheme through wire communication. Specifically, after Hank Johnson, Senator for Georgia, asked Cook if Apple treats all [third-party] developers equally in the App Store—Cook stated, that Apple "treat[s] all developer[s] the same." Cook participated in the trail of fraud on the Court by giving testimony, which was based on falsehood and deceit. Cook's statements misdirected Congress, and concealed key facts that dramatically "changed the truth." *Kornblum v. Schneider*, 609 So.2d 138 (Fla. 4th DCA 1992).



98

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Specifically, under the direction of Cook's attorneys, Apple's in-house and outside attorneys, and each DOE Defendant, Cook gave perjurious statements through mail and wire, that intended to, and did, "hide key facts" related to:

a) Apple favoring Uber in the App Store over other third-party developers. Specifically, Apple pre-installed Uber's apps on iPhone and the Apple Watch that contained Apple-code, not limited to the cyber-surveillance code described above and further below;

b) Apple giving Uber special treatment over other third-party app developers. Specifically, Apple and Cook granted Uber access to the cyber-surveillance methods within iPhones and iMacs and potentially other Apple products;

c) Apple and Uber's creation, implementation and use of cyber-surveillance;

d) Apple and Uber rewriting iOS to conduct cyber-surveillance, and used it to extract files from Plaintiff's and other's iPhones. This includes the use of other means of file access and extractions capabilities, that caused Plaintiff's injuries and damages;

e) Apple and Uber distributing cyber-surveillance to Wang, Henley, Acebedo and others in furtherance of the business arrangement and targeting scheme. Specifically, Wang's use of "Apple-provided software" used to mirror devices and plant evidence;

f) Apple and Uber's coordinated litigation misconduct aimed at concealing the cyber-surveillance, business arrangement and other alleged targeting schemes;

g) Apple and Uber's sherlocking activity;

h) Apple and Uber's access to, and use of, Plaintiff and other third-party developer's DTSA data, not limited to Plaintiff's patent drafts, code and documents; and

i) Apple allowing DiDi, and potentially China to access DTSA data;

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

In fact, after William Gregory Steube, Senator for Florida, asked Cook, "Do you believe that the Chinese Government steals technology from [United States] Companies?" Cook evaded the question and replied:

> "uh... I don't know of specific cases where we... uh... have been stolen from... I'm saying... uh... I... I... I know of no case of ours, where... uh.... it occurred... which is... I... I... can only speak of first-hand knowledge."

Cook knowingly concealed facts related to multiple agreements that were materially made between China, Apple, DiDi and Uber, all who are allegedly funded by China and share in the DTSA data collection. Cook testified that Apple removed various apps from the App Store over "concern[] about[] privacy and security..." knowing Apple and Uber used the cyber-surveillance to target Plaintiff and potentially others—violating Plaintiff's privacy and security—after Cook, Apple and Uber *copied* and *killed* (sherlocked) Plaintiff's iHug Health app, and after Apple and Uber launched infringing goods, services, products and partnerships derived from Plaintiff's healthcare innovation, contained within Plaintiff's patent drafts, that were accessed by the Defendants through improper and illegal means.

Similar to *Stonehill,* Id. 444., Cook's perjured statements continued working a massive fraud upon the Courts to continue pumping Apple's stock price. The Defendants alleged acts, are comprised of numerous acts of deceit, misconduct and fraud, to "hide key facts," that are central to the use of cyber-surveillance. Although recklessness is all that needs be shown to establish fraud on the Court under the controlling authorities cited in this motion, the vast majority of misconduct outlined here was intentional, calculated, callous, malicious and egregious. Standing alone, the Defendants conspiracy to urge perjurious statements upon multiple courts that concealed material facts (the Concealment Scheme) constitutes fraud upon the Court and warrants relief under Rule 60(d)(3).

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 222 of 312    Page
ID #:222
Case 9:23-cv-80316-AMC    Document 4-1    Entered on FLSD Docket 03/02/2023    Page 117 of
203

9.      **Apple, Cook and their Counsel Launched *ad hominem* Attacks at Plaintiff,**
**Fabricated Cyber-Surveillance Evidence, Obfuscated the Record, and Perjured**
**Multiple Legal Briefs to Conceal the Cyber-Surveillance and Other Illegal Acts.**

Apple, Cook and the other Defendants fraud on the Court grew, as evidenced in the
*Mackintosh* case, filed in the Northern District Court of California, San Francisco Division,
at Dkt. Entry 1. In fact, the Defendants misconduct in the United States Senate and
Congressional hearings, the *DOJ, Waymo* and *Harang* case, and potentially other cases
ensued and effectively defiled California's Northern District Court.

The Plaintiff in the *Mackintosh* case, alleged that Apple distributed to Amazon,
Uber, Wang, Acebedo and others, "Apple-provided" software and Apple-code, not limited
to "com.apple.private.allow-explicit-graphics-priority" and "Private IOKit" among other
("cyber-surveillance") code. The cyber-surveillance and servers created digital access
methods that allowed the Defendants to impersonate Plaintiff on his iPhone, Macbook Pro
and iMac to remotely mirror and view Plaintiff's and other individual's device screens.

The cyber-surveillance methods also allowed the extraction of app data, files, text
messages, iCloud data and other files "DTSA data" through improper means i.e. the use of
"cyber-surveillance." It was alleged that Wang (a Former Apple employee who worked on
iPhone in Apple's secret projects, code named "M68") executed "Apple-provided software"
and "rewritten iOS" to improperly access and acquire Plaintiff's DTSA data through wire
communication, by remotely accessing Plaintiff's Apple product screens (See *DOJ* case,
at Dkt. Entry. 149, Hanna Decl. Ex. DD at 64 ("We agree… [] that the system requires
Apple['s] authentication"). While remotely mirroring multiple device screens that contained
Plaintiff's DTSA data—Apple, Apple employees, Uber, Wang, Sullivan, Henley and each

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

DOE Defendant acquired through improper means, Plaintiff's DTSA data using remote "screen captures" (Remote 'Screen Captures/Recordings' means the Defendants can interact with and view Plaintiff's DTSA data on a separate iPhone, iMac or Macbook in possession of the Defendants who are remotely connected to Plaintiff's iPhone). The use of screen captures is a new digital method of misappropriating DTSA data, evidenced in Will's expert report, Zdziarski evidence, Jacobs Letter in the *Waymo* case at Dkt. Entry 2401-1, 2309 ¶ 14:17-18, the *Harang* case in Illinois Eastern District Court, 2:18-cv-02998-PSG-GJS at Dkt. Entry 1, ¶ 28, paragraph 121, and as described in the *Mackintosh* case. After acquisition of Plaintiff's DTSA data, the Defendants deleted these files located on multiple iPhones, Macbooks, encrypted chat apps, on Amazon servers and elsewhere that allowed Plaintiff adverse inferences. The Defendants alleged years-long cyber-surveillance activity inherently violates the RICO Act, 18 U.S.C. § 1961 et seq., Computer Fraud and Abuse Act 18 U.S.C. § 1030, et seq., Defense Trade Secret Act as amended in 2016, the Economic Espionage Act of 1996 as amended by DTSA, California Business & Professional Code § 17200, Conspiracy to violate 18 U.S.C. §§ 1961 (5), 1962 (d) and § 502 among other laws.

After Apple, Uber and Uber Health, LLC ("Uber"), Acebedo and Wang received and read Plaintiff's Complaint, Summons and other legal documents, Uber, Acebedo and Wang did not, and have not since, submitted a responsive pleading to the Complaint, nor have they disputed Plaintiff's proofs of service. As the Ninth Circuit Court of Appeal opinioned and upheld, Motions under Rule 12(b)(6) "must be made before pleading if a responsive pleading is allowed," F.R.C.P. 12(b), *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 954 (9th Cir. 2004), "[a] fundamental tenet in the F.R.C.P. is that certain defenses under F.R.C.P. 12 must be raised at the first available opportunity, or, if they are not, they

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

are forever waived," *American Association of Naturopathic Physicians v. Hayhurst*, 227 F.3d 1104, 1106 (9th Cir. 2000), an answer to a complaint is a responsive pleading. F.R.C.P. 7(a)(2). Therefore, Uber and Uber Health, Wang and Acebedo's failure to answer within 21 days with a responsive pleading constitutes foreclosure entirely, forever waiving their right to Relief under F.R.C.P. 12. [Emphasis added], see the case of *Hasty v. Carpenter*, 276 S.E.2d 513 (1981), citing *Acceptance Corp. v. Samuels*, 11 N.C.App 504, 181 S.E.2d 794 (1971) "allegations in pleadings are admitted when not denied" [emphasis added].

While Uber, Acebedo and Wang evaded the *Mackintosh* case, the Defendants' attorneys continued setting in motion, multiple well-planned and well-executed schemes, aimed at attacking the material issues being tried, i.e. "screen captures" and other cyber-surveillance allegations made by Plaintiff. Between December 2020 - January 2021, partners Marc Lewis and Paul Llewellyn at Lewis and Llewellyn, LLP hired a young attorney, Daniel Jordan. Between approximately January - February 2021, Cook, Lewis, Llewellyn and others bribed and or suborned Jordan to commit perjury, wire and mail fraud. As a result, their unlawful acts furthered the concealment scheme——allowing Cook, Apple and others to achieve their goal of defiling the court by having Jordan set in motion a "scheme" to fabricate "screen capture" evidence. In doing so, Jordan took multiple "screen shots" from a PC screen and declared they were "screen captures" in a bogus declaration he signed under penalty of perjury under the laws of the State of California.

On February 22, 2021, Jordan attached the fabricated evidence and perjured declaration to Apple's motion to dismiss and urged the fraudulent documents upon the court through mail and wire. Jordan's aforesaid statements were false, perjurious and

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

material to the issues being tried. Jordan's misstatements were used to advance Apple's fraudulent defense, much like Cook and Apple did in the *DOJ* case. These documents were then used to repeatedly attack the operating facts that are "central issue[s] in the case," Estate of *Stonehill*, 660 F.3d at 452 in an attempt to "affect the outcome of the case," Id. at 448. In similar fashion to the Hartford's attorneys in the case of *Hazel-Atlas*, when they "urged the [bogus] article upon . . . [the appellate court]…" Id., Apple's attorneys urged fabricated evidence and perjured declarations upon California's Northern District Court to conceal their unconstitutional use of the cyber-surveillance technology. This type of **litigation malfeasance is reprehensible, egregious and unlawful.** Jordan patently failed to uphold his "general duty to preserve the integrity of the judicial process," 11 F.3d at 458 (citing 322 U.S. 238) by harming and defrauding Plaintiff and the court in the process. When Jordan committed these unlawful acts, he knowingly aided and abetted Cook, Uber, and the other named Defendants by attacking the truth-finding mechanics of the court's judicial machinery. *Hazel-Atlas*, 322 U.S. at 245 (finding a fraud upon the Court based on manufactured evidence), *United States v. Farrell*, 921 F. 3d 116, 139 (4th Cir.), 140 2. Ct. 269 (2019) ("Just as an attorney may operate and manage an enterprise in violation of section 1962 (c), attorneys may be held liable as conspirators…").

The Supreme Court addressed this species of fraud in *Hazel-Atlas. Hazel-Atlas* is instructive because it parallels the Defendants alleged misconduct in multiple United States Senate and Congressional hearings, the *DOJ, Waymo, Harang* and *Mackintosh* case. In the *Hazel-Atlas* case, Hartford's attorneys created a bogus trade journal article, which they submitted in support of a patent application. 322 U.S. at 240. Thus, the Hartford attorneys "conceived" of the article "in an effort to persuade a hostile Patent Office to grant

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

their patent application," id. at 247, much like Cook and the other Defendants "conceived" of having Jordan and his law firm take multiple screen shots from a PC and labeled them as "screen captures" to attack the central issues being tried in the *Mackintosh* case. Jordan's acts were not only an attempt to deceive the court, he used them to continue defrauding Plaintiff, the DOJ, United States Senate, Congress, and the public.

Apple and Uber's attorney's species of fraud on the Court amounts to "a deliberately planned and carefully executed scheme" to defraud the court. In fact, it far exceeds the unlawful conduct in *Hazel-Atlas* because the Defendants allegedly perpetrated fraud on the Court in multiple courts in different interrelated cases in an effort to conceal their interrelated use of cyber-surveillance that is at the heart of the causation of the cases. Exhibited below is a picture of Jordan's "screen shot" from a PC of a limited liability company in California he cleverly labeled as "screen captures." Jordan knew Plaintiff alleged that screen capture is an unlawful method of cyber-surveillance. Exhibited on the next page is Jordan's perjured declaration he electronically filed with the court and mailed to Plaintiff.



Dr. Shirley N. Weber
California Secretary of State

🔍 Business Search - Entity Detail

The California Business Search is updated daily and reflects work processed through Monday, February 15, 2021. Please refer to document Processing Times for the received dates of filings currently being processed. The data provided is not a complete or certified record of an entity. Not all images are available online.

201614510101   IHUG, LLC

| | |
|---|---|
| Registration Date: | 05/18/2016 |
| Jurisdiction: | CALIFORNIA |
| Entity Type: | DOMESTIC |
| Status: | SOS/FTB SUSPENDED |
| Agent for Service of Process: | ADAM JOHN MACKINTOSH |
| | 10923 PROGRESS COURT |
| | RANCHO CORDOVA CA 95670 |
| Entity Address: | 10923 PROGRESS COURT |
| | RANCHO CORDOVA CA 95670 |

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO   Document 1   Filed 07/08/24   Page 227 of 312   Page
ID #:227
Case 9:23-cv-80316-AMC   Document 4-1   Entered on FLSD Docket 03/02/2023   Page 122 of
203

As exhibited below, Jordan and others known and unknown to Plaintiff, did knowingly, and with

the intent to defraud, devise and execute, and attempt to execute, a material scheme and artifice to

defraud Plaintiff, and to obtain moneys, funds, favors, intangible favors, fame, credit, profits and

other property that were then under the custody and control of Apple, Cook, Uber, West and

others known and unknown to Plaintiff, by means of materially false and fraudulent pretenses,

representations, and promises, specifically, Jordan's promise to Apple, Cook, and the other

Defendants that he would falsify statements and fabricate screen capture evidence in his

declarations in furtherance of the concealment scheme. Jordan's perjury and fabrication of

evidence exhibited below satisfies *Hazel-Atlas, Derzack, Pumphrey,* and *Philip Morris.*

| | |
|---|---|
| 1 | I, Daniel Jordan, declare as follows: |
| 2 | 1.    I am an attorney licensed to practice law in the State of California and am |
| 3 | admitted to practice before this Court. I am an attorney with the law firm Lewis & Llewellyn |
| 4 | LLP, counsel for Defendant Apple Inc. ("Apple") in this action. I submit this declaration in |
| 5 | support of Apple's Motion to Dismiss Complaint or, In the Alternative, Motion for a More |
| 6 | Definite Statement and Motion to Strike. I have personal knowledge of the facts set forth in this |
| 7 | declaration and, if called upon as a witness, I could and would testify such facts under oath. |
| 8 | 2.    Attached as **Exhibit A** is a true and correct copy of screen captures of the |
| 9 | California Secretary of State's business records for iHug, LLC and iHug, Inc. accessed on |
| 10 | February 16, 2021, through the California Secretary of State's "Business Search" webpage, |
| 11 | available at https://businesssearch.sos.ca.gov. |
| 12 | I declare under penalty of perjury under the laws of the State of California that the |
| 13 | foregoing is true and correct. Executed this February 22, 2021 in San Francisco, California. |
| 14 | |
| 15 | |
| 16 | By: _____ */S/DANIEL JORDAN*_____<br>       Daniel Jordan |
| 17 | |

106

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Under the direction of Cook and each DOE Defendant, Jordan perpetrated multiple perjuries and other fraudulent acts that amount to fraud on the Court as further described herein. In fact, Jordan and his colleagues had never used "screen capture" or "screen captures" language in past declarations when attaching exhibits to legal briefs. This is evident in several signed declarations from his firm. Attorneys at the firm each have attached exhibits to their declarations at separate times in separate cases that do not use or contain the language "screen captures." See exhibited declarations below:

Case 4:12-cv-01444-DMR   Document 15   Filed 05/10/12   Page 4 of 4

1   Deysenkar is dated September 21, 2010.

2          10.    I have reviewed the website of Datafiniti, LLC ("Datafiniti") (currently

3   available at www.datafiniti.net). The website includes a link to "Terms" which directs the user

4   to Datafiniti's Terms of Use.  A true and correct copy of what purports to be Datafiniti's Terms

5   of Use, currently available at https://www.datafiniti.net/index.php/tao (last accessed on May 9,

6   2012), that I downloaded from Datafiniti's website, is attached as Exhibit G.

7          11.    Attached as Exhibit H is a true and correct copy of the "About Us" section

8   of the Yelp website currently available at http://www.yelp.com/about (last accessed on May 9,

9   2012).

10         12.    Attached as Exhibits I and J are true and correct copies of Exhibits that

11  were filed by Yelp in the Texas Action on May 9, 2012, and which accompanied Yelp's Motion

12  to Dismiss Or, In the Alternative, Transfer Venue. The exhibits consist of records from the

13  Texas Secretary of State's Office.

14          I declare under penalty of perjury that the foregoing is true and correct.

15          Executed on May 10, 2012 at San Francisco, California.

16

17                                                    /s/
                                                  Paul T. Llewellyn

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

| 1 | I, Marc R. Lewis, declare as follows: |
| 2 | 1. I have personal knowledge of the facts stated in this declaration; and, if called upon to |
| 3 | testify, I could and would testify thereto under oath. |
| 24 | the interests of non-~~~~~s when they are subpoenaed regarding relevant, but sensitive and |
| 25 | highly confidential, inform~~~~~ |
| 26 | 8. Attached hereto as Exhibit A is a proposed order sealing the relevant portions of non- |
| 27 | party Founders Fund's testimony and exhibits. |

Exhibited below on page 110 is an actual screen capture from the Defendants

unlawful use of remote cyber-surveillance into Apple iPhones and other Apple products.

The importance of this evidence cannot be overstated. It demonstrates Apple, Uber,

Henley, Wang and each DOE Defendant executing the offensive cyber-surveillance

(through Apple's consumer-based iOS/Private Key/Rewritten iOS/Apple-Provided

Software, and through Apple Maps, Car Play, Uber's Apps and other methods and

means within Apple's infrastructure as described in the Ninth Circuit Court of Appeals)

to remotely access the iPhone screen and front-facing camera, while Acebedo observed the

Defendants and each DOE Defendant, remotely taking screen captures of Plaintiff's DTSA

data from his iPhone screen and from Plaintiff's non-public app while it was undergoing

testing at Plaintiff's healthcare startup.

The material fact and evidence, not limited to other video, audio, photo and forensic

cyber-surveillance evidence in possession of Plaintiff are critical pieces of evidence that are

central to the issues being tried in the *Mackintosh* case. It also reveals Apple and Uber's use

of cyber-surveillance outlined in Will's expert report, Jacobs Letter, the *Harang* case and

potentially other looming cases—including similar spying allegations made by other

Americans, who are Apple Customers and iPhone users, which is a direct contradiction to

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Apple's statements made in the *DOJ* and other similar cases. Moreover, its alleged Jordan was informed by Cook and his attorneys, Apple, Uber, Covington and Burling, LLP and their attorneys, and others unknown to Plaintiff at this time, that all "screen capture" files and other electronic cyber-surveillance files had been deleted and or destroyed from Acebedo, Wang, Henley and other's Apple iPhones, Apple Macbook Pros, storage devices, hard drives, laptop computers, and other devices that utilized and or executed the unlawful cyber-surveillance technology in violation of 18 U.S.C. 1961, sections §§ 1503, 1510, among other RICO predicate acts. In fact, Holder, at Covington and Burling, LLP, who's associated to Obama, Cook and others through a loose-knit group and or who are in-fact associated, conducted a sham investigation into Uber during the *Waymo* case and allegedly participated in the concealment scheme by internally ordering DOE Defendants to destroy all electronic cyber-surveillance files (evidence) from Acebedo, Wang and other's devices.

Additionally, not only did Holder order the destruction of evidence, he co-wrote an "Uber Report" that omitted the offensive cyber-surveillance. His law firm later filed a civil lawsuit against Henley and Uber's former security team in San Francisco's Superior Court in California, see case number CGC-18-571617. Uber alleged Henley possessed a "laptop computer" a "storage device" and or a "hard drive" and "electronic files." Henley's attorney, Matthew Umhofer, answered Uber's civil complaint (who also perpetrated the concealment scheme by omitting "iPhone," "Macbook," "iOS," and other identifying material facts related to Apple's cyber-surveillance, and instead named and accused "Uber's apps"). Umhofer asserted Uber was attempting to force Henley to destroy evidence during a criminal investigation into Uber's use of remote "screen captures/recordings" and other methods of cyber-surveillance which potentially amounts to obstruction of justice.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION



PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

As described above and further in Plaintiff's Complaint in the *Mackintosh* case, not only did the Defendants destroy critical screen capture and screen recording files from multiple devices, the Defendants engaged in espionage at Plaintiff's healthcare startup by using a cyber-surveillance method called "dragnet." Dragnet allowed the Defendants to execute Apple code on an iPhone in Josef's possession to extract thousands of files from every iPhone near Acebedo at Plaintiff's healthcare startup without prompt, notification and or authorization. As exhibited below, Plaintiff's DTSA data was transmitted by the Defendants to the Defendants servers and elsewhere.

While Plaintiff's DTSA data was transmitted to various servers, the DTSA data was auto-compressed from hundreds of megabytes down to a few megabytes. After the files were compressed, they were transferred to a server the Defendants designated for extraction and deletion. The Defendants used these methods of cyber-surveillance on Plaintiff, Levandowski, Waymo, and other Americans and American startups.

The activity not only puts at risk America's innovation, it causes other harm that directly breaches National Security. The Defendants use of Plaintiff's novel and unique data and DTSA data, and ideas derived therefrom, transformed Apple and the App Store between 2013 to present at Plaintiff's detriment and without properly compensating Plaintiff——*whilst*——Cook, Obama, Pelosi, federal judges, law firms and others received illegal gains as a result of the activity described in this motion.



PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION





PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO   Document 1   Filed 07/08/24   Page 234 of 312   Page
ID #:234
Case 9:23-cv-80316-AMC   Document 4-1   Entered on FLSD Docket 03/02/2023   Page 129 of
203



PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION








114

By March 2021—while the Defendants continued profiting at Plaintiff's expense—and

after Jordan and Chhabria stonewalled Plaintiff's litigation to further the concealment

scheme—United States Senator for Utah, Mike Lee, and United States Senator for

Minnesota, Amy Klobuchar, urged Apple and Cook to send a witness to appear before

a select Subcommittee on April 9, 2021 in a letter that was sent to Apple and Cook.

Available at: https://www.klobuchar.senate.gov/public/index.cfm/2021/4/after-urging-from-

klobuchar-and-lee-apple-agrees-to-send-witness-to-hearing-on-app-stores-and-mobile-app-

competition. The Subcommittee demanded answers from Apple and Google for alleged

anticompetitive misconduct in their "illegal App Stores."

After weeks of refusing to send a witness to testify, Apple finally agreed to send

Kyle Andeer, Apple's Vice President of Corporate Law & Chief Compliance Officer.

Andeer was allegedly tasked with concealing any and all facts related to the unlawful

schemes that formed and furthered the business arrangement—presumably under Apple,

Latham Watkins, LLP, Covington and Burling, LLP, Gibson, Dunn and Crutcher, LLP,

Cook, and their attorney's direction and advice.

During the hearing, Andeer was properly sworn in under oath, who agreed to tell

the truth, and nothing but the truth, so help him God. Senator Lee subsequently asked

Andeer to explain why Apple does not charge Uber a 30% Apple tax/commission fee in the

App Store. Andeer explained that Uber is a digital service, and so Uber is not subject to the

fee. He effectively concealed facts related to the agreements made between Apple, Cook,

and the other Defendants, not to charge Uber the fees to prolong the sherlocking and

cyber-surveillance activity that formed and furthered the business arrangement. Andeer's

misconduct satisfies *Stonehill*, Id. 444. Another United States Senator from Missouri,

<hr>

115

Josh Hawley, asked Andeer if Apple would commit the "billions of dollars" in Apple's App Store profits to provide security and safety for Apple Customers and the iPhone. Andeer refused to make the commitment, because allegedly, it would allow an expert like Will and Todesco into Apple's infrastructure who would be required to whistle blow facts related to the offensive cyber-surveillance. Instead, Andeer agreed with Hawley that Apple has purchased "$58 billion in stock buy backs" when pressed on the issue. Unbeknownst to the Senate, the buybacks were bribes and or other forms of payment to officers of the court and other public officials to further conceal the schemes that constitute racketeering.

Unfortunately, the fraudulent concealment did not end there. Prior to and after the Senate hearing, Chhabria, the judge who presided over the *Mackintosh* case, chose not to address Jordan's illegal evidence. In view of these unfortunate circumstances, Chhabria's decision not to address Jordan's misconduct is itself an act of fraud on the Court. *In re Clinton Street Foods.* Moreover, just as in *Pumphrey*, *Shaffer*, *Levander* and *Hazel-Atlas*, Jordan and Chhabria violated their first duty of candor to the court (and their obligation to protect the truth-finding mechanics of the courts judicial machinery).

Further, the collective and coordinated fraud concealed facts central to the issues being tried, and in doing so, Chhabria defiled the court. As one example of the fraud, while Jordan inserted irrelevant, extraneous and impertinent material in Apple's illegal motion to dismiss document, Chhabria improperly considered those matters while intentionally omitting cyber-surveillance facts from his orders that are central to the issues being tried, including Plaintiff's screen capture evidence. Chhabria was keenly aware that screen capture was a method of the cyber-surveillance and a central issue being tried. His misconduct can only lead one to believe that he participated in the Defendants concealment

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

scheme. Nevertheless, under civil RICO law, when a judge is determining whether the complaint is sufficient, the court is limited to consideration of the four corners of the complaint. *Shear*, 606 F.2d at 1253; *Caudle v. Thomason*, 942 F. Supp. 635, 638 (D.D.C. 1996). Chhabria then proceeded to sign an order based on "partial facts" while he obstructed Plaintiff and others from presenting additional facts to the court. Chhabria signed the order after Plaintiff "adduce[d] [sufficient] set[s] of facts in his Complaint and other legal briefs related to the unlawful use of cyber-surveillance that supports Plaintiff's legal claim[s] [that would have] survive[d] [Apple's] motion to dismiss" under F.R.C.P. 12(b)(6), *Wells v. United States*, 851 F.2d 1471, 1473 (D.C. Cir. 1988).

Further, after Plaintiff signed a declaration under penalty of perjury and attached screen capture evidence in support of the "set of facts" he put forth upon the court that are consistent with the allegations in the Complaint, Plaintiff had raised a right to relief above the speculative level. *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007). Instead of adjudicating Apple's motion for relief under F.R.C.P. 12(b)(6), Chhabria patently perpetrated the judicial scheme by intentionally erring in civil RICO law and dismissed and closed the *Mackintosh* case under F.R.C.P. 12(b)(1). Chhabria knew Apple's F.R.C.P. 12(b)(6) is "viewed with disfavor and [is] rarely granted." CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1357 at 321 (1990 Edition).

However, Chhabria knew or should have known that under civil RICO law, despite describing the proximate causation requirement as "RICO standing" such standing is not jurisdictional in nature under F.R.C.P. 12(b)(1), rather an element of the merits addressed under a F.R.C.P. 12(b)(6) motion for failure to state a claim. *Gould*, 220 F.3d at 178. In

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

the *Gould* case, the Appeals Court warned the trial court against treating a Rule 12(b)(1)

motion as a Rule 12(b)(6) motion in reaching the merits of the claims. Thus, it's clear and

convincing that Chhabria defiled the court by "abus[ing] [his] [authority through a

plain usurpation of judicial power], particularly, after [he] ignored []material factor[s]

deserving significant weight, [and considered] improper factors, including Apple and

Jordan's fraudulent legal briefs, illegal and fabricated evidence and perjured declarations,

[and made an intentional error in civil RICO law]" to unlawfully close the case and

provide the Defendants with immunity from the law. *Independent Oil and Chemical

Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co.*, 864 F.2d 927, 929 (1st Cir. 1988).

Chhabria and the Defendants misconduct was addressed in the *Pumphrey* case.

In *Pumphrey*, general counsel was aware based on in-house testing that a handgun could

fire when dropped, and yet allowed trial counsel to advance the theory that the gun would

not do so. 62 F.3d at 1131-32. Similarly, in the *Mackintosh* case, Chhabria and Jordan were

aware, based on Plaintiff's allegations and screen capture evidence (or in the alternative

material fact related to the existence and use of cyber-surveillance), that Jordan's fabricated

screen capture evidence had "significantly change[d] the picture already drawn by Plaintiff's

allegations in the Complaint" Estate of *Stonehill*, 660 F.3d at 452. Jordan knew his

participation in the concealment scheme would advocate a fraudulent defense, and he

chose to use it to lie repeatedly under penalty of perjury.

As one example, he mischaracterized screen capture—which was a central issue

being tried—and because he declared under penalty of perjury under the laws of the State

of California that he attached a "screen capture" to his declaration, he gave the "false

impression" that anyone can create a screen capture—knowing screen capture was alleged

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

in the complaint, and that it's an unlawful method of cyber-surveillance. As perhaps a second example, because Jordan urged fabricated "screen capture" evidence and false statements upon the court—after Apple employees were suborned to sign declarations that contained materially false and deceitful statements that were urged upon the court in the *DOJ* case—specifically that no other iPhone access methods existed, aside from physically entering a passcode on an iPhone to decrypt it—it allowed Jordan to lie repeatedly that:

> "...there are no supporting..." cyber-surveillance "...facts or evidence and..." [Plaintiff] "...sufficiently alleges none." Plaintiff's declaration, "...contains no evidence—nor could it—that Apple actually wrote or used a "key," let alone concealed its existence or used it."

Another example involves Clayton Halunen, attorney for Richard Jacobs, who allegedly concealed any reference to: a) "Apple" b) "Apple iPhones" c) "Apple Macbooks" d) "iOS" e) "rewritten iOS" and f) "Apple private key," from Jacobs Letter, and concealed material facts related to "Apple devices and Apple's operating systems" that were used to conduct the unlawful and offensive cyber-surveillance.

The Defendants unlawful concealment scheme allowed Jordan to request that the court strike Jacobs Letter on the basis that:

> "[Plaintiff's declaration] itself relies on evidence from another third-party, Richard Jacobs, "a former Uber employee," introduced in an unrelated litigation, Waymo LLC v. Uber Technologies, Inc., No. 3:17-CV-00939 (N.D. Cal.). See id. ¶¶ 5-8, 11-12 (citing the "Jacobs Letter" attached as Exhibit A to Mackintosh's complaint). This letter, however, makes no reference to Apple whatsoever. See generally Complaint, Ex. A.""

In yet another example, because Cooper intentionally omitted "screen captures" and "remote recordings" from his report that were methods used to conduct the offensive cyber-surveillance—at Dkt. Entry 2396 in the *Waymo* case—it *again* allowed Jordan to

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

request that the court strike Jacobs Letter because it didn't mention Apple. Jordan's participation in the concealment scheme allowed him to further conceal the schemes that formed and furthered the business arrangement, inasmuch as litigating "in bad faith and doing so with complete lack of candor." Jordan's misconduct satisfies *Derzack*.

Certainly, Jordan's repeated lies to the court that, "there are no supporting facts or evidence and [Plaintiff] sufficiently alleges none" is not only false, it derives from the effects of the concealment scheme. Jordan knew screen capture was a central issue, and that Plaintiff had submitted undisputed evidence of a screen capture that contradicted Jordan's unlawfully fabricated screen capture evidence. Jordan's gross misconduct and malfeasance satisfies *Pumphrey*. In *Pumphrey*, general counsel proffered discovery responses that mischaracterized the gun testing and denied any record of the test in which the gun fired, Id. at 1131-32, just as Jordan responded to the court alleging that he and anyone else can execute and or create a screen capture. His fraud, perjury, misstatements and falsifications occurred during motion practice to advance Apple's fraudulent defense and trail of fraud on the Court—all to conceal the Defendants years-long racketeering activity in court.

While Jordan continued advancing a fraudulent defense, Plaintiff had properly and timely filed a motion to disqualify Chhabria from the case. Chhabria vacated the motion, including Plaintiff's other motions, and sat on the case for 120-days, violating Canons 2 and 3 and other Canons of a judge's professional code of conduct. Chhabria knowingly failed to diligently address Plaintiff's disqualification motion within a reasonable period of time (within 10 days by any legal standard). While Chhabria sat on the case, Plaintiff discovered Apple had launched a deceptive billboard advertising campaign, blanketing the San Francisco California Area where Plaintiff resides and where the case was filed. The

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

digital ad version was seen on millions of iPhones that continued fraudulently inducing and influencing Americans, who Apple knew could be summoned for jury duty in the *Mackintosh* case, or any case involving Apple. Apple and Cook and their attorneys intended to, and did, continue prejudicing Plaintiff at every corner, as exhibited below, see *United States v. Philip Morris USA, Inc.,* 449, F.Supp.2d 1, 909, D.D.C.2009. As was the case in *Philip Morris*—Cook, Apple and others in the *Mackintosh* case were furthering and protecting the Apple Company Enterprise, and conspiracy, and their profits by:

- "making false and misleading statements to the public through press releases, advertising, and public statements, such as before Congress, that were intended to be heard by the consuming public, and adhering to their common scheme of deception and falsehood in lawsuits, including, among other things, destroying and concealing documents."



Chhabria knew, and swore under oath prior to taking public office that he would, "reach a decision in cases by first 'developing a firm grasp of the facts.'" He also swore that, he would look "to applicable Supreme Court and Ninth Circuit precedent…" "for persuasive authority, and where appropriate," "examine the history of the applicable provision." Chhabria did neither, nor did he allow facts from being presented to the court either by Plaintiff, witnesses and others or through an evidentiary hearing to address Jordan's misrepresentations, misstatement of the facts, fabrication of evidence,

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

and perjured declarations. See the exhibits below of multiple excerpt of Chhabria's

statements that were made under oath:

---

5.  **You have spent your entire legal career as an advocate for your clients.  As a judge, you will have a very different role.  Please describe how you will reach a decision in cases that come before you and to what sources of information you will look for guidance.  What do you expect to be most difficult part of this transition for you?**

Response:  If confirmed, I would reach a decision in cases by first developing a firm grasp of the facts, and then applying the law narrowly to those facts, without deciding or addressing any issue that is unnecessary to the resolution of the case.  In cases involving statutory interpretation, I would first look to the language of the statute, with the hope and expectation that the case can be resolved simply by applying that language to the facts of the case.  I would also look to applicable Supreme Court and Ninth Circuit precedent.  If the statute were

---

10. **Please explain your view of the appropriate temperament of a judge.  What elements of judicial temperament do you consider the most important, and do you meet that standard?**

Response:  A judge should be modest and respectful.  Modesty in this context means that a judge should not be quick to assume he or she knows the right answer, and should not reach a final decision before allowing the parties to complete their presentations.  Respect in this context means that a judge should treat all who appear in his or her courtroom well, be they attorneys, parties, witnesses or jurors.  I believe these are the most important elements of judicial temperament, and that I possess these traits.

---

After the Defendants allegedly (1) misdirected, deceived and defrauded the court (2)

launched fraudulent, deceitful and misleading ads (3) obstructed Plaintiff from presenting

his case in federal court (4) obstructed factual development that harmed the truth-finding

mechanics of the court while (5) failing to disclose financial interests in Apple that caused

judicial bias that favored Apple from past litigation—Plaintiff discovered that additional

Verify.ly servers were deleted and or taken down from Will's website. These online servers

contained evidence related to Apple's cyber-surveillance capabilities within Apple and

Uber's apps. The evidence was central to the issues being tried, and could have supported

the fact that Apple, China and DiDi had used the same cyber-surveillance capabilities it

---

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

granted Uber that proximately caused Plaintiff's damages and injuries.

It's clear Chhabria obstructed Plaintiff from obtaining critical pieces of evidence during a requested preliminary injunction and evidentiary hearing. It's convincing he obstructed factual development without knowing all of the facts. This type of fraud on the Court satisfies *Pacific Packaging* and *Dixon.* In *Dixon*, 316 F.3d at 1046-47 (finding a fraud on the Court based on the actions of [officers of the court] in covering up relevant evidence). The coordinated and collective effort described above, fraudulently restrained Plaintiff from obtaining crucial evidence and information that is central to the Apple and Uber related cases cited above and further below. Chhabria defrauded, misled and deceived Plaintiff, a pro se litigant, who was an ignorant person as to his rights under the law.

This type of fraud on the Court perpetrated by Chhabria, who's a government actor and officer of the court, infringed Plaintiff's Constitutional Rights as well. He injured and prejudiced Plaintiff indefinitely. That is, Plaintiff was obstructed from obtaining critical evidence that he could use to prosecute the *Mackintosh* case and potentially other cases, against other defendants. Nonetheless, Plaintiff was successful in recovering and preserving various pieces of cyber-surveillance evidence, including (deleted) Tweets and other pertinent evidence that Cook, Apple, Uber, their attorneys, and other Defendants allegedly tampered with and or deleted as part of the concealment scheme as described in the *Mackintosh* case and, as also described in the Ninth Circuit Court of Appeals case.

As exhibited on the next page, Plaintiff took multiple screen shots of Verify.ly's website and server. The server times out and appears to have been deleted and or taken down. These and other related servers contained relevant evidence central to the issues being tried here. It also appears Apple sherlocked Will's "warning label" app to further

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

conceal the cyber-surveillance embedded in unknown apps in the App Store.





Fraud on the Court will, most often, be found where the fraudulent scheme defrauds the "judicial machinery" or is perpetrated by an "officer of the court..." and in the *Mackintosh* case, the perpetrators and co-conspirators are Cook and the other Defendants, the Defendants attorneys, Apple and Uber's attorneys, Chhabria, Soong, and each DOE Defendant, such that California's Northern District Court could not perform its function as a neutral arbiter of justice—that is—fraud directed at the "judicial machinery" proximately caused by the Defendants years-long schemes and racketeering activity.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Additionally, because Cook, Sewell, Apple's employees and others gave misleading and perjurious testimony on multiple occasions that was material and central to the issues being tried, it was detrimental to the *Mackintosh* case. See *e.g.*, *Levander v. Prober* (*In re Levander*), 180 F.3d 1114, 1120 (9th Cir. 1999) (perjury committed by a single non-party witness was so detrimental to the entire[] proceeding that it was held to be fraud on the Court); *In re Cardwell*, No. 09-43121, 2017 WL 2304220, at 5-6 (Bankr. E.D. Tex. May 25, 2017); *In re Clinton Street Foods Corp.*, 254 B.R. 523 (Bankr. S.D.N.Y. 2000).

The stonewalling of the *Mackintosh* case satisfies *In re Clinton Street Foods*. It also provides another unfortunate example of their willingness to ignore their solemn obligation to ensure "that justice shall be done..." and instead, obstructed the administration of justice, so Apple and the other Defendants could "win . . . [the] case" *Berger*, 295 U.S. at 88" . . . through influence, deceit, political power, corruption, abuse of power, usurpation of judicial power, fraud, perjury, self-dealings, conspiracy to commit "perjury, mail and wire" fraud and other RICO predicate acts, including obstruction of justice by deception.

This species of fraud that harmed the court satisfies *Derzack*. In *Derzack*, the plaintiffs "engaged in a pattern and practice of 'stonewalling, bad faith and lack of candor." Id. It is yet another striking example of fraud on the Court that provided Cook and the other Defendants with immunity from the law. In fact, every instance of fraud, allowed the Defendants to continue conceiving more unconscionable schemes aimed at targeting and harming Plaintiff and destroying files related to the cyber-surveillance to further the concealment scheme. This fraud satisfies *Dixon, Hazel-Atlas,* and *Derzack*.

In that regard, *Pumphrey* is informative because of the strong parallels between the misconduct of the general counsel in that case, and the alleged misconduct of officers of the

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

court in the *Mackintosh* case. This misconduct is a clear and convincing scheme that not only obstructed the proper administration of justice, and deprived Plaintiff of intangible honest services, property, damages and other relief—it "change[d] [Plaintiff's] story as presented to the district court." *Stonehill*, 660 F.3d at 452. Standing alone, this misconduct constitutes fraud upon the Court and warrants relief under Rule 60(d)(3).

The misconduct described in the *Mackintosh* case, exceedingly satisfies *Hazel-Atlas*. Specifically, where the appellate court in *Hazel-Atlas* cited the fraudulent trade journal article in its decision, id. at 240-41, Chhabria refused to make any citation to Jordan's fraudulent and fabricated screen capture evidence, even after it was brought to his attention, because it would establish "fraud on the Court," and so he thus participated in the concealment scheme with Cook, his attorneys, Sewell, Boutrous, Halunen, Umhofer, Cooper and others by intentionally omitting "screen capture facts" and other offensive "cyber-surveillance facts" in his orders and judgement. He instead, harmed and defiled the court and tampered with the integrity of the judicial process.

The Apple-provided software, iOS, rewritten cyber-surveillance iOS, remote screen recordings and screen capture allegations and verified screen capture evidence submitted by Plaintiff are material and central facts related to the existence and offensive use of cyber-surveillance—and are central and interconnected to the above-named cases. It ties together Plaintiff's legal theory and allegations against the above-named Defendants, that their creation, and execution of cyber-surveillance, used to steal DTSA data, establishes a pattern of racketeering, *Sedima, S.P.R.L. v Imrex Co.*, 473 U.S. 479, (1985), see also *Sedima* at 496. The continuous use of cyber-surveillance violated the mail, wire, economic espionage and theft of trade secrets predicate RICO acts at a minimum, that are related and

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

continue benefiting Apple and Uber, and providing the Defendants with continuous profits.

Moreover, in *Hazel-Atlas*, the Supreme Court rejected the argument advanced by the Hartford attorneys that their submission did not constitute fraud on the Court because the article was not "basic" or "the primary basis" for the appellate decision. Id. at 246-247. The Supreme Court noted that the Hartford attorneys "thought the article material," Id. at 247, just as Cook, Apple's in-house attorneys and each DOE Defendant "thought to have Jordan perjure himself" and "fabricate screen capture evidence" which was urged upon the court, and was material to the merits of the *Mackintosh* case, as evidenced by the fact that Jordan attempted to rely upon it to dispute multiple material facts proffered by Plaintiff.

As perhaps another example of the Defendants fraud on the Court, in *Hazel-Atlas*, the Supreme Court found it sufficient that the Hartford attorneys "urged the [bogus] article upon . . . [the appellate court]..." Id. in an effort to prevail, much like Jordan urged multiple bogus and perjured declarations and fabricated evidence upon the court, in an effort to prevail and continue fraudulently inducing the court and the consuming public, the DOJ and others, and used it to harm and subvert the administration of justice.

The filings he proffered to the court attempted to aid and abet Chhabria in his decision before the deceptions and misrepresentations revealed themselves and were brought to the court's attention. That being the case, Cook, Apple, Jordan and the other Defendants are in no "position to now dispute its effectiveness." Id. The misconduct, while similar to that of the Hartford attorneys, is all the more egregious in view of Jordan's status as a young newly hired attorney and representative of the law, *Berger*, 295 U.S. at 88.

Similarly, Chhabria's misconduct also perverted justice. He not only violated Plaintiff's rights, he harmed and prejudiced Plaintiff in potentially other cases. While the

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Defendants destroyed evidence, and engaged in more corporate cover up—he violated Plaintiff's First Amendment Rights when he vacated all hearings, effectively gagging Plaintiff from speaking. In fact, while Chhabria was disqualified by law, he continued signing orders that prohibited Plaintiff from speaking. In doing so, he deprived Plaintiff of honest services, intangible honest services, property, damages, and other just relief. Chhabria's misconduct amounts to multiple violations of the Professional Code of Conduct and Cannons he swore to uphold before taking the bench, evidenced by his refusal to recuse himself from the *Mackintosh* case while he:

a) obstructed Plaintiff from presenting evidence and additional facts to the court;

b) participated in the judicial, concealment, influence, corruption, and bribery schemes;

c) obstructed factual development in furtherance of the business arrangement;

d) provided the Defendants with immunity from the law among other illegal acts.

It is well documented that should a judge issue any order after he has been disqualified by law, and if the party has been denied of any of his or her property, then the judge may have been engaged in the Federal Crime of "interference with interstate commerce" defined under civil RICO, *Stirone v. United States*, 361 U.S. 212, 215, 80 S.Ct. 270, 272 (1960), *Wickard v. Filburn*, (317 U.S. 111): Hobbs Act, 18 USC § 1951.

As evidenced in this Rule 60(d)(3) Motion, Soong, Chhabria, Jordan, Gonzalez, Sewell, Berkowitz, and other officers of the court defiled and harmed multiple courts and "tamper[ed] with the administration of justice." *Hazel-Atlas*, Id. at 246.

Chhabria unmistakably aided and abetted the years-long trail of fraud on the Court, and effectively allowed Apple and Uber to continue using Plaintiff's DTSA data to further unjustly enrich the Defendants. *Brand Energy & Infrastructure Servs. v. Irex Contr. Grp*

128

2017 at *27-28 (E.D. Pa. Mar. 23, 2017), "There is also a threat that the DTSA violations will continue because, allegedly, the defendants continue to use Brand's TRS in their business affairs at Irex. These allegations alone are sufficient to constitute a "pattern of racketeering activity" under RICO. Id. at *27-28 (emphasis added)."

After Chhabria vacated all of Plaintiff's motions and unlawfully closed the case, Plaintiff filed a motion for administrative relief, and *again*, Chhabria stonewalled that motion and factual development through an order exhibited on the next page. His order constitutes extrinsic fraud on the Court. *Bauer v. Bauer*, 944 N.E.2d 578 (2011), No. 22A05-1003-DR-191. Thus, Chhabria continued harming the court, and in doing so, he used the court as a RICO enterprise to aid and abet the Defendants. A long line of cases establishes that justice is defeated when judgments are founded on partial[] facts.

Every order signed by Chhabria was based on partial facts at best. The judgement and orders at worst, are void, not voidable, and derive from an alleged trail of fraud on the Court, which is harmful in nature to the court and the judicial system as a whole. The very integrity of the judicial system and public confidence in the system depends on full disclosure of the facts. Chhabria knew or should have known this, and still he obstructed the disclosure of facts—specifically, facts that are central to the issues being tried here, i.e. the cyber-surveillance-scheme, sherlocking scheme, and other schemes.

By stonewalling the *Mackintosh* case, Chhabria knowingly, recklessly and with complete disregard for the law, concealed facts related to the Defendants offensive use of the cyber-surveillance, that proximately caused Plaintiff's injuries and damages. Additionally, Chhabria's order to dismiss the case omitted and failed to address the cyber-surveillance facts, specifically, the order did not address the screen capture

<div align="center">129</div>

allegations or other cyber-surveillance capabilities as these facts are central to the issues

and at the heart of the *Mackintosh* case. This species of fraud on the Court and reckless

misconduct has been addressed by the Supreme Court in the *United States v. Throckmorton*

in 1878. The Supreme Justices ruled and opinioned that fraud on the Court is when:

> "…fraudulent acts[] keep a person from obtaining information
> about his/her rights to enforce a contract or getting evidence to
> defend against a lawsuit. This could include destroying evidence
> or misleading an ignorant person about [their rights]…"
> That is, where, "by reason of something done by the successful
> party to a suit, there was in fact no adversary trial or decision of
> the issue in the case, an unsuccessful litigant is entitled to
> equitable relief from the judgement thus obtained…"

This type of fraud and malfeasance separately constitute fraud upon the Court and

warrants relief under Rule 60(d)(3), setting aside the judgment and entering default

judgement in favor of Plaintiff against the Defendants.

| v. | **ORDER RE: MOTION FOR ADMINISTRATIVE RELIEF** |
|---|---|
| APPLE, INC., et al., | Re: Dkt. No. 48 |
| Defendants. | |

The motion for disqualification is denied. No further filings from the plaintiff will be considered in this case.

**IT IS SO ORDERED.**

Dated: July 23, 2021

VINCE CHHABRIA
United States District Judge

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

10.   A Ninth Circuit Judge Cashed in on Apple Stock and sent a Notification

Letter to Joseph R. Biden After Obstructing Plaintiff's Rule 60(b) Motion.

On September 24, 2021—after Plaintiff filed a fraud on the Court notice in the

Northern District Court—and after Soong used extra-judicial authority to assign the

case to Chhabria who defiled the court—on September 26, 2021—the Chief Judge for

the Ninth Circuit Court of Appeals, Sidney Thomas, announced Soong's promotion

to work with him in the Ninth Circuit Court of Appeals.

As Plaintiff pointed out, because the Defendants conceived of and executed "an

unconscionable plan or scheme" which was designed to "improperly influence the court"

in its decisions—and because Soong, Chhabria and Jordan defiled the Northern District

Court—Plaintiff sought equitable relief in the court of appeals requesting adjudication

of fraud on the Court allegations as described in the Ninth Circuit Appeals Court; *Zone*

*Sports Center Inc. LLC, et. al. v. Red Head, Inc.*, see case number 11-CV-00634-JST, 2013

WL 2252016, at *6 (N.D. Cal. May 22, 2013). In the *Zone Sports* case ("The court has the

authority to construe Plaintiff's request as either a motion brought under Rule 60(b) or as

an independent action under Rule 60(d) because the substance of the relief sought is what

controls, not the label of the submissions"); *Buck*, 281 F.3d at 1341-42.

In covering up the key events that are material to the issues at the heart of

Plaintiff's fraud on the Court action against Cook, Apple, Uber, West and each of the

other Defendants—Jordan continued setting in motion unconscionable schemes that

allegedly harm "the integrity of the judicial process" *Dixon*, 316 F.3d at 1046, preventing

the "judicial machinery [from] perform[ing] in the usual manner . . . ." *Intermagnetics*, 926

F.2d at 916. Specifically, on October 5, 2021, after Jordan tailored and filed a motion to

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

dismiss based on Chhabria's misconduct—Jordan urged upon the appeals court a signed Certificate of Service affirming he mailed Plaintiff a copy of the motion to dismiss to the service address on record for Plaintiff—and never mailed Plaintiff a copy. In sum, Jordan attempted to prevent Plaintiff from answering within 7 days pursuant to the Fed. R. App. 27(a)(3). "[F]raud on the court . . . embrace[s] only that species of fraud [that][] attempts to defile the court…" by a "…party [who] sentiently set in motion some unconscionable scheme calculated to interfere with the judicial systems ability to adjudicate a matter by improperly influencing the trier of fact or unfairly hampering the presentation of the opposing claim or defense." *Aoude v. Mobile Oil Corp.*, 892 F.2d, 1115, 1118, (1st Cir. 1989); *In re Intermagnetics Am., Inc.*, 926 F.2d 912, 916 (9th Cir. 1991) (quoting 7 JAMES WM. MOORE & J LUCAS, MOORE'S FEDERAL PRACTICE ¶ 60.33 (2nd ed. 1978)). Plaintiff's request to have the circuit judges in the Ninth Circuit Appeals Court review his fraud on the Court allegations against the Defendants was a crucial opportunity for the appeals court to "uphold the integrity of the judicial system." Instead, Thomas inserted himself into the case to (a) further the concealment scheme and (b) ignore Chhabria, Soong and Jordan's gross malfeasance and other acts that constitute fraud on the Court.

However, under the laws of the United States, circuit judges are Article III Judges, who are sworn in to public office as arbiters of truth. They should at all times, under any circumstance, uphold the integrity of the courts and judicial system, especially when fraud on the Court presents itself, *In re Levander*, 180 F.3d 1114, 1118-19 (9th Cir.1999). They must always protect against the tampering with the judicial machinery within these courts, and to safeguard all constitutional rights, judicial process, and ensure our government is

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

absolutely impartial. In fact, in every case brought before and presented to the Ninth

Circuit Court of Appeals, that did not list Apple, Cook, Uber, West, and other Defendants

as a party, judges in the Ninth Circuit Court of Appeals opinioned and ruled as follows:

a)  *Living Designs, Inc. v. El Dupont de Nemours and Co.* ("the *Living Design* case"),
431 F.3d 353, (9th Cir.2005), "[T]he RICO statute, itself, provides that conduct relating to
prior litigation may constitute racketeering activity."

b)  *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) "'Courts' have inherent equity
power to vacate judgments obtained by fraud."

c)  *In re Levander*, 180 F.3d 1114, 1118-19 (9th Cir.1999), "the power to vacate
for fraud on the Court 'is so great, and so free from 'procedural limitations.'""

Accordingly, after Plaintiff cited the above Ninth Circuit cases and Supreme Court

precedent, opinions, and legal authority, the circuit judges who are officers of the court,

dismissed Plaintiff's fraud on the Court legal brief, citing a "30-day procedural limitation"

contrary to their ruling in *In re Levander*, 180 F.3d 1114, 1118-19 (9th Cir.1999), and after

knowing they had jurisdiction to adjudicate Plaintiff's fraud upon the Court legal brief.

Thomas and the other circuit judges ignored the Ninth Circuit's long-standing

instructive rulings that requires all judges in any court to uphold the integrity of the

judicial system when fraud on the Court presents itself, as it did in the *Mackintosh* case.

The Ninth Circuit Court of Appeals was vested with jurisdiction to use its inherent powers.

Instead, these circuit judges, who are government actors, deprived Plaintiff of honest

services, intangible honest services, property, damages and relief. They instead granted

Cook, and the other Defendants unlawful immunity from the law. In fact, the corruption

revealed itself after the appeals court concealed Plaintiff's fraud on the Court legal brief at

Dkt. Entry 3 in the electronic filing system exhibited on the next page. The corruption also

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

revealed itself after the judges read that Jordan lied to the Court by affirming he served

Plaintiff when he did not, and still failed to address the harm to the court. They also

ignored his perjury and fabrication of evidence among other misconduct. What's even

more concerning, they failed to redress Jordan and the other Defendants alleged fraud

and or failed to hold them accountable for their alleged fraud on the Court.

| Date Filed: 12/24/2020 Date Order/Judgment: 07/23/2021 | Date Order/Judgment EOD: 07/23/2021 | Date NOA Filed: 09/24/2021 | Date Rec'd COA: 09/24/2021 |
|---|---|---|---|
| 10/18/2021  4 | Filed Appellant Adam John Mackintosh response opposing motion to dismiss for lack of jurisdiction. [12262214] (RR) [Entered: 10/19/2021 06:10 PM] | | |
| 10/18/2021  5 | Filed Appellant Adam John Mackintosh emergency motion for injunction pending appeals for claim of fraud on the court. Deficiencies: None. [12262215] (RR) [Entered: 10/19/2021 06:14 PM] | | |
| 10/18/2021  6 | Filed Appellant Adam John Mackintosh response to appellees motion to dismiss and strike. [12262217] (RR) [Entered: 10/19/2021 06:18 PM] | | |
| 10/25/2021  7 | Filed (ECF) Appellee Apple, Inc. reply to response (). Date of service: 10/25/2021. [12267228] [21-16576] (Jordan, Daniel) [Entered: 10/25/2021 11:26 AM] | | |
| 10/25/2021  8 | Filed Appellant Adam John Mackintosh motion to dismiss case pursuant to FRAP 42(b). Deficiencies: None. [12270957] (RR) [Entered: 10/27/2021 04:08 PM] | | |
| 11/01/2021  9 | Filed (ECF) Appellee Apple, Inc. response opposing motion ([5] Party Motion). Date of service: 11/01/2021. [12273942] [21-16576] (Jordan, Daniel) [Entered: 11/01/2021 10:29 AM] | | |
| 11/03/2021  10 | Filed Appellant Adam John Mackintosh reply to opposition for emergency injunction filed by Appellee Apple, Inc. in 21-16576. [12281974] (RR) [Entered: 11/08/2021 05:14 PM] | | |

Plaintiff's legal brief alleged Jordan perpetrated fraud on the Court, aided and

abetted by Soong, Chhabria and each DOE Defendant within the Northern District Court

of California. Plaintiff also attached cyber-surveillance evidence related to Jacobs Letter

and Will's report to his legal brief Dkt Entry 3. It contained multiple deleted Tweets from

Twitter that include Will's computer-science-based evidence of the cyber-surveillance

present in Apple and Uber's apps in the App Store in 2014, and potentially as early as 2011.

As evidenced, the Defendants have corrupted officers of the court in the Ninth Circuit in a

years-long influence scheme, kickbacks, favors, gifts, stock/dividends payouts, tangible and

intangible favors or things of value in breach of the federal judge's fiduciary duty, by means

of materially false and fraudulent pretenses, representations, and promises, and by means

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

of omission and concealment of material facts. The circuit judges materially participated, perpetrated and or aided and abetted the judicial, concealment, influence, corruption, and bribery schemes, who are continuing and or threatening to continue aiding and abetting the Defendants in violation of 18 U.S.C. § 1349, 18 U.S.C. §§ 1343, 1346 and 18 U.S.C. § 2.

These judges may potentially fear political retribution and cyber-surveillance retaliation by those who are associated to Cook and Obama—or—West—who's a former DOJ employee and Uber's Chief Legal Counsel, who's also related to Kamala Harris, who has allegedly received raw intelligence from West, Uber and the other Defendants use of cyber-surveillance that targeted Justice Brett Kavanaugh and others (available at https://www.scribd.com/document/392243706/2018-11-02-CEG-to-DOJ-FBI-Munro-Leighton-Referral-With-Redacted-Enclosures)—or—fear of Apple and Uber's political power that can be used by those who are associated to the other Defendants and each DOE Defendant. In addition to O'Scannlain, Thomas, and Tallman's alleged misconduct in the appeals court—they purposefully failed to disclose to Plaintiff and the consuming public—that they hold a substantial legal and or beneficial financial interest in Apple through various investments, retirement funds, and other property, not limited to the:

- Vanguard Growth Funds, i.e. the (VUG); (VV); (IWF); and (VOO).

This posed an imminent conflict of interest and in-fact bias in their view of Plaintiff's fraud on the Court legal brief against Cook, Apple, Uber, West and others—and they knew any ruling favoring Plaintiff would also endanger their financial interest in Apple among other things. Instead of disclosing these facts, and recusing themselves, they obstructed Plaintiff's Rule 60(b) motion and failed to uphold the integrity of the judicial system involving the

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Defendants emerging fraud. In fact, Chief Judge Thomas' retirement letter was sent to

Joseph R. Biden—who was allegedly elected as a result of election meddling and or

tampering and or election irregularities caused by the App Store, among other methods

(https://republicans-judiciary.house.gov/ wp-content/uploads/2022/03/2022-03-31-HJC-

GOP-to-Twitter-re-Hunter-Biden-story.pdf)—presumably under the direction of Cook,

West, Apple, Obama and those associated to Obama, Twitter and its Executives and Legal

Counsel and others, not limited to corrupt government Agents. Thomas' letter was sent

on March 11, 2022, after he obstructed Plaintiff's Rule 60(b) motion, and after Chhabria

obstructed Plaintiff's preliminary injunction that requested relief, not limited to:

1. Prohibiting Apple from competing in the App Store that's inherently causing
   continuous harm to third-party developers and the consuming public;
2. Prohibiting Apple from pre-installing its own apps and other software into its
   own products i.e. iPhone, Macbook, iMac etc.;
3. Ordering Apple to manufacture Apple hardware i.e. iPhone, Macbook, iMac
   and other products to allow hardware to be interchangeable.

The relief aimed at preventing further racketeering activity that exploits "live data"

of Americans, see Mudge's testimony available at https://tinyurl.com/Testimony-Congress.

The relief also aimed at deconstructing the cyber-surveillance, that has, and continues

eroding the courts and judicial system through organized and malicious crime against

Americans as evidenced with Levandowski and potentially others. See the below

excerpt from Jacobs Letter. See also "the Thomas Letter" on the next page:

> Likewise, Gicinto and the SSG team had similar non-attributable devices purchased
> through vendors and sub-vendors where they conducted virtual operations impersonating
> protesters, Uber partner-drivers, and taxi operators. SSG used the devices to store raw
> information collected by their operatives from politicians, regulators, law enforcement, taxi
> organizations, and labor unions in, at a minimum, the U.S.,

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION



**United States Court of Appeals
for the Ninth Circuit**

P. O. Box 31478
BILLINGS, MONTANA 59107-1478

CHAMBERS OF
SIDNEY R. THOMAS                    March 11, 2022               TEL: (406) 373-3200
U.S. CIRCUIT JUDGE                                               FAX: (406) 373-3250

President Joseph R. Biden, Jr.
The White House
1600 Pennsylvania Ave.
Washington, D.C.  20500

Dear President Biden:

I am writing to inform you that I intend to assume senior status and retire
from my regular active service as a United States Circuit Judge for the Ninth
Circuit, effective upon the appointment of my successor.

It has been a great honor and a privilege to serve as an active judge on the
Ninth Circuit Court of Appeals for 26 years.  Pursuant to 28 U.S.C. § 371(b), I
intend to continue to render substantial judicial service as a senior Circuit Judge
upon the appointment of my successor.

Sincerely,

Sidney R. Thomas
United States Circuit Judge

cc:    The Honorable John G. Roberts, Chief Justice of the United States
       The Honorable Mary H. Murguia, Chief Judge of the Ninth Circuit Court of
          Appeals
       The Honorable Roslynn R. Mauskopf, Director of the Administrative Office
          of the United States Courts
       John S. Cooke, Director of the Federal Judicial Center
       Carol Sefren, Chief, Judges Compensation and Retirement Divison,

See also Thomas' legal interest in Apple through various Vanguard Funds and

portfolios that hold over $99 billion in Apple stock. Thomas cashed in on Apple's stock

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

after he obstructed Plaintiff's fraud on the Court motion. These acts constitute as bribery, see *United States v. Manton*, 107 F.2d 834, 846 (2d Cir. 1939).

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

🔒 courtlistener.com

| | |
|---|---|
| 📄 | Vanguard Small Cap Index Fund (VSIAX) (IRA Account) |
| 📄 | Vanguard Small Cap Index Fund (VSIAX) (IRA Account) |
| 📄 | Vanguard Mid-Cap Index Fund (VIMAX) (IRA Account) |
| 📄 | Vanguard Mid-Cap Index Fund (VIMAX) (IRA Account) |
| 📄 | Vanguard Mid-Cap Index Fund (VIMAX) (IRA Account) |

🔒 courtlistener.com

| | |
|---|---|
| 📄 | Vanguard Growth (VUG) (Second IRA Account) |
| 📄 | Ishares Edge MSCI USA Quality Factor ETF (QUAL) (Sec |
| 📄 | Vanguard Large Cap ETF IV (VV) (Second IRA Account) |
| 📄 | Vanguard Short Term Treasury (VGSH) (Second IRA Acco |
| 📄 | Vanguard Short Term Bond Index (VBISX) (Second IRA A |
| 📄 | Graniteshares Xout US Large Cap ETF (XOUT) (Second I |
| 📄 | ARK Genomic Revolution ETF (ARKG) (Second IRA Acco |
| 📄 | iShares Russell 1000 Growth ETF (IWF) (Second IRA Acc |
| 📄 | Invesco NASDAQ Next Gen 100 ETF (QQQJ) (Second IR |
| 📄 | SPDR Fund Consumer Stapes ETF (XLP) (Second IRA A |
| 📄 | Select Sectory Health Care SPDR ETF (XLV) (Second IR |
| 📄 | Vanguard Utilities (VPU) (Second IRA Account) |
| 📄 | Ishares Small Cap 600 (IJS) (Second IRA Account) |
| 📄 | Ishares Core S&P 500 (IVV) (Second IRA Account) |
| 📄 | Vanguard Value (VTV) (Second IRA Account) |
| 📄 | Vanguard Dividend Appreciation (VIG) (Second IRA Acco |

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

| | courtlistener.com |
|---|---|
| 📄 | Vanguard Mid-Cap Index Fund (VIMAX) (Investment Acc⌐ |
| 📄 | Vanguard Mid-Cap Index Fund (VIMAX) (Investment Acc⌐ |
| 📄 | Vanguard Mid-Cap Index Fund (VIMAX) (Investment Acc⌐ |

| | courtlistener.com |
|---|---|
| 📄 | Vanguard Utilities (VPU) (Second IRA Account) |
| 📄 | Ishares Small Cap 600 (IJS) (Second IRA Account) |
| 📄 | Ishares Core S&P 500 (IVV) (Second IRA Account) |
| 📄 | Vanguard Value (VTV) (Second IRA Account) |
| 📄 | Vanguard Dividend Appreciation (VIG) (Second IRA Acc⌐ |
| 📄 | Invesco QQQ Trust (QQQ) (Second IRA Account) |
| 📄 | Invesco QQQ Trust (QQQ) (Second IRA Account) |
| 📄 | Vaneck Vectors Gold Miners ETF (GDX) (Second IRA Acc⌐ |
| 📄 | Vaneck Vectors Gold Miners ETF (GDX) (Second IRA Acc⌐ |
| 📄 | iShares TIPS BOND ETF (TIP) (Second IRA Account) |
| 📄 | iShares TIPS BOND ETF (TIP) (Second IRA Account) |
| 📄 | Vanguard Short-Term Investment Grade INV (VFSTX) |
| 📄 | Vanguard Short-Term Investment Grade INV (VFSTX) |

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

| | Description |
|---|---|
| 🗎 | Northwest Billings Associates (Partnership) |
| 🗎 | UBS USA Deposit Account |
| 🗎 | First Trust ISE Cloud Index (SKYY) (Investment Account) |
| 🗎 | First Trust NASDDAQ Cybersecurity EFT (CIBR) (Investm |
| 🗎 | iShares NASDAQ Biotech EFT (IBB) (Investment Accoun |
| 🗎 | Robo Global ETF (ROBO) (Investment Account) |
| 🗎 | Vanguard S&P 500 ETF (VOO) (Investment Account) |
| 🗎 | Vanguard S&P 500 ETF (VOO) (Investment Account) |
| 🗎 | Vanguard S&P 500 ETF (VOO) (Investment Account) |
| 🗎 | Vanguard S&P 500 ETF (VOO) (Investment Account) |
| 🗎 | Vanguard S&P 500 ETF (VOO) (Investment Account) |
| 🗎 | Vanguard S&P 500 ETF (VOO) (Investment Account) |

| | |
|---|---|
| 🗎 | Vanguard S&P 500 Fund EFT (VOO) (IRA Account) |
| 🗎 | Vanguard S&P 500 Fund EFT (VOO) (IRA Account) |
| 🗎 | Vanguard S&P 500 Fund EFT (VOO) (IRA Account) |
| 🗎 | Vanguard S&P 500 Fund EFT (VOO) (IRA Account) |
| 🗎 | Vanguard S&P 500 Fund EFT (VOO) (IRA Account) |
| 🗎 | Vanguard S&P 500 Fund EFT (VOO) (IRA Account) |
| 🗎 | Vanguard S&P 500 Fund EFT (VOO) (IRA Account) |

In sum, Chhabria, Soong, O'Scannlain, Thomas and Tallman all knew that any

judicial decision that rightfully weighed in favor of Plaintiff, would reveal and endanger

---

141

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

the years-long alleged schemes that formed and furthered the business arrangement. They each independently, either directly and or indirectly, participated and engaged in conduct with a common purpose of concealing material facts from their orders and or filings related to the cyber-surveillance among other schemes that furthered the business arrangement.

Thus, it can be safely said that the Defendants and various corrupt officers within these courts are using the Ninth Circuit as a RICO Enterprise, caused by the effects of the racketeering activity. "A long line of cases hold that any governmental agency, court, political office or the like could serve as a RICO 'enterprise.'" *United States v. Thompson*, 685 F.2d 993, 999 (6th Cir.1982) (en banc), 459 U.S. 1072 (1983); Officers of the court are not the court. In *Bulloch v. United States*, 763 F.2d 1115, 1121 (10th Cir.1985) the ruling and opinion of the court asserted that "A judge is an officer of the court, as well as are all attorneys""); *People v. Zajic*, 88 Ill.App.3d 477, 410 N.E.2d 626 [1980], the court also ruled that "A judge is not the court." After the circuit judges reviewed Plaintiff's fraud on the Court allegations in his legal brief—they acted corruptly in concert, by choosing not to uphold the integrity of the courts, and consequently, harmed the judicial system as a whole.

They became a party to the fraud and concealment scheme in doing so, in violation of all ethical and legal requirements. *Cone v. Harris* Case Nos. 12288, (Okl. 1924), 230 P. 721, 723, fraud on the Court also occurs when "a judge himself is a party to the fraud." Standing alone, this misconduct constitutes fraud upon the Court and warrants relief under Rule 60(d)(3).

Beginning on a date unknown, but no later than 2013, and continuing until on or about November 2022, in the Northern District of California and elsewhere, public

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

officials, Chhabria, Soong, O'Scannlain, Thomas, and Tallman, knowingly, and with the intent to defraud, participated in, devised, and intended to devise a scheme and artifice to defraud the public, specifically Plaintiff of his right to the honest services of public officials as a result of the Defendants bribery, kickbacks and other methods of payments, favors and political fame in breach of the judicial officers fiduciary duty, by means of materially false and fraudulent pretenses, representations, and promises, and by means of omission and concealment of material facts.

The objectives of the judicial, concealment, influence, corruption, and bribery schemes to defraud were, among other objectives (a) to provide Cook and the other Defendants with immunity from the law (b) conceal facts related to the existence and continuous use of cyber-surveillance and sherlocking activity (c) obstruct cases (d) defile courts and (e) allow continuous profits in exchange for personal financial benefits from Apple and others including, but not limited to, artificially inflated Apple stock payouts, favors, promises, contributions, votes, promotion to higher courts, and any other political and non-political favors, kickbacks, self-dealings and other ill-gains unknown to Plaintiff at this time. In addition to public official's participation in, and perpetration of the judicial, concealment, influence, corruption, and bribery schemes—they used the Ninth Circuit (specifically the State of California) as a RICO enterprise affecting the outcome of Plaintiff's RICO case," *United States v. Warner*, Nos. 02 CR 506-01, 02 CR 506-4, 2006 WL 2583722 at \*4 (N.D. Ill. Sept. 07, 2006) ("The Court reaffirms its previous conclusion that the State of Illinois may, as a matter of law, serve as a RICO Enterprise....."), see also *Stonehill*, 660 F.3d at 452, id. at 448, *In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078, 1097 (9th Cir. 2007). The misconduct satisfies, *Stonehill, Pumphrey,* and *Derzack.*

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

11.    **Fraud on the Court by a Federal Judge.**

As Plaintiff continued pursuing justice—he sought equitable relief in the State of Massachusetts.

After initiating a fraud upon the Court proceeding under Rule 60(d)(3), federal judge, Richard G. Stearns, was assigned to this motion. Shortly thereafter, Stearns and court staff perpetrated the judicial scheme, by sentiently setting in motion, yet another unconscionable scheme. The scheme involves the intentional and improper application of Rule 60(d)(1), while applying the elusive "Iqbal standard" [24] to dismiss this "Motion" as a "Complaint." The scheme aimed to (a) interfere with the courts ability to conclude that the Defendants committed a fraud upon the Court, and (b) obstruct Plaintiff from obtaining relief in which he is legally entitled as evidenced in this motion. See *Aoude*, supra at 1118.

In fact, the Docketing Clerk issued a "new Summons" on the dockets in an attempt to "accommodate" the Defendants and allow them to "disclaim their fraudulent conduct" and "fabrication of evidence." However, Courts have held that "Even the slightest accommodation of deceit []in any material respect quickly erodes the validity of the process," *Shaffer*, 11 F.3d at 457—and of course there is no "Summons" requirement under a Rule 60(d)(3) Motion." The Supreme Court in Hazel-Atlas has already set precedent

---

[24] Harvard – Law & Policy Review by Professor Roger Michalski | Available at https://harvardlpr.com/online-articles/assessing-iqbal. "Iqbal [is] corrosive to enforcing civil rights, antitrust protection, consumer protection, and employment discrimination." As a result of Congress' inaction and failure to pass the Notice Pleading Restoration Act, there has been a significant increase in subjectivity abuses by judges using the "plausibility standard" instead of the "notice pleading standard." All of this has led to decreased enforcement of constitutional and civil rights claims that are potentially valid. Iqbal will continue to have a profound impact on civil litigation and the enforcement of individual rights because judges continue using Iqbal as a reason not to separate facts from conclusory assertions to examine if the assertions can be inferred from the interrelated facts.

---

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

that "[a] party who presented fraudulent evidence cannot disclaim its effectiveness after

the fact"—meaning the Defendants cannot answer and or disclaim the effectiveness of

their fabrication of "screen capture" evidence among other corrupt acts in any material

proceeding Plaintiff initiates involving the Defendants alleged trail of fraud and lies to

Congress, see *Diaz v. Home Depot USA, Inc.*, 196 So. 3d 504, 505 (Fla. 3d DCA 2016), see

also *Ramey v. Haverty Furniture Co.*, Inc., 993 So. 2d 1014, 1018 n.2 (Fla. 2d DCA 2008),

the district courts signed multiple orders ("...striking defendant's answer and defenses[]")

which may be employed against a defendant who has perpetrated a fraud on the Court.

On November 2, 2022—44-days after a new Summons was issued—and 22-days

after Plaintiff requested the court to initiate a fraud on the Court proceeding pursuant to

Rule 60(d)(3)——Stearns defiled the court by obstructing Plaintiff's Rule 60(d)(3) Motion

through a plain usurpation of judicial power. In doing so, Stearns aided and abetted

the Defendants trail of fraud by signing an order that not only made several material

misstatements of facts, it allowed the perpetuation of the Defendants original fraud on

multiple Courts by refusing to address it. The order failed to address facts related to the

cyber-surveillance, *yet again*, and omitted these facts from the courts record in what could

only be described as a continuing pattern of racketeering as described above, aimed at

concealing the existence and use of cyber-surveillance to target Plaintiff and others. The

order obstructed justice, and delayed the truth from coming out, *Islamic Shura Council of S.

Cal. v. F.B.I.*, 779 F. Supp. 2d 1114, 1125 (C.D. Cal. 2011), "deception perverts justice." Id.

The continuous delays have allowed the Defendants to destroy additional electronic

cyber-surveillance files related to this motion, and instruct their attorneys to delete files and

other related paper documents. The Defendants also allegedly met in private with their

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

attorneys and corrupt government actors under attorney client privilege to set in motion more unconscionable schemes aimed at obstructing Plaintiff from obtaining relief and justice. The schemes include, and are not limited to (a) misapplying the law (b) potentially exercising Congressional-like power and (c) continuing to stonewall and or prejudice Plaintiff and this motion. In fact, Stearns patently ignored this Rule 60(d)(3) Motion, who turned a blind eye to the Defendants alleged fraud on the Court, and not only failed to redress the fraudulent acts he refused to appoint a special master to assist in analyzing this motion. In doing so, Stearns made multiple corrupt and fatal errors in law as follows:

*First*, he applied a "merits based legal standard" to this "Motion" so he could construe it as a "Complaint" on the legal basis of "continuing the original [RICO] suit" to establish jurisdiction. Bending the law and curtailing the fraud on the Court precedent only perpetuated the Defendants fraud upon the Court for reasons that are *two-fold*: (1) Federal Jurisdiction was already established when the Defendants original fraud upon the Court occurred as early as 2013. Jurisdiction was established to redress the wrongs against the courts and harm to parties affected from the fraud, including Plaintiff; and (2) Having read this motion, Stearns knew or should have known that he had jurisdiction over the Defendants fraud upon the Court. Instead, he called Plaintiff's motion names and ignored the fact that this motion was written based on facts from federal court dockets and evidentiary hearings and admissible evidence from the Defendants alleged trail of fraud upon the Court that proximately caused Plaintiff damages, injury and irreparable harm.

Not only did Stearns misapply the law, he failed to preserve the integrity of the judicial process when he refused to address the Defendants fraud upon the Courts. The Supreme Court itself, has repeatedly emphasized, in plain written language, that courts are

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 268 of 312    Page
ID #:268
Case 9:23-cv-80316-AMC    Document 4-1    Entered on FLSD Docket 03/02/2023    Page 163 of
203

vested with jurisdiction and extensive equitable powers to fashion appropriate remedies

to redress fraud upon the Court with no prerequisite of applying a "merits based legal

standard." This is so judges can preserve the integrity of the judicial system, *Swann v.

Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1 (1971). "All in all, we find it surpassingly

difficult to conceive of a more appropriate use of a court's inherent power than to protect

the sanctity of the judicial process." *Aoude v. Mobile Oil Corp.*, 892 F.2d 1115, 1120

(1st Cir. 1989). Furthermore, because the Defendants lied "to the court[s]" and to Plaintiff,

"intentionally, repeatedly, and about issues central to the truth-finding process," "it can

fairly be said that" [the Defendants] "ha[ve] forfeited [the] right to have [the] claim decided

on the merits." (McMunn, 191 F. Supp 2d at 445). Thus, this motion is not about the merits

of the *Mackintosh* case, it's about addressing the Defendants lies to courts, Congress, and

the public, and to redress Plaintiff.

    ***Second***, because Chhabria's judgement in the *Mackintosh* case is fraudulent, Stearns

refused to affirm Chhabria's judgment and its legal basis. Instead, Stearns aided Chhabria's

acts by failing to initiate a fraud upon the Court proceeding. In fact, all five federal judges,

who presided over the *Mackintosh* case, faced a major decision in law (1) address Jordan's

fabrication of evidence, perjury and patent litigation misconduct after Plaintiff motioned

for it, or (2) *sua sponte*—preserve the integrity of the judicial process and protect the

judicial system by initiating a fraud upon the Court proceeding after the courts learned

of the Defendants fraud on the Court acts. See *Pumphrey* v. *K.W. Thompson Tool Co.*, 62

F.3d 1128, 1130 (9th Cir. 1995) (proceedings initiated from [the] court learning of conduct

constituting fraud on the Court). Facing this critical decision, all five federal judges in lower

district and appeals courts chose to delay the *Mackintosh* case, and obstruct the courts from

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

"*sua sponte*" initiating a proceeding after these same courts learned of the Defendants alleged fraud upon the Court as described in this motion. As perhaps proof the judicial and concealment scheme succeeded, Stearns never addressed, and intentionally omitted, the cyber-surveillance facts from his order by applying Rule 60(d)(1) to construe this motion as a "Complaint"—even after Plaintiff instructed the court to construe it as a "Motion" under 60(d)(3). Stearns then proceeded to cleverly insert the elusive "*Iqbal*" case law to unlawfully dismiss this motion as a "Complaint." However, under Rule 60(d), the "substance of the relief sought is what controls...," and the substance in this motion is premised on Rule 60(d)(3) not 60(d)(1). In fact, this motion never mentioned a Rule 60(d)(1) before Stearns. As such, Stearns was judicially required to initiate a Rule 60(d)(3) proceeding———not stonewall Plaintiff and defile the court *again*. [25]

Even more concerning, Stearns obstructed the judicial process [26] while failing to cite case law that gave him the legal authority to deny Plaintiff the right to conduct a Rule 60(d)(3) proceeding against the Defendants. This single act of obstruction, not only erodes public confidence in the judicial system as a whole, its corrosive to the rule of law. In fact, there is no case law or legal authority that allows Stearns to obstruct a Rule 60(d)(3) Motion, because the courts judicial machineries and long-standing precedent are designed to address the Defendants alleged fraud upon the Court that harmed the judicial process.

---

[25] See, e.g., HENRY L. MCCLINTOCK, MCCLINTOCK ON EQUITY ("MCCLINTOCK") § 4, at 11, 459 (1948); see also id. § 171, at 459 ("Since [the seventeenth century] . . . there has been no serious question as to the power [of equity] to enjoin the enforcement of a judgment obtained by fraud . . . .").

[26] See also *Chevron v. Danziger, et al.*, S.D.N.Y., 1:11-cv-00691 "the Chevron case" at Dkt. Entry 1874, ¶ 496 of 497, "It is distressing that the course of justice was perverted."

---

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO   Document 1   Filed 07/08/24   Page 270 of 312   Page
ID #:270
Case 9:23-cv-80316-AMC   Document 4-1   Entered on FLSD Docket 03/02/2023   Page 165 of
203

***Third***, in his order, Stearns recited an old case Jordan used in his "illegal motion

to dismiss" that was supported by a "perjured declaration and fabricated evidence" as

described in the *Mackintosh* case. Stearns' threadbare recitation of this old case should

be stricken from the record in its entirety because Chhabria refused to strike the same

old case Jordan cited in his "illegal motion to dismiss." [27]

In fact, after Plaintiff disqualified Chhabria, and while Chhabria was disqualified

by law, Chhabria cited the same case in his judgment to favor Jordan and Apple. It's an old

case the Defendants are clearly using to obfuscate their years-long litigation misconduct

that tampered with the courts impartial task of adjudging multiple cases that could reveal

the cyber-surveillance. *Intermagnetics*, 926 F.2d at 916 (citation omitted).

Moreover, after Congress recently required federal judges to publicly report their

legal interests, Plaintiff discovered that the judge who was assigned to the old case was only

assigned after he cashed out of Apple stock, which is considered bribery. The assignment of

that judge after he sold Apple's stock was an attempt to prevent Plaintiff from discovering

the bribery scheme and other schemes described in this Rule 60(d)(3) Motion. The assigned

judge thereafter wrote a "findings and recommendations" that intentionally omitted the

Racketeer Influenced and Corrupt Organization Act and restricted Plaintiff from filing an

amended complaint that exceeded 25 pages. The judges' intent was to mislead Plaintiff from

learning about the RICO statute, thus preventing Plaintiff from asserting RICO in his

---

[27] See *Ramey v. Haverty Furniture Co., Inc.*, 993 So. 2d 1014, 1018 n.2 (Fla. 2d DCA 2008)
39, 125 See *Diaz v. Home Depot USA, Inc.*, 196 So. 3d 504, 505 (Fla. 3d DCA 2016), the
district courts signed orders ("...striking defendant's answer and defenses[]") which may be
employed against a defendant who has perpetrated a fraud on the Court.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

amended complaint. The judge knew or should have known that under the RICO statute, limiting a complaint to 25 pages would not only prejudice a litigant, it would obstruct the case from surviving a motion to dismiss, see Manual for Complex Litigation, 1995 Edition, 33.8 Civil RICO fn 1273 .81, Pleadings (33.81), "pleadings play an especially important role in civil RICO fn 1274. When filing a civil RICO case, RICO applies to a broad range of conduct, often occurring over an extended period of time and involving numerous people and entities. The complaint will often assert numerous claims against a number parties... So, the complaint may be lengthy and complex..." Thus, this old case should be disregarded and stricken from the courts records because its being used as a tool and mechanism to obfuscate the Defendants alleged trail of fraud on the Court misconduct.

More to the point here. Stearns ignored the fact that Jordan was hired by Apple, Cook and others unknown to Plaintiff at this time, who launched *ad hominem* attacks at Plaintiff, fabricated cyber-surveillance evidence, obfuscated the record, and perjured himself in multiple legal briefs—*whilst*—Jordan failed to correct the courts record after he urged illegal filings upon the court——even after Plaintiff raised the issue to Jordan and brought it to the courts attention. [28] Thus, the Defendants, who are working alongside federal judges and other public officers have used interstate communications to urge fraudulent filings upon the Courts to further the alleged fraud upon the Court scheme,

---

[28] See 16 Nevada's Law Journal 707, Hague-Final ¶ 740, "The court, in addressing whether fraud on the court occurred under Rule 60, focused on the [attorney who committed the offense], and noted that as an officer of the court, [the attorney] had a duty to not mislead [and or] correct [the] misrepresentation. It held that "simple dishonesty of any attorney is so damaging on courts and litigants that it is considered fraud upon the court." And, citing to rules of professional conduct, the court further held that "[a]n officer of the court perpetrates fraud on the court (a) through an act that calculated to mislead the court or (b) by failing to correct a misrepresentation or retract false evidence submitted to the court."

---

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

among other schemes. [29] All of this fraud makes their filings void, not voidable. See the case of *Valley v. Northern Fire & Marine Ins. Co.*, 254, U.S. 348, 41 S. Ct. 116 (1920), see also *Williamson v. Berry*, 8 HOW. 945, 540 12 L. Ed. 1170, 1189 (1850).

*Fourth*, Stearns defended the corruption by citing case law in his order suggesting that this motion is somehow "vexatious." His calculated citation is far from the truth. The American People have an important interest here—a concern Edward Snowden has been whistle blowing on for many years. The "cyber-surveillance was designed, financed, distributed and executed by the Defendants"—to extract DTSA data from Americans and third-party app developer victims who compete in the App Store, so Apple and others can launch new and infringing services, products, goods and partnerships derived from the DTSA data to pump stock prices—*while*—maliciously persecuting and prosecuting these same victims using the cyber-surveillance—*whilst*—Cook, public officers, judicial officers, law firms, attorneys and others illegally profited from the ill-gains as a bribe and or other form of payment.

*Fifth*, at Plaintiff's detriment, Stearns unsealed sensitive damages material without citing case law and legal authority to do so, and without holding a single hearing.

---

[29] See, e.g., *United States v. Profit*, 49 F.3d 404, 406 n. 1 (8th Cir.) (the four essential elements of wire fraud are: (1) that the defendant voluntarily and intentionally devised or participated in a scheme to defraud another out of money; (2) that the defendant did so with the intent to defraud; (3) that it was reasonably foreseeable that interstate wire communications would be used; and (4) that interstate wire communications were in fact used) (citing *Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit* 6.18.1341 (West 1994)), cert. denied, 115 S.Ct. 2289 (1995); *United States v. Hanson*, 41 F.3d 580, 583 (10th Cir. 1994) (two elements comprise the crime of wire fraud: (1) a scheme or artifice to defraud; and (2) use of interstate wire communication to facilitate that scheme); *United States v. Faulkner*, 17 F.3d 745, 771 (5th Cir. 1994) (essential elements of wire fraud are: (1) a scheme to defraud and (2) the use of, or causing the use of, interstate wire communications to execute the scheme), cert. denied, 115 S.Ct. 193 (1995).

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

*Sixth*—by continuing to egregiously inflict injustice onto Plaintiff—by misappropriating his filing fees without intending to provide honest service—and by depriving Plaintiff of intangible honest services and relief——is to breed and perpetuate "absolute injustice." [30] Justice is not at all served by inflicting injustice. The ends do not justify the means. Every delay in the judicial process was caused by the Defendants briberies, political power, influence, and threats among other things——who continue working in concert with bribed or otherwise influenced (1) judicial officers (2) public officials, and (3) corrupt government actors. Their alleged conduct continues allowing the Defendants to engage in additional corporate and governmental cover up through methods described in Jacobs Letter and as described by Edward Snowden and others. [31] As asserted by Plaintiff, the "*long train of abuses*" and "*usurpations*" and abuse of judicial power" has effectively subverted and harmed multiple courts, including Plaintiff and his significant RICO and Fraud on the Court case against Tim Cook and the other Defendants.

The issue has now turned into whether a court decision was procured by corrupt means, i.e. fraud upon the Court, regardless of **whether the cause was just.** When courts are asked to grant relief from a prior judgment on the ground of fraud, a central question is whether such an outcome is appropriate to "protect the fairness and integrity of litigation" (which is entirely appropriate here), see 12 MOORE'S FEDERAL PRACTICE §60.43[1][d] (3d ed. 2012) (quoting Lonsdorf v. Seefeldt, 47 F.3d 893, 898 (7th Cir. 1995)).

---

[30] *Diaz v. Methodist Hosp.*, 46 F.3d 492, 497 (5th Cir. 1995) (full and fair opportunity to present case), *Green v. Foley*, 856 F.2d 660, 665 (4th Cir. 1988), See also the *Chevron* case, "There is no "Robin Hood" defense to []illegal and wrongful conduct."
[31] *Wilkin v. Sunbeam Corp.*, 466 F.2d 714, 717 (10th Cir. 1972) (corruption of judicial officers is fraud on the court); *Root Ref. Co. v. Universal Oil Prods. Co.*, 169 F.2d 514, 517, 541 (3d Cir. 1948) (vacating judgments obtained by bribery of Third Circuit judge).

---

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Plaintiff's point is analogous to that made by the Second Circuit in the infamous *Manton* case, a criminal prosecution of a Court of Appeals judge where the Circuit rejected a contention that there had been no obstruction of justice by a judge because the cases would have been decided the same way in any case. [32] The Circuit's view in that case has equal bearing here. Even in cases of extrinsic fraud short of judicial corruption, Plaintiff need not prove that the outcome of the "*Mackintosh* case" would have been different absent the fraud. [33] He must show that the fraud "prevented [him] from fully and fairly presenting his case." [34] Aside from the above examples, another example is that the Defendants used the cyber-surveillance to observe and listen to Plaintiff's meetings with his attorneys through their Apple products, who later dropped him as a client and misled him from filing a "RICO case." This prevented him from "fully and fairly presenting his case" because, among other things, he was coerced into filing a RICO case as a pro se litigant.

---

[32] Judicial action, whether just or unjust, right or wrong, is not for sale; and if the rule shall ever be accepted that the correctness of judicial action taken for a price removes the stain of corruption and exonerates the judge, the event will mark the first step toward the abandonment of that imperative requisite of even-handed justice proclaimed by Chief Justice Marshall more than a century ago; that the judge must be 'perfectly and completely independent with nothing to influence or control him but God and his conscience.'" See *United States v. Manton*, 107 F.2d 834, 846 (2d Cir. 1939) (emphasis added).

[33] E.g., *Ty Inc. v. Softbelly's Inc.*, 353 F.3d 528, 536-37 (7th Cir. 2003); *Schultz v. Butcher*, 24 F.3d 626, 631 (4th Cir. 1994); *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 924 n.10 (1st Cir. 1988); RESTATEMENT (SECOND) OF JUDGMENTS § 70, cmt c, d (1983) (party seeking relief must show either corruption of court or that fraud goes to a material matter and that party seeking relief had "a substantial case to present"); RESTATEMENT (FIRST) OF JUDGMENTS § 124, cmt. d (1942) ("It is of the essence of a fair trial that a judicial tribunal should have an uncorrupted mind and if it does not the trial is not fair even though it may be shown that the tribunal would have reached the same result had there been no corruption or duress. Thus, where a party, although believing that he can prove his case, nevertheless out of excess of caution bribes a tribunal, equitable relief will be given against him even though, on the facts presented, the tribunal would have reached the same decision."). 73 F.2d 1332, 1339 (5th Cir. 1978); see *Ty Inc.*, 353 F.3d at 536-37. [34] *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1339 (5th Cir. 1978); see *Ty Inc.*, 353 F.3d at 536-37.

---

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

### 12.    A Potential Abuse of Congressional-like Power under the APA.

After Chhabria, O'Scannlain, Thomas, Tallman, and Stearns participated in the influence, corruption, judicial and bribery schemes, Plaintiff sought relief in a Texas Court on November 1, 2022. He again, initiated a fraud on the Court proceeding, and requested the appointment of a Special Master to investigate and write an independent fraud on the Court report to assist the court in analyzing if the Defendants fraud constitutes a fraud upon the Court. Subsequently, Plaintiff discovered that his case was terminated, and a new case was filed by the court, without his consent.

He also learned that the clerk asserted on the dockets that, "all parties were notified." In the coming months, Plaintiff had never received notification to his mailing address from the court, while presumably, Apple and the other Defendants received notice to prepare a defense and conspire with unknown parties to allegedly continue setting in motion unconscionable schemes aimed at targeting Plaintiff, and to use Apple's unconstitutional reach i.e. accessing iPhones, Macbook, iMacs, Apple Watches, etc. and the DTSA data within these products and services to track down and tamper with witnesses and non-party witnesses and to destroy electronic files among other acts as described in Jacobs Letter, by Snowden, by Will and other whistle blowers.

In sum, the federal judge, clerk and other unknown parties and non-parties in the court set in motion a scheme to aid and abet the Defendants without notifying Plaintiff. This is yet another act by a federal judge in a federal court to aid and abet Cook, Apple, Uber and the other Defendants. It has, and will continue prejudicing Plaintiff in every way. Plaintiff also learned that the new case was filed under the "Administrative Procedures Act ("APA")/Cause: RICO." What's potentially concerning here, is that Tim Cook and the

154

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

other Defendants fraud on the Court is no longer the focus, because the "standing, standards and burden" under APA are entirely different and focus on agency action.

The federal judge and court will presumably focus on Chhabria, O'Scannlain, Thomas, Tallman, and Stearns alleged misconduct and not the Defendants trail of fraud upon the Court (the "Diversion Scheme").

After Plaintiff reviewed portions of the APA, the act states that under the APA, a challenger must prove that a government agency acted, "capricious" and or "arbitrary" and or took willful and "unreasonable action without consideration or in disregard of facts or law." Although Plaintiff may prove so, a fraud upon the Court remedy is legally appropriate and should be exhausted first. Plaintiff never initiated an APA action against the Defendants, nor would he, because the "standing, standards and burden" are improper, and if initiated, it can potentially initiate the diversion scheme to shift the courts truth-finding mechanics away from the Defendants. Plaintiff never requested the court to perform a judicial review. A judicial review prompts a review of Chhabria, O'Scannlain, Thomas, Tallman, and Stearns acts to determine if they violated their oath of office——and not——the Defendants alleged harm to the integrity of the judicial system. Again, although Plaintiff may prove so, this should not be the courts focus at this time. The court should have solely focused on the Defendants alleged trail of fraud upon the Court. The notion that an APA action is proper, instead of a fraud upon the Court proceeding, is concerning, if it in any way accommodates and favors the Defendants, which it appears it has.

It also appears, that under the guise of "improv[ing] the administration of justice by prescribing fair administrative procedure"—the fraud on the Court proceeding was obstructed. The APA gives courts unlimited power, in what can only be described as

<div align="center">155</div>

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

"Congressional-like Power." [35] It can strip Plaintiff (a Natural Born American Citizen) of his inalienable rights granted to him under the intrinsic power of the United States Constitution, Declaration of Independence and Bill of Rights among other rights. [36] It can potentially enjoin him from seeking justice and or addressing Tim Cook, Apple, and the other Defendants alleged fraud. The APA also provides a court with Hearing Power under HEARINGS, section (b). [37] It gives the court the power to force Plaintiff into a trial-like proceeding without a jury, to administer oaths, perform discovery, evaluate evidence, sign subpoenas, among other procedural motion. However, these procedures have been subverted long before the court initiated the APA. Alsup himself, admitted on the courts record, that "if even half of what is in [Jacobs Letter] is true, it would be an injustice for Waymo to go to trial." The same applies to Plaintiff. It would be an injustice to have Plaintiff go to trial and or a trial-like proceeding because Plaintiff was targeted and exploited using the cyber-surveillance as described in Jacobs Letter, see Exhibit A attached hereto. For this reason, a fraud upon the Court remedy is proper. To prevail under a fraud upon the Court, Plaintiff only has to prove that an "**officer of the court**" "**thought**" to "**fabricated evidence**" to attack the central issues in the action and or "**attempted to prevent Plaintiff from fairly and fully presenting his significant case.**" It also appears

---

[35] The Administrative Procedure Act (APA), Pub.L. 79-404, 60 Stat. 237, enacted June 11, 1946, governs the way in which administrative agencies of the federal government of the United States may propose and establish regulations and "grant[s] U.S. federal courts oversight over all agency actions."

[36] However, under the APA, section, "Construction and Effect," clearly states under section 12, "Nothing in this act shall be held to diminish the constitutional rights of any person..." [37] HEARING POWERS.—Officers presiding at hearings shall have authority, "subject to the published rules of the agency and within its powers, to (1) administer oaths and affirmations, (2) issue subpoenas authorized by law, (3) rule upon offers of proof and receive relevant evidence...."

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

the Defendants set in motion yet another unconscionable scheme, aimed at obstructing

justice. After the Defendants used apps within the App Store to cause irregularities in the

United States Election that allegedly elected Joseph R. Biden into office——on his first day

in office——Biden immediately signed an APA Executive Order 13992, abolishing Trump's

APA Executive Order 13892, which can potentially form into an ("APA Scheme").

Shortly after the abolishment, the House Judiciary Committee held a hearing

regarding the APA. Cicilline himself stated, "Today's hearing [will ensure that] the

rulemaking process [under the APA] is effective, transparent, accountable and consistent

with Congress' intent." Contrary to Congress' intent, the potential APA scheme has

effectively abolished Executive Order 13892 that aimed to promote the "Rule of Law Through

Transparency and Fairness" among other accountability measures to ensure the APA is being

used consistent with Congress' intent. After the abolishment, and after Plaintiff filed this motion

requesting a fraud upon the Court proceeding against the Defendants, the court initiated an APA

action *sua sponte* that may potentially be ambiguous, improper, and was initiated without first

exhausting all remedies, specifically, a fraud upon the Court remedy.

Biden's revocation of Executive Order 13892 can potentially be construed as fraud

upon the Court, because it has the propensity not to uphold the integrity of the judicial system

as a whole, i.e. Promoting the "Rule of Law" through various means, not limited to Trump's

Executive Order. It appears the APA may be used against Plaintiff to aid and abet Cook and

others, with the intent of concealing the unconstitutional use of cyber-surveillance among

other schemes in furtherance of the business arrangement, and with the intent of obstructing

Plaintiff's fraud upon the Court claim against the Defendants. Plaintiff believes the scheme

may effectively give the Defendants unlawful immunity from liability through diversion

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

of—standing, standards, and burden—and not redress the fraudulent information the Defendants urged upon the courts in their legal briefs. See *Clipper Exxpress v. Rocky Mtn. Motor Tariff Bur., Inc.*, 690 F.2d 1240, 1261 (9th Cir. 1982) ("In the adjudicatory sphere . . . []supplying []fraudulent information thus threatens the fair and impartial functioning of these agencies and does not deserve immunity" from liability).

Moreover, after Biden abolished Trump's Executive Order 13892, the Defendants set in motion an APA action. Thus, the APA may further allow the Defendants to speak half-truths and potentially continue urging fraudulent information in their legal briefs and other documents upon the court and or continue stripping Plaintiff of his Constitutional Rights to speak during multiple requested proceedings. Below, are a few sections that have been abolished from Trump's APA Executive Order, which can potentially further injure Plaintiff, specifically, Plaintiff *may be forced to face an agency action* that may not:

1) act "**transparently and… fairly**" which allows the judge and the Defendants to act in concert to obstruct the truth-finding mechanics and subvert justice; 2) use proper APA "**Guidance documents**"; 3) provide "**proper reliance**" on APA "**guidance documents**" so the judge can abuse the court's authority to obstruct justice, harming both Plaintiff and another court; 4) "**establish a violation of law by applying statutes and regulations**" giving the Defendants immunity from the law and or ripping Plaintiff of his Constitutional Rights; and may not have "**Fairness or Notice…**" as evidenced in the recent termination of Plaintiff's fraud on the Court claim against the Defendants.

In fact, after the judge (who financially benefits from Apple Stock) *sua sponte* initiated an APA proceeding, the docketing clerk asserted that all parties were notified, yet the court *failed* to notify Plaintiff that an APA action was initiated which has created

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

"unfair surprise/undue burden." Plaintiff discovered the APA action to his own surprise. In fact, Plaintiff *did not receive* the purported Order as described in the dockets, nor has he *been properly informed* or *warned* as to what "legal standard will be administered by the Agency," which should be fraud upon the Court. And even if the court made a mistake in initiating a proceeding under the APA, the judge failed to correct it, and the Defendants original fraud upon the Courts only perpetuated. Nonetheless, Congress has already protected Plaintiff in this respect, specifically, under the APA, Sec. 12, "Nothing in th[e] Act shall be held to diminish the constitutional rights of any person…"

On February 14, 2023, Plaintiff was coerced into joining a "status conference" under the APA. And because the judge terminated Plaintiff's fraud upon the Court proceeding, Plaintiff's free speech was infringed. Specifically, he was unable to present verbal arguments related to the Defendants alleged fraud upon the Court. Instead, Plaintiff was strong-armed into using his time to make a case as to why an APA action is improper. In fact Plaintiff's motion to vacate the status conference was ignored by the judge who received it. During the hearing, the judge made clear and convincing stances favoring the Defendants as follows:

(1)     He asserted that although the Defendants may have been notified by the Court (so they can appear), Plaintiff did not serve the Defendants, and that it was Plaintiff's responsibility to serve them so they can "have their day in court." Not only did the Defendants already have their day in court in the Northern District Court of California, four of the five Defendants refused to answer the complaint within 21 days, while Apple's attorneys obfuscated the record, fabricated cyber-surveillance evidence, filed fraudulent documents that were signed under perjury under the laws

of the State of California, among other alleged misconduct. The

judge made these statements knowing that under the fraud upon the

Court remedy and sanctions, the motion is largely free from these

procedural limitations, and that the Defendants cannot be allowed

to continue disclaiming the effectiveness of their fraud after the fact.

It became clear the judge was allegedly attempting to accommodate

the Defendants in their trail of fraud and deceit by instructing

Plaintiff to serve the Defendants so that they can appear

and disclaim their fraud after the fact. This stance goes

against the Supreme Court's instructive ruling in Hazel-Atlas.

The Supreme Justices already set precedent in this respect,

specifically, they ruled that "[a] party who presented fraudulent

evidence cannot disclaim its effectiveness after the fact." See

*Shaffer*, 11 F.3d at 457, "Even the slightest accommodation of

[the Defendants] deceit []in any material respect quickly erodes

the validity of the process. As soon as the process falters in that

respect (which has here under an APA proceeding), the people

are then justified in abandoning support for the system in favor

of one where honesty is preeminent, see also *Islamic Shura

Council of S. Cal. v. F.B.I.*, 779 F. Supp. 2d 1114, 1125

(C.D. Cal. 2011) "deception perverts justice." Id.

(2)    He attempted to trick Plaintiff into confessing that Plaintiff

was challenging the administrative act. Plaintiff immediately

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

corrected the record and stated that he did not challenge the administrative act and or initiate the APA. That it was the court who initiated an APA action. In fact, the Court filed a new APA action on November 9, 2022 after Plaintiff filed a fraud upon the Court motion on November 1, 2022. The court then terminate Plaintiff's Rule 60 (d)(3) filing and set an APA status conference for February 14, 2023. Plaintiff never filed an "APA" action or challenged the administrative act. He asked the court to address the "Defendants fraud upon the Court acts" and to grant Plaintiff relief. Moreover, although it appears the federal judges aided and abetted the Defendants, those acts should be addressed by Congress, and the court should focus on the Defendants.

(3)    He attempted to place procedural limitations on Plaintiff's right to seek relief under a fraud upon the Court remedy, contrary to the case *In re Levander*, 180 F.3d 1114, 1118 (9th Cir. 1999). Specifically, he asserted that Plaintiff must file a complaint in order for the court to have jurisdiction, which is entirely false. Under the fraud upon the Court remedy, federal judges are compelled to use the courts historical power of equity to **"manage [its] own affairs so as to achieve the orderly and expeditious disposition of [its] cases"** and "**further[] the pursuit of achieving complete justice,**" In re *Levander*, 180 F.3d 1114, 1118 (9th Cir. 1999) (internal quotations omitted). The judge had 95

161

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

days to write an order as to how the court will proceed and how it would like Plaintiff to act. It's not Plaintiff's responsibility to manage a fraud upon the Court proceeding or an APA action, nor is it Plaintiff's responsibility to manage the affairs of federal courts. The judge failed in this respect, specifically, he failed to ensure that:

> (a) Special Master was appointed to assist in investigating and writing an independent report to assist the court in analyzing this motion to proceed in the adjudication process;

> (b) Plaintiff's requests were addressed either by Denying or Granting them, not limited to prohibiting the Defendants from disclaiming the effectiveness of their fraud as a preliminary sanction as requested by Plaintiff); and

> (c) All other fraud upon the Court related proceedings were initiated.

(4) He again refused to accept jurisdiction (knowing all federal courts have jurisdiction in this matter as outlined in this motion. A motion he himself acknowledged he read).

(5) He suggested that Plaintiff needs to go back to the original court where Plaintiff filed the complaint. The capricious and arbitrary act and suggestion was made, knowing officers of the Court in the original district, already stonewalled Plaintiff's litigation, and corruptly aided and abetted the Defendants. He also knew Thomas, a Ninth circuit judge in California cashed out of Apple Stock after he refused to redress the Defendants alleged fraud upon the Court. Thus, the judge "substantially

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 284 of 312    Page
ID #:284
Case 9:23-cv-80316-AMC    Document 4-1    Entered on FLSD Docket 03/02/2023    Page 179 of
203

undermine[d] the judicial process by preventing [the] [court] from

analyzing [Plaintiffs] [fraud upon the Court] case" against the

Defendants. See *Stonehill*, 660 F.3d at 452, 454. His acts also

went against the Supreme Court's instructive ruling in *Hazel-Atlas*.

In sum, the above acts, taken either collectively and or independently, constitute

a fraud upon the Court, and warrants relief under Rule 60(d)(3) by this Court.

### 13.    The Defendants Continue Their Interstate Fraud upon the Court Scheme.

The Defendants consistent patterns continue interfering with the courts judicial

machinery that continues obstructing multiple proceedings. These judicial officers have

repeatedly ignored the Defendants lies, procedural abuses, and obstructionist delay tactics.

Specifically, because Chhabria (1) intentionally misapplied the law to "stall" Plaintiff for

"120 days," Jordan (2) used Chhabria's delay to tailor his legal briefs to attack Plaintiff,

asserting that Plaintiff filed "204 days," "seventy days," and "sixty-three days" after the

"July 23, 2021 Order." After the Defendants caused multiple delays and tricked Plaintiff

out of his legal rights—the Ninth Circuit Appeals Court (3) intentionally ignored the

Defendants fraud on the Court and (4) ignored Plaintiff's Rule 60(b) fraud upon the Court

time exemption (5) citing a 30-day procedural limitation when fraud upon the Court has

no such time limit, see *In re Levander*. Similarly, when Plaintiff sought relief under Rule

60(d)(3) motion in a separate Court, the presiding judges in the case, Stearns and Ellison

(6) corruptly delayed the judicial proceeding approximately 161-days after it was filed,

who then abused their power to obstruct justice.

These separate and or collective efforts intentionally obstructed justice in multiple

pending judicial proceedings. Obstruction of justice provides that "[w]hoever . . . corruptly

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice" is guilty of an obstruction of justice.

In Section 1503, [38] "[Plaintiff] must establish (1) that there is a pending judicial . . . proceeding constituting the administration of justice, (2) that the [Defendants] knew or had notice of the proceeding, and (3) that the [Defendants] acted with the wrongful intent or improper purpose to influence the judicial . . . . . proceeding, whether or not the defendant is successful in doing so." [39] "[A] defendant does not need to know with certainty that his conduct would affect judicial proceedings . . . [i]nstead, the [Defendant's] conduct must only have the natural and probable effect of interfering with the due administration of justice." [40] Section 1503 requires also proof of "a connection between the defendant's intentional acts (Officers of the Court's use of the Judicial scheme among other schemes) and the likelihood of potentially affecting the administration of justice." [41] That is, "'the act must have a relationship in time, causation, or logic with the judicial proceedings.'" [42] Obstruction of justice is also a predicate act under RICO in cases where, as here, [the Defendant's] efforts were "designed to prevent detection and prosecution of the organization's illegal activities [and] were part of a consistent pattern that was likely to continue for the indefinite future absent outside intervention." [43]

---

[38] 18 U.S.C. § 1503, [39] *United States v. Quattrone*, 441 F.3d 153, 170 (2d Cir. 2006), [40] *United States v. Kumar*, 617 F.3d 612, 620-21 (2d Cir. 2010) (noting that courts afford Section 1503 "a generally non-restrictive reading") (internal quotations omitted); see also *United States v. Aguilar*, 515 U.S. 593, 598 (1995) (noting that "the 'Omnibus Clause' serves as a catchall, prohibiting persons from endeavoring to influence, obstruct, or impede the due administration of justice"). [41] *Quattrone*, 441 F.3d at 170. [42] Id. (quoting Aguilar, 515 U.S. at 599). [43] *United States v. Coiro*, 922 F.2d 1008, 1017 (2d Cir. 1991).

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 286 of 312   Page
ID #:286
Case 9:23-cv-80316-AMC   Document 4-1   Entered on FLSD Docket 03/02/2023   Page 181 of
203

Wire fraud is yet another RICO predicate act that prohibits the use of the wires

"for the purpose of executing" a "scheme or artifice to defraud." [44] A "scheme or artifice

to defraud" is a plan to deprive a person of something of value by trick, deceit, chicane or

overreaching. "[A]ny 'mailing that is incident to an essential part of the scheme satisfies the

mailing element,' even if the mailing itself contain[s] no false information." [45] Nor need the

defendant personally communicate by wire—he or she need only cause the wires to be or

initiate a series of events which foreseeably would result in their use. [46]

As evidenced above, officers of the court, federal judges and the Defendants caused

through wire and mail, the obstruction of justice that has injured Plaintiff and deprived him

of intangible honest services, property and damages. Even more concerning, the injustices

deprived Plaintiff of his rights under the law and in equity. The Defendants pervasive and

unrelenting fraud on the Court has caused a grave miscarriage of justice. Nevertheless,

Plaintiff believes no person and or entity shall impede the weight of justice from bringing to

surface such injustices. They should be overruled using the fraud on the Court remedy set

by the Supreme, Appeals, and lower District Courts. The egregious, intrusive and pervasive

fraud upon the Court falls within the purview of a fraud on the Court remedy and should

be addressed as such to redress Plaintiff. This court must recognize, that although the facts

---

[44] 18 U.S.C. §§ 1341, 1343.

[45] *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008) (quoting
*Schmuck v. United States*, 489 U.S. 705, 712, 715 (1989) (alteration in original));
*United States v. Maze*, 414 U.S. 395, 400 (1974) (mails need only be "for the purpose
of executing" the scheme) (quoting *Kann v. United States*, 323 U.S. 88, 94 (1944)).

[46] See, e.g., *United States v. Bortnovsky*, 879 F.2d 30, 39 (2d Cir. 1989) (noting that
"defendant need not actually intend, agree to or even know of a specific mailing to
'cause' mail to be sent as long as he or she 'does an act with knowledge that the use
of mails will follow in the ordinary course of business, or where such can reasonably
be foreseen'" (internal citations omitted)).

---

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

described in this motion may seem "difficult to believe," it's exactly what the Defendants wanted. The Defendants conspiracy to defraud Plaintiff and multiple courts had one goal, to conceal the existence of cyber-surveillance used to target third-party app developers and other Americans in what's turning into one of the largest frauds ever perpetrated on the American People. In this respect, Plaintiff agrees with only one aspect of Stearns' opinion in his void order, the facts are "**broad**"—there are many facts—and many are complex. Perhaps Apple, Tim Cook and the other Defendants have taken advice from Gibson Dunn, among others to, "obscure the truth" and "obstruct justice," a tactic they are all too familiar with, see *Chevron v. Steven Donziger*, et al., in New York's Southern District Court case number 1:11-cv-00691, Dkt. Entry 1874. The Chevron Corporation is Gibson Dunn's client, as is Apple, and potentially Tim Cook and others involved here.

The *Chevron* case is extraordinary yet factual—the civil RICO and Fraud on the Court case—included, "coded emails among Steven Donziger and his colleagues describing their private interactions with and machinations directed at judges and a court appointed expert, their payments to a supposedly neutral expert out of a secret account, a lawyer who invited a film crew to innumerable private strategy meetings and even to *ex parte* meetings with judges, an Ecuadorian judge who claims to have written the multibillion dollar decision but who was so inexperienced and uncomfortable with civil cases that he had someone else (a former judge who had been removed from the bench) draft some civil decisions for him...."

The acts Donziger orchestrated in the *Chevron* case parallels Apple's racketeering with corrupt government officers, Apple and Uber Executives, various high profile Board Members and Investors, Padilla, Kalanick, Apple and Uber's Legal Team, current and

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO    Document 1    Filed 07/08/24    Page 288 of 312   Page
ID #:288
Case 9:23-cv-80316-AMC   Document 4-1   Entered on FLSD Docket 03/02/2023   Page 183 of
203

former DOJ/FBI employees, an Uber Driver who engaged in cyber-surveillance and

espionage, a former Apple Employee and hacker who executed and or caused the execution

of cyber-surveillance, among others to———avert a paper trail of their schemes by meeting

in secret, using ephemeral encrypted chat apps that automatically delete their chat activity

and files, forming MA and SSG teams to "steal trade secrets from third-party developers in

the App Store" to obfuscate Apple's cyber-surveillance used to steal DTSA data, suborning

employees to perjure themselves, repeatedly lying to Congress, using the FBI/DOJ and the

Courts to dispense justice on acts of fraud using the cyber-surveillance to frame and

corruptly indict victims to take the fall for the Defendants illegal activity and or eliminate

third-party developers from the App Store through corrupt indictments, witness tampering,

destroying cyber-surveillance files, using methods of the cyber-surveillance to impersonate

Americans on multiple devices to access DTSA data, using federal judges to "corruptly

close cases," "intentionally err in law," and "provide the Defendants immunity from the

law in doing so"———while expending millions to hire the largest law firms to aid and

abet the Defendants in their effort to continuously set in motion, multiple unconscionable

schemes, aimed at attacking the central issues in multiple federal cases to conceal the

offensive use of cyber-surveillance used to pump stock prices among other illegal and

corrupt acts used to pay, bribe and or influence persons and entities in power—these

events ultimately center on one man———Tim Cook.

Judge Lewis A. Kaplan, who presided over the *Chevron* case best described this type

of mass scale "fraud on the Court" at Dkt. Entry 1874 ¶ 496 of 497, citing Tr. (Shinder)

1298:21-1299:4, "It is troubling that []what happened here probably means[] "we'll never

know whether or not there was a case to be made against Chevron."

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

## XI. MULTIPLE INSTANCES OF MISCONDUCT BY OFFICERS OF THE COURT COLLECTIVELY CONSTITUTES FRAUD ON THE COURT AND FRAUD UPON THE CIRCUIT.

Various courts have found that each of the above types of misconduct can independently constitute fraud on the Court under Rule 60(d)(3). But even if the Court were to conclude that no discrete sequence of events was sufficient to constitute on its own a fraud on the Court, the analysis most certainly would not end there.

Fraud on the Court may also be found by assessing various acts of misconduct that, when taken together over the entire course of the federal proceedings, rise to the level of a fraud on the Court.

This is true here, in what could be the most significant fraud on the Court case, such that the Defendants interconnected trail of misconduct in multiple courts concealed the existence of cyber-surveillance used to sherlock apps and target Levandowski, Plaintiff and potentially other inventors and third-party developers in the App Store.

In *Stonehill*, 660 F.3d at 446-52 the court (analyz[ed] seven separate instances of litigation malfeasance in isolation to determine whether each of those instances constituted a fraud upon the Court, and after answering that inquiry in the negative, analyzing whether the "allegations as a whole" amounted to fraud on the Court). In *Pumphrey*, 62 F.3d at 1133 (see the above listed series of alleged steps undertaken by Cook, Apple, Kalanick, Dara, West, Jordan, Uber, the Defendants attorneys, Latham Watkin, LLP, and other global law firms, government actors, corrupt government actors, lower district court judges, appeals court judges, clerks, docketing clerks, public officials, and each DOE Defendant which, taken together, constitute a fraud upon the Court).

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Case 2:24-cv-05854-RGK-RAO   Document 1   Filed 07/08/24   Page 290 of 312   Page
ID #:290
Case 9:23-cv-80316-AMC   Document 4-1   Entered on FLSD Docket 03/02/2023   Page 185 of
203

As the Ninth Circuit recognized in *Stonehill*, a fraud upon the Court occurs when
the alleged conduct, considered in its totality, "changes the story . . . presented to the
district court," alternatively, when the same conduct "substantially undermine[s] the
judicial process by preventing the [court] from analyzing the case." 660 F.3d at 452, 454.
Considered as a whole, the alleged conduct of Cook, Apple, Sewell, Uber, Kalanick,
Sullivan, Padilla, Gonzalez, Berkowitz, Henley, Wang, Acebedo, the other Defendants,
government actors and each DOE Defendant, their attorneys, and officers of the court not
only meets the applicable standards, but far exceeds any threshold associated with showing
grave damage to the integrity of our judicial system—all to unjustly enrich Cook, Obama,
Uber, and the other Defendants, not limited to DiDi, China and other foreign powers.

Indeed, beyond perpetrating a single act of fraud on the Court, such as was the
case in *Hazel-Atlas*, Apple and Uber's attorneys and officers of the court, in the series
of cases leading up to the *Mackintosh* case, conceived of and engaged in a series of
interconnected acts—all driven by an unlawful effort to not only close and obstruct
cases at any cost and by any means, but their collective efforts were coordinated—all aimed
at concealing the schemes that proximately caused these cases—that dramatically "changed
the truth" and substantially undermined the judicial process. This long-running deception
started well before the *Mackintosh* case and involves an unspoken argument that the
"iPhone is unconstitutional." When Cook, Kalanick, Sullivan, Gonzalez, Apple, Uber
and the other Defendants including officers of the court deception was exposed in the
Ninth Circuit Court of Appeals, instead of demanding answers, the Ninth Circuit judges
O'Scannlain, Thomas, and Tallman, all whom are federal stewards of justice, ignored the
fraud perpetrated by the Defendants that harmed multiple United States Courts and

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Plaintiff. In the case of *Levander*, 180 F.3d 1114, 1118-19 (9th Cir.1999), the Ninth Circuit judges opinioned and ruled that "the power to vacate for fraud on the Court 'is so great, and so free from 'procedural limitations''" yet every judge cited a "procedural limitation" in Plaintiff's fraud on the Court motion. Their misconduct cannot be overstated. In *Levander*, the Ninth Circuit judges properly followed federal practice guidelines and the law and ruled that fraud on the Court is so great, that its free from procedural limitation. However, when it came to Apple, Cook, corrupt government actors and other Defendants fraud on the Court, they ignored the law knowing the misconduct in *Levander* parallels the Defendants misconduct in the *Mackintosh* case and Plaintiff's fraud on the Court claim asserted here.

They clearly chose not to address Jordan's misconduct in multiple Ninth Circuit Courts in California, and elsewhere. Instead, they knowingly and with wonton disregard for the law and Plaintiff's Constitutional Rights and other rights under the law and in equity, failed to address the "wrong[s] against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." *Pumphrey* v. *K.W. Thompson Tool Co.*, 62 F.3d 1128, 1133 (9th Cir. 1995) (quoting *Hazel-Atlas*, 322 U.S. at 264). In sum, Apple's attorneys and government actors who are officers of the court allegedly conspired to perpetrate the influence, corruption, judicial, bribery, and diversion schemes to defraud Plaintiff out of his rights to honest services, through a scheme to violate a fiduciary duty to further their ill-gains, corrupt political agenda, self-dealings and the business arrangement.

Indeed, the Defendants and their attorneys, and other officers of the court engaged in, what can only be described as, a pattern and practice of fraud upon multiple courts, in multiple litigation proceedings, and during motion practice—all to conceal their

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

racketeering activity in the App Store, iPhones and other devices and federal courts.

While the facts of malfeasance certainly support the conclusion that these acts were willful and perpetrated with wonton disregard for the law and Plaintiff's rights, additional corroborating evidence is abundant, including what has been revealed by Plaintiff, Edward Snowden, Julian Assange's Wikileak's Website, Jacobs Letter, Will, Mudge, Zdziarsk, not limited to Plaintiff's cyber-surveillance evidence. In fact, a U.S. Central Intelligence Agency ("CIA") document was leaked during the *Waymo* case, exposing the cyber-surveillance present in Apple and Uber's apps. After the documents were leaked, Cook used the Media and Public Relation Enterprise arms of Apple to corruptly state "While our initial analysis indicates that many of the issues leaked today were already patched in the latest iOS…" (the "iOS Scheme")—whilst—the Defendants actively used the cyber-surveillance to target Plaintiff and potentially others during the same period of time. See exhibits below of a CIA document and Apple's false public statement addressing it.

Cook, Apple's Legal Team, Apple's Executives and Apple's Board ratified the false and deceptive publication of statements through the Media Enterprise i.e. Main Stream Media, which are contrary to the Defendant's cyber-surveillance used to target Plaintiff for his DTSA data at all times relevant to the *Mackintosh* case, Plaintiff's Rule 60(b) legal brief filed in the Ninth Circuit, and this Rule 60(d)(3) Motion.



PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

☰     appleinsider     🔍

Apple is deeply committed to safeguarding our customers' privacy and security. The technology built into today's iPhone represents the best data security available to consumers, and we're constantly working to keep it that way. Our products and software are designed to quickly get security updates into the hands of our customers, with nearly 80 percent of users running the latest version of our operating system. While our initial analysis indicates that many of the issues leaked today were already patched in the latest iOS, we will continue work to rapidly address any identified vulnerabilities. We always urge customers to download the latest iOS to make sure they have the most recent security updates.

In sum, Apple and Uber's attorneys, Cook, Kalanick and their attorneys, officers of the court who are corrupt, and or yet to be corrupted government actors, did not stay "within the rules" either during multiple United States Senate and Congressional hearings or during federal litigation in multiple District Courts. *United States v. Maloney*, 755 F.3d 1044, 1046 (9th Cir. 2014) ("The [defendants] job isn't just to win, but to win fairly, staying well within the rules") (quotation marks and citations omitted). Instead, they did whatever necessary, by any means, not limited to—violating multiple court orders, suborning

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

witnesses to perjure themselves in open court, signing bogus declarations, remotely

and physically destroying screen capture and other cyber-surveillance electronic files

and evidence that hurt their cases/indictments, deceiving the DOJ, defrauding Congress

and the public—in an all-out effort to further Cook and the other Defendants legal

interests and benefits in Apple and Uber and payouts to judges and others in power.

Specifically, Chhabria and other officers of the court in the Ninth Circuit—shielded

by the high level of trust our system of justice naturally places in them—pursued their goal

of aiding and abetting Cook, Apple, Uber, Kalanick, Dara, West, Padilla, Gonzalez,

Wang, Acebedo, Latham Watkins, LLP, Jordan, Gibson, Dunn and Crutcher, LLP,

Lewis and Llewellyn, LLP and Morrison and Foerster, LLP, and the other Defendants and

each DOE Defendant at the expense of justice and at Plaintiff's detriment and the detriment

of the courts while they continuously cash in on Apple's inflated and pumped up stock and

dividends, favors, self-dealings, bribes, promotions, fame, votes, etc.

Thus, the pervasive, coordinated, and gross malfeasance that has harmed

multiple courts and other tribunals, whether viewed in isolated parts or as a whole,

clearly and convincingly reflects "an effort by Cook and the other Defendants, officers

of the court, including Chhabria and the circuit judges in the Ninth Circuit who are

government actors, all who prevented the judicial process from functioning 'in the usual

manner,'" in the Ninth Circuit, and was [ ] so fundamental that it undermined the workings

of the adversary process itself." *Stonehill*, 660 F.3d at 445. "The total effect of all this fraud

. . . calls for nothing less than" ordering severe and enhanced sanction against Defendants

and granting Plaintiff's requested relief. *Hazel-Atlas*, 322 U.S. at 250. See Massachusetts

case *Packaging Prods., Inc. v. Barenboim*, 2014 WL 2766735 (Mass. Super. 2014).

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

## XII.    THE DEFENDANTS CORRUPTED THE FIVE PILLARS OF JUSTICE

### I.    JUDICIAL POWER

The venerable structure of justice depends on judicial power. This power exists **only if:** (a) the judiciary is an independent entity that has freedom from intrusion from other branches of government on the judicial function (b) the judge is an independent actor within the judicial entity, who's insulated from outside influences from his or her decision making and (c) that accountability is always a component of judicial independence in order to preserve the public support that allows the judiciary to remain independent and rightfully uphold and use the judicial power.

### II.    THE FIVE PILLARS OF JUSTICE

1.    **Accountability.** All proceedings shall be transparent, and must be open to the public and to the press.    2.    **Ethical Probity.** Every judiciary must avoid the appearance, as well as conflicts of interest, and avoid favoritism. It must be neutral in the treatment of those who appear to litigate before them.    3.    **Accessibility.** The consuming public must always understand the work that the judiciary performs. The public can only understand the work if the judges explain what they do, and why they do it, in clear, written and rational decisions that are published for the public to examine.    4.    **Efficiency.** Litigants must always have their disputes resolved in a reasonable period of time, and in a reasonable manner.    5.    **Discipline.** The judiciary must recognize, and correct their own mistakes, and adapt themselves to the changing needs of the public they serve.

Contrary to the five pillars of justice, Plaintiff's public hearings and proceedings have been stonewalled by the Defendants, by corrupt officers of the court, and by corrupt government actors who are working in concert with each other through the

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Defendants' attorneys and Counsel Enterprise, who are knowingly abusing the attorney client-privilege/work-product doctrine as described in Jacobs Letter to evade cases and use government to dispense justice on acts of deceit. Plaintiff was obstructed from litigating because it would reveal the malicious and unconstitutional use of cyber-surveillance that has caused Plaintiff and others life-long cyber-surveillance injuries and damages.

The judges in the *Mackintosh* case were bias and prohibited the public from viewing Plaintiff's speech within various documents in which the public was constitutionally entitled to view. The judges clearly aided and abetted the Defendants, who patently deprived Plaintiff of intangible honest services. In fact, while doing so, they held and or hold a legal interest in Apple and or have political bias that favors the Defendants who are associated in fact to Apple. All five judges who should have acted independently—collectively abused their power to favor and accommodate the Defendants deceit, and failed to cite cases that gave them the legal authority to obstruct justice, including multiple 60(d)(3) motions over the past *two years* after Plaintiff filed the *Mackintosh* case in December 2020.

Every judge has delayed Plaintiff's filings and other proceedings, and refused to resolve the growing legal issue between Plaintiff and the Defendants while the Defendants have continuously destroyed evidence. The judges did so by abusing their authority to block Plaintiff's prosecution of his case in both lower district courts and the Ninth Circuit Court of Appeals. In fact, all factual development was obstructed, as was the due administration of justice. And finally, the judges within these courts have failed to correct the injustices created by the Defendants, and even more concerning, they failed to correct the perversion of justice that furthers the business arrangement. Contrary to their failures, they provided Cook, Apple and the other Defendants with immunity from the law.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

## XIII. PLAINTIFF HAS SUFFERED SUBSTANTIAL DAMAGES AS A RESULT OF THE DEFENDANTS CONSPIRACY, AND ENFORCEMENT OF A CORRUPT JUDGMENT, ORDERS AND MANDATE WOULD ONLY DEEPEN THE HARM.

The Defendants, their subordinates, counterparts and co-conspirators have used the corruption and politicization of the judicial system to their advantage by colluding with corrupt agents within the government and corrupting the courts and tampering with and or destroying any and all evidence related to the cyber-surveillance.

It is therefore likely that federal courts and the judges within the courts will do the same as the Defendants and their co-conspirators have desired and enter multiple orders that conceal the cyber-surveillance that are based on partial facts and one-sided, favoring the Defendants, even though there is evidence of liability and damages.

Plaintiff thus stands in jeopardy of a corrupt judgement, orders and mandate, that if ultimately rendered, could be the result of a fraud practiced by the Defendants, their attorneys, judicial officers and others who are part of the corruption.

The jeopardy that Plaintiff faces is compounded by the fact that the Defendants, particularly, Apple, continue to have access to a significant amount of funds and DTSA Data to carry out the schemes, including schemes that have yet to be uncovered and or are currently being formulated to be set in motion to harm Plaintiff if he continues pursing relief and justice. Apple's funds are carefully dispersed to large U.S. law firms, who continue the Defendants activity in the U.S.

Moreover, a judgement signed by Chhabria after he refused to address Jordan's fraud on the Court misconduct appears to be imminent as evidenced in multiple courts

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

who are acting in concert, who should be independent. The Defendants extensive and wide-ranging schemes to defraud and extort Plaintiff, as described in this motion, has already had a long lasting and irreparable effect on Plaintiff's life.

The Defendants false and misleading statements have been relied on by U.S. courts, state and federal government agencies, Congress and Americans.

Plaintiff has suffered the loss of fees and other expenses, including damages to his property and interest in that property, and lost invaluable time he can never replenish, investigating and pursuing the *Mackintosh* case to recover damages and other relief which he is legally entitled to as a matter of law and in equity.

In addition, many of the Defendants alleged extortionate and retaliatory acts have presented unfair and false representations of Plaintiff and his short-lived healthcare startup, and much worse——the alleged acts interfered with Plaintiff's innovation that would have drove down healthcare costs for every American.

Instead, the U.S. Government has been forced to pay, and continues paying, the high cost of healthcare for American and has harmed the government and tax payers in the process. And even worse, it's clear from the above named Defendants actions and words that they have no intention of stopping until Plaintiff surrenders to their corruption.

Without this courts intervention, Plaintiff will continue to suffer significant harm at the hands of the Defendants and their alleged schemes that have corrupted the five pillars of justice. The facts and evidence presented in this motion are the result of many thousands of hours of work by Plaintiff, and have been assembled at extraordinary costs and life-long sacrifices and suffering by various whistle blowers from around the world, not limited to

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

a former U.S. Central Intelligence Agency and U.S. National Security Agency Contractor Edward Snowden, former U.S. Department of Defense Agent Richard Jacobs, former U.S. Department of Defense Agent Mudge also known as Peiter Zatko, Scientist and Apple Employee Jonathan Zdziarski, Will Strafach, Luca Todesco, and other whistle blowers.

In sum, the requested relief in the courts records is critical because Apple's alleged years-long schemes hamstrung Plaintiff in obtaining highly relevant, if not dispositive digital cyber-surveillance files and related evidence concerning the targeting of Plaintiff, including *copying* and *killing* Plaintiff's healthcare apps and the functionalities within his healthcare apps, including and not limited to copying ideas from Plaintiff's keylogging/screen activity/voice activity through Plaintiff's iPhone(s) microphone/cameras, including misappropriating ideas related to his patent draft that was accessed, stolen and transmitted to Apple and its employees and or accessed using Apple's infrastructure, i.e. "iPhone, Macbook, iOS, MacOS, Xcode, Test Flight, iCloud, contracted ISP's, etc."

The alleged fraud on the Court activity also gave Apple, its attorneys, and corrupt government agents the time to use the cyber-surveillance to plant, tamper with, fabricate and or transmit DTSA data between iPhones and other devices/servers within Apple's infrastructure and elsewhere to ruin the credibility of witnesses and or blackmail these witnesses from testifying, who are key witnesses to the multiple interrelated cases. Additionally, every time the Defendants delayed Plaintiff's case, they planted, deleted, tampered with, fabricated and or transmitted DTSA data within Apple's infrastructure and elsewhere to obstruct Plaintiff from proving Apple's unlawful use of his DTSA data with the intent to deprive Plaintiff of damages and other relief sought by Plaintiff.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

## XIV.  CONSTITUTIONAL ARGUMENT

### A.  PLAINTIFF INVOKES HIS RIGHTS UNDER THE DECLARATION OF INDEPEDENCE TO GRANT HIM INSTANT INJUNCTIVE RELIEF

Plaintiff seeks permission from this Court to obtain relief that not only overturns the injustices created by the Defendants and provides him with damages, but seeks to insure that what happened to him, never happens to another American as guaranteed under the Declaration of Independence:

> *"When a long train of abuses and usurpations, pursuing invariably the same object, evinces a design to reduce them under absolute despotism, it is their right, it is their duty, to throw off such government, and to provide new guards for their future security."*

**Again**, *"When a long train of abuses and usurpations…"*

(Corrupt federal judges and corrupt government actors who refuse to redress the Defendants alleged trail of fraud upon the Court, fraud upon Congress, and fraud upon the American People that centers around their ill-gains from their use of cyber-surveillance)…

*"pursuing invariably the same object… evinces a design to reduce them…"*

(The nature of the Defendants alleged fraud effectively continued concealing the existence and use of the offensive cyber-surveillance, that continues undermining American toddlers, teenagers and adults, including Plaintiff's rights, by coercing them into "bonding with mobile devices" (i.e. iPhone) to (1) coercively create data on them (2) extract the data (3) tamper with the data (4) delete and or tamper with the data that may harm cases that may be brought against them, to falsely imprison them as evidenced with Levandowski (5) use

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

their data to unjustly enrich persons other than themselves (6) infringe their free speech

(7) infringe their votes during elections (8) obstruct their pursuit of happiness, by using

the data created and extracted from the cyber-surveillance, to launch injurious influence

operations against them, among other tyrannical acts, not limited to exploiting live data

to track down Americans, and to cause them harm, injury and potentially death, or cause

death to their family, friends or business acquaintances, among other criminal acts to

benefit the Defendants and have complete control of American lives)...

*"under absolute despotism..."*

(The Defendants organized crime and their use of cyber-surveillance that has penetrated

legitimate government institutions and corrupted government actors with the desire and

intent of depriving Americans of life, liberty, property, damages, relief and justice)...

*"it is their right..."*

(The right of Plaintiff and his fellow Americans)...

*"it is their duty to throw off such government... and provide new guards..."*

(It is their right, Plaintiff and his fellow Americans to use the Fraud upon the Court

Remedy to overturn injustices and to remove corrupt Politicians, Public Officers, Big Tech

Executives and others and to elect, appoint and hire Honorable and Righteous ones)...

*"for their future security..."*

(To use the fraud on the Court remedy to deconstruct the cyber-surveillance that inherently

erodes American's rights and stains the meaning of the words in the Declaration of

Independence among other long-established foundational principals of the United States)"

---

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

The Defendants in the *Mackintosh* case, not limited to corrupt federal judges, in collusion with Tim Cook and the other Defendants, have, as exhibited below *"called together legislative, judicial and political bodies at places unusual, uncomfortable, and distant from the depository of their public Records, for the sole purpose of fatiguing..."* Plaintiff and other Americans into compliance with their unchecked and injurious data creation, collection and exploitation measures, including and not limited to their delay tactics and failure to *"assent to law"* which are inherently oppressive, and have subverted the proper administration of justice, which has further constrained the rights of the people, including Plaintiff, and prevented Plaintiff from obtaining relief:

> *"In every stage of these Oppressions We have Petitioned*
> *for Redress in the most humble terms: Our repeated*
> *Petitions have been answered only by repeated injury.*

*"In every stage of these Oppressions We have Petitioned for Redress in*

*the most humble terms:"*

(Every time Plaintiff filed his legal briefs and other petitions for relief to the Courts)...

*"Our repeated Petitions have been answered only by repeated injury..."*

(Plaintiff's petitions were met with repeated injury, caused by the Defendants penetration of legitimate government institutions——who have repeatedly abused their authority——while the judges and other public officers and the Defendants ill-gained at Plaintiff's expense after the Defendants used the cyber-surveillance to access Plaintiff's data and ideas therefrom)

The alleged acts described above violate the United States Declaration of Independence, United States Constitution, Bill of Rights among other foundational rules, laws and inalienable rights, and thus every act must be overturned.

---

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION



PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

← **Tweet**



**9to5Mac** ✔
@9to5mac

⋯

Tim Cook mingles with lawmakers on Capitol Hill during visit to Washington D.C. 9to5mac.com/2018/03/13/tim... by @ChanceHMiller



3:39 PM · 3/13/18

**46** Likes  **14** Retweets

  ♡ 🔖 

Tweet your reply

    

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

| Top | Latest | People | **Photos** | Videos |
|-----|--------|--------|-----------|--------|



 **Alan K. Ota** ☑ @Alank... · 3/13/18    •••
Apple CEO **Tim Cook** walks in Senate **basement**, declines 2 take q's.
@CQnow



♡3    ⟲1    ♡5    ıl.    ⬆

 **Chris Knape** @Kcorner · 2/15/18
Hey @tim_cook my son, **Tim**, is
building an impressive @Apple
museum in the **basement**. Feel free to

    

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Top    Latest    People    Photos    Videos



**K Tully-McManus** @k... · 6/9/22 ···
First Bill Gates and now Apple's **Tim Cook** moving through the Senate **basement** today



💬 2    🔁 13    ♡ 21    �510

**P A P I T O** @PapitoCa... · 11/28/2...

185

## XV.    CONCLUSION

The Honorable Justices and Judges in the Supreme, Appeals and Lower District Courts have for over a span of two centuries, laid the foundation, that set the precedent, which legally loops a party (Plaintiff in this case) into litigation until the opposing party's fraud upon the Court is redressed and Plaintiff is provided with appropriate relief.

Any action taken by a judge, government actor and or a federal Court that does not initiate a fraud on the Court proceeding to address the Defendants alleged fraud upon it and redress Plaintiff, can generally be construed as a fraud upon the Court.

### RELIEF SOUGHT

For the foregoing reasons, Plaintiff respectfully requests that this Court restore justice and enter a final default judgement against the Defendants, and sign an order:

(a)    awarding Plaintiff reimbursement for incurred time spent bringing forward his case, equivalent to attorney's fees at the maximum hourly attorney rate totaling—$22.9 million (which is continuing to accrue) and should be multiplied in some fashion for each of the Defendants alleged fraud upon the Court acts as an enhanced sanction and deterrence measure. Plaintiff will submit a Timekeeping activity declaration at the courts request;

(b)    awarding Plaintiff nominal damages to redress multiple violations of Plaintiff's First Amendment Rights to speak at multiple requested 60(d)(3) proceedings, among other rights under the Constitution and Declaration of Independence;

(c)    awarding Plaintiff all injunctive and other requested relief in the court's records, including damages involving his DTSA data that exceed $75,000;

186

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

Dated: February 23, 2023                    Respectfully Submitted,

                                            ADAM JOHN MACKINTOSH (*Pro Se*)

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO A RULE 60(d)(3) MOTION

# PRIORITY MAIL EXPRESS®

## FLAT RATE ENVELOPE
ONE RATE ■ ANY WEIGHT

To schedule free Package Pickup,
scan the QR code.



USPS.COM/PICKUP



PS10001000006

EP13F October 2023
OD: 12 1/2 x 9 1/2

## FOR DOMESTIC AND INTERNATIONAL USE
## PLACE MAILING LABEL HERE

- Guaranteed delivery date*
- Guaranteed delivery time†
- USPS Tracking® service included for domestic and many international destinations.
- Pick up available.
- Domestic shipments include $100 of insurance (restrictions apply).**
- Signature included upon request.

* Money Back Guarantee to U.S., select APO/FPO/DPO and select international destinations.
  See DMM and IMM at pe.usps.com for complete details.
** Insurance does not cover certain items. For details regarding claims exclusions see the Domestic Mail Manual at http://pe.usps.com.
† Money Back Guarantee for U.S. destinations only.

WHEN USED INTERNATIONALLY, A CUSTOMS DECLARATION LABEL MAY BE REQUIRED.







UNITED STATES POSTAL SERVICE®

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail Express® shipments. Misuse may be a violation of federal law. This package is not for resale. EP13F © U.S. Postal Service; October 2023; All rights reserved.

This package is made from post-consumer waste, please recycle again.





UNITED STATES POSTAL SERVICE®

PRIORITY MAIL EXPRESS®

EMS

FLAT RATE ENVELOPE
ONE RATE ■ ANY WEIGHT

To schedule free Package Pickup, scan the QR code.

USPS.COM/PICKUP

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

PS10001000006

EP13F October 2023
OD: 12 1/2 x 9 1/2

GUARANTEED* ▪ TRACKED ▪ INSURED

For Domestic shipments, the [illegible] m weight is 70 lbs. For international shipments, the maximum weight is 20 lbs.

RVICE®

PRIORITY®

PRIORITY MAIL POSTAGE REQUIRED

PRESS FIRMLY TO SEAL

tions apply).*
ny international destinations.

is required.

xclusions see ... Domestic

nd limitations of coverage.

UNITED STATES POSTAL SERVICE. Click-N-Ship®

P

usps.com
$8.80
US POSTAGE
Insured

9405 8301 0935 5110 7940 26

U.S. POSTAGE PAID

07/02/2024 Mailed from 90012

PRIORITY MAIL®

ADAM MACK...
STE 4311
350 W 1ST ST
LOS ANGELES CA 90012-4565

RDC 03

C058

CENTRAL DISTRICT COURT - MOTION FILING
UNITED STATES CLERKS OFFICE
350 W 1ST ST STE 4311
LOS ANGELES CA 90012-4565

USPS TRACKING #

9405 8301 0935 5110 7940 26

PRESS FIRMLY TO SEAL

USPS.COM®
PLIES ONLINE

ORDER FREE SUPPLIES ONLINE

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® and Priority Mail International® shipments. Misuse may be a violation of federal law. This package is not for resale. EP14 © U.S. Postal Service; July 2022; All rights reserved.

DuPont™ Tyvek®

TRACKED ■ INSURED

MAILING ENVELOPE
FOR DOMESTIC AND INTERNATIONAL USE

